IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL MURRAY,                          :
                                        :
            Plaintiff,                  :
                                        :
            v.                          :    CIVIL ACTION
                                        :    NO. 05-4557
ALLEN WEINSTEIN, Archivist              :
of the United States,                   :
National Archives and                   :
Records Administration,                 :
                                        :
            Defendant.                  :

ORDER

AND NOW, this        day of              , 2007,

upon consideration of the government's Motion for Summary

Judgment (Docket Entry No. 26), the memoranda submitted in

support thereof and in opposition thereto, and after a

January 25, 2007 hearing at which plaintiff and counsel for

the government were heard, IT IS HEREBY ORDERED that:

        1.    The motion for summary judgment is GRANTED.

        2.    JUDGMENT is ENTERED in favor of defendant and

against plaintiff, with prejudice.


                        BY THE COURT:


                        _____

                        HONORABLE NORMA L. SHAPIRO
                        *Senior Judge, U.S. District Court*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL MURRAY,                    :
                                  :
          Plaintiff,              :
                                  :
          v.                      :    CIVIL ACTION
                                  :    NO. 05-4557
ALLEN WEINSTEIN, Archivist        :
of the United States,             :
National Archives and             :
Records Administration,           :
                                  :
          Defendant.              :

          GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

          Pursuant to Federal Rule of Civil Procedure 56(b),

the government respectfully moves for summary judgment, as

reflected in the attached proposed Order, all as set forth

in the accompanying memorandum of law.

                         Respectfully,

                         PATRICK L. MEEHAN
                         United States Attorney


                         _____
                         VIRGINIA A. GIBSON
                         Assistant United States Attorney
                         Chief, Civil Division

                                               GBS3408
                         _____
                         GERALD B. SULLIVAN (PA#57300)
                         Assistant United States Attorney
                         615 Chestnut Street, Ste. 1250
                         Philadelphia, PA 19106-4476
                         (215) 861-8786
                         (215) 861-8349 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL MURRAY,                          :
                                        :
          Plaintiff,                    :
                                        :
          v.                            :       CIVIL ACTION
                                        :       NO. 05-4557
ALLEN WEINSTEIN, Archivist              :
of the United States,                   :
National Archives and                   :
Records Administration,                 :
                                        :
          Defendant.                    :

---

### MEMORANDUM OF LAW IN SUPPORT OF GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . 3

      A.   Pre-August 2004. . . . . . . . . . . . . . . . . 3

      B.   The August 2004 Postings and NARA's Response. . 6

      C.   The Post-August 2004 Postings, And
           NARA's September 16, 2004 Response. . . . . . . 13

      D.   The Events of September 22, 2004,
           And The Resulting Investigation. . . . . . . . 18

      E.   NARA's Proposed Removal of Murray
           From Service. . . . . . . . . . . . . . . . . . 26

      F.   The Final Agency Decision To Remove Murray. . . 28

III.  LEGAL ARGUMENT: THIS MOTION SHOULD BE GRANTED. . . . 34

      A.   Murray Fails To Point To Any
           Evidence Of Disparate Treatment. . . . . . . . 34

      B.   Murray, Beyond Speculation, Fails
           To Point To Any Evidence Of Discrimination. . . 40

      C.   Murray's Attack On NARA's Business Decision
           To Terminate Him, Which Was Based On
           Legitimate And Non-Discriminatory Reasons
           And Procedures, Does Not Save His Claim. . . . . 43

      D.   No Reasonable Factfinder Could Conclude That
           NARA's Articulated Reasons For Terminating
           Murray Were So Implausible That They Must
           Have Been A Pretext For Discrimination. . . . . 47

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . 52

**TABLE OF AUTHORITIES**

**Cases**

Abramson v. William Paterson College
    of New Jersey,
        260 F.3d 265 (3d Cir. 2001). . . . . . . . . 34, 35

Bailey v. Principi,
        2003 WL 22245100 (E.D. Pa. Aug. 20, 2003). . 41, 44

Bullock v. Children's Hosp. of Phila.,
        71 F. Supp. 2d 482 (E.D. Pa. 1999). . . . . 36, 42

Celotex Corp. v. Catrett,
        477 U.S. 317 (1986). . . . . . . . . . . . . . . 36

Fuentes v. Perskie,
        32 F.3d 759 (3d Cir. 1994). . . . . . . 44, 46, 50

Harp v. SEPTA,
        2006 WL 1517390 (E.D. Pa. May 31, 2006)
        (Shapiro, J.). . . . . . . . . . . . . . . . . passim

McDonnell Douglas Corp. v. Green,
        411 U.S. 792 (1973). . . . . . . . . . . . . . . 35

Peterson v. Hewlett-Packard Co.,
        358 F.3d 599 (9th Cir. 2004). . . . . . . . . . 39

Pivirotto v. Innovative Sys., Inc.,
        191 F.3d 344 (3d Cir. 1999). . . . . . . . . . . 41

Reeves v. Sanderson Plumbing Prods., Inc.,
        530 U.S. 133 (2000). . . . . . . . . . . 35, 47-48

Sheridan v. E.I. DuPont de Nemours and Co.,
        100 F.3d 1061 (3d Cir. 1996) (en banc). . . . . 47

Shnabel v. Abramson,
        232 F.3d 83 (2d Cir. 2000). . . . . . . . . . . 48

**Smith v. Borough of Wilkinsburg**,
      147 F.3d 272 (3d Cir. 1998). . . . . . . . . . . 47

**Texas Dept. of Community Affairs v. Burdine**,
      450 U.S. 248 (1981). . . . . . . . . . . . . . . 35

## Statutes, Regulations, and Rules

42 U.S.C. § 20000e-16.. . . . . . . . . . . . . . . . . . 34

5 C.F.R. § 734.101. . . . . . . . . . . . . . . . . . . 17

5 C.F.R. § 734.306. . . . . . . . . . . . . . . . . . . 17

Fed. R. Civ. P. 50. . . . . . . . . . . . . . . . . . . 48

Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . 36, 48

I.  __INTRODUCTION__

Plaintiff Darryl Murray, a Muslim, alleges that religion-based disparate treatment employment discrimination caused his firing from the National Archives and Records Administration ("NARA").  Before discovery began, it was unclear whether he was disputing that he had threatened his NARA workplace.  He has since admitted during his deposition, however, that in September 2004, while he was on disciplinary administrative leave from NARA and in the parking lot of the Federal Records Center in Philadelphia where he worked, he stated to a NARA-based security guard there, with specific reference to the Federal Records Center:  "Somebody ought to blow that place up."  Exhibit "1" hereto (Deposition of D. Murray), at 180-185; 188-190.  His so remarking is one of the two grounds for his removal from NARA service.  He is unaware of any non-Muslim NARA employee who has uttered similar remarks, let alone an employee who remained employed after doing so.

Regarding the other ground for his removal -- that, after being directed to cease doing so, he insubordinately continued to post comments at his work

station that disparaged co-workers, management, and the workplace -- Murray does not dispute such displays. Nor does he identify any non-Muslim co-workers who similarly flouted a management directive to cease such postings (or who even ever posted similarly disparaging commentary), much less who remained employed after such insubordination.

What the summary judgment record reveals, apart from Murray's mere speculation that his religion may have played some role in NARA's decision to terminate him, is not only an absence of evidence of religious discrimination but such conduct that would justify any employer in firing any employee. NARA managers, fully directed by NARA headquarters, and carefully following NARA written guidances, found that Murray's conduct justified his termination. Because no reasonable factfinder could conclude that NARA's articulated reasons for so finding were so implausible that they must have been a pretext for discrimination, Murray cannot carry his summary judgment burden, and the government respectfully requests summary judgment in its favor.

## II. **FACTUAL BACKGROUND**

### A. **Pre-August 2004**

For approximately twenty years, plaintiff Murray has been a non-practicing adherent to the Islamic faith. Exhibit "1" hereto (Deposition of Darryl Murray), at 11. He subscribes to some views of the Nation of Islam. <u>Id.</u> at 11-12. Until his employment was terminated in November 2004, Murray was -- and had been since 1987 -- an Archives Technician at the NARA Mid-Atlantic Records Center ("Federal Records Center"), which is located at 14700 Townsend Road in Northeast Philadelphia. <u>Id.</u> at 12-14.

Beginning in 2003, Murray worked in the facility's Trust Fund Section where, among other things, he filed and retrieved case files for the federal district courts. Exhibit "1," at 14; 16-17. His first-level supervisor in 2003 and 2004 was Elizabeth Washington, a Protestant. <u>Id.</u> at 14; Exhibit "2" (E. Washington EEO Affidavit), at 1-2. NARA management appraised Mr. Murray's work performance, for the October 1, 2002 to June 28, 2003 period, as unacceptable. As a result, he was denied a within-grade pay increase at the end of that period. Exhibit "1," at 45-46;

Exhibit "3" (J. Janshego Affidavit), at ¶ 26.  In August

2003, Murray was suspended for three days for neglect of

duty and for inaccurately reporting completed work and

carelessness.  Exhibit "1," at 52-53; Exhibit "3," at ¶ 22

and Exhibit "G" thereto.

 According to Murray, by no later than the year

2000, a "clique" of co-workers that included Mitchell

Buffone, a Catholic, and whose constituents all were at pay

grades higher than Murray's, had "declared war" on him

(Murray) and had begun harassing him.  Exhibit "1," at 30-

33; 47-48.  "The clique," Murray maintains, influenced

management's decisions on whether to promote staff to higher

pay grades and persuaded management never to promote Murray.

Id. at 235-236; Exhibit "4" (Deposition of co-worker Irene

Jones), at 40.

 In early 2003, Murray, feeling betrayed by

Buffone's refusal to support the hire of one of Murray's

friends, wrote Buffone a letter "terminating [their]

friendship."  Exhibit "1," at 40-41.  In response, Buffone

complained to then-Director of Operations of the Federal

Records Center, David Roland, a non-practicing Roman

Catholic, that he (Buffone) feared for his life around Murray.  Id. at 62-63; Exhibit "5" (D. Roland EEO Affidavit), at 1-2.  Murray's distrust and dislike of Buffone and the clique increased when, later in 2003: (a) someone put pasta on Murray's car while it was parked outside the Federal Records Center; (b) personal items went missing from his work station; and (c) someone recurrently placed trash on top of his desk.  Exhibit "1," at 47-48; 63; 65-67.  Murray now believes that Buffone was the responsible individual.  Id. at 48; 64.

Additionally, in late 2003, and throughout 2004, certain of Murray's personal documents, toiletries, and other items disappeared from his work station on an ongoing basis.  Exhibit "1," at 58-60; 65.  He suspects, again, that Mr. Buffone -- perhaps conspiring with a deaf and mute co-worker, Hong Diep, who was not a member of the clique -- was/were responsible.  Id. at 60-61; 100-102.  Then, in August 2004, Murray observed a scratch on his new car.  He similarly suspects (and suspected at the time) that Mr. Diep and/or Mr. Buffone was/were responsible.  Id. at 65-69; 85-86; 102.

Murray never formally complained to management about any of these alleged incidents.  Exhibit "1," at 69-70.  He did however make, in his words, "several veiled comments or threats about wishing someone [to] do something drastic to force management to" deal with the clique. Id. at 71-72.  For example, he announced to the security guard at the Federal Records Center that someone should drop boxes "on managements' head."  Id. at 72.  He also chose, in the weeks leading up to August 17, 2004, and in a passive-aggressive effort to express some of his anger and frustration, to post at his work station messages to and about the clique and management.[1]  Id. at 65; 76; 83. Murray intended many such postings that were directed at co-workers as "retaliation."  Id. at 76-77; 79; 102-103; see also id. at 80 (Murray stating that purpose of comments was "to let [clique members] know that I knew what they were doing as far as my items missing and trash under my desk.  I

_____

[1]  Each staff member at the Federal Records Center who performs the sort of work that Murray performed is assigned a cubicle -- similar to a library carrel -- that adjoins similar cubicles in an oft-traveled open area near stacks of filed records.  See Exhibit "1," attached deposition exhibit "Murray-13" (photograph of Murray's work station).

couldn't accuse them outright, not [having seen] them [commit the offenses], but I was letting them know [that I knew what they were doing] by putting up adjectives that best described their personality and known character") (interpolations added).

By way of example of such postings, Murray, in response to the placing of trash on his desk, displayed above his desk in plain view of co-workers the comment "Worthless Losers, Nothing Ass Employees." Exhibit "1," at 67 and attached deposition exhibit "Murray-12" (photographs of Murray's August 17, 2004 postings). To criticize the clique, and primarily Mr. Buffone, he posted the comments: "Low Self[-]Esteem, Inferiority Complex, Inflated Ego, Jealous/Envious." Exhibit "1," at 80 and attached deposition exhibit "Murray-12." After observing what Murray considered to be the one-the-job indolence of Buffone and a fellow clique member, Murray posted the comment "Federal Record Center Is Not An Equal Opportunity Employer," by which he meant that "people [such as Buffone] don't have to work [hard] . . . [and therefore] the work is not equal." Exhibit "1," at 85 and attached deposition exhibit "Murray-

12" (interpolations added).  And in response to the
scratching of his car, he posted the remark:  "Revenge Is A
Dish Best Served Cold."  Exhibit "1," at 85-86; 102; and
attached deposition exhibit "Murray-12."  This was intended
to send a message to "who[ever] scratched my car" that "if I
find out" who they are "I am going to scratch their car
back."  Exhibit "1," at 86.  Murray contends that he posted
near these statements the comment, "The Beast Is Coming
After You," merely as a reminder to himself that the movie
"The Predator" was being released in August 2004.  Id. at
86-88.

        By August 17, 2004, Murray was also displaying at
his work station -- together with a poster from the Michael
Moore film Farenheit 9/11 and the cover of a publication by
the head of the Nation of Islam, Louis Farrakhan -- the
messages/comments: "Osama [bin Laden] Didn't Do It"; "`Osama
Totally Exonerated'; An Innocent Man"; "Who Are The Real
Terrorist[s]?"; and "ALLAH AKBAR," which, according to
Murray, is Arabic for "God is great."[2]  Exhibit "1," at 74-

---

[2]  He posted the Farrakhan article, which was about "the
possible origin of dysfunctional families, especially in
America," not as a part of a religious statement but as a
reminder that he should finish reading the article.  Exhibit "1,"

77 and attached deposition exhibit "Murray-12."  His intent

in making these displays was to highlight to co-workers

Michael Moore's thesis that Osama bin Laden had been a

United States government "scapegoat" for the September 11,

2001 attacks.  Exhibit "1," at 76-77.[3]

    According to Murray, there was no religious

content in his August 2004 postings apart from the Arabic

references to "God is great."  Exhibit "1," at 81-82; 88;

104-105; and 125.  He does not understand how any of the

postings could have been viewed as offensive by co-workers

or management, because he did not name any NARA employees by

_____

at 82-83.  He also posted: (i) an article entitled "The
Government's war on the black family"; and (ii) a picture of a
deceased member of the National of Islam on which Murray wrote,
again in Arabic, "God is great."  Id. at 83-84 and attached
deposition Exhibit "Murray-12."  His stated purpose in making
these two postings was similarly not to make a religious
statement but simply to remind himself to read more about the
subject matter of the article and about the deceased individual.
Exhibit "1," at 83-84.

    [3] In 1996, Murray, after distributing in the workplace
documents that management found objectionable, entered into a
written agreement not to "post or distribute" "any materials in
the workplace."  Exhibit "1," at 27-28 and attached deposition
exhibits "Murray-1" through "Murray-4."  At his deposition in
this case, Murray stated that he interpreted the 1996 agreement
to bar him in perpetuity from posting only threatening and
offensive materials of a racial or religious nature.  Exhibit
"1," at 29; 77-78; 81; 88-90; and 137-138 (Murray defining
"offensive" as either offensive to Catholic co-workers' politics,
race, or religion or offensive to "the Catholic hierarchy").

name. Id. at 91. He now agrees, however, that many of the
postings that took aim at co-workers were inappropriate.
Id. at 128.

On August 17, 2004, the then and current Director
of Records Center Operations, John McEvoy, a Protestant,
first saw Mr. Murray's postings. Exhibit "6" (McEvoy EEO
Affidavit), at 1; 4. Wanting to respond appropriately,
Director McEvoy immediately consulted with Joan Janshego, a
NARA Human Resources Specialist in employee relations at
NARA headquarters in College Park, Maryland,[4] and David
Roland, who by then had been promoted to Assistant Regional

_____

[4] Ms. Janshego, who works in NARA's Human Resources
Division, guides and directs NARA managers at locations
throughout the United States, including in the Mid-Atlantic
region, on employee relations matters such as employee
performance and discipline. Exhibit "3," at ¶¶ 1-2. From 1995
until Mr. Murray was terminated from NARA service, Janshego was
the Human Resources Specialist who was responsible for directing
and guiding Federal Records Center managers on performance,
discipline, and related matters concerning Murray. Id. at ¶ 3.
Under the governing NARA written guidance, NARA managers such as
McEvoy and Roland were required to "obtain advice and assistance"
from Ms. Janshego or someone in her office before proposing to,
or finally deciding to, remove a NARA employee from NARA service.
Id. at ¶¶ 16-17 (Janshego stating that her office is required to
ensure that proposed and final removal notices "meet[] the
procedural and other requirements for taking" such actions).
When managers consult Janshego about such matters, her "normal
procedure" is, "while in discussions with the manager(s), to
advise a course of action, to prepare the notices, and to send
them to management for suggested changes and/or concurrence."
Id. at ¶ 17.

Administrator for NARA's Mid-Atlantic Region.  Exhibit "6,"
at 4; Exhibit "3" (Janshego Affidavit), at ¶ 4.  That same
day, after reviewing photographs of Murray's postings,
Janshego drafted, for the signature of Murray's first-line
supervisor, Elizabeth Washington, a letter that McEvoy
reviewed and concurred in and that Ms. Washington, later
that day, handed to Murray.  Murray then immediately
acknowledged receipt and review of the letter by signing it.
Exhibit "3," at ¶ 4; Exhibit "2," at 2-3; Exhibit "1," at
92.

　　　　In the letter, NARA management concluded that
Murray's then-recent postings were "offensive to coworkers,
the security force and management" and "create[] a hostile
work environment and will not be tolerated."  Exhibit "3,"
Exhibit "A" thereto.  NARA management further "order[ed]"
Murray:

> [T]o immediately remove (no later than
> 2:30 p.m. today) all of these materials
> from your work area and to never display
> them or anything similar in any work area
> at the National Archives.  <u>To be clear,
> you are to display no materials that make
> reference to</u> race, religion, <u>political
> views or that make disparaging remarks in
> any way</u> at any location at the National
> Archives.

Id. (emphasis added).  In the closing paragraph of the letter, Murray was warned: "If you fail to follow this order, you will be charged with insubordination, which will form the basis for removal from the federal service."  Id.

Also on that date, August 17, 2004, Mr. Murray sat down with Ms. Washington to discuss the particular requirements of the directive, and he then responded by removing all posted items from his work station.  Exhibit "1," at 94-99; Exhibit "2," at 2.  Murray believed and continues to believe that the directive resulted from Mr. Buffone or another co-worker complaining to management that the postings were offensive to staff.  Exhibit "1," at 99; 103.  Murray speculates that the directive aimed, in part, at harassing him because he had written "God is great" in Arabic on some of his postings.  Id. at 125-126.  He understood that, because he had promptly removed all of the work station postings in compliance with the directive, he would not be disciplined for those postings but would, rather, be disciplined only if he made further postings in violation of the directive.  Id. at 142.  He also understood that he was not to post further comments similar to the

comments that he had removed, including disparaging comments such as "worthless losers, nothing ass employees." <u>Id.</u> at 238-239.

    C.    The Post-August 17, 2004 Postings,
           <u>And NARA's September 16, 2004 Response</u>

Notwithstanding the August 17, 2004 directive, Murray soon resumed posting materials at his work station, and he continued to do so until September 16, 2004. Meanwhile, he never consulted with management to determine whether any of the new postings were in violation of the directive. Exhibit "1," at 124. None of his post-August 17, 2004 displays (as Murray admits) had any religious or race-based content. <u>Id.</u> at 107. In violation of the directive, however, the new displays contained political content and remarks that were disparaging of co-workers, management, and the workplace.

Specifically, as Murray acknowledged, after August 17, 2004 he posted, in full view of co-workers:

•    The following comments relating to the then-upcoming November 2004 presidential election: "It's Just A Matter Of Time Now. Be Patient. Vote Nov[.] 11, 2004[.] Kerry[.]" Exhibit "1," at 109 and attached deposition

exhibit "Murray-13" (photographs of Murray's work station on 9/16/04).  These reflected, in part, Murray's hope that John Kerry would be elected U.S. president.  Exhibit "1," at 110-111.

- The comment "Two Legged Cockroaches," which was directed at co-worker Hong Diep because Murray suspected him of removing boxes from Murray's desk.  Exhibit "1," at 113; 123-24; and attached deposition exhibit "Murray-13."  Murray intended this comment to be retaliatory and to "mock[]" Diep.  Exhibit "1," at 113.  Murray knew that the posting was disparaging to Diep, and he agrees that it was inappropriate.  Id. at 123; 127-28.

- The comment "Beware of the Snitch Committee," which Murray now says was a suggestion to his friends to be cautious about gossiping.  Exhibit "1," at 112-113 and attached deposition exhibit "Murray-13."

- The title of the movie "Predator," as well as a graphic depicting a predatory creature from that movie, which were displayed above a posted copy of NARA Interim Guidance 300-1, Personnel 300, Chapter 752.  That chapter guides NARA on applicable "disciplinary and adverse actions"

14

against employees.  According to Murray, the juxtaposition of these postings signified nothing, and the "predator" references were there merely to remind him about the release of the movie.  Exhibit "1," at 109-114.

• Finally, under the phrase "American Gov[ernmen]t vs. American People (Human Race)," three documents on which Murray made handwritten comments. Exhibit "1," attached deposition exhibit "Murray-13."  On the first document, which was an e-mail exhorting the African-American community's vigilance regarding voting rights, Murray wrote "Separate + Unequal."  On the second document, an August 2004 memo from Director McEvoy to various staff that attached revised NARA polices, Murray highlighted a reference to NARA's "Absence and Leave" policy and wrote "None Dare Call It Conspiracy!"  On the third document, the August 17, 2004 directive to Murray from NARA management, Murray drew an arrow from Director McEvoy's name to the name of an article, "The Government's Assault on the Black Family."  At the bottom of this posted directive Murray wrote: "The Plot Thickens!"

Murray testified that these phrases that he wrote on the three documents, as well as his posted statement above them, were all references to books that he intended to read and were (notwithstanding the added exclamation points) mere self-reminders to read them.  He asserted that the underlying documents were displayed simply to keep them from getting lost on, or taken from, his desk.  Exhibit "1," at 114-122.  In so testifying, Murray distanced himself from his union representative's October 2004 letter on his behalf in which the representative stated that the comments on the three documents expressed Murray's "feelings about workplace conditions."  Id. at 118-119 and attached deposition exhibit "Murray-18."

When confronted at his deposition with the political and disparaging content of these postings, Murray testified that, in his current view, he did not violate the August 17, 2004 directive, even though it stated a prohibition on the posting of such content.  According to Murray, he chose to interpret the directive narrowly to bar him from posting only such material that would be

"offensive" "to the Catholic hierarchy."  Exhibit "1," at

105; 111-112; and 137-140.

On September 16, 2004, Mr. McEvoy and Mr. Roland

first observed Murray's post-August 17, 2004 postings.

Exhibit "6," at 2; Exhibit "5," at 4.  McEvoy and Roland

found many of these postings to be of concern, and some even

to be threatening; they furthermore believed the postings to

be in violation not only of the August 17, 2004 directive

but also, possibly, of the Hatch Act.[5]  Exhibit "6," at 2-3;

Exhibit "5," at 4.  That same day, McEvoy forwarded

photographs of the new postings to NARA Human Resources

Specialist Janshego, and McEvoy consulted with Janshego and

Roland about how to respond.  Exhibit "3," at ¶ 5; Exhibit

"6," at 2; Exhibit "5," at 4.

Janshego then immediately prepared, for McEvoy's

review and approval, a letter to Murray stating that:

_____

[5]  Hatch Act regulations prohibit all federal employees,
while on duty, from engaging in "political activity," which is
defined as "an activity directed toward the success or failure of
a political party, candidate for partisan political office, or
partisan political group."  5 C.F.R. § 734.101.  Murray was
specifically prohibited from displaying partisan political signs
while on duty.  5 C.F.R. § 734.306 (Example 16).  See generally
NARA Notice No. 2003-189, Exhibit "7" hereto (warning NARA
employees in July 2003 that "[v]iolations of the Hatch Act may
result in disciplinary action, up to and including removal").

17

(i) McEvoy was consulting with Janshego's division regarding Murray's "recent misconduct"; (ii) Murray was being placed on administrative leave, with pay, until further notice; (iii) Murray was required immediately to turn in his NARA badge; (iv) Murray was required, while on leave, to call McEvoy every Wednesday morning; and (v) Murray was required to call Janshego if he had any related questions.  Exhibit "3," at ¶ 5.  McEvoy approved the letter and, on the same day, September 16, 2004, handed a copy to Murray -- which Murray then acknowledged by signing -- during a meeting among McEvoy, Murray, and Ms. Washington in McEvoy's office. Id. at ¶ 6 and Exhibit "B" thereto (copy of letter); Exhibit "1," at 145; 147-148.  Murray says that after receiving the letter he promptly turned in his badge, cleaned out his locker, and left the work site.  Exhibit "1," at 146.

    D.    The Events of September 22, 2004,
           And The Resulting Investigation

        Under the terms of the September 16, 2004 letter, Murray was required to call Director McEvoy on the morning of Wednesday, September 22, 2004.  At approximately 10:00 a.m. on that day, Murray left the following voice message for McEvoy:

> Hey Johnny, it's ah, this is ah, Darryl
> Murray calling, ah, the paper said to
> call you every Wednesday at 10 o'clock,
> ah, I'm having some problems with my
> passport trying to get a flight back, but
> you can call me, ah, on 215-681-8924.
> There might be a little disturbance on
> the plane but I still should be able to
> still get a signal.  Talk to you later
> Mr. McEvoy.

Exhibit "1," at 156-161; Exhibit "3," Exhibit "I" thereto

(November 9, 2004 Final Decision Letter), at 5; Exhibit "6,"

at 5.  A few minutes later, Murray left a voice message for

his supervisor, Ms. Washington, in which he stated that he

had taken "a little flight overseas," was experiencing some

"passport problems," but "should be back in town by Friday."

Exhibit "1," at 157-161; Exhibit "3," Exhibit "I" thereto,

at 5.[6]

Murray has since admitted not only that he made

these telephonic statements but that they were in fact

"white lies."  Exhibit "1," at 158-161.  He confesses that

when he made the calls he was in Philadelphia in the

presence of a female friend who wanted him to travel abroad

for a vacation while he was on administrative leave, and he

---

[6] Both of these voice recordings were preserved and were
produced to Murray during discovery in this case.

was trying to mislead her into thinking, contrary to fact, that he could not do so because he had passport problems. Id. at 158-161 and attached deposition exhibits "Murray-17" and "Murray-22."

The same morning, after placing those calls, Murray drove his female friend to a doctor's appointment in Northeast Philadelphia near the Federal Records Center. The friend's three-year-old son rode with the couple. Exhibit "1," at 162-163. While the friend was at her appointment, Murray remained in the car, with the child sleeping in the back seat. Id. Murray then checked the voice messages on his cell phone and heard one from a NARA co-worker, Warren "Skip" Hammond, who had called to learn how Murray was faring. Id. at 153-156; 164.[7] Because it was almost the records center lunch hour, Murray decided quickly to drive there in the hope that he could speak to Hammond and perhaps other co-worker friends. Id. at 164; 170-171. Before leaving for the records center, Murray called the receptionist there and asked her to page Hammond to let him

_____

[7] Hammond testified that he left a voice message for Murray between September 17 and 21, 2004. Exhibit "8" (Deposition of W. Hammond), at 24-25.

know that Murray would soon be arriving, which she agreed to do.  Id. at 164-166.

Minutes later, Murray entered the records center parking lot and parked his car (with the child passenger still sleeping and the engine still running) in front of the building entrance.  Exhibit "1," at 166-171.  As soon as Murray arrived, the Federal Records Center security guard, James Hughes,[8] a Protestant, emerged from the building, and Murray (according to his testimony) asked Hughes if he had seen Mr. Hammond.  Exhibit "1," at 171-172; 174; 184; Exhibit "9" (J. Hughes EEO Affidavit), at 1.[9]  Hughes then re-entered the records center.  Exhibit "1," at 184.  While inside, Hughes received confirmation from records center management that Murray was not permitted on NARA property. Exhibit "9," at 3.  Meanwhile, some of Murray's co-workers,

---

[8]  Hughes works for Alrod Security Services, which is under contract with the U.S. Department of Homeland Security to secure the NARA Federal Records Center.  Exhibit "6," at 5; Exhibit "9" (J. Hughes EEO Affidavit), at 1.

[9]  Hughes states, contrary to Murray, that he yelled out the front door to Murray, "Darryl, what are you doing here?"  Murray then replied, "I am here to blow up the building; I'm here to see Skip."  Exhibit "9," at 2 and attached 9/22/04 statement.  Hughes then stated, "Darryl, watch what you say," and Murray laughed in response.  Id.  Murray added: "I'm bringing my people up here, and you know what that means."  Id.

including Irene Jones, exited the building for their lunch hour. Exhibit "1," at 173; 178. Jones walked over to Murray's car, spoke to him through the rear passenger's side window, and asked him about the child passenger. <u>Id.</u> at 174-175; Exhibit "4," at 15; 17.

Security Officer Hughes then re-emerged from the records center and (according to Murray) stated: "Darryl, they said that you are not welcome[] on the property." Exhibit "1," at 175-176; 184-185. Hearing this, Murray felt humiliated, embarrassed, and angry. <u>Id.</u> at 179-180; 185; 188. He knew Hughes and therefore felt that he could speak to him without having his comments repeated to management. <u>Id.</u> at 179. Experiencing a kind of "road rage," Murray (according to his deposition testimony as well as his written statements) then stated to Hughes that "somebody ought to blow that place up." <u>Id.</u> at 180-185; 187; 189-190; and attached deposition exhibits "Murray-23," "Murray-24," and "Murray-25."[10]

---

[10] According to Hughes, Murray stated: "When I come back, I'm blowing up the place." Exhibit "9," at 4 and attached 9/22/04 statement.

Murray testified that Ms. Jones turned away from his car and spoke to other co-workers during his discussion with Security Officer Hughes, and Murray does not know whether Jones heard any of the conversation. Exhibit "1," at 178. Jones herself testified that, though she saw Hughes and Murray speak to each other, she may not have heard much of the conversation between them, and she has no basis for disbelieving any of Murray's assertions about statements that he made to Hughes. Exhibit "4," at 17-20; 22-23. In a statement that Jones gave to a federal investigator immediately after the incident, Jones denied having heard anything. Exhibit "10" (Special Agent L. Pepe Affidavit), at ¶¶ 5 and 9 and attached notes from September 24, 2004 interview of I. Jones (recording that Jones "denied hearing any of the conversation between Murray [and] the guard"). At her deposition, Jones stated that she had given an honest statement to the investigator. Exhibit "4," at 28-29.

Murray says that, when Hughes told him that he was not welcome at the records center, he had speculated that his co-worker, Mr. Diep, had said something to management that had led to Murray being prohibited from NARA property.

Exhibit "1," at 187.  Murray testified that his statement

that "somebody ought to blow that place up" was therefore

only in part meant to communicate that someone ought to blow

the records center up; the comment was also meant to convey

his momentary feeling that someone ought to blow up Diep.

Id. at 186-187 and attached deposition exhibit "Murray-16."

According to Murray, he further said to Hughes at that time,

"I might need to bring Johnnie Cochran and the dream team

back with me."  Exhibit "1," at 188; 192.  Murray then drove

out of the parking lot and did not return to the records

center.  Id.  at 177; 186.

　　　　As soon as Director McEvoy learned about Murray's

comments from Security Officer Hughes that same day, McEvoy

and Hughes telephoned the Criminal Investigations &

Intelligence Section of the Federal Protective Service

("FPS") of the Department of Homeland Security, and FPS

Special Agent Louis Pepe began investigating the incident.

Exhibit "6," at 5; Exhibit "9," at 4; Exhibit "10," at

¶ 3.[11]  McEvoy took Murray's stated threats especially

seriously because of the "security-conscious environment"

---

[11]  Among other things, FPS polices and secures federal
agencies, including NARA.  Exhibit "10," at ¶ 2.

after "the incidents of 9/11/2001 and Oklahoma City."
Exhibit "6," at 5.

On September 22, 2004, Special Agent Pepe
interviewed Security Officer Hughes, who repeated Murray's
comments that he was at the records center, or would be
returning to the facility, to "blow the place up."  Exhibit
"10," at ¶¶ 4 and 9 and attached interview notes thereto.
The following day, Special Agent Pepe interviewed Murray at
his home.  Exhibit "1," at 193-195; Exhibit "10," at ¶ 7.[12]
Accompanying Pepe were another FPS Special Agent and a
Philadelphia Police Department detective.  Exhibit "10," at
¶ 7; Exhibit "1," at 196.  When asked if he had ever
threatened to "blow up" the records center, Murray did not
tell the investigators about his now-admitted comment to
Security Officer Hughes.  Exhibit "1," at 198-200; Exhibit
"10," at ¶¶ 8 and 9 and notes attached thereto from Murray
interview.  Murray stated to the investigators only that he
had gone to the records center the previous day to see Mr.

_____

[12] Murray consents to the public use of the FPS file as an
exhibit in this case.  Exhibit "1," at 259.

25

Hammond about "a small debt."  Exhibit "10," at ¶ 8; Exhibit
"1," at 200-201.[13]

### E.  NARA's Proposed Removal Of Murray From Service

Between September 22 and 24, 2004, Director McEvoy
apprised Human Resources Specialist Janshego about the
reported events of September 22, and McEvoy and Janshego
discussed at length how NARA should respond both to Murray's
September 2004 workplace postings and to the September 22
threatening remarks.  Exhibit "3," at ¶¶ 6-7.  The two
agreed that NARA -- with Janshego's direction and guidance,
and after her full review -- would immediately write to
Murray and propose to remove him from NARA service within 30
days.  Id. at ¶ 7.

Janshego then prepared a proposed removal notice,
which she based on two separate instances of misconduct.
The first cited ground was Murray's insubordination in
failing, by displaying his September 2004 postings, to
comply with the August 17, 2004 directive against displaying
any material "that makes reference to . . . political views

---

[13]  Pepe also interviewed McEvoy on September 23 and Irene
Jones (see supra at page 23) on September 24.  Exhibit "10," at
¶¶ 5-6; 9.

or that makes disparaging remarks in any way" and that warned him that any such further postings would result in a charge of insubordination that would lead to removal. Exhibit "3," at ¶ 8. The second cited ground of misconduct was Murray's September 22, 2004 threatening remarks, which violated NARA Interim Guidance 300-19. That guidance states, in part, that: "NARA will not tolerate comments concerning weapons or bombs or other threats directed to NARA security guards -- even if the comment was intended as a joke." The guidance adds that employees who make such remarks are subject to disciplinary action, criminal penalties, or both. Exhibit "3," at ¶ 8 and Exhibit "C" thereto.

Director McEvoy reviewed the proposed removal notice, approved it, and sent it to Murray On September 24, 2004. Exhibit "3," at ¶ 10 and Exhibit "D" thereto (notice of proposed removal); Exhibit "1" at 208-209; Exhibit "6," at 6. The notice invited Murray to reply in writing and advised him that he could designate an attorney or other representative. Exhibit "3," Exhibit "D" thereto. The only reply that Murray made, however, was by way of October 21,

2004 letter from his union representative, James Cassedy, to Mr. Roland, who was the NARA deciding official.  Exhibit "3," at ¶ 11 and Exhibit "E" thereto (Cassedy letter).

      F.    <u>The Final Agency Decision To Remove Murray</u>

Mr. Roland and Ms. Janshego fully considered Mr. Cassedy's statement.  Exhibit "3," at ¶¶ 11-15; 24.  In the final decision letter that she prepared for Roland, Janshego re-emphasized, with Roland's concurrence, that Murray was not being disciplined for his August 17, 2004 postings (because he had promptly removed them as ordered) but for his insubordination in later failing to follow the prohibition in the August 17, 2004 directive on political and disparaging remark postings.  <u>Id.</u> at ¶¶ 13; 14; 19. Janshego and Roland noted that Cassedy did not suggest that Murray's "Vote Nov. 11 2004 Kerry" posting was apolitical. Cassedy conceded, moreover, that the posted "two legged cockroach" comment referred to Murray's colleague and was Murray's "humorous attempt at revenge."  Cassedy added that the posted comments "None Dare Call It Conspiracy," "The Plot Thickens," and "Separate and Unequal" were Murray's "protest of working conditions at the NARA facility."

Janshego's proposed final decision letter therefore considered those comments to be disparaging of the NARA workplace and in violation of the August 17, 2004 directive. <u>Id.</u>

With regard to Murray's September 22, 2004 parking lot remarks, both Janshego and Roland, after reading Cassedy's response, remained of the view that Murray had threatened the Federal Records Center and/or NARA employees. <u>Id.</u> at ¶ 15. Janshego and Roland considered that Cassedy: (i) did not deny that Murray had referred to "blowing up the place" but, rather, characterized that remark as "at worse . . . a bad, off hand attempt at humor"; and (ii) admitted that Murray made the remark during a moment when he was "shocked, humiliated and angry." <u>Id.</u> Having considered Cassedy's response, Janshego advised Roland that, in her draft of the final decision letter, she would conclude that Murray's stated defense to the charge of threatening remarks was unacceptable because, among other things, the remarks, even if intended as a joke, were in violation of NARA Interim Guidance 300-19 and were of serious concern to NARA. <u>Id.</u>

In drafting the final decision letter, Janshego adhered to and was guided by the NARA Penalty Guide, which is Appendix 752A to NARA Interim Guidance 300-1, Personnel 300. Exhibit "3," at ¶ 20 and Exhibit "F" thereto. Specifically, she relied upon the penalties for the offenses that are listed as numbers 5 and 7b. Id. Listed offense number 5 is "Insubordination: direct or indirect refusal to comply with instructions issued by a supervisor; disrespect, insolence, and similar behavior." Janshego concluded that this corresponded to the "insubordination" offense that had been stated in the notice of proposed removal and that was re-stated in the draft final decision letter. Id. She advised Roland that the penalty range for such an offense, regardless of whether it was a first or second offense, authorized Murray's "removal." Id. at ¶¶ 20; 22; and Exhibit "F" thereto.

Listed offense number 7b in the NARA penalty guide is "Disorderly Conduct: Fighting, or threatening, attempting to inflict, or inflicting bodily injury on another person." Janshego concluded that this corresponded to the "threatening remark" offense that had been stated in

the notice of proposed removal and that was re-stated in the
draft final decision letter.  Exhibit "3," at ¶ 21 and
Exhibit "F" thereto.  She counseled Roland to view this
offense category in the light of NARA Interim Guidance 300-
19, which states that NARA takes seriously all threatened
incidents of violence.  Id. at ¶ 21.[14]  She advised Roland
that the penalty range for such an offense, regardless of
whether it was a first or second offense, authorized
Murray's removal.  Id. at ¶¶ 21-22 and Exhibit "F" thereto.

        Janshego instructed Roland further that, though
the two cited offenses could be viewed individually, they
should, consistently with the governing NARA Interim
Guidance, instead be viewed together, with the seriousness
of the offenses being given due weight.  Exhibit "3," at
¶ 23 (citing NARA Interim Guidance 300-1, Personnel 300,
Chapter 752, Part 1, Paragraph 8c).  Roland agreed with
Janshego that the two cited offenses should be considered to

_____

        [14]  She also advised Roland that it was appropriate to
consider the offense under the penalties listed for "7b" offenses
regardless of whether or not Murray's threatening remarks fit
neatly into the 7b offense definition.  Id. (citing NARA Interim
Guidance 300-1, Personnel 300, Chapter 752, Part 1, Paragraph
8a).

be second offenses.[15]  Id. at ¶ 22.  With the offenses so
jointly viewed as second offenses, and Janshego's draft
final decision notice reflecting that view, Janshego advised
Roland, and he agreed, that removal from federal service was
the appropriate penalty for Murray.  Id. at ¶ 23.

In arriving at the decision to remove Murray,
Roland and Janshego assessed the appropriateness of removal
under the sanctions considerations known as "Douglas
factors" that have been established by the Merit Systems
Protection Board.  The notice of final decision that
Janshego drafted reflected that assessment and
consideration.  Exhibit "3," at ¶¶ 24-26.  In the context of
the Douglas factor analysis, Janshego noted in the draft
notice that removing Murray was consistent with penalties
that NARA had imposed upon other employees for the same or
similar offenses, though Murray was the first NARA employee

_____

[15]  Janshego advised Roland that Murray's offenses were
second offenses because he had been suspended for 3 days in
August 2003 for neglect of duty and for inaccurately reporting
completed work and carelessness.  Exhibit "3," at ¶ 22.  She
further advised Roland not to base his penalty determination upon
Murray's 14-day suspension in 1996 because it occurred too long
in the past to be considered a prior offense.  Id.

to be charged with both an insubordination and a threatening remark offense.  Id. at ¶ 25.[16]

   As the deciding official, Mr. Roland reviewed Ms. Janshego's draft notice of final decision to remove Murray from NARA service, concurred in it, and on November 9, 2004 sent it, as the agency's final decision notice, to Murray. Exhibit "3," at ¶ 27 and Exhibit "I" thereto.  Murray was removed from NARA service on November 16, 2004.

---

[16]  According to Janshego: (i) NARA removed one employee in the Mid-Atlantic Region in December 2003 for making a threatening remark in the workplace and lying during the course of the related administrative investigation, which were the employee's first offenses; (ii) NARA decided to remove another employee at headquarters in February 2002 for threatening a building security guard, but the employee, for whom that was a first offense, resigned before the removal went into effect; and (iii) NARA removed a Maryland employee from service in 1989 on a first offense charge of insubordination for failing to follow an order to turn in work to his supervisor.  Exhibit "3," at ¶ 25 (also stating that none of the three employees was known by NARA to be Muslim).

III.    **LEGAL ARGUMENT: THIS MOTION SHOULD BE GRANTED**

This Court previously ruled that plaintiff Murray's only remaining claim is for religion-based employment discrimination.[17]  (Docket Entry No. 18.)  Of the two types of religious discrimination claims,[18] Murray asserts only a disparate treatment claim.[19]  The facts that are material to that claim are not disputed, and none of Murray's contentions has merit.  This is so for one or more of the following four interrelated reasons.

A.    Murray Fails To Point To Any
       Evidence Of Disparate Treatment

First, Murray cannot satisfy his prima facie burden of showing that, in terminating his employment, NARA treated him -- based on his religion -- differently from other similarly situated (or even non-similarly situated)

_____

[17] Title VII prohibits, with respect to personnel actions affecting employees, federal government employer "discrimination based on . . . religion[.]"  42 U.S.C. § 2000e-16(a).

[18]    These are: (1) disparate treatment, involving an employer's direct, intentional discrimination against a person of a particular religion; and (2) failure to accommodate a person's religious beliefs or practices.  See, e.g., Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 281 (3d Cir. 2001).

[19]    See Exhibit "1," at 216 (Murray testifying that he never requested management to accommodate his religious beliefs in any way).

employees.  As a part of that burden,[20] Murray must point to

evidence showing not only that his job performance was

satisfactory[21] but also that (1) a comparable non-Muslim

NARA employee (2) made similarly threatening remarks to the

parking lot statement that Murray made on September 22, 2004

and/or (3) similarly failed to follow an order to cease

displaying political or disparaging remark comments -- or

_____

[20] Because of the absence of direct evidence of
discrimination, Murray must make a prima facie showing that:
(1) he belonged to a protected class (Muslims); (2) he was
qualified for the job that he lost; (3) he suffered an adverse
employment action (termination); and (4) the job termination
occurred under circumstances that support an inference of
discrimination, such as that similarly situated persons who did
not belong to Murray's protected class (e.g., non-Muslim
employees) were treated more favorably.  See, e.g., Abramson v.
William Paterson College of New Jersey, 260 F.3d 265, 281-82 (3d
Cir. 2001) (also stating that elements of prima facie case for
discriminatory discharge based on race or sex are nearly
identical to those for such a case based on religion).  If Murray
were to carry his prima facie burden, a rebuttable presumption of
discrimination would arise, which NARA can rebut by articulating
a legitimate, nondiscriminatory reason for terminating him.  See,
e.g., Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133,
142 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802
(1973) (same); Texas Dept. of Community Affairs v. Burdine, 450
U.S. 248, 253-54 (1981) (same).  Should NARA articulate such a
reason, Murray must demonstrate that the reason is a pretext for
unlawful discrimination, and on this Murray bears the burden of
persuasion.  McDonnell Douglas, 411 U.S. at 802.

[21] Although as discussed in the statement of facts, supra,
Murray cannot show that his job performance was satisfactory in
2003 and 2004, the government does not seek summary judgment on
this ground, though it may raise this deficiency at trial should
this motion be denied.

similarly offensive or threatening material -- but

(4) nevertheless was not fired.[22]  Murray fails, however, to

satisfy his summary judgment burden even with respect to

these minimal demands for a prima facie case of

discrimination.[23]

    Murray admits that there are no such non-Muslim

comparators.  Regarding his threatening remarks, Murray has

failed to identify any -- and is unaware of any -- NARA

employee who has uttered similar remarks to his statement

that "somebody ought to blow that place up," let alone who

remained in employment after making such remarks.  Exhibit

---

    [22]  See Bullock v. Children's Hosp. of Phila., 71 F. Supp.
2d 482, 489 (E.D. Pa. 1999) (to show disparate treatment,
plaintiff has to point to persons who engaged in same conduct he
did without "such differentiating or mitigating circumstances
that would distinguish their conduct or the employer's treatment
of them for it") (quotation marks omitted).

    [23]  Summary judgment is mandated where, as here, the
plaintiff has failed "to make a showing sufficient to establish
the existence of an element essential to that party's case and on
which that party will bear the burden of proof at trial."
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Fed.
R. Civ. P. 56(e) ("When a motion for summary judgment is made and
supported as provided in this rule, an adverse party may not rest
upon the mere allegations or denials of the adverse party's
pleading, but the adverse party's response . . . *must set forth
specific facts showing that there is a genuine issue for trial*")
(italics added); accord Harp v. SEPTA, 2006 WL 1517390, at *3
(E.D. Pa. May 31, 2006) (Shapiro, J.) ("mere conclusory
allegations or denials are not enough to preclude summary
judgment").

"1," at 216.  Regarding his offense of insubordination, the record is similarly devoid of evidence of comparator employees.  See Exhibit "1," at 152-153 (Murray stating inability to identify any of his co-workers who were treated more favorably than he was for posting religious, political, or disparaging remark content).[24]  He testified that, in the entire time that he worked at the Federal Records Center, he never observed any postings that were similar to his in their political content.[25]  Nor did he, in the entire time that he worked there, ever observe any postings by coworkers or managers that made disparaging remarks towards other employees.[26]  There is thus no record evidence that Murray's charged offenses of making threatening remarks and

---

[24]  Regarding "racial" content, Murray testified only that Mitchell Buffone, an Italian-American, had posted photographs of Mafia figures, but in 2004 was required to cease, and then apparently did cease, such displays.  Exhibit "1," at 151-153.

[25]  Exhibit "1," at 149; 150-151; see also Exhibit "4" (Deposition of I. Jones), at 49 (co-worker/friend of Murray's stating inability to recall records center staff apart from Murray ever posting anything political in content).

[26]  Exhibit "1," at 149-151; see also Exhibit "4," at 49 (co-worker stating inability to recall records center staff apart from Murray ever posting anything that threatened co-workers, management, or the workplace).

insubordination were out of line with NARA's treatment of non-Muslims.

Murray has on occasion in this case suggested that he is challenging as discriminatory not only the September 2004 charge of insubordination but also the underlying August 17, 2004 directive.  He has, however, pointed to no evidence that any non-Muslim co-worker posted content similar to what was contained in his August 17, 2004 postings that NARA management found troubling (for example, his posted disparaging remarks and his apologetics for Osama bin Laden).  To the extent that those postings could be characterized as having any religious content apart from the Arabic saying "God is great," Murray never observed, in the entire time that he worked at the Federal Records Center, any displays by coworkers or managers that had similar content.[27]  Rather, the only religious-content postings and displays that Murray ever observed there were of the wholly

_____

[27]  Exhibit "1," at 150-151; see generally Exhibit "5" (D. Roland EEO Affidavit), at 5 ("No one had things posted that were as extreme as Mr. Murray's"); Exhibit "2" (E. Washington EEO Affidavit), at 4 ("I have not observed anyone else in my section [posting] similar things [to what Murray posted]").

non-offensive sort,[28] and neither he nor his co-workers were taken to task for displaying religious prayers, books, and symbols.[29]  There is thus no basis in the record for a claim that non-Muslims who posted material similar to Murray's August 17, 2004 postings were not issued a similar NARA directive to cease their displays, because there were no such similarly offensive, beyond-the-pale postings.[30]

---

[28]  Murray faintly recalled seeing on a records center desk a magazine about the Holocaust in which there was a picture of a swastika, which may have been within an article condemning the Holocaust.  Exhibit "1," at 50-51; 151-152.

[29]  Exhibit "1," at 51-52 (Murray stating that he had a Koran at his desk when he worked at the Federal Records Center, and was never asked to remove it); id. at 49-51 (referring to NARA employees being permitted to post or display on their computer screen savers or work stations "Christian crosses, Jewish Menorah symbols . . . prayers"), and at 149 (stating that some co-workers kept on screen savers statements of faith such as "God is great"); see also Exhibit "4," at 48-49 (co-worker testifying that she was unable to recall records center staff posting anything religious that was considered offensive).

[30]  Cf. Peterson v. Hewlett-Packard Co., 358 F.3d 599, 605 (9th Cir. 2004) (in religion-based disparate treatment action, rejecting terminated employee's comparisons of himself with other employees who posted religious and other messages and symbols but were not fired because plaintiff "failed to present any evidence that the posters in other . . . employees' cubicles were[, like plaintiff's,] intended to be hurtful to, or critical of, any other employees," and because there was an absence of record evidence that employer "would have permitted any . . . employee to post messages . . . that demeaned other employees") (quotation marks omitted).

NARA, in fact, has handled the most analogous instances of insubordination and threatening remarks by non-Muslim employees similarly to the way that it handled Murray's offenses.  <u>See</u> Exhibit "3" (J. Janshego Affidavit), at ¶ 25 (stating that there have been two recent instances of NARA employees making threatening remarks, and one case of employee insubordination, and NARA acted to remove all three employees, none of whom was known by NARA to be Muslim, and none of whom had been charged with being *both* insubordinate and making threatening remarks).  In sum, therefore, Murray has failed to satisfy his summary judgment burden of pointing to specific facts that are sufficient to establish a prima facie case of disparate treatment based on differing treatment of non-Muslim NARA employees.

> B.  Murray, Beyond Speculation, Fails
>     To Point To Any Evidence Of Discrimination

Second, even apart from his failure to adduce any evidence of differing treatment, Murray has altogether failed to point to any evidence that could support an inference, and a prima facie case, that NARA managers, in terminating his employment, discriminated against him based on his religion.  Murray apparently concedes that his case

depends not upon evidence but upon his mere speculation of discrimination.  See infra, pages 41-42.  Such speculation and subjective views are, however, inadequate to survive summary judgment.[31]

The solely subjective basis for Murray's case became fully evident at his deposition.  He admitted that neither Mr. McEvoy, Mr. Roland, nor anyone else in management ever stated anything orally or in writing to him suggestive of a prejudice against Muslims.  Exhibit "1," at 212-213; 216-217.  He further testified that he has leveled his chief allegation in this case -- that management, based on his religion, terminated him for making threatening remarks -- only because he can think of no other reason why

_____

[31]  See, e.g., Bailey v. Principi, 2003 WL 22245100, at *2, 6 (E.D. Pa. Aug. 20, 2003) (recognizing that "[a] plaintiff cannot avert summary judgment with speculation," and stating that "Plaintiff correctly contends that he is not required to establish that he was treated differently than non-minority employees, but can rely on other evidence of discrimination[,]" . . . "[h]owever, the plaintiff still must demonstrate the existence of sufficient facts to allow him to prove by a preponderance of the evidence that a *prima facie* case of discrimination exists that goes beyond the plaintiff's mere speculation") (citation omitted); cf. Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999) (recognizing that a gender discrimination plaintiff can meet prima facie burden with general evidence of discrimination -- that is, without specifically demonstrating that employees outside of her class were treated more favorably).

he was not permitted to make an oral statement in his defense.  He therefore was merely "speculat[ing]" that there was such a religious basis.[32]  Undercutting his own speculation, Murray acknowledged that the September 24, 2004 notice of proposed removal invited him to make a written response and that the only response that he chose to make was by way of his union representative's October 2004 letter to Mr. Roland.  Exhibit "1," at 202-210.

Turning to the September 2004 charge of insubordination, Murray does not contend that it was based on religious discrimination.  He conjectures only that there may have been a religion-based discriminatory aspect to the underlying August 17, 2004 directive because some of his August 17, 2004 postings stated, in Arabic, that "God is great."  Exhibit "1," at 126-27; 143-144 (acknowledging that

_____

[32]  Exhibit "1," at 205-06; 212 (Murray also stating his subjective belief that management took his remarks "more seriously because [they were made by] a person of the Islamic religion").  See generally Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 490-91 (E.D. Pa. 1999) (granting employer summary judgment on claim of discriminatory termination where plaintiff merely speculated that there was discrimination based on race "because she could not figure out any other reason that [the employer] would have criticized her job performance," and holding that plaintiff therefore failed to establish prima facie case).

he was nonetheless never disciplined for the pre-August 2004 postings because he removed them on August 17, 2004 in compliance with the NARA directive). In the end, however, he concludes that his religion did not play a primary role in any of management's decisions regarding his postings. In his view, these decisions were, instead, primarily based upon Director McEvoy's and non-manager Buffone's personal dislike of him (Murray) and consequent desire to harass him. Id. at 143-144.

Even as Murray describes his claim, therefore, he fails to articulate, let alone support by pointing to probative evidence, a non-speculative, prima facie case of religious discrimination that can survive summary judgment.

> C.   Murray's Attack On NARA's Business Decision
>      To Terminate Him, Which Was Based On
>      Legitimate And Non-Discriminatory Reasons
>      And Procedures, Does Not Save His Claim

Third, Murray's theory of his case -- that there must have been religious discrimination because, he says, the government's investigation was not sufficiently thorough and did not sufficiently account for his explanations of conduct, and because NARA could have chosen a lesser penalty than termination -- encounters an insurmountable legal

obstacle because it is the sort of attack on employer
decision-making that our Court of Appeals has forbidden.  It
is now well-established that the purpose of Title VII is to
police employment discrimination, not to micro-manage an
employer's conduct of its business.  In short, as this Court
and our Court of Appeals have recognized,

> an employer is not liable under Title VII
> for terminating an employee based on the
> belief that the employee was
> insubordinate or otherwise acted
> improperly even if that belief is
> incorrect or the investigation itself was
> flawed.  The key inquiry remains `whether
> discriminatory animus motivated the
> employer,' and [p]laintiff has presented
> no evidence of discriminatory intent or
> motive on the part of [d]efendant in
> either its initiation or completion of
> its investigation into his . . .
> misconduct.

Bailey, 2003 WL 22245100, at *6-7 (citing Fuentes v.
Perskie, 32 F.3d 759, 765 (3d Cir. 1994)); see also Fuentes,
32 F.3d at 765 (reasoning that it is insufficient for a
plaintiff "simply [to] show that the employer's decision was
wrong or mistaken" because Title VII is not concerned with
"whether the employer is wise, shrewd, prudent, or

competent"); <u>accord</u> <u>Harp v. SEPTA</u>, 2006 WL 1517390, at *4
(E.D. Pa. May 31, 2006) (Shapiro, J.).

Here, the summary judgment record is replete with
evidence that NARA had nondiscriminatory, well-discerned,
and well-founded business reasons for terminating Murray for
his insubordination and threatening remarks, which were of
legitimately serious concern to NARA, and which were fully
articulated in the agency's notice of final decision.  The
Philadelphia-based NARA managers that are the focus of
Murray's claim, Messrs. McEvoy and Roland, far from acting
on their own regarding Murray's conduct and removal in 2004,
were throughout that period under the active direction of
headquarters-based NARA Human Resources Specialist Joan
Janshego.  It was Janshego, not McEvoy or Roland, who
drafted the August 17, 2004 directive, the September 16,
2004 letter, the notice of proposed removal, and the final
removal notice.  In doing so, she adhered to nationally
applicable NARA standards and guidances, including NARA's
Interim Guidance on Violence in the Workplace, NARA's
Guidance on Adverse Actions and Discipline, and NARA's
Penalty Guide.

Even if for the sake of argument, however, and contrary to the record evidence, it were the case that NARA, in deciding to terminate Murray, did not properly apply its penalty guide or ascertain properly all of the relevant facts or reach correct conclusions,[33] still Murray could not -- and cannot -- satisfy his summary judgment burden.  As the Court of Appeals emphasized in <u>Fuentes</u>, it is insufficient for a plaintiff who wishes to survive summary judgment on a Title VII discrimination claim "simply [to] show that the employer's decision was wrong or mistaken." In short, Murray's claim fails as a matter of law because he points to no evidence either that NARA terminated him for reasons other than those that it identified in its removal notices or that discriminatory animus was a motivating or determinative cause of the decision to terminate him.[34]

---

[33] Murray seems to contend, for example, that Mr. McEvoy as proposing official and Mr. Roland as deciding official: (1) did not understand that some of his September 16, 2004 postings were not disparaging comments but were, rather, book titles; (2) misinterpreted his "Predator" postings; and (3) did not appreciate that his September 22, 2004 parking lot remarks were meant as a joke and/or were stated in confidence to Security Officer Hughes.

[34] <u>See</u> <u>Fuentes</u>, 32 F.3d at 764 (stressing that, to "defeat summary judgment . . . the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)

**D. No Reasonable Factfinder Could Conclude That NARA's Articulated Reasons For Terminating Murray Were So Implausible That They Must <u>Have Been A Pretext For Discrimination</u>**

Fourth and finally, as our Court of Appeals emphasized in <u>Smith v. Borough of Wilkinsburg</u>, 147 F.3d 272 (3d Cir. 1998), it remains, at all times, the plaintiff's ultimate burden of proof to show that intentional discrimination was a determinative factor in the adverse employment decision. 147 F.3d at 278. To meet this burden, as the <u>en</u> <u>banc</u> Court of Appeals stated in <u>Sheridan v. E.I. DuPont de Nemours and Company</u>, 100 F.3d 1061 (3d Cir. 1996):

> [T]he plaintiff [must] cast <u>sufficient</u> doubt upon the employer's proffered reasons to permit a <u>reasonable</u> factfinder to conclude that the reasons are <u>incredible</u>[.]

100 F.3d at 1072 (emphasis added).

These principles were re-enforced in <u>Reeves v. Sanderson Plumbing Prod. Inc.</u>, 533 U.S. 130 (2000), in which the Supreme Court wrote that even though a plaintiff has met his prima facie burden and cast doubt on the bona fides of

---

believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action"); <u>accord</u> <u>Harp v. SEPTA</u>, 2006 WL 1517390, at *3 (E.D. Pa. May 31, 2006) (Shapiro, J.).

the employer's explanation -- a situation that the
government respectfully submits does not exist here -- there
will nonetheless be instances in which

> no rational factfinder could conclude
> that the action was discriminatory.  For
> instance . . . if the plaintiff created
> only a weak issue of fact as to whether
> the employer's reason was untrue and
> there was abundant and uncontroverted
> independent evidence that no
> discrimination had occurred, [defendant
> would be entitled to judgment as a matter
> of law].

Id. at 148 (interpolation added).[35]

This is the case here.  The government
respectfully suggests that NARA had good, sufficient, and
perfectly legitimate business reasons for terminating Murray
and that the record does not contain even a scintilla of
evidence that, in light of the materials that Murray posted
and his conceded September 22, 2004 remarks, would cast
doubt on the bone fides of those reasons.[36]  To the extent

_____

[35] Post-Reeves, most circuits have endorsed the use of
either Rule 50 or Rule 56 to dismiss Title VII cases.  See, e.g.,
Schnabel v. Abramson, 232 F.3d 83, 89 (2d Cir. 2000).

[36] The record bears out that NARA managers were genuinely
concerned about security after Murray's parking lot remarks.
Director McEvoy immediately called FPS.  Then, following and
because of Murray's remarks, McEvoy instituted new requirements
that: (i) the Federal Records Center be shut down on weekdays at

that Murray is contending that if he were non-Muslim he
would not have been removed, he is merely conjecturing,
without any sufficient basis in the record upon which a
reasonable factfinder could agree with him.  See Harp v.
SEPTA, 2006 WL 1517390, at *4 (E.D. Pa. May 31, 2006)
(Shapiro, J.) (stating that "a plaintiff's pretext rebuttal
is insufficient if it is not supported by evidence, and is
based on nothing more than plaintiff's personal opinion of
her employer's proffered reason") (citations omitted).

        Murray in fact agrees that it is appropriate for
federal employers to be increasingly vigilant regarding
security in the wake of September 11, 2001.  Exhibit "1," at
201-202.  He acknowledges, moreover, that his comments to
Security Officer Hughes on September 22, 2004 -- which were
made minutes after he left his admittedly strange and

---

4:30 p.m., with all employees required by then to be out of the
facility; (ii) if employees now work on the weekend, a security
guard must be present.  Exhibit "6," at 5.  According to Mr.
Roland, Murray's remarks caused Philadelphia-based NARA
facilities to heighten security because of "fear of reprisal on
[Murray's] part."  Exhibit "5," at 3.  Soon after the incident,
efforts were underway to install a better security fence at the
Federal Records Center and to purchase metal detectors and more
sophisticated security measures.  Id.; see generally Exhibit "9"
(J. Hughes EEO Affidavit), at 4-5 (noting new security measures
after incident).

misleading phone messages for Director McEvoy and Ms.
Washington -- were inappropriate and could have had an
"alarming effect" on NARA management.  Id. at 202-203.
Indeed, he states that if he had been in Mr. Roland's or Mr.
McEvoy's shoes and had received a report from Security
Officer Hughes that an employee had made the comments that
Hughes reported had been made by Murray, he (Murray) "would
have done the same thing" that Roland and McEvoy did.  Id.
at 202-203; 206-207.  There is thus abundant and
uncontroverted evidence that no discrimination occurred, and
not only has Murray not created even a weak issue of fact,
he has created no issue of fact at all, as evidenced in part
by his admission that NARA managers acted appropriately
based on the facts that were presented to them.

        In the last analysis, no reasonable factfinder
could conclude by a preponderance of the evidence that
NARA's articulated reasons for terminating Murray were so
implausible that they must have been a pretext for
discrimination.[37]  Murray having failed to carry his summary

_____

     [37]  See Fuentes, 32 F.3d at 765 (summary judgment warranted
where plaintiff fails to demonstrate such "weaknesses,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a

judgment burden, summary judgment in favor of the government

is wholly warranted.

---

reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons") (emphasis in original) (citations, quotation marks, and brackets omitted); <u>accord</u> <u>Harp v. SEPTA</u>, 2006 WL 1517390, at *4 (E.D. Pa. May 31, 2006) (Shapiro, J.).

IV.  <u>CONCLUSION</u>

The government respectfully submits that summary

judgment should be granted in its favor.


Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney


_____
VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division


_____ GBS3408
GERALD B. SULLIVAN (PA#57300)
Assistant United States Attorney
615 Chestnut Street, Ste. 1250
Philadelphia, PA 19106-4476
(215) 861-8786
(215) 861-8349 (fax)