IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL MURRAY,                    :
                                  :
          Plaintiff,              :
                                  :
     v.                           :        CIVIL ACTION
                                  :        NO. 05-4557
ALLEN WEINSTEIN, Archivist        :
of the United States,            :
National Archives and            :
Records Administration,          :
                                  :
          Defendant.              :

AFFIDAVIT OF JOAN M. JANSHEGO,
NARA HUMAN RESOURCES SPECIALIST

     I, Joan M. Janshego, having been duly sworn under

oath, depose and state as follows:

     1.   I am, and have been since 1985, a Human

Resources Specialist (Employee Relations) in the Human

Resources Division of the National Archives and Records

Administration ("NARA").  I work at NARA's Archives II

facility at 8601 Adelphi Road, College Park, Maryland,

which, among other things is the headquarters of NARA's

Human Resources Division.  I service, in matters that

concern employee relations, NARA's: (a) Washington

D.C./College Park, Maryland offices; (b) Presidential

GOVERNMENT
EXHIBIT
3

Libraries on a nationwide basis; and (c) Mid-Atlantic region.

2.   As a Human Resources Specialist in employee relations, I am responsible for guiding and directing managers at these facilities regarding employee performance and discipline.  On a nationwide basis, I also train managers in employee relations and provide guidance on NARA notices and guidances.  I have been responsible for employee relations in NARA's Mid-Atlantic Region, which includes the Federal Records Center in Philadelphia, since approximately 1995.

3.   From about 1995 until Darryl Murray's termination from employment in November 2004, I was the NARA Human Resources Specialist who was responsible for directing and guiding -- and I in fact directed and guided -- management at the Federal Records Center in Philadelphia on performance, discipline, and related issues concerning Darryl Murray.  I am therefore familiar with, among other things: (a) Mr. Murray's history of performance and discipline at the Federal Records Center in Philadelphia, including the bases for the decision to remove him from NARA

2

service in late 2004, a decision in which I took part;
(b) NARA guidances and policies that touch in any way upon
employee relations; (c) federal statutes and regulations
that govern disciplinary and adverse actions that NARA may
take against its employees, and related NARA policies and
procedures; and (d) the extent to which other NARA employees
in the Mid-Atlantic Region have engaged in conduct similar
to the conduct for which Mr. Murray was terminated, and
NARA's response(s) to any such conduct.

     4.   On August 17, 2004, John McEvoy, the Director
of Operations for the Federal Records Center in
Philadelphia, forwarded to me photographs of Mr. Murray's
work station.  The photographs revealed statements that were
posted on Mr. Murray's work station such as: "Worthless
Losers, Nothing Ass Employees"; "Low Self Esteem;
Inferiority Complex; Inflated Ego; Jealous/Envious";
"Federal Record Center Is Not An Equal Opportunity
Employer"; "Revenge Is A Dish Best Served Cold"; "The Beast
Is Coming After You"; "Osama Didn't Do It"; "Who Are The
Real Terrorists?"; and "Osama Totally Exonerated An Innocent
Man."  Mr. McEvoy asked me for guidance on what, if any,

disciplinary action was appropriate.  In response, I advised that, with Mr. McEvoy's concurrence, I would prepare a letter to Mr. Murray that would be signed by his supervisor and that would: (a) state that his comments created a hostile work environment that would not be tolerated; (b) order him immediately to remove the posted materials and never again to display them or anything similar in any NARA work area; (c) clarify further that he was to display no materials that make reference to race, religion, or political views or that make disparaging remarks in any way at any NARA location; and (d) advise him that, if he failed to follow such order, he would be charged with insubordination, which would form the basis for his removal from the federal service.  I prepared this letter, which was reviewed and concurred in by Mr. McEvoy and Mr. Murray's first-level supervisor, Elizabeth Washington, who signed the document.  This was sent to Mr. Murray on August 17, 2004. I attach a copy of the letter hereto as Exhibit "A."

5.  On September 16, 2004, Mr. McEvoy telephoned to advise me that he had discovered more postings at Mr. Murray's work station.  That same day, Mr. McEvoy forwarded

4

to me photographs of those postings, which revealed posted statements such as: "It's Just a Matter of Time Now -- Be Patient"; "Vote Nov. 11, 2004 Kerry"; "Beware of the Snitch Committee"; "Two-Legged Cockroaches"; and "American Gov't vs. American People (Human Race)."  The photographs also depicted documents, including the August 17, 2004 letter from Ms. Washington, and a memo from John McEvoy, on which Mr. Murray had written statements such as "None Dare Call It Conspiracy!" and "The Plot Thickens!"  I advised Mr. McEvoy that I would immediately prepare a letter, addressed to Mr. Murray, that would state: (a) that he (Mr. McEvoy) was in the process of consulting with my office about these postings, which would be the subject of an imminent letter; (b) in accordance with law, Mr. Murray would be placed on administrative leave with pay until further notice; (c) Mr. Murray should turn in his NARA badge and any federal government property in his possession; and (d) Mr. Murray should contact me, not Federal Records Center management, should he have any related questions.  I prepared the letter and sent it to Mr. McEvoy for his review and approval.  Mr.

McEvoy, on September 16, 2004, sent Mr. Murray such a
letter, a copy of which I attach as Exhibit "B" hereto.

       6.   On September 22, 2004, Mr. McEvoy telephoned
me and advised that Mr. Murray on that date, while on
administrative leave, had parked his car in front of the
Federal Records Center entrance.  According to Mr. McEvoy,
James Hughes, who was the security guard at the facility,
then asked Mr. Murray why he was at the NARA site.
According to Mr. Hughes, Mr. Murray responded: "I'm here to
blow up the place.  I'm here to see [a coworker]."  It was
further reported to me that: (a) Mr. Hughes advised Mr.
Murray to "watch what [you] say," upon which Murray stated:
"I'll bring my people up here and you know what that means";
(b) Mr. Hughes then went to get confirmation from management
that Mr. Murray was not to be present on the property;
(c) when Mr. Hughes received such confirmation and conveyed
it to Mr. Murray, Murray replied, "When I come back, I'm
blowing the place up"; and (d) Mr. Murray then left the
property.  Mr. McEvoy told me that as soon as he learned
about Mr. Murray's remarks he reported them to Federal
Protective Services of the United States Department of

Homeland Security and made arrangements for extra security at the Records Center.

7.   Between September 22 and 24, 2004, Mr. McEvoy was in frequent telephone discussions with me about how NARA should respond both to Mr. Murray's recent workplace postings and to his September 22, 2004 threatening remarks. Under my direction, guidance, and review, we agreed that NARA would immediately write to Mr. Murray and propose to remove him within 30 days from his position of Archives Aid, GS-1421-3, and from NARA altogether.

8.   Based on the information that Mr. McEvoy provided to me, I prepared a proposed removal notice that was based upon two separate instances of misconduct that adversely affected the efficiency of NARA operations. First, the proposed removal letter that I prepared was based upon Mr. Murray's insubordination in failing, by posting the materials that he posted in September 2004, to comply with the August 17, 2004 order that directed him "to display no material that makes reference to . . . political views or that makes disparaging remarks in any way" and that warned him that any such further postings would result in a charge

7

of insubordination, which would form the basis for removal. Second, the proposed removal letter that I prepared was based upon Mr. Murray's threatening remarks on September 22, 2004, which violated NARA Interim Guidance 300-19, a copy of which I attach hereto as Exhibit "C." That guidance states, in part, that: "NARA will not tolerate comments concerning weapons or bombs or other threats directed to NARA security guards -- even if the comment was intended as a joke." The guidance adds that employees who make such remarks are subject to disciplinary action, criminal penalties, or both.

9.    I included in the letter proposing Mr. Murray's removal: (a) a statement that these were not his first instances of recent misconduct but, rather, that he had in fact been suspended for three days in August 2003 for neglect of duty and for inaccurately reporting completed work and carelessness; and (b) a statement that Murray was to contact me if he had questions or concerns about his rights relating to the proposed removal.

10.    I sent the proposed removal letter to Mr. McEvoy for his review and full approval. Mr. McEvoy, on

8

September 24, 2004, sent Mr. Murray such a letter, a copy of which I attach as Exhibit "D" hereto.

11.  The letter proposing Mr. Murray's removal invited Mr. Murray to make a written reply and advised him that he could designate an attorney or other representative. The only reply that Mr. Murray made was by way of October 21, 2004 letter from his union representative, James Cassedy, to Mr. David Roland, Assistant Regional Administrator for NARA's Mid-Atlantic Region and the deciding official, a copy of which I attach as Exhibit "E" hereto.  Mr. Roland promptly shared Mr. Cassedy's letter with me.  Mr. Roland gave it full consideration in consultation with me.

12.  In his letter, Mr. Cassedy referred Mr. Roland to NARA Interim Guidance 94-167, which states that "private offices may be decorated to reflect the occupant's personality."  That guidance expressly applied and applies, however, only to the Archives II facility in College Park, Maryland, where I work, and not to the Federal Records Center in Philadelphia.  I advised Mr. Roland that I would

explain this in the final decision letter that I would prepare for Mr. Roland's signature.

13.  I also advised Mr. Roland that the final decision letter that I would prepare would emphasize to Mr. Murray: (a) the consequential and qualitative difference between mere workspace decorations, on the one hand, and the posting of materials with objectionable messages after an employee has been ordered specifically not to post them, on the other hand; and (b) that Mr. Murray was not being disciplined for his August 17, 2004 postings (because he had removed them as ordered) but for his insubordination in failing to follow the August 17, 2004 order when in September 2004 he posted additional materials with political and disparaging content.

14.  After reviewing Mr. Cassedy's October 21, 2004 response letter, Mr. Roland and I were of the view that Mr. Murray, in September 2004, had posted political and disparaging comments that were in direct violation of the August 17, 2004 order prohibiting the posting of such content.  Mr. Cassedy did not suggest that the "Vote Nov. 11 2004 Kerry" posting was apolitical.  He conceded, moreover,

10

that the posted "two legged cockroach" comment referred to
Mr. Murray's colleague and was Mr. Murray's "humorous
attempt at revenge."  Mr. Cassedy added that the posted
comments "None Dare Call It Conspiracy," "The Plot
Thickens," and "Separate and Unequal" were Mr. Murray's
"protest of working conditions at the NARA facility."  I
therefore viewed those comments as disparaging of the NARA
workplace and in violation of the August 17 order and so
informed Mr. Roland.

        15.  Further, after reviewing Mr. Cassedy's letter,
Mr. Roland and I were of the view that Mr. Murray, on
September 22, 2004, had made threatening remarks directed at
the Federal Records Center and/or employees of that
facility.  In fact, Mr. Cassedy did not suggest that Mr.
Murray had not referred to "blowing up the place" but,
rather, only that such a reference "was at worse . . . a
bad, off hand attempt at humor."  Also, Mr. Cassedy admits
that Mr. Murray stated that "somebody ought to blow this
place up" during a moment when he was "shocked, humiliated
and angry."  Based on all of the known circumstances, I
advised Mr. Roland, as the deciding official, that the final

11

decision letter should state that Mr. Murray's stated
defense to the charge of threatening remarks was
unacceptable because, among other things, the stated
remarks, even if intended as a joke, were in violation of
NARA Interim Guidance 300-19 and were of serious concern.

16.  In determining appropriate disciplinary and
adverse actions against NARA employees, my office strives to
adhere to, and to guide managers on: (a) NARA directives on
the requirements and procedures for taking such actions; and
(b) the related NARA penalty guide.  These NARA directives
and penalty guide are found in NARA Interim Guidance 300-1,
Personnel 300, Chapter 752, and Appendix 752A, which I
attach hereto as Exhibit "F."  My understanding is that
these are authorized by federal statute and federal
regulations.

17.  In addressing Mr. Murray's August and
September 2004 conduct, I advised Mr. Roland as to the
appropriate response based upon those directives and that
penalty guide.  In fact, directives in this Interim Guidance
-- Chapter 752, Part 3, Paragraphs 2.52 and 2.54 --
expressly require a proposing official such as Mr. McEvoy

12

and a deciding official such as Mr. Roland to "obtain advice and assistance from [my office]" in order "to ensure that" a notice proposing removal from federal service and a final decision notice of removal from federal service "meet[] the procedural and other requirements for taking" such actions. My normal procedure is, while in discussions with the manager(s), to advise a course of action, to prepare the notices, and to send them to management for suggested changes and/or concurrence.

18.  In providing such direction to Mr. McEvoy and Mr. Roland, I relied in part upon NARA Interim Guidance 300-1, Personnel 300, Chapter 752, Part 1, Paragraph 6, which provides that "disciplinary and adverse actions require careful consideration but when the circumstances call for such action, it should be taken promptly."

19.  Under NARA Interim Guidance 300-1, Personnel 300, Chapter 752, Part 3, Paragraph 30a, the deciding official is directed to ensure that final decision notices proposing an employee's removal from NARA service "[c]onsider only the reasons specified in the proposed notice, the employee's answer, and the relevant mitigating

13

factors in making a decision." Accordingly, I guided Mr.
Roland in limiting his final decision to the charges of
insubordination and making a threatening remark that formed
the basis for Mr. McEvoy's notice proposing Mr. Murray's
removal. I also guided Mr. Roland in assessing any
mitigating factors, at which time he could consider other
factors not listed in the notice of proposed removal letter.

     20. In determining an appropriate penalty for Mr.
Murray's offenses, I advised Mr. Roland that he should rely
upon the NARA penalty guide, which is Appendix 752A to NARA
Interim Guidance 300-1, Personnel 300. Specifically, I
relied upon the penalties for listed offenses number 5 and
number 7b. Listed offense number 5 is "Insubordination:
direct or indirect refusal to comply with instructions
issued by a supervisor; disrespect, insolence, and similar
behavior." This corresponds to the first offense that was
stated in the notice of proposed removal and in the notice
of final decision that Mr. Murray received. The penalty
guide states the penalty range for a first such offense is
"official reprimand to removal," and the penalty range for a
second such offense is "suspension to removal."

14

21.   Listed offense number 7b in the Penalty Guide is "Disorderly Conduct: Fighting, or threatening, attempting to inflict, or inflicting bodily injury on another person." This corresponds to the second offense -- making threatening remarks  -- that was stated in the notice of proposed removal and in the notice of final decision that Mr. Murray received.  My office viewed this "offense category" 7b in the light of NARA Interim Guidance 300-19 ("Violence in the Workplace"), which states that NARA takes seriously all threatened and actual incidents of violence, whether oral or physical conduct, and I so advised Mr. Roland.  Because of the uniquely serious nature of Mr. Murray's conduct in making threatening remarks, I and my office, in determining the penalty for those remarks, were also mindful of NARA Interim Guidance 300-1, Personnel 300, Chapter 752, Part 1, Paragraph 8a, which states that:

> Managers are not required to fit a
> specific instance of misconduct into one
> of the stated offenses.  If the actual
> offense is not specifically listed, the
> employee should be charged with the
> actual offense.  Penalties for offenses
> not listed should be consistent with the
> penalties listed for offenses of
> comparable seriousness.

15

The penalty listed in the penalty guide for a first offense
of offense number 7b is "official reprimand to removal," and
for a second such offense is "removal."  I advised Mr.
Roland that these penalties corresponded to Mr. Murray's
threatening remark offense.

22.  I therefore advised Mr. Roland that, even
viewing the offenses individually rather than together, the
penalty guide authorized the agency to remove Mr. Murray
from service.  Although even first such offenses would alone
have been a basis for Mr. Murray's removal, I determined, in
consultation with Mr. Roland, that Mr. Murray's offenses
were in fact second offenses because he had been suspended
for 3 days in August 2003 for neglect of duty and for
inaccurately reporting completed work and carelessness.  (I
attach as exhibit "G" hereto the July 30, 2003 notice
proposing Murray's suspension and the August 14, 2003 notice
of suspension.)  I advised Mr. Roland that, when he
considered the appropriate penalty for Mr. Murray's
misconduct, he (Roland) should not consider Murray's 14-day
suspension in 1996 as a prior offense because it occurred
too long in the past.

16

23.  I advised Mr. Roland that he should, however, rather than viewing Mr. Murray's insubordination offense and threatening remark offense individually, view the offenses together and give weight to the seriousness of the offenses. In doing so, I advised Mr. Roland that such consideration would be based in part upon NARA Interim Guidance 300-1, Personnel 300, Chapter 752, Part 1, Paragraph 8c of that Part, which provides that:

> The penalty should take into account the number of offenses, the nature of each offense and the extent to which the offenses indicate a pattern of unacceptable conduct.  When two or more unrelated offenses occur at the same time, a greater penalty than would be imposed for a first offense is normally appropriate.  If an act of misconduct is unrelated to a previous act or acts of misconduct, the penalty falls under the second or third offense, as appropriate.

With the offenses so viewed, I advised Mr. Roland, and he agreed, that removal from federal service was the appropriate penalty for Mr. Murray.

24.  In making that determination, I advised Mr. Roland that he should assess the appropriateness of Mr. Murray's removal from NARA under the non-exhaustive list of sanctions considerations that have been established by the

17

Merit Systems Protections Board and that were first
articulated in Douglas v. Veterans Administration, 5
M.S.P.R. 313 (1981) ("Douglas").  For example, regarding the
first Douglas factor ("the nature and seriousness of the
offense . . . including whether the offense was intentional
. . . or was frequently repeated"), Mr. Roland should (I
advised him) take into account, with regard to Mr. Murray's
insubordination offense, that Mr. Cassedy's letter indicated
that the September 2004 postings, which violated Murray's
supervisor's August 17, 2004 order, were not inadvertent but
intentional.  Mr. Cassedy specifically stated not that Mr.
Murray did not believe that his postings violated the August
17 order but, instead, that he considered such postings to
be justified as a form of protest.  Mr. Roland should (I
further advised) take notice and consider that Mr. Murray
had, in 1996, been counseled to stop displaying
objectionable materials in the workplace and had, in April
1996, signed a Memorandum of Agreement with the Agency (a
copy of which is attached hereto as Exhibit "H") in which he
agreed that he would not post or distribute any
objectionable material in the workplace.

18

25.  With regard to the fifth <u>Douglas</u> factor ("the consistency of the penalty with those imposed upon other employees for the same or similar offenses"), I advised Mr. Roland that NARA had previously removed employees who were charged, as a first offense, with insubordination or with making threatening remarks.  Specifically, NARA removed one employee in the Mid-Atlantic Region in December 2003 for making a threatening remark in the workplace and lying during the course of an administrative investigation.  Those were the employee's first offenses.  In February 2002, NARA decided to remove another employee at headquarters in College Park, Maryland for threatening a NARA building security guard.  It was the first offense for that employee, who then resigned before the removal went into effect.  In December 1989, NARA removed another College Park employee from service based on a first-offense charge of insubordination for failing to follow an order to turn in work to his supervisor.  None of these employees stated that he/she was Muslim; none of them was known by NARA to be Muslim.  In addition to advising Mr. Roland about these earlier agency actions, I informed him that no single NARA

19

employee had, until Mr. Murray, been charged with both the offense of making a threatening remark and insubordination.

26. With regard to the twelfth Douglas factor ("The employee's past work record"), I advised Mr. Roland that he should take into account Mr. Murray's checkered job performance history, including the fact that in 1998 and again in 2003 he was denied a Within Grade Increase ("WGI") to his pay because of minimally satisfactory work performance.

27. With my guidance, direction, and assistance, and in accordance with them, Mr. Roland, as the deciding official, then sent to Mr. Murray, on November 9, 2004, the agency's final decision notice. That notice responded to Mr. Cassedy's letter, found that the charges of insubordination and making threatening remarks were supported by a preponderance of the evidence, sustained those charges, took into consideration the Douglas factors, and concluded that Mr. Murray should and would be removed from his position on or about November 16, 2004. A copy of Mr. Roland's final decision letter is attached hereto as Exhibit "I."

20

28.  All of the NARA employment decisions regarding Mr. Murray and leading up to and including his removal from federal service in November 2004 were, in accordance with NARA policy and procedures, made in full consultation with, direction from, and the concurrence of my office and me.  I remain of the view that all such decisions were consistent with all applicable NARA policies and procedures.


_____
JOAN M. JANSHEGO


Subscribed and sworn
before me on this 28th  day
of December, 2006

_____
NOTARY PUBLIC


CONSTANCE M. BROWN
NOTARY PUBLIC
County of Anne Arundel
State of Maryland
My Commission Expires 7/1/07

21



# *National Archives and Records Administration*

MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-102
*www.archives.gov*

August 17, 2004

Mr. Darryl Murray
National Archives and Records Administration
Mid Atlantic Region Northeast (Philadelphia)
14700 Townsend Road
Philadelphia, PA  19154

Dear Mr. Murray:

You are currently displaying posters and other written material
in your work area that are offensive to coworkers, the security
force and management.   These include an article entitled "The
Governments Assault on the Black Family" and postings such as:

  "Who are the real Terrorists?  "Osama Totally Exonerated An
Innocent Man,"

 "This center is a non-equal opportunity employer"

  "Worthless losers, nothing ass employees"

This creates a hostile work environment and will not be
tolerated.

This is not the first time that you have engaged in this type of
behavior.  In the past, you have been counseled about scrawling
offensive graffiti on a box that was delivered to the Social
Security Administration who called the Federal Protective Service
to conduct an investigation.

You are ordered to immediately remove (no later than 2:30 p.m.
today) all of these materials from your work area and to never
display them or anything similar in any work area at the National
Archives.  To be clear, you are to display no materials that make
reference to race, religion, political views or that make
disparaging remarks in any way at any location at the National
Archives.

If you fail to follow this order, you will be charged with
insubordination, which will form the basis for removal from the
federal service.

Sincerely,

ELIZABETH M. WASHINGTON
Supervisor, Archives Specialist

GOVERNMENT
EXHIBIT
3-A

cc:  J. McEvoy
     NHH
     file

8-17-04
Darryl Murray

 *National Archives and Records Administration*

MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-10
*www.archives.gov*

September 16, 2004

Mr. Darryl Murray
112 W. Champlost Avenue
Philadelphia, PA 19120

Dear Mr. Murray:

We are consulting with Human Resources Services Division concerning recent misconduct on your part. You will soon be issued a letter concerning this matter.

In accordance with 5 CFR752.604(4), you will be on administrative leave until further notice. This means that you will be paid your regular salary under further notice. At this time, you should turn in your NARA personal identification badge and any Federal Government property you have in your possession.

In order to remain in a paid status, you are ordered to call me every Wednesday at 10:00 a.m. If I am not available when you call, you must leave a telephone number where you can be reached and I will return the call provided there is information that needs to be communicated to you.

If you have any questions about this letter, you may contact Joan Janshego, Human Resources Specialist (Employee Relations) at 301-837-1844.

Sincerely,

JOHN MCEVOY
Director, Record Center Operations
Mid Atlantic Region

_____

Darryl Murray                                   9-16-04
                                                 Date

My signature above acknowledges receipt of this letter.

GOVERNMENT
EXHIBIT
3-B

OFFICE OF REGIONAL RECORDS SERVICES

# NARA@work

Wednesday, August 9, 2006
www.nara-at-work.gov

## INTERIM GUIDANCE 300-19
September 13, 2002

**SUBJECT**: Violence in the Workplace

**TO**: All employees

### 1. What is the purpose of this directive?
This directive provides guidance to employees and supervisors on addressing and avoiding violence in the workplace.

### 2. What is the authority for this directive?
5 U.S.C., Ch. 75; and 5 CFR Part 752

### 3. What is NARA's goal as it relates to possible violence in the workplace?
NARA's goal is to promote a safe environment - one that is free from violence, threats of violence, harassment, intimidation, and other disruptive behavior. Our employees, contractors, and customers have the right to perform their jobs or use our resources without fear of harm. NARA has zero tolerance for violence in the workplace.

### 4. Why is a policy necessary for violence in the workplace?
It is important to communicate that NARA will not tolerate violence in the workplace. Although we are fortunate that violent behavior is rare at NARA, workplace violence or disruptive behavior at one time or another can affect every agency.

### 5. What kind of behavior is covered by this policy?
This policy covers both threats and physical contact. Threats include threatening to inflict bodily injury, harassment, intimidation, and other disruptive behavior. Such behavior can include oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm. Physical contact includes fighting or attempting to inflict, or inflicting bodily injury to another person. NARA does not tolerate violent behavior in the workplace, whether it is a threat or physical contact.

### 6. What action can be taken against an employee who makes threats or behaves violently in the workplace?
NARA takes seriously and deals appropriately with all incidents of violence, whether the incidents are verbal threats or physical contact. Individuals who make threatening statements or commit violent acts may be removed from the premises and may be subject to disciplinary action, criminal penalties, or both.

### 7. How does NARA assist employees in resolving personal or work-related

GOVERNMENT
EXHIBIT
3-C

**problems?**

NARA is committed to assisting employees in resolving personal or work-related problems that could adversely affect the employee's conduct or performance. Employees who wish to discuss problems with a trained counselor are encouraged to contact NARA's Employee Assistance Program (EAP) at 1-800-222-0364. Employees may also contact RESOLVE, NARA's Alternative Dispute Resolution Program, at 301-837-1750.

**8. How can employees help to maintain a safe environment?**

We need everyone's cooperation in maintaining a safe environment at NARA. Do not ignore threatening, harassing, intimidating, or other disruptive behavior. If you see such behavior on NARA premises, whether or not it involves a NARA employee, report it immediately to a supervisor or to local security, as appropriate.

**9. Where can supervisors get assistance with workplace violence situations?**

Supervisors should seek advice from the Employee Relations and Benefits Branch (NHHR) when they become aware of violent behavior or situations. Report threats or assaults that require immediate attention to local security or police forces.

**10. Are comments made to security guards concerning weapons or bombs or threatening the guards ever appropriate in the NARA workplace?**

NARA security personnel have the serious responsibility of ensuring the safety of NARA personnel and property. NARA does not tolerate comments concerning weapons or bombs or other threats directed to NARA security guards - even if the comment was intended as a joke. Employees who make such remarks are subject to the actions described in par. 6.

**11. Whom can I contact for more information?**

For questions about this interim guidance, contact Joan Janshego (NHHR) in room 1200; All; on 301-837-1844; or by email.


JOHN W. CARLIN

Archivist of the United States

---

Page URL: http://www.nara-at-work.gov/nara_policies_and_guidance/directives/0300_series/300_19.html

---

The U.S. National Archives and Records Administration

8601 Adelphi Road, College Park, MD 20740-6001 • Telephone: 1-86-NARA-NARA or 1-866-272-6272



*National Archives and Records Administration*

MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-1025
*www.archives.gov*

September 24, 2004

SENT VIA FEDERAL EXPRESS AND FIRST CLASS MAIL

Mr. Darryl Murray
112 W. Champlost Avenue
Philadelphia, PA  19120

Dear Mr. Murray:

This is notice that, to promote the efficiency of the Service, I propose to remove you from your position of Archives Aid, GS-1421-3, and the National Archives & Records Administration no earlier than 30 calendar days from your receipt of this letter for the reasons stated below.

INSTANCE OF MISCONDUCT:  Insubordination

On August 17, 2004, I had a complaint from a coworker that you were exhibiting offensive posters and other written material at your work station. These include an article entitled "The Governments Assault on the Black Family" and postings such as :

"Who are the real Terrorists?  "Osama Totally Exonerated An Innocent Man."

"This center is a non-equal opportunity employer"

"Worthless losers nothing ass employees."

GOVERNMENT
EXHIBIT
3 — D

I informed your first-line supervisor, Elizabeth Washington, about this unacceptable situation.  She issued you a letter on August 17, 2004, which put you on notice that these materials create a hostile work environment and will not be tolerated.  The letter of August 17, 2004 specifically said:

"This is not the first time that you have engaged in this type of behavior.  In the past, you have been counseled about scrawling offensive graffiti on a box that was delivered to the Social Security Administration who called the Federal Protective Service to conduct an

ROI 000273

14

investigation.

You are ordered to immediately remove (no later than 2:30 pm today) all of these materials from your work area and *to never display them or anything similar in any work area at the National Archives. To be clear, you are to display no materials that make reference to race religion, political views or that make disparaging remarks in any way at any location at the National Archives.* [emphasis added].

*If you fail to follow this order, you will be charged with insubordination, which will form the basis for removal from the federal service.* [emphasis added].

You complied with the order to remove the offensive material on August 17, 2004.

However, on a walk-through of the Record Center on September 16, 2004, I passed your work station and found that you had again posted various documents on your bulletin board and wrote unacceptable remarks on the documents or on tape around these documents. These included statements such as :

"It's Just a Matter of Time Now. Be Patient."

"Vote Nov. 11, 2004 Kerry "

"Beware of the Snitch Committee"

"Two-Legged Cockroaches"

American Government vs. American People (Human Race)

"Separate and Unequal"

"None Dare Call it Conspiracy"

"The Plot Thickens!"

ROI000274

You failed to comply with the order of Ms. Washington of August 17, 2004 in which you were told that "you are to display no materials that make reference to race, religion, political views or that make disparaging remarks in any way at any location at the National Archives." You were clearly told in the letter that if you failed to follow this order, you would be charged with insubordination, which would form the basis for removal.

You are charged with insubordination on September 16, 2004 for failure to follow this order.

## INSTANCE OF MISCONDUCT: Making Threatening Remarks

By letter of September 16, 2004, you were informed that management was consulting with Human Resources Services Division concerning misconduct on your part and that you would be on administrative leave until further notice.

On September 22, 2004, you came to the Record Center and attempted to enter the facility. The Security Guard, James Hughes, was aware that you were not permitted in the building and asked you why you were there. You stated, "I'm here to blow up the place. I'm here to see Skip."

Mr. Hughes told you to "watch what [you] say." You then said, "I'll bring my people up here and you know what that means." Mr. Hughes went to Dan Bedesem, Supervisor Archives Specialist, to get confirmation that you were not permitted to be on the property. When he got confirmation from Mr. Bedesem, he informed you that you must leave, and you did so. However, before going you said "When I come back, "I'm blowing the place up"

Your threatening remarks were so disturbing that management called the Federal Protective Service, put on an extra guard at the facility and mandated that no one can stay at the facility beyond 4:30 p.m.

NARA Interim Guidance 300-19 clearly states that NARA will not tolerate violence in the workplace, including threats. The guidance further specifically states that "NARA does not tolerate comments concerning weapons or bombs or other threats directed to NARA security guards – even if the comment was intended as a joke" and that employees who make such remarks are subject to disciplinary action, criminal penalties, or both.

You are charged with making threatening remarks on September 22, 2004.

The above described instances of misconduct will not be tolerated because they adversely affects the efficiency of the Federal service.

Moreover, this is not your first instance of misconduct. You were suspended for three days in August 2003 for neglect of duty and inaccurately reporting completed work and carelessness.

Within 15 calendar days of your receipt of this notice, you may reply in writing, in person or both to David Roland, Assistant Regional Administrator, National Archives and Records Administration, Mid Atlantic Region Northeast (Philadelphia), 14700 Townsend Road, Philadelphia, PA 19154 (telephone 215-305-2003) setting forth any pertinent facts or extenuating circumstances or other information you desire to submit. You may also submit affidavits in support of your reply and may be represented by an attorney or other representative. In addition, you may designate a Union representative in this matter.

The documents on file supporting this proposal will be sent to you under separate cover by NARA's Human Resources Services Division.

If you do not understand your rights concerning this proposed removal, you may contact Joan Janshego, NARA Human Resources Services Division on 301-837-1844.

Your reply will be given full consideration before a final decision is made.

You will remain in paid status until further notice. You should call me every Wednesday at 10:00 am in order to remain in paid status.

Sincerely,

JOHN McEVOY
Director, Record Center Operations
Mid Atlantic Region

American Federation of Government Employees
Council 260

October 21, 2004

Mr. David Roland
Assistant Regional Administrator
National Archives and Records Administration
Mid-Atlantic Region Northeast (Philadelphia)
14700 Townsend Road
Philadelphia, PA 19154

Dear Mr. Roland:

My name is James Cassedy; I am a Representative with the American Federation of Government
Employees Council 260 (AFGE 260). As we previously discussed, AFGE 260 has been asked by Mr.
Darryl Murray to represent him, and present a response to the proposal to remove him from his position of
Archives Aid, GS-1421-3, as proposed by Mr. John McEvoy, Director, Records Center Operations, on
September 24, 2004.  Thank you for extending the opportunity to respond to the proposal to remove Mr.
Murray.

Mr. Darryl Murray has been employed with the National Archives and Records Administration (NARA)
for 17 years.  This long term experience has earned him the respect of most of his colleagues.  He is known
as a knowledgeable worker.  He is also known as a person with strong opinions.  Mr. Murray's opinions are
not a threat, however, to his colleagues at NARA's Mid-Atlantic Region Philadelphia facility.  The
proposed removal of Mr. Murray not only adversely affects the efficiency of the service of the Federal
Government, but is also an injustice, and, if implemented, will reflect badly on NARA.

On August 17, 2004, Mr. Murray received a letter from Ms. Elizabeth Washington which stated that certain
signs that Mr. Murray had hung around his desk were offensive.  Mr. Murray maintains that these signs and
postings were decorations reflective of his personal religious and political beliefs.  NARA Interim
Guidance 94-167, dated February 16, 1994, and still in effect, clearly states, "Private Offices may be
decorated to reflect the occupants' personality."

Other colleagues of Mr. Murray in the Philadelphia office also decorate their work spaces to reflect their
personality. These decorations may include prayers to help one get through the day, or "Wanted Dead or
Alive" posters of Osama Bin Laden. These decorations may fact reflect, religious or political beliefs.

Mr. Murray is a follower of the Nation of Islam, which believes that the Federal Government is raging war
against the "black family." Mr. Murray believes that the movie Fahrenheit 9-11 supports the supposition
that Osama Bin Laden is not guilty of heinous crimes of which he is accused.  Mr. Murray hung these
materials to decorate his office to reflect his personal beliefs, or personality.  If Mr. Murray believed that
NARA is not an equal opportunity employer, or that NARA employees are treated as worthless losers, than
it seemed to Murray that he could decorate his personal workspace to reflect his beliefs, in accordance to
NARA interim Guidance 94-167.  He did not hang these items to threaten, but to express personal beliefs,
and perhaps generate discussion, and even to serve as a catalyst to change.

Nevertheless, at Ms. Washington's written request, dated August 17, 2004, he removed the decorations on
that very day.  Mr. Murray believed that the reason he was asked to remove his signs was because someone
found them to be politically and religiously offensive.



GOVERNMENT
EXHIBIT
3-E

On September 16, 2004, Mr. Murray was found to have hung other signs as decorations. These signs were not expressive of Mr. Warren's political views or religious beliefs, as were the previous posters which were taken down on August 17, 2004. They were of a more personal nature.

Mr. Murray was having a conflict with a fellow employee, who he believes was playing practical jokes on him. The sign, "Two legged cockroach," refers to this employee. Mr. Murray acknowledges that this attempt at humorous revenge was not an appropriate way to handle this conflict.

Mr. Murray hung other official issuances from NARA managerial staff, as well as personal letters he received from management, and labeled them with statements that indicated his feelings about NARA workplace conditions. For instance, one item governing workplace rules was hung with the rubric, "None Dare Call it Conspiracy." The letter he received from Ms. Washington on August 17, 2004, asking that Mr. Murray remove his original decorations, which he believed that he had a right to put up, was labeled, "The Plot Thickens!" A third document which discusses African Americans and voting rights was labeled, "separate and unequal."

All of these decorative protest signs were placed at Mr. Murray's work place. None were placed in areas that could be accessed by the public. All of these signs/decorations could be ignored (and were ignored) by colleagues who did not agree with his viewpoints.

All three of these documents, printed with a protest message, were Mr. Murray's non-violent protest of working conditions at the NARA Mid-Atlantic Record Center Operations in Philadelphia, PA. As a result of these non-violent protest signs, Mr. Murray was placed on administrative leave until further notice.

It here should be noted that during a telephone conversation on October 20, 2004, Ms. Elizabeth Washington, the immediate supervisor of Mr. Murray, stated that she had never felt threatened by Mr. Murray. Ms. Washington noted that she had had conversations with Mr. Murray, whom she had known for seven years, and supervised for one and a half years, concerning his job performance. Although Ms. Washington was occasionally critical of Mr. Murray's job performance, the discussions that she had with Mr. Murray when these criticisms were raised were always a "reasonable discussion." There was never a "yelling match," and nobody raised their voice. These statements were made in the presence of Mr. John McEvoy, Director of Records Center Operations.

Mr. Murray was given a letter dated September 16, 2004, which he acknowledged receiving by his signature on that date. The letter states that, "(i) n accordance with 5 CFR 752.604(4), you will be on administrative leave until further notice. This means that you will be paid on your regular salary under further notice. At this time, you should turn in your NARA personal identification badge and any Federal Government property you have in your possession." The letter also states that, "in order to remain in a paid status, you are ordered to call me (Mr. John McEvoy) every Wednesday at 10:00 am."

After his suspension on September 16, 2004, Mr. Murray took a friend to the doctor on September 22, 2004. While waiting, Murray checked his voice mail, and received a message from Mr. Warren Hammond, a friend and colleague at the Records Center, who was trying to get in touch with him. Mr. Murray phoned the Records Center, and asked the receptionist, Ms. Vanessa Adams, to page Mr. Hammond, and to have Mr. Hammond meet him in the parking lot. Mr. Murray then drove to the Philadelphia Records Center parking lot, and remained in his car while he waited for Mr. Hammond. It should be noted that Mr. Murray did have the young daughter of his friend, whom he had taken to the doctor, in the car.

According to Mr. Murray, he saw several of his friends and colleagues from his car, as it was around lunchtime. He also spoke with Ms. Irene Johnson, who approached the car driven by Murray, and spoke to him, and also to see the young daughter. At no time did Mr. Murray leave the car's vicinity while waiting for Mr. Hammond.

According to Mr. Murray, Security Officer (S/O) James Hughes emerged from the building and approached the car. In a written statement dated September 22, 2004, S/O James Hughes, states that at 11:04 am, "I,

(S/O Hughes) knowing he (Murray) wasn't allowed in the building asked why he was here. He stated, "I'm here to blow up the place, I' m here to see Skip (sic)."

It seems fairly evident that Mr. Murray intended only to speak with his friend, Mr. Hammond (aka Skip). Any reference he made to "blow up the place" was at worse a bad, off hand, attempt at humor.

S/O Hughes then notes, "I told Darryl to watch what he say and he laughed.  Darryl further went to say, "I'm bringing my people up here and you know what that means (sic)."

Again, Mr. Murray is laughing.  This is not meant as a serious threat, but probably humorous posturing. Mr. Murray, again, at worse, makes a bad, off hand attempt at humor.

S/O Hughes states that he then returned to the Record Center building, and raised the issue of Mr. Murray's presence with Mr. Dan Bedesem.  Mr. Bedesem informed S/O Hughes that Mr. Murray was not permitted on Federal Record Center Property.  S/O Hughes then states he, "went back outside and informed Darryl to leave which he did but not before saying, 'when I come back I'm blowing the place up' (sic)."

Mr. Murray maintains that S/O Hughes told him something to the effect that he had to go, that Record Centers officials did not want him in the property or the premises.  Mr. Murray admits that he was shocked and angered, and may have uttered an obscenity, and made the statement, "somebody ought to blow this place up."  Mr. Murray denies stating that *he* would come back and blow the place up.

By turning in his badge and Federal property, the letter dated September 16, 2004, from Mr. McEvoy to Mr. Murray, implies that Mr. Murray was not permitted to enter the building.  As noted by Security Officer James Hughes, however, Mr. Murray did not try to access the building.  He remained in his car, in the parking lot.  Mr. Murray wished to make a quick visit with a friend in the parking lot.  He did not think that the letter of September 16 precluded this quick visit.  When he was informed that it did, both Mr. Murray and S/O Hughes agree that Murray immediately left the Records Center.

Unfortunately, Mr. McEvoy's letter of September 16, 2004, is unclear for another reason.  The Code of Federal Regulations citation, 5 CFR 752.604 (4), is part of Regulatory Requirements for Taking Adverse Actions Under the Senior Executive Service (CFR 5 Parts 700 to 1199, Administrative Personnel, 2004).  It does not apply to Mr. Murray, GS-1421-3.  When adverse action is taken against employees, it is important that the letter of the law is studiously followed, and properly cited.

Mr. Murray wanted to see a friend, Mr. Hammond, who had requested Mr. Murray speak to him.  Mr. Murray called the receptionist, Ms. Vanessa Adams, and asked Mr. Hammond to meet Murray in the parking lot.  Mr. Murray had no intention of entering the building.  Mr. Murray was in front of friends and colleagues, with his friend's young daughter in the car, when S/O Hughes told him he had to leave the property.  Mr. Murray was shocked, humiliated, and angry.  He made a statement that should not have been made.

Mr. Murray deeply regrets the inappropriate use of language.  In the present climate of high security at Federal centers, he acknowledges that the inappropriate use of language can have an alarming effect. But Mr. Murray never had the intent, or the means, to inflict personal injury, or to damage or destroy Federal Government property.  Nor, as testified to by Ms. Washington, did Mr. Murray ever pose a physical threat to individuals in the Records Center.

5 CFR 752.403 states that an agency may take an adverse action only when such action promotes the efficiency of the service.  Removal of Mr. Darryl Murray, a 17 year employee of the National Archives, with substantial knowledge Philadelphia Records Center procedures, does not promote the efficiency of the service.  His actions do not merit dismissal. Adverse actions that merit legal appeal may not be supported in venues beyond NARA, and may disrupt the efficiency of the service provided by NARA.

NARA Interim Guidance 300-19, <u>Violence in the Workplace</u>, included in the removal letter package, does cite alternatives to dismissal, including the Employee Assistance Program (EAP), the Alternative Dispute Resolution (ADR) procedure, and other disciplinary actions short of dismissal.

Mr. Murray desires to meet with Ms. Washington, Mr. McEvoy, and you, to apologize, to make amends, and to move beyond the disagreements and misunderstandings of the past few months.  We also hope that you will consider alternative means to resolve this unfortunate situation.  We are more than happy to meet with you.

Sincerely,


Jim Cassedy
Representative
AFGE Council 260
301-837-1584

cc:  Peter Themelis, NHHR; Joan Janshego, NHHR; Mitchell Buffone, NRBPC; Darryl Murray, Philadelphia, PA.

000150

GOVERNMENT
EXHIBIT
3-F
PENGAD-Bayonne, N. J.

... - PERSONNEL 300, Chapter 752

Home   NARA Policies & Guidance   Directives   PERSONNEL 300, Chapter 752

| Staff Resources & Services | Supervisor Resources | NARA Policies & Guidance | Archives & Records Management | Safety, Security & Emergency | NARA Organizations | Procurement, Budget & Finance | Project Information | Information Technology | Strategic Planning & Reporting |
|---|---|---|---|---|---|---|---|---|---|

Feedback   Archives.gov   Firstgov.gov

What's New   FAQs   Site Map   Print this Page

**Directives**

| 100 - Mission and Organization |
| 200 - General Administration |
| 300 - Human Resources |
| 400 - Budget and Accounting |
| 500 - Procurement (Acquisition) |
| 600 - Travel |
| 700 - Transportation |
| 800 - Information Management |
| 900 - Congressional and Legislative |
| 1100 - Legal, Ethics, and Professional Conduct |
| 1200 - Audits and Investigations |
| 1300 - Records Lifecycle (general) |
| 1400 - Front End |
| 1500 - Archival |
| 1600 - Access |

**PERSONNEL 300**

**Chapter 752**

Interim guidances relating to this chapter: 300-1and 300-14.

## Chapter 752. Disciplinary and Adverse Actions

PART 1. GENERAL

- Authority
- Purpose
- Applicability
- Definitions
- Cause for action
- Timing of the action
- Inquiry to determine the facts
- Penalty Guide
- Reserved

PART 2. DISCIPLINARY ACTIONS

- Letters of warning
- Letters of reprimand
- Procedures for issuing letters
- Contents of letter
- Reserved

- Text Size +

000151

NARA@WORK - PERSONNEL 300, Chapter 752

2005

**Search NARA Directives:**

search
Help
Advanced Search

**Page Options**

Print this Page

Email this Page

Find Text on this Page

Provide Feedback on this Page

Add Page to Favorites

**Site Search**

Go

◉ Entire Site ○ This Section

Advanced Search

**Employee Locator**

Go

Advanced Locator



## PART 3. ADVERSE ACTIONS

### SECTION 1. SUSPENSION FOR 14 DAYS OR LESS

- Coverage
- Cause of action
- Proposing official
- Deciding official
- Advance written notice
- Employee's answer
- Representation rights
- Clearance with NHHR
- Contents of notice
- Final decision notice
- Agency records
- Appeal
- Reserved

### SECTION 2. REMOVAL, SUSPENSION FOR MORE THAN 14 DAYS, REDUCTION IN GRADE OR PAY, OR FURLOUGH FOR 30 DAYS OR LESS

- Coverage
- Cause of action
- Proposing official
- Deciding official
- Advance written notice
- Employee status during notice period
- Exceptions to the 30-day advance written notice
- Employee's answer
- Representation rights
- Removal and termination of temporary employees
- Termination of excepted service intermittents for unavailability
- Clearance with NHHR
- Contents of notice
- Final decision notice
- Agency records

- Appeal
- Reserved

APPENDIX 752A. PENALTY GUIDE

## PART 1. GENERAL

### 1. Authority.

a. Subchs. I and II of ch. 75, title 5, United States Code (U.S.C.).

b. Part 752, title 5, Code of Federal Regulations (CFR).

### 2. Purpose.
This chapter describes the requirements and procedures for taking disciplinary and adverse actions and the rights of employees against whom such actions are taken.

### 3. Applicability.

a. This chapter applies to bargaining unit and nonbargaining unit employees of the National Archives and Records Administration (NARA). For bargaining unit employees, the applicable labor-management agreement may contain additional procedures.

b. This chapter applies to all employees as defined in subpars. 4d and 4i but does not apply to: an employee whose appointment is made by and with the advice and consent of the Senate, a Senior Executive Service (SES) member, or an employee in a position excepted under Schedule C.

c. Although all excepted service employees identified in subpars. 4d and 4i are administratively covered by this chapter, only preference eligibles in the excepted service who have completed one year of current continuous service in the same or similar positions and certain employees who occupy positions under Schedule B of 5 CFR Part 213 are entitled to appeal actions under part 3, sec. 2 to the Merit Systems Protection Board (MSPB).

### 4. Definitions.
For the purposes of this chapter, the following definitions apply:

a. **Adverse action.** A suspension, reduction in grade or pay, furlough for 30 days or less, or removal.

b. **Day.** Calendar day, i.e, consecutive days, including weekends. A calendar day is the 24-hour period between 12 midnight and 12 midnight. In computing the advance notice period, the day on which the notice is delivered is not counted since it is not a full calendar day.

c. **Disciplinary action.** An official letter of warning or reprimand.

d. **Employee.** An individual who is serving on an appointment in the competitive or excepted service, other than an individual in the SES or with a Schedule C appointment or a temporary employee as defined in subpar. i.

e. **Furlough.** The placing of an employee in a temporary status without duties and pay because of a lack of work or funds or other nondisciplinary reasons.

f. **Grade.** A level of classification under a position classification system.

g. **Pay.** The rate of basic pay fixed by law or administrative action for the position held by an employee.

h. **Suspension.** The placement of an employee in a temporary status without duties and pay for disciplinary reasons.

i. **Temporary employee.** An individual who is:

(1) Serving on Term or TAPER (temporary appointment pending establishment of a register) appointment and who has not completed one year or more of continuous service; or

(2) Serving on an appointment limited to 1 year or less, regardless of the amount of continuous service.

5. **Cause for action.** The actions described in this chapter may be taken against an employee only for just cause. Actions taken under 5 U.S.C. ch. 75 and 5 CFR Part 752, (described in part 3 of this chapter) may only be taken for such cause as will promote the efficiency of the service.

6. **Timing of the action.** Disciplinary and adverse actions require careful consideration but when the circumstances call for such action, it should be taken promptly. Delay in taking such action tends to diminish its effectiveness. For bargaining unit employees, the labor-management agreement may establish specific timeframes for initiating actions.

7. **Inquiry to determine the facts.**

a. Supervisors are responsible for determining the facts of an alleged act of misconduct. The Penalty Guide (app. 752A) lists offenses that normally warrant investigation by the appropriate supervisor. If the offense is of a serious nature that may lead to removal, or if the supervisor cannot adequately ascertain facts, the supervisor may request investigative assistance from the Office of Inspector General (OIG).

b. The following steps are recommended when an inquiry to determine the facts is needed to decide if a disciplinary or adverse action is warranted:

(1) Interview the employee who allegedly committed the offense. The initial interview should be conducted in private. If the employee readily admits the offense or provides an acceptable explanation, the inquiry may be closed.

(2) Interview witnesses and others who can furnish pertinent information.

(3) Try to reconcile any conflicting statements by reinterviewing the parties concerned or obtaining outside corroboration.

c. The supervisor may request written statements from witnesses and the alleged offending employee.

d. If the employee is in a bargaining unit and requests union representation, the employee must be given an opportunity to obtain representation before the supervisor can begin the interview. If the employee requests representation during the interview, the interview may not continue until the employee has an opportunity to obtain representation.

e. Additional investigation is not necessary if sufficient evidence is available from some other official source, such as a report of investigation, a police or court record, or a finding by the Office of Personnel Management (OPM).

**8. Penalty Guide.**

a. The Penalty Guide (app. 752A) lists an appropriate range of penalties for first, second, and third offenses. Managers are not required to fit a specific instance of misconduct into one of the stated offenses. If the actual offense is not specifically listed, the employee should be charged with the actual offense. Penalties for offenses not listed should be consistent with the penalties listed for offenses of comparable seriousness.

b. The Penalty Guide is intended to ensure reasonable uniformity in taking disciplinary and adverse actions. Penalties should generally conform to the guide since the range of penalties provides latitude for the exercise of sound judgment. In individual cases, a greater or lesser penalty may be imposed unless the violation is one for which the penalty is specified by law.

c. The penalty should take into account the number of offenses, the nature of each offense and the extent to which the offenses indicate a pattern of unacceptable conduct. When two or more unrelated offenses occur at the same time, a greater penalty than would be imposed for a first offense is normally appropriate. If an act of misconduct is unrelated to a previous act or acts of misconduct, the penalty falls under the second or third offense, as appropriate.

d. The penalty of reduction in grade may be used in place of removal, where appropriate.

**9 and 10. Reserved.**

Top of Page

# PART 2. DISCIPLINARY ACTIONS

**11. Letters of warning.**

a. A warning is a letter of reproof for an act of misconduct that admonishes the employee against future acts of misconduct. Warnings generally are appropriate for first offenses that are not of a serious nature.

b. A warning letter issued under this part may be signed by supervisory officials no lower than:

(1) First-level supervisors in the Office of Records Services - Washington, DC (NW);

(2) First-level supervisors in the Presidential libraries;

(3) Coordinators of records programs (i.e., Coordinator, Archival Operations; Coordinator, Records Center Operations; or Coordinator, Records Management Program) in regional records services facilities in the Office of Regional Records Services (NR);

(4) Branch chiefs at the National Personnel Records Center (NRP);

(5) Staff directors, branch chiefs, and directors of divisions without a branch structure (other than NW) in the Washington, DC area; and

(6) The Assistant Inspectors General for Investigations and for Audits in the Office of the Inspector General (OIG).

c. Warnings are filed in the employee's Official Personnel Folder (OPF) as a temporary record and are withdrawn after a maximum of 1 year. At the discretion of the issuing supervisor, or pursuant to a grievance decision, the notice may be withdrawn earlier. This should provide the employee with a strong incentive to observe the rules of conduct. In determining if a warning letter should be withdrawn in less than 1 year, the supervisor should consider the employee's conduct after issuance of the warning, general attitude toward the job, and performance.

12. **Letters of reprimand.**

a. A reprimand is a formal notice of official censure for a serious act of misconduct, for repetition of conduct for which the employee has previously been warned, or when two or more offenses warrant more than a warning. A reprimand admonishes the employee against future acts of misconduct.

b. Letters of reprimand issued under this part may be signed by supervisory officials at a level no lower than:

(1) First-level supervisors in NW;

(2) First-level supervisors in the Presidential libraries;

(3) Coordinators of records programs in NR;

(4) Branch chiefs at NRP;

(5) Staff directors, branch chiefs, and directors of divisions without a branch structure (other than NW) in the Washington, DC area; and

(6) The Assistant Inspectors General for Investigations and for Audits in the OIG.

c. Letters of reprimand are filed in the employee's OPF as a temporary record and are withdrawn after a maximum of 3 years. At the discretion of the issuing supervisor, or pursuant to a grievance decision, the notice may be withdrawn earlier. In determining if a letter of reprimand should be withdrawn in less than 3 years, the supervisor should consider the employee's conduct after issuance of the reprimand, general attitude toward the job, and performance.

**13. Procedures for issuing letters.** Upon learning of an alleged act of misconduct, the supervisor should contact the Employee Relations and Benefits Branch (NHRR) for advice and assistance. Supervisors must send warnings and reprimands to NHHR for review before issuing them to the employee. The official file copy of each disciplinary action and a copy showing receipt by the employee (or other evidence of issuance) must be forwarded to NHHR or the Human Resources Operations Branch (NHHO) to be filed in the employee's OPF as a temporary record. Disciplinary actions are removed from the OPF as stated in subpars. 11c and 12c or when the employee leaves the agency.

**14. Contents of letter.** Warnings and reprimands must, at a minimum, contain the following information:

a. A complete description of the offense;

b. The specific reasons for the action;

c. The period of time for which the warning or reprimand is placed in the employee's OPF, and a statement that the warning or reprimand may be removed at an earlier time;

d. A statement that the employee may review any documentary evidence or information which was relied on to support the disciplinary action;

e. A statement that the employee may grieve the disciplinary action under the administrative grievance system, ch. 771, or under a negotiated grievance procedure if the employee is in a bargaining unit; and

f. A statement that the employee may be represented in any grievance that may be filed.

**15 thru 20. Reserved.**

Top of Page

# PART 3. ADVERSE ACTIONS

## SECTION 1. SUSPENSIONS FOR 14 DAYS OR LESS

**21. Coverage.** This section applies to suspensions for 14 days or less but does not apply to those taken for reasons of national security (5 U.S.C. 7532), or those taken under authority of the Special Counsel of MSPB (5 U.S.C. 1206).

**22. Cause of action.** An employee may be suspended for 14 days or less only for such cause as will promote the efficiency of the service.

**23. Proposing official.** Suspensions under this part may be proposed by supervisory officials no lower than:

a. Division directors or lab chiefs in NW (in actions involving staff of the Washington National Records Center (NWMW), the Assistant Director of NWMW is the proposing official);

b. First-level supervisors in the Presidential libraries;

c. Coordinators of records programs in NR;

d. Branch chiefs at NRP;

e. Staff directors, branch chiefs, and directors of divisions without a branch structure (other than NW) in the Washington, DC area; and

f. The Assistant Inspectors General for Investigations and for Audits in the OIG.

24. **Deciding official.** The deciding official must be a supervisory official in the chain of command at a level higher than the proposing official. The lowest level deciding official must be:

a. NW - The program director (e.g., Access Programs (NWC), Public Programs (NWE), Center for Legislative Archives (NWL), Modern Records Programs (NWM), Preservation Programs (NWT)) is the deciding official. For actions involving NWMW staff, the Director of NWMW is the deciding official.

b. Presidential libraries - The Assistant Director of the Presidential library is the deciding official. Where there is no Assistant Director or the Assistant Director is the proposing official, the Director of the Presidential library is the deciding official.

c. Regional records services facilities - The Assistant Regional Administrator is the deciding official.

d. NRP - For actions proposed by branch chiefs, the Assistant Directors for Civilian/Military Operations are the deciding officials. For actions proposed by branch chiefs in other NARA units in the Washington, DC area, the division director is the deciding official.

e. For Washington, DC area divisions without a branch structure, in actions in which the director of the division was the proposing official, the office head is the deciding official.

f. For actions proposed by staff directors, the Archivist or Deputy Archivist is the deciding official.

g. OIG - For actions proposed by the Assistant Inspectors General for Investigations and for Audits, the Inspector General is the deciding official.

25. **Advance written notice.** An employee against whom a suspension for 14 days or less is proposed is entitled to a written notice that states the specific reasons for the proposed action at least 15 days in advance of the effective date.

26. **Employee's answer.** An employee must be given a reasonable length of time, normally not less than 10 days, to answer the notice. The employee has the right to make both oral and written answers and to furnish affidavits and other documentary evidence in support of the answer. If the employee answers orally, a written summary of the meeting must be made and this

summary must become part of the record. Official time to prepare an answer may be granted at the discretion of the supervisor but this period shall not exceed 1 day.

**27. Representation rights.**

a. An employee is entitled to be represented by an attorney or other representative of his/her choice. The employee's choice of a representative normally should not be disallowed. However, the deciding official may disallow an employee's representative for any of the following reasons:

(1) If the activities as a representative would cause a conflict of interest or position;

(2) If release of the representative from his/her position would result in unreasonable costs to the Government; or

(3) If priority work assignments preclude release of the individual to serve as a representative.

b. A deciding official who considers disallowing someone from serving as an employee's representative must consult with NHHR before making a decision.

**28. Clearance with NHHR.** The supervisor proposing the adverse action must:

a. Obtain advice and assistance from NHHR (to ensure that the notice meets the procedural and other requirements for taking adverse actions).

b. Send the notice to NHHR for concurrence before issuing it to the employee.

**29. Contents of notice.** The proposing official (see par. 23) must sign the notice of proposed suspension and must include the following information:

a. A complete description of the offense;

b. The number of days the employee will be suspended;

c. The specific reasons for the proposed suspension;

d. A statement that the employee is entitled to answer orally and in writing to the deciding official or designee;

e. To whom the employee's answer, if any, should be addressed;

f. The employee's right to review the material that is relied on to support the reasons for action given in the notice;

g. Notification that the employee may be represented by an attorney or other representative of his/her choice;

h. The amount of time the employee has to answer the notice (the time allowed should be reasonable but should not exceed 10 days from the date the employee receives the notice); and

i. A statement that a written decision will be issued to the employee before the suspension takes effect.

30. **Final decision notice.** At the earliest practicable date after the employee answers, or following expiration of the period the employee was given to answer, the deciding official must issue a notice of decision to the employee before the suspension is effective. In preparing the notice, the deciding official must:

a. Consider only the reasons specified in the proposal, the employee's answer, and relevant mitigating factors in making a decision;

b. Include the effective date of the suspension and state the specific reasons for taking the action;

c. State that the employee has a right to grieve the suspension in accordance with ch. 771, or the negotiated grievance procedure, as applicable;

d. Obtain advice and assistance from NHHR in drafting the decision;

e. Send the decision letter to NHHR for concurrence before issuing it to the employee; and

f. Provide a copy of the decision to the employee's representative, if any, and to NHHR.

g. Submit a Standard Form (SF) 52, Request for Personnel Action, through normal channels so that an SF 50, Notification of Personnel Action is created and placed in the employee's OPF (see subpar. 31b).

31. **Agency records.**

a. NHHR retains (in a case file) the official file copy of the proposed action, a copy that shows receipt by the employee (or other evidence of issuance), the employee's answer (including a summary of any oral reply), the notice of decision, and any supporting material.

b. Suspensions for 14 days or less are recorded on the SF 50 that is maintained as a permanent record in the employee's OPF.

32. **Appeal.** A suspension of 14 days or less is not appealable to the MSPB. However, a suspension of 14 days or less may be grieved through the administrative grievance system (see ch. 771), or the negotiated grievance procedure, as applicable. If an employee alleges that the suspension was taken for reasons prohibited under 5 U.S.C. 2302, he/she may submit a complaint to the Office of Special Counsel, MSPB.

33 thru 40. **Reserved.**

Top of Page

**SECTION 2. REMOVAL, SUSPENSION FOR MORE THAN 14 DAYS, REDUCTION IN GRADE OR PAY, OR FURLOUGH FOR 30 DAYS OR LESS**

NARA - PERSONNEL 300, Chapter 752

**41. Coverage.**

**a. Actions covered.**

(1) A removal.

(2) A suspension for more than 14 days.

(3) A reduction in grade.

(4) A reduction in pay.

(5) A furlough of 30 days or less.

**b. Actions not covered.**

(1) A reduction-in-force action.

(2) A suspension or removal in the interest of national security.

(3) The reduction in grade of a supervisor or manager who fails to successfully complete a probationary period as a supervisor or manager if such reduction is to the grade held immediately before becoming a supervisor or manager.

(4) An action that entitles an employee to grade retention, and an action to terminate this entitlement.

(5) A voluntary action initiated by the employee.

(6) Termination of appointment on the expiration date specified as a basic condition of employment at the time the appointment was made.

(7) An action that terminates a temporary promotion within a maximum of 2 years and returns the employee to the position from which temporarily promoted, or reassigns or demotes the employee to a different position not at a lower grade or level than the position from which temporarily promoted.

(8) Cancellation of a promotion to a position not classified before the promotion.

(9) Reduction of an employee's rate of pay from a rate that is contrary to law or regulation to a rate that is required or permitted by law or regulation.

(10) An action against a reemployed annuitant or a Presidential appointee.

(11) A reduction in grade or removal based on unacceptable performance.

(12) The termination of an employee serving a probationary or trial period under an initial appointment (unless the employee is a

veterans preference eligible in the excepted service who has completed 1 year of current continuous service in the same or similar positions) or the termination of an employee serving on a temporary limited appointment.

(13) A reduction in the number of hours to be worked by a part-time employee.

(14) The removal or termination of a temporary employee, other than a TAPER employee (see par. 50).

(15) The termination for unavailability of excepted service intermittent employees who are not veterans preference eligibles (see par. 51).

(16) The removal or termination of a TAPER employee who has not completed 1 year of current continuous service in the same or similar position.

42. **Cause of action.** Action may be taken under this section only for such cause as will promote the efficiency of the service.

43. **Proposing official.** Adverse actions under this part may be proposed by supervisory officials no lower than:

a. Program directors in NW (NWC, NWE, NWL, NWM, and NWT)(in actions involving NWMW staff, the Director of NWMW is the proposing official).

b. Directors of Presidential libraries.

c. Coordinators of records programs in NR.

d. Branch chiefs at NRP.

e. Staff directors and division directors in the Washington, DC area.

f. The Assistant Archivist for Human Resources and Information Services (NH) is the proposing official for all furloughs of 30 days or less.

g. The Assistant Inspectors General for Investigations and for Audits in the OIG.

44. **Deciding official.** The deciding official must be a supervisory official in the chain of command at a level higher than the proposing official.

a. In NW, the Assistant Archivist for the Office of Records Services - Washington, DC is the deciding official.

b. For Presidential libraries, the Assistant Archivist for Presidential Libraries (NL) is the deciding official.

c. For regional records services facilities, the Assistant Regional Administrator is the deciding official.

d. In NRP, the Assistant Directors for Civilian/Military Operations are the deciding officials.

e. For actions proposed by staff directors, the Archivist or Deputy Archivist is the deciding official.

f. For actions proposed by division directors in other NARA units in the Washington, DC area, the appropriate office head is the deciding official.

g. For furloughs proposed by NH, the Archivist or Deputy Archivist is the deciding official.

h. OIG - For actions proposed by the Assistant Inspectors General for Investigations and for Audits, the Inspector General is the deciding official.

**45. Advance written notice.** An employee against whom an action is proposed under this section is entitled to receive a written notice that states the specific reasons for the proposed action at least 30 days in advance of the effective date.

**46. Employee status during notice period.** Under ordinary circumstances, an employee whose removal has been proposed remains in a duty status in his or her regular position during the advance notice period. In those rare circumstances where it is determined that the employee's continued presence in the work place during the notice period may pose a threat to the employee or others, result in loss of or damage to Government property, or otherwise jeopardize legitimate Government interests, the proposing official must consider whether any of the following alternatives are feasible:

a. Assigning the employee to duties where he or she is no longer a threat to safety, NARA's mission, or Government property;

b. Placing the employee on leave (annual, sick, or leave without pay (LWOP), as appropriate) with his or her consent;

c. Placing the employee on involuntary sick or other leave when the agency has medical documentation demonstrating physical or mental incapacitation;

d. Carrying the employee on appropriate leave (annual leave, sick leave, leave without pay, or absence without leave) if he or she is absent for reasons not originating with NARA; or

e. Curtailing the notice period when the crime provision can be invoked (see subpar. 47a). This provision may be invoked even in the absence of judicial action if there is reasonable cause to believe that the employee has committed a crime for which a sentence of imprisonment may be imposed. If none of these alternatives is available, NARA may place the employee in a paid, nonduty status (administrative leave) during all or part of the advance notice period.

**47. Exceptions to the 30-day advance written notice.**

a. Crime provision. When there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, advance written notice of less than 30 days may be given. The employee must be given at least 7 days to respond to the notice. When the circumstances require immediate action, the employee may be placed in a nonduty status with pay for up to 10 days. The crime provision may not be invoked solely on evidence of the employee's arrest.

b. Furlough for 30 days or less. The advance notice and opportunity to answer are not necessary for furlough without pay due to

unforeseeable circumstances, such as sudden breakdowns in equipment, acts of God, or emergencies requiring immediate curtailment of activities. The employee is entitled to written notice of the furlough and may appeal or grieve the action.

**48. Employee's answer.** The employee must be given a reasonable time, normally not less than 15 days, to answer the notice and furnish affidavits and other documentary evidence. The employee has the right to make both oral and written answers. If the employee answers orally, the deciding official may hear the employee's answer or designate a representative to hear the employee's answer and recommend a decision. The right to answer orally in person does not provide the right to a formal hearing. If the employee answers orally, the deciding official prepares a written summary of the meeting and includes it as part of the record.

**49. Representation rights.**

a. An employee is entitled to be represented by an attorney or other representative of his or her choice. The employee's choice of a representative normally should not be disallowed. However, the deciding official may disallow an employee's representative for any of the following reasons:

(1) If the activities as a representative would cause a conflict of interest or position;

(2) If release of the representative from his or her position would result in unreasonable costs to the Government; or

(3) If priority work assignments preclude release of the individual to serve as a representative.

b. A deciding official who considers disallowing someone from serving as an employee's representative should consult NHHR before making such a decision.

**50. Removal and termination of temporary employees.**

a. A temporary employee may be removed at any time because of lack of work or lack of funds.

b. A temporary employee may be terminated at any time because of unacceptable performance or conduct.

c. The appropriate official (see par. 44) consults with NHHR and notifies the temporary employee, in writing, of the reasons for removal or termination and the effective date of the action. The temporary employee does not have the right to reply to the notice and does not have the right to grieve or appeal the action.

**51. Termination of excepted service intermittents for unavailability.**

a. An excepted service intermittent employee appointed under 5 CFR 213.3102(g) may be terminated at any time during their first 2 years of service, or during their first year of service if they are a veterans preference eligible.

b. The appropriate official (see par. 44) consults with NHHR and notifies the employee, in writing, of the reasons for the termination and the effective date. The employee does not have the right to reply to the notice and does not have the right to

grieve or appeal the action.

52. **Clearance with NHHR.** The supervisor proposing the action must:

a. Obtain advice and assistance from NHHR (to ensure that the notice meets the procedural and other requirements for taking adverse actions).

b. Send the notice to NHHR for concurrence before issuing it to the employee.

53. **Contents of notice.** The proposing official (see par. 43) must sign the notice of proposed adverse action and must include the following information:

a. The type of adverse action that is being proposed (if the action includes a reduction in grade or pay, the proposed grade or pay must be stated in the notice);

b. The specific reasons for the proposed action;

c. A statement that the employee is entitled to answer both orally and in writing;

d. Notification that the employee's answer, if any, should be addressed to the deciding official and the name and address of the deciding official;

e. The employee's right to review the material that is relied on to support the reasons for action given in the notice;

f. Notification that the employee may be represented by an attorney or other representative;

g. The time limit for answering the notice (normally, the time allowed should not be less than 15 calendar days following the date the employee receives the notice); and

h. A statement that a decision on the proposal will be subsequently issued to the employee.

54. **Final decision notice.** At the earliest practicable date after receipt of the employee's answer, or following expiration of the period within which the employee was given an opportunity to answer, the deciding official must issue a notice of decision to the employee before the action is effective. In preparing the notice, the deciding official must:

a. Consider only the reasons specified in the proposed notice, the employee's answer, and relevant mitigating factors in making a decision;

b. Include the effective date of the action if an action is taken;

c. State the specific reasons for taking the action;

d. State that the employee has a right to appeal to MSPB, or grieve through the negotiated grievance procedure, as applicable;

e. Include a copy of MSPB's regulations and appeal form, and the appropriate address for filing an appeal;

f. Obtain advice and assistance from NHHR before drafting the decision;

g. Send the decision letter to NHHR for concurrence before issuing it to the employee (NHHR clears the action with the General Counsel (NGC), as necessary);

h. Provide a copy of the decision to the employee's representative, if any, and to NHHR; and

i. Submit an SF 52 through normal channels so that an SF 50 is created and placed in the employee's OPF (see subpar. 55b).

**55. Agency records.**

a. NHHR retains (in a case file) the official file copy of the proposed action, a copy that shows receipt by the employee (or other evidence of issuance), the employee's answer (including a summary of any oral reply), the notice of decision, and any supporting material. These records are furnished to MSPB upon request and to the employee at the employee's request.

b. Adverse actions under this section are recorded on an SF 50 that is maintained as a permanent record in the employee's OPF.

**56. Appeal.** A removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less is appealable to MSPB within 30 days after the effective date of the action. In the excepted service, only veterans preference eligibles who have completed 1 year of current continuous service are entitled to appeal to MSPB. Bargaining unit employees may file a grievance under the negotiated grievance procedure, or appeal to MSPB, but not both.

**57 thru 60. Reserved.**

- See Appendix 752A, Penalty Guide
- See Interim Guidances 300-1 and 300-14.

Top of Page

Home    Privacy & Use    Accessibility    Archives.gov    Firstgov.gov    What's New    FAQs    Feedback    Sitemap    NARA@work Tour

NARA@work - NARA Personnel Manual

- Text Size +

Feedback   Archives.gov   Firstgov.gov

What's New   FAQs   Site Map   Print this Page

| Staff Resources & Services | Supervisor Resources | NARA Policies & Guidance | Archives & Records Management | Safety, Security & Emergency | NARA Organizations | Procurement, Budget & Finance | Project Information | Information Technology | Strategic Planning & Reporting |

Home   NARA Policies & Guidance   Directives   NARA Personnel Manual

**Directives**

- 100 - Mission and Organization
- 200 - General Administration
- 300 - Human Resources
- 400 - Budget and Accounting
- 500 - Procurement (Acquisition)
- 600 - Travel
- 700 - Transportation
- 800 - Information Management
- 900 - Congressional and Legislative
- 1100 - Legal, Ethics, and Professional Conduct
- 1200 - Audits and Investigations
- 1300 - Records Lifecycle (general)
- 1400 - Front End
- 1500 - Archival
- 1600 - Access

PERSONNEL 300

APPENDIX 752A. PENALTY GUIDE

| Nature of Offense | 1st Offense | 2nd Offense | 3rd Offense |
|---|---|---|---|
| 1. Unauthorized absences1/: | | | |
| a. Recurring tardiness: arriving up to 1 hour late for work or returning late from lunch or authorized break without adequate justification. | Warning | Official reprimand to suspension | Official reprimand to removal 2/ |
| b. Absence from duty for 1 day or less which is not authorized or for which a request for leave has been denied. | Warning | Official reprimand to suspension | Official reprimand to removal 2/ |
| c. Absence from duty for more than 1 day which is not authorized or for which a request for leave has been denied. (When absence exceeds 10 days, penalty of removal may be imposed for the first offense.) | Warning to suspension | Official reprimand to removal | Removal |
| 2. Misuse of sick leave (such as using sick leave for absences unrelated to illness | Official reprimand to suspension | Suspension to removal | Removal |

**Search NARA Directives:**

search
Help
Advanced Search

**Page Options**

Print this Page

Email this Page

Find Text on this Page

Provide Feedback on this Page

Add Page to Favorites

**Site Search**

⊙ Entire Site ○ This Section   Go

Advanced Search

**Employee Locator**

Advanced Locator   Go

or medical care).

| Offense | | | |
|---|---|---|---|
| 3. Reporting for duty or being on duty under the influence of intoxicants or drugs so as to render the employee unfit for duty 3/; unauthorized drinking, using, or selling intoxicants on Government-owned or leased premises; possession of illegal substances on Government-owned or leased premises. | Warning to removal | Official reprimand to removal | Removal |
| 4. Driving Government vehicle (or privately owned car on official business) while under the influence of intoxicants or drugs. | Suspension to removal | Removal | |
| 5. Insubordination: direct or deliberate refusal to comply with instructions issued by a supervisor; disrespect, insolence, and similar behavior. | Official reprimand to removal | Suspension to removal | Removal |
| 6. Sleeping on duty: | | | |
| a. Where safety of persons or property is not endangered; | | | |
| (1) In non-public areas | Warning to official reprimand | Suspension to removal | Removal |
| (2) In public areas | Suspension to removal | Removal | |
| b. Where safety of persons or property is endangered. | Suspension to removal | Removal | |
| 7. Disorderly conduct: | | | |
| a. Use of abusive or offensive | Warning to suspension | Official reprimand to removal | Removal |

| | | | |
|---|---|---|---|
| language, quarreling, or creating a disturbance; | | | |
| b. Fighting, or threatening, attempting to inflict, or inflicting bodily injury on another person. | Official reprimand to removal | Removal | |
| 8. Violation of regulations where safety of persons or property is endangered (other than items 3 and 6b above). | Official reprimand to removal | Suspension to removal | Removal |
| 9. Neglect of duty: Loafing, deliberate failure to be at work on assigned task, unreasonable delay or failure in carrying out instructions, conducting personal affairs on official time, or careless workmanship resulting in waste or delay. Also may include negligence which leads to improper accounting for Government funds or funding documents or devices. 4/ | Warning to suspension | Suspension | Suspension to removal 2/ |
| 10. Engaging in outside employment, business, or professional activity without obtaining prior written approval: | | | |
| a. When no conflict of interest is involved; | Warning | Official reprimand | |
| b. When a conflict of interest is involved. | Official reprimand to removal | Removal | Suspension to removal 2/ |

| | Warning | Official reprimand to suspension | Suspension to removal 2/ |
|---|---|---|---|
| 11. Unauthorized use of Government telephones.5/ | | | |
| 12. Unauthorized use, removal, or possession of Government property, funds, services, supplies or materials, including use of, or permitting the improper use of, Government charge cards, Accounting Control Transaction (ACT) numbers, or other obligating forms or devices, or the property of other employees. 5/ | Warning to removal | Suspension to removal | Removal |
| 13. Knowing and willful misstatement or omission of material facts on, or unlawful concealment, removal, mutilation, or destruction of, official documents, contract files, or administrative records. 6/ | Official reprimand to removal | Suspension to removal | Removal |
| 14. Knowing and willful misappropriation of Government funds or other funds which come into employee's possession by reason of his or her official position. | Removal | | |
| 15. Partisan political activity in violation of law. 7/ | Removal or other penalty as directed by MSPB. | | |
| 16. Knowing and willful use of public office for private gain. | Suspension to removal | Removal | |

| | | | |
|---|---|---|---|
| 17. Misconduct, whether or not in violation of a criminal statute, which impairs job performance or trustworthiness of the employee or otherwise impairs the ability of a NARA unit to perform its mission. | Official reprimand to removal | Suspension to removal | |
| 18. Willful use, or authorizing use, of Government-owned or leased passenger motor vehicles or aircraft for unofficial purposes 5/ 8/ | 30 days suspension to removal | Removal | |
| 19. Loss of or damage to Government property 5/: | | | |
| a. Through carelessness or negligence. | Warning to suspension | Official reprimand to suspension | Official reprimand to removal 2/ |
| b. Through maliciousness or intent, or when property involved is of significant value. | Official reprimand to removal | Suspension to removal | Removal |
| 20. Refusal to provide information in connection with an authorized investigation and to furnish a signed statement when required, except where such refusal is based on grounds of self-incrimination in a potential criminal case, or privileged communications. | Official reprimand to removal | Suspension to removal | Removal |
| 21. Negligent or willful mismanagement of a contract, or contract files, or failure to | Official reprimand to removal, with a minimum of suspension if the employee acted | Suspension to removal | Removal |

| | | | |
|---|---|---|---|
| administer provision thereof, which results in a loss to the Government. | knowingly and willfully | | |
| 22. Knowing and willful failure to abide by established contracting practices, procedures, or regulations. | Suspension to removal | Suspension to removal | Removal |
| 23. Knowingly making false statements which are slanderous or defamatory about other employees or officials. | Official reprimand to removal | Removal | |
| 24. Gambling, betting, or promotion thereof on Government-owned or leased property, or while on duty. | Official reprimand to removal | Suspension to removal | Removal |
| 25. Soliciting or making a contribution for gift to an official supervisor, or acceptance of such a gift by an official superior. 9/ | Removal 10/ | | |
| 26. Lending money for profit on Government- owned or leased premises; borrowing money from a subordinate employee or obtaining a subordinate employee's endorsement on a loan. | Official reprimand to removal | Removal | |
| 27. Unethical or improper use of official authority or credentials, or unauthorized disclosure or use of official information. | Official reprimand to removal | Removal | |

000172

...(@work - NARA Personnel Manual

| | Warning to removal | Official reprimand to removal | Removal |
|---|---|---|---|
| 28. Negligent, knowing or willful discrimination against or harassment of an employee or applicant for employment based on race, color, religion, sex, age, national origin, physical or mental handicap, marital status, or lawful political affiliation. | Warning to removal | Official reprimand to removal | Removal |
| 29. Reprisal against any person for proper exercise of the right to file a discrimination complaint or grievance or for reporting an irregularity, real, or suspected. | Warning to removal | Official reprimand to removal | Removal |
| 30. Smoking inside a NARA facility. | Removal | | |
| 31. Unauthorized use, removal, or possession of Government records, artifacts, or exhibits | Removal | | |

1/ Penalties are in addition to forfeiture of pay for period of absence, which will be charged as absence without leave (AWOL).

2/ Removal is appropriate for the fourth disciplinary or adverse action.

3/ If the employee is not ready, willing, or able to work, the employee may be required to take annual leave.

4/ This refers to a specific instance of misconduct and is not to be confused with unacceptable performance of a continuing nature. For neglect of duty by sleeping, see item 6.

5/ Employee also may be charged for cost to the Government.

6/ Contract throughout this penalty guide denotes all procurement actions which bind the Government and includes purchase orders, leases and other contract arrangements. Administrative records include time cards, sign-in sheets, work records, travel vouchers, etc.

7/ Penalties prescribed by 5 U.S.C. 7325.

000173

8/ Penalties prescribed by 31 U.S.C. 638 A(c)(2). Where the element of willfulness is not clearly shown or when the vehicle is not a passenger vehicle, the same or lesser penalty must be invoked depending on the circumstances.

9/ This does not prohibit a voluntary gift of nominal value or donation in a nominal amount made on a special occasion.

10/ Required by 5 U.S.C. 7351.

Return to PERSONNEL 300, Ch. 752

Top of Page

Home   Privacy & Use   Accessibility       Archives.gov   Firstgov.gov       What's New   FAQs   Feedback   Sitemap       NARA@work Tour



MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-1025
*www.nara.gov/regional*

July 30, 2003

Mr. Darryl Murray
National Archives and Records Administration
Mid Atlantic Region Northeast (Philadelphia)
14700 Townsend Road
Philadelphia, PA  19154

Dear Mr. Murray:

This is notice that, to promote the efficiency of the Service, I propose to suspend you for a period of 3 calendar days from your position of Archives Aid, GS-1421-3, no earlier than 15 calendar days from your receipt of this letter for neglect of duty; inaccurately reporting completed work/carelessness.   The reasons supporting this proposal are as follows:

**INSTANCE OF MISCONDUCT: Neglect of Duty**

> On December 29, 2000, Tasha Odom requested her bankruptcy file for an in-house review.  The file was found, reviewed by Ms. Odom, and correctly refiled both in the FileTracker software and its physical location.

> On June 18, 2003, Ms. Odom requested the mailing of the "package" service and the order was placed in FileTracker at approx. 1:30 p.m.

> On June 18, 2003, the request was scanned and assigned to you for retrieval.

> On June 26, 2003, Ms. Odom called to state that she did not receive the materials.

> Dewayne Wilkerson, Archives Technician, was assigned to search for the file.  He discovered that the outcard sheet was in the correct box indicating that you had pulled the file on the June 19, 2003.  But the file could not be found.

> On June 27, 2003, Mr. Wilkerson again searched for the file without success.  Elizabeth Washington, Supervisory Archives Specialist, increased the search patterns by notification, interview of all appropriate employees, and search of all possible points and areas of normal file movement, all without success.  The Basic FileTracker history was inconclusive.

> On approximately July 9, 2003, John McEvoy, Supervisory Archives Specialist, received a telephone call from Ms. Odom who explained that it was imperative that she receive the file.   Mr. McEvoy assigned Vernell Tate, Archives Technician, GS-1421-7, to assist in the search.

GOVERNMENT
EXHIBIT
3-6

Sometime between June 27 and July 9, Ms. Washington discussed this with you. You indicated that you remember pulling the file and believed that you followed applicable procedures. Therefore, you did not know what happened to the file.

On or about July 14, 2003 Mr. McEvoy spoke to you regarding the missing Odom file. You said that you remembered pulling the file and that you believed that you had followed all applicable procedures, i.e. placing one of two copies of the outcard in the box, stapling the other copy to the file itself, placing the file on his streamliner, and rolling the streamliner and all other retrieved files to the office. You were unsure if anyone was in the office at that time to perform required scanning of the found files, thus you may have rolled the files directly to the research room.

You also had two theories as to the whereabouts of the file. One was the possibility that an unnamed individual may have dumped the file, after Ms. Odom complained about not receiving the requested package. The other theory was that you thought you had heard that the original file had been mailed.

During the period July 9 to July 16, 2003, Mr. McEvoy provided Ms. Odom with status updates. Ms. Tate continued searching, using more FileTracker activity reports. Finally, Ms. Tate found the file on the afternoon of July 16.

The file was located under the following circumstances. Ms. Tate researched physical locations that were visited by you on June 19 using FileTracker reports. The Odom File was found in Accession 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, location G14-016-4-5, box 17. This was misfiled. You had pulled another file from that box that day and apparently the misfiling occurred at that time.

The efforts required to locate the file meant the expenditure of enormous resources: we had to take employees from their regular duties to search for this document.

Also importantly, if we had not located the file, Ms. Odom would have not been able to prove that she had discharged her bankruptcy requirements, which would have adverse financial repercussions for her. That is why a lost file is such a serious matter and results in unacceptable customer service.

You therefore are charged neglect of duty for misfiling the Odom file.

**INSTANCE OF MISCONDUCT:  Inaccurately reporting completed work/carelessness**

On July 15, 2003, John McGee, Supervisory Archives Specialist, assigned you to pull files in batch #196-1, Volume 183.  At the end of the day, you recorded on the task sheet that you pulled 166 files and left 17 unfinished.  You brought the 17 requests that you were not able to complete to General Reference, as required.

However, on July 17, 2003, Mitchell Buffone, Archives Technician, found seven uncompleted requests on a cart in stack D and so informed Elizabeth Washington in a note.   The requests Mr. Buffone found on the cart were:

Watts, A; Phavi, V; Moyer G; Perry, L; River, J; Moore, C and Locke J

However, you indicated on the task sheet that you completed this work when you recorded that you completed 166 files on July 15, 2003.

You are charged with inaccurately reporting completed work when you wrote on the task sheet that you completed 166 requests on July 15, 2003, whereas you only serviced 159 requests.  In addition, you are charged with carelessness for leaving the seven unfilled requests on the cart in stack D.   If Mr. Buffone had not found these requests, our customer – the Social Security Administration - would not have received these files in a timely manner and would have had to make a second request to us for the files.  This would have reflected poorly on the customer service that we provide to the Social Security Administration.

A continuation of such misconduct will not be tolerated because it adversely affects the efficiency of the Federal service.

Within 10 calendar days of your receipt of this notice, you may reply in writing, in person or both to V. Chapman, Regional Administrator, National Archives and Records Administration, Mid Atlantic Region Northeast (Philadelphia), 14700 Townsend Road, Philadelphia, PA  19154  (telephone 215-305-2002) setting forth any pertinent facts, extenuating circumstances, or other information you desire to submit.  You may also submit affidavits in support of your reply and may be represented by an attorney or other representative.  In addition, you may designate a Union representative in this matter.

You will be allowed a reasonable amount of official time, if otherwise in a duty status, to prepare your reply, to secure affidavits or other documents.  The documents on file supporting this proposal are attached.  You should contact me to arrange for the use of official time.

If you do not understand your rights concerning this proposed suspension, you may contact Carol Wehrkamp, Human Resources Services Division, on 301-837-3113.

Your reply will be given full consideration before a final decision is issued.  If you are suspended, a written decision notifying you will be issued before the suspension takes effect.

Sincerely,

DAVID ROLAND
Assistant Regional Administrator

Attachments

Official: NHHR
Reading: NHHR
Info copies: NHHR (SL),
jjanshego, jmj,7/29/03
DOC:MurrayProposedSuspension

file code: 329



*National Archives and Records Administration*

**MID ATLANTIC REGION**
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-1025
*www.nara.gov/regional*

August 14, 2003

Mr. Darryl Murray
National Archives and Records Administration
Mid Atlantic Region Northeast (Philadelphia)
14700 Townsend Road
Philadelphia, PA 19154

Dear Mr. Murray:

The letter of July 30, 2003, from David Roland, Assistant Regional Administrator, notified you of a proposal to suspend you for a period of 3 calendar days from your position of Archives Aid, GS-1421-3, for Neglect of Duty and inaccurately reporting completed work/carelessness. The reasons supporting the proposal were set forth in that letter.

You responded to the proposed suspension letter by memorandum of August 5, 2003.

In your response, you fail to take responsibility for the charge of neglect of duty. You indicate that your supervisors should have identified the case file as missing on June 20, 2003. The methodology employed to find the file was to retrace your entire workday on June 18. This confirmed that you had mishandled the Odom file. Whether this method of retracing your workday was conducted earlier than it was is irrelevant to the issue of your neglect. It was necessary for others to conduct this search because you were unsuccessful in your own efforts to locate your misfiled work and you were not helpful to your supervisor in recovering the file.

Your actions represent neglect of duty --- "careless workmanship resulting in waste or delay." Your carelessness caused waste because of the people hours (including Ms. Tate's) that had to be expended to locate the document.

The second charge – your inaccurately reporting completed work and carelessness for leaving the unfilled requests on your cart - was another incident of work carelessness which occurred within a month of the above incident. Our procedures require that all uncompleted work be reported to management at the end of the day, so customer services can be managed effectively. Your actions grossly compromised our ability to do this with your inaccurate reporting and carelessness. It is only because of the due diligence of a work group leader that we were able to contain the impact on our customer. It was not your decision to make regarding whether this work should be held over for the next day.

In your response, you indicate that you believe that you should receive a warning letter for the charges described in the proposal to suspend.    In determining the penalty, Personnel 300, Chapter 430, Appendix 752A Penalty Chart was consulted.  The Penalty Chart indicates that for a first offense of neglect of duty, a warning to suspension is appropriate. If you had been charged with only one instance of misconduct, a warning letter or reprimand may have been the appropriate penalty for a first offense.  However, there was also a second charge of inaccurately reporting completed work/carelessness.  These combined charges justified the more severe penalty of a suspension.

I have considered all relevant documents and factors and find that the specified instances of misconduct cited in the letter of July 30, 2003, is fully supported by the evidence. Your response does not refute the essential facts of the case which was the basis for the proposal to suspend.  I, therefore, find that a suspension is warranted.  Accordingly, it is my decision that, to promote the efficiency of the Service, you be suspended for 3 calendar days, effective August 18, 2003, through August 20, 2003.  You will be expected to return to work on August 21, 2003.

A suspension is a serious disciplinary action.  A further instance of misconduct could result in more severe disciplinary action, including removal from the Federal service.

You may contest the propriety of this action by filing a grievance in accordance with the Labor-Management Agreement.  If you have any questions regarding your rights, you may request additional information from Carol Wehrkamp, NARA Human Resources Services Division, on 301-837-3113.

Sincerely,

V. CHAPMAN-SMITH
Regional Administrator

Attachments:  Extra copy of letter – MARKED FOR UNION

_____

My dated signature below acknowledges receipt of this letter.

_____         _____
Darryl Murray                                               Date

_____

Official:  NHHR
Reading:  NHHR
Info copies: NHHR (SL), NRBPC
Jjanshego, jmj, 08/12/2003
Doc: Murray Susp Dec

file code 329

## MEMORANDUM OF AGREEMENT

On March 13, 1996, Mr. Darryl Murray was issued a notice of proposed 14-day suspension from the position of Archives Aid, GS-1421-2, for insubordination and unauthorized absence.

Mr. David S. Weber, Director, Philadelphia Federal Records Center, has considered Mr. Murray's oral and written responses, given on March 29, 1996. Mr. Weber, the Deciding Official, has determined that the 14-day suspension is for the efficiency of the service and should be effected. However, this suspension will be held in abeyance for one year from the date of this agreement, subject to the following:

      (1) Execution of this Memorandum of Agreement, and
      (2) Compliance with each of the provisions outlined herein.

A. By signing below, Darryl Murray and the National Archives and Records Administration (NARA), freely and voluntarily enter into this Agreement.

B. Darryl Murray agrees to follow all of the work rules and procedures that his supervisors establish.

C. Darryl Murray agrees that he will not post or distribute any materials in the workplace, including any work spaces which may belong to or are shared with other organizations. Darryl Murray understands that this means he may not distribute any materials in the workplace even during lunch periods, breaks, or before or after working hours.

D. Darryl Murray agrees to follow proper procedures to request approval of his absences from his supervisors. Darryl Murray understands that failure to follow proper procedures to request leave may result in being charged as absent without leave (AWOL), which is an unauthorized absence. Unauthorized absence may serve as the basis for disciplinary action, up to and including removal. Darryl Murray understands that requests for leave are to be made in advance of the absence, normally at least one day prior to the absence, except in the case of an emergency or illness. In the case of emergency or illness, leave should be requested within two hours after his scheduled arrival time.

E. NARA agrees that if Darryl Murray complies with the provisions of this agreement for one year from the date of this agreement, NARA will cancel its decision to effect a 14-day suspension after the one year is completed.

F. Darryl Murray understands that if he does not follow the terms of this agreement, NARA will effect the 14-day suspension.

G. Darryl Murray understands that if there is future misconduct on his part, NARA


GOVERNMENT
EXHIBIT
3-H

will effect the suspension, and NARA will initiate disciplinary action up to and
including removal.


David S. Weber          (Date)                Darryl Murray          (Date)   04/23/9

Director, FRC, Philadelphia

NARA

SENT VIA FEDEX , SIGNATURE REQUESTED, and FIRST CLASS MAIL

Mr. Darryl Murray
112 W._Champlost Avenue
Philadelphia, PA 19120

November 9, 2004

Dear Mr. Murray

The notice of September 24, 2004, from John McEvoy, Director, Record Center
Operations, Mid Atlantic Region, informed you of a proposal to remove you from your
position of Archives Aid, GS-1421-3, and from the National Archives and Records
Administration no earlier than 30 calendar days from your receipt of that notice for
insubordination and making threatening remarks.  Details supporting the proposal were
stated in that notice.

Mr. James Cassedy, Representative with the American Federation of Government
Employees Council 260 (AFGE 260) asked that you be given an extension of time in
which to make a response.  This was granted, and we informed Mr. Cassedy that he had
until October 22, 2004 to respond.

Mr. Cassedy submitted a letter to me dated October 21, 2004 on your behalf.

You were charged with 2 serious offenses and I would like to address each separately.

## Charge of Insubordination

The charge of insubordination has its genesis in a letter which your first-line supervisor,
Elizabeth Washington gave you on August 17, 2004.  In that she letter she gave you an
unambiguous order  in which she directed you to immediately remove objectionable
materials from your work area and to never display them or anything similar in any work
areas at the National Archives in the future.

Specifically, she told you in the August 17, 2004 letter that she received a complaint from
a coworker that you were exhibiting offensive posters and other written material at your
work station.

These include an article entitled "The Governments Assault on the Black Family" and
postings such as:



000226

(16)

"Who are the real Terrorists? "Osama Totally Exonerated An Innocent Man."

"This center is a non-equal opportunity employer"

"Worthless losers nothing ass employees."

In his response, to the proposed removal, Mr. Cassedy said that your position is that these signs and postings were decorations reflective of your personal religious and political beliefs.  The response said that you are "...a follower of the Nation of Islam, which believes that the Federal Government is raging war against the 'black family'."  In addition, you believe that the movie Fahrenheit 9-11 supports the supposition that Osama Bin Laden is not guilty of heinous crimes of which he is accused."  Ms. Cassedy says that if you believe that "NARA is not an equal opportunity employer," or that NARA treats its employees "as worthless losers," then it seems to you that you can decorate your personal workspace to reflect your beliefs, in accordance with NARA Interim Guidance 94-167.

NARA Interim Guidance 94-167 is entitled "Care of the Archives II Facility" and specifically referred to the opening of the new Archives building in College Park, Maryland in February, 1994.  It has nothing to do with the Philadelphia Records Center.  Most importantly, although an employee may decorate offices to reflect their personalities, it does not give the employee license to post materials with objectionable messages – particularly when the employee has been specifically ordered not to do so and disregards that order.

As stated in Mr. Cassedy's letter, you did remove the objectionable postings on August 17, 2004 after you received the letter from Ms. Washington.  Mr. Cassedy's letter states that you believe that the reason you were asked to remove the postings on August 17, 2004 was because "...someone found them to be politically and religiously offensive."

As is clear from the record, you were not disciplined for these postings, because you did take them down on August 17, 2004 as ordered.

Rather the proposed removal is based in part on the charge of insubordination when you failed to follow the order of Ms. Washington of August 17, 2004 after you initially complied on August 17, 2004.   To reiterate, she told you on August 17, 2004:

> "You are ordered to immediately remove (no later than 2:30 p.m. today) all of these materials from your work area *and to never display them or anything similar in any work area at the National Archives.  To be clear, you are to display no materials that make reference to race, religion, political views or that make disparaging remarks in any way at any location at the National Archives."* [italics added].

When we walked through the Record Center on September 16, 2004, John McEvoy and I found that you had again posted documents on your bulletin board and wrote disparaging

or political remarks on the documents or on tape around these documents. These included statements such as:

> "It's Just a Matter of Time Now. Be Patient."

> "Vote Nov. 11, 2004 Kerry "

> "Beware of the Snitch Committee"

> "Two-Legged Cockroaches"

> American Government vs. American People (Human Race)

> "Separate and Unequal"

> "None Dare Call it Conspiracy"

> "The Plot Thickens!"

In his response, Mr. Cassedy says that these postings were "…not expressive of your political views or religious beliefs, as were the postings which were taken down on August 17 2004. They were of a more personal nature."

Specifically, in his response, Mr. Cassedy says that the "Two legged cockroach" remark refers to a colleague and was "your attempt at humorous revenge." The letter says that you admit that this was not an appropriate way to handle a conflict. This remark is in fact a disparaging remark and is in defiance of Ms. Washington's order which said that you were not to post disparaging remarks.

Mr. Cassedy further states that the postings "None Dare Call it Conspiracy" "The Plot Thickens" and "Separate and unequal" were a "protest message" and your "non-violent protest of working conditions at the NARA facility."

You did not have the liberty of posting disparaging signs in the workplace under guise of "non-violent protest." particularly when you specifically were ordered not to do so.   If you believed that NARA was not treating you fairly, you had other avenues of redress rather than the path you choose to follow which was to defy an order given to you.

In addition, the "Vote Nov. 11, 2004 Kerry" posting was of a political nature and clearly failed to conform to Ms. Washington's order.

In summary, you failed to follow a lawful order when you exhibited disparaging and/or political postings at your work station, and this forms part of the basis for the proposed removal.

## Threatening a Security Guard

The other charge which forms the basis for this proposal to remove is the very serious charge of making threatening remarks. Specifically, on September 22, 2004 at approximately 11:10 AM, after being placed on administrative leave while the insubordination charge was being investigated, you drove to the Townsend Road facility and told the security guard, James Hughes, "I'm here to blow up the place. "I'm here to see Skip." Further when Mr. Hughes told you to "watch what [you] say," you said "I'll bring my people up here and you know what that means." Later, you said "When I come back, 'I'm blowing the place up."

In his response, Mr. Cassedy says that your remarks were a joke. Specifically he says:

> "It seems fairly evident that Mr. Murray intended only to speak with his friend, Mr. Hammond (a.k.a "Skip"). Any reference to 'blow up the place' was at worse a bad, off hand, attempt at humor."

Further, Mr. Cassedy says that your remark "I'll bring my people up here and you know what that means" was not a serious threat but:

> "…probably humorous posturing. Mr. Murray, again, at worse, makes a bad, off hand attempt at humor," according to Mr. Cassedy.

Therefore, although Mr. Cassedy admits that you made the above statements, he claims that they were jokes and therefore presumably acceptable.

However, Mr. Cassedy says that you deny saying "When I come back, I'm blowing the place up."

Rather, he alleges that you said "somebody ought to blow this place up." He says that you made this remark – not as a joke – but because you were "shocked, humiliated and angry" when you learned that you could not enter the building. Mr. Cassedy says this was "a statement that should not have been made."

Although with the exception of the latter remark, your comments to the security guard are characterized as jokes by Mr. Cassedy, NARA does not take these remarks lightly. NARA takes very seriously the matter of security and does not accept this defense. Specifically, NARA Interim Guidance 300-19 clearly states that comments made to security guards – even if they were intended as a joke will not be tolerated.

Further, management at the Record Center have taken your comments very seriously as evidenced by the fact that we immediately contracted an extra guard for the facility and mandated that no one can stay at the facility beyond 4:30 p.m. These latter changes in security are still in effect.

Additionally, I do not find your statement that you did not say "When I come back, I'm blowing the place up" credible. The security guard heard you say this, and I have no

reason to doubt his credibility, whereas I have reason to doubt the credibility of your response.  For example, Mr. Cassedy says that in a conversation of October 20, 2004, "Ms. Elizabeth Washington, the immediate supervisor of Mr. Murray, stated that she had never felt threatened by Mr. Murray."  However, Ms. Washington reports that in an answer to a question from Mr. Cassedy as to whether she ever felt threatened by you, she stated "No, not until the bulletin board incident."

Another example of your lack credibility was your phone voice mail messages to both Elizabeth Washington and John McEvoy on Wednesday, September 22, 2004.

On September, 22 you left a message for John McEvoy at 9:58 AM, as instructed for remaining in a paid (administrative leave) status.  During that call you stated:

> " Hey Johnnie, it's ah, this is ah, Darryl Murray calling, ah, the paper said to call you every Wednesday at 10 o'clock, ah, I'm having some problems with my passport trying to get a flight back, but you can call me, ah, on 215-681-8924. There might be a little disturbance on the plane but I still should be able to still get a signal.  Talk to you later Mr. McEvoy."

During the call to Ms, Washington at 10:38 AM you specifically alluded to leaving Mr. McEvoy  a message and stated that you had taken "a little flight overseas," but were experiencing some "passport problems," and that you "should be back in town by Friday" (presumably the 24th) once you got your passport issues resolved.

Yet you arrived at the Townsend Road facility less than an hour later at approximately 11:10 am

In conclusion, I find it that it is unacceptable to the agency that you should be in the workplace after the threats that you made.

As the deciding official, I have thoroughly reviewed all of the evidence of record which formed the basis for the proposal.  I have also considered the October 21, 2004 letter that Mr. Cassedy submitted on your behalf.

After careful consideration, it is my finding that the charges are supported by the preponderance of evidence and are sustained.  Having sustained the charges as proposed, it is my conclusion that you should be removed from your position and the National Archives and Records Administration, November 16, 2004.

In making my decision, I have considered the Douglas factors as follows:

1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.

As stated above, there were two offenses:  insubordination and threatening a security guard.  Both of these charges are very serious.

I will address the insubordination charge first.

Insubordination in itself is sufficient cause to justify discharge from federal service on a first offense - even for an exemplary employee, which you are not.

Management directives are to be followed.   It is clear from Mr. Cassedy's response that your posting the objectionable material was intentional and not inadvertent because you believed that it was justified as a form of protest.

Moreover, the August 17, 2004 incident was not the first time that you were involved with posting unacceptable material.

In October, 2001, I discovered a box of Social Security Administration (SSA) files in the mailroom, ready for shipping to SSA which contained graffiti written in red magic marker.   I reported this to John McGee, who was your supervisor at the time.   A short time later, I was contacted by the SSA in Wilkes Barre, Pa and informed that in one of NARA's daily shipments to the SSA were two boxes that contained similar writings. Written in red magic marker was:

> 10-15-101
> The Great Mutah
> Allah
> Akbar
>
> 10-15-01
> Homo-Sapiens –
>  Sapiens
> Thinking Man?

The SSA official believed that in light of the September 11, 2001 terrorist attacks, that this incident needed to be reported to the authorities.  The Federal Protection Service (FPS) were then involved and sent photographs of the boxes to the agency.  After reviewing the photographs and reflecting on your past history, it was suspected that you were responsible for the markings on these boxes.   You were showed the photographs of the boxes and you admitted that you were responsible.  You wrote a memo to John McGee, in which you said in part:

> "I would like to apologize to my co-workers, management and
> Social Security Personnel for alarming them with Slogans or

ROI000294

Perceived Offensive material.  The boxes marked with so-called graffiti were intended for personal use and Trash.  I was just exercising my Brain Cells."

In 1996, you received a proposal to suspend you for 14 days for insubordination.  The charges which formed the basis for that suspension were similar to the current charges.  The agency received a complaint from the Director of Personnel, Veterans Administration Regional Office (VARO)  that you had left photocopies and highlighted pages of The Final Call, a Nation of Islam publication, in the VARO break room.  You had in that instance also been counseled that you were not to display information regarding political beliefs anywhere in the workplace.

In April 1996, you signed a Memorandum of Agreement with the Agency in which you agreed that you would not post or distribute any objectionable material in the workplace.  In return, the agency agreed to cancel its decision to effect the 14-day suspension.

Therefore, it is clear that this latest incident was not inadvertent.  You unfortunately have a history of this type of misconduct as evidence by the SSA incidents in 2001 and the 1996 incident.

Regarding the threat charge, as stated in Interim Guidance 300-19 threats directed to NARA security guards – even if intended as a joke as is alleged by Mr. Cassedy - cannot be tolerated.   Therefore, frequency of the misconduct is not at issue here.  Even one instance of a threat is grounds for removal on a first offense.

2)  The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public and prominence of the position.

You are employed as an Archives Aid, GS-1421-3.  The position does not normally have public contact and is not a prominent one nor is it supervisory or fiduciary in nature.

3)  The employee's past disciplinary record:

You were suspended for three days in August 2003 for neglect of duty and inaccurately reporting completed work and carelessness.

In July, 1997, you were suspended for 14 days for falsification of your daily work log and neglect of duty.

4) The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties:

As a result of these two very serious charges, the agency has no confidence in your ability to perform your regularly assigned duties.

5) Consistency of the penalty with those imposed upon other employees for the same or similar offenses:

   NARA has removed employees who were charged with insubordination or made threatening remarks to a security guard as a first offense.   You are the first employee who has been charged with both offenses.

6) Consistency of the penalty with any applicable agency table of penalties:

   The penalty of removal for these two serious offenses fall within the parameters of NARA's disciplinary regulations (Personnel 300, Chapter 752).

7) The notoriety of the offense or its impact upon the reputation of the agency;

   The agency was fortunate that there was no public notoriety, although there was the potential of notoriety if there had been loss of life, injury, or destruction of irreplaceable documents had you followed through with your threats to the security guard.

8) The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.

   You were put on clear notice by the letter of August 17, 2004 from Elizabeth Washington that if you failed to follow the order that you were not to display political or disparaging materials in the workplace that you would be charged with insubordination and that this will form the basis for removal from the federal service.

   All employees have access to NARA notices – including Interim Guidance 300-19, Violence in the Workplace.   The notices are posted on an employee bulletin board when issued.

9) Potential for rehabilitation:

   As the above shows, you have a history of difficult behavior, particularly as it relates to posting material in the workplace which expresses your political and/or offensive views.   I find that you lack the potential for rehabilitation for this reason.

10) Mitigation circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment harassment, or bad faith, malice or

provocation on the parts of others involved in the matter:

> I do not find these to be mitigating circumstances.

11) The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others:

> I do not believe that a lesser penalty is sufficient given the serious nature of your offenses and your unwillingness to take responsibility for them or efforts to make light of them.

12) The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability:

> In making my determination I have considered your 12 years of federal service. However, your serious misconduct substantially outweighs any mitigation as it relates to your length of service. In addition, your performance has not always been satisfactory. In 1998 and 2003, you were denied a Within Grade Increase (WGI) because of Minimally Satisfactory performance.

You have the right to file an appeal with the Merit Systems Protection Board (MSPB), Northeastern Regional Office, Room 501, Second and Chestnut Streets, Philadelphia, PA 19106-2987. Facsimile No. 215-597-3456. Your appeal must be filed during the period beginning with the day after the effective date of this action and ending on the 30th day after the effective date. If you do not submit an appeal within the time set by statute, regulation or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown. A copy of the appeal form and the Board's regulations are enclosed.

If you appeal, you may be represented by an attorney or other representative of your choosing. You may contact Joan Janshego, NARA Human Resources Services Division on 301-837-1844, if you desire additional information on how to pursue an appeal. You may, as an alternative to filing an appeal with the MSPB, choose to use the negotiated grievance procedure by submitting a grievance in accordance with the NARA/AFGE Labor-Management Agreement. You cannot choose to challenge this action through both procedures because the election of one procedure will preclude proceeding in the other.

If you wish to allege discrimination because of your removal, you may address that issue in any appeal to the MSPB, or you may file a discrimination complaint with NARA's Office of Equal Employment Opportunity (EEO), but you may not do both. If you wish to file a complaint with NARA alleging discrimination because of race, color, religion, sex, national origin, handicap, or age, you must first contact an EEO counselor. You must contact a counselor within 45 calendar days of the effective date of your removal if you choose to follow the discrimination complaint procedure.

In summary, if you elect to challenge this removal, you must choose between (1) an appeal to the MSPB,   (2) the negotiated grievance procedure or (3) a discrimination complaint through NARA.   Whichever type of action is filed first shall be considered an election to proceed in that forum.

Sincerely,

DAVID ROLAND
Assistant Regional Administrator
Mid Atlantic Region)

Attachments:
MSPB regulations and appeal form; extra copy of decision letter MARKED FOR UNION

Official: NHHR
Reading: NHHR
Info copies: NHHR (SL),NL, NRB, NRBPA, NRBPC
Jjanshego, jmj, 11/5/04
DOC: MurrayRemovalDecision