Page 1

```
 1           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF PENNSYLVANIA
 2              CASE NO.: 05-cv-4557
                      - - -
 3
    DARRYL MURRAY,                :
 4
              Plaintiff,          :
 5
         vs                       :
 6
    ALLEN WEINSTEIN,
 7   Archivist of the             :
    United States,
 8                                :
              Defendants.
 9
10
                      - - -
11         Tuesday, November 14, 2006
             Philadelphia, Pennsylvania
12                    - - -
13
              Oral Deposition of IRENE JONES taken
14  pursuant to Notice, at the VA MEDICAL CENTER,
    University and Woodland Avenues, Philadelphia,
15  Pennsylvania commencing at approximately 2:06
    p.m., on the above date, before Tracey L. Pinsky,
16  CSR, RPR and Notary Public.
17
18
19                    - - -
20
21       CLASS ACT REPORTING AGENCY, LLC
           Registered Professional Reporters
22  1420 Walnut Street        133H Gaither Drive
    Suite 1212                Mt. Laurel, NJ 08054
23  Philadelphia, PA 19103    (856) 235-5108
    (215) 928-9760
24
```

GOVERNMENT EXHIBIT 4

Page 2

1  A P P E A R A N C E S :
2     GERALD B. SULLIVAN, ESQUIRE
       U.S. Department of Justice
3     U.S. Attorney's Office
       Eastern District of Pennsylvania
4     615 Chestnut Street
       Suite 1250
5     Philadelphia, Pennsylvania 19106
       Counsel for the Defendants
6
7
    ALSO PRESENT:
8
       Darryl Murray, pro se
9     John E. Davenport, General Counsel

Page 4

1          IRENE JONES, after having been first
2   duly sworn, was examined and testified as follows:
3   EXAMINATION
4   BY MR. SULLIVAN:
5       Q.   Ms. Jones, good morning.
6       A.   Good morning.
7       Q.   My name is Jerry Sullivan; I'm the
8   assistant United States attorney. I represent the
9   National Archives and Records Administration in
10  this lawsuit that's been brought by Mr. Murray,
11  who I understand is your former coworker. Do you
12  understand that your testimony today is under
13  oath?
14      A.   Uh-huh.
15      Q.   And that means that you're required
16  not just to tell the truth, but to tell the
17  complete truth so that we have a full picture of
18  what happened during the event that we will be
19  talking about today. Do you understand that?
20      A.   Yes.
21      Q.   Okay. Because your testimony is
22  being taken down by a court reporter, it's really
23  important that all of your responses be oral in
24  words and not nods of the head or shrugs of the

Page 3

1              I N D E X
2   WITNESS                          PAGE
3   IRENE JONES
4      By Mr. Sullivan               4
5
6
7            E X H I B I T S
8   NUMBER    DESCRIPTION            PAGE
9   A         Statement              7

Page 5

1   shoulder. So if you could make sure that you do
2   make oral responses to all of my questions, that
3   would be much appreciated. Do you understand
4   that?
5       A.   Yes.
6       Q.   Okay. Have you ever been deposed
7   before?
8       A.   Yes.
9       Q.   Okay. How many times?
10      A.   Once.
11      Q.   In what kind of action was that?
12      A.   It's a family matter.
13      Q.   Okay. So you understand a little
14  bit about how depositions proceed?
15      A.   Yes.
16      Q.   I'll still go through a few more
17  instructions, preliminary instructions so that you
18  understand the protocol.
19      A.   Uh-huh.
20      Q.   If you don't understand one of my
21  questions, please just let me know and I'll try to
22  rephrase it in a way that's understandable to you.
23  If you understand -- if you answer the question,
24  I'm going to assume that you understood my

CLASS ACT REPORTING AGENCY, LLC
(215) 928-9760   (856) 235-5108

1ea0a61c-fe5a-4884-87ed-bf3588bb15cf

Page 6

1  question. Okay?
2      A.   Yes.
3      Q.   Okay. If you don't remember the
4  answer to a question, you can say I don't
5  remember. If you don't know the answer to a
6  question, you could say I don't know. Okay?
7      A.   Okay.
8      Q.   If you need to take a break at any
9  point, just let me know.
10     A.   Okay.
11     Q.   I'm going to ask if you do take a
12 break, though, that you not discuss any of the
13 deposition with Mr. Murray. Okay?
14     A.   Uh-huh.
15     Q.   Are you on any medications today
16 that might impair your ability to answer any of my
17 questions?
18     A.   No.
19     Q.   Okay. Now, my subpoena directs you
20 to bring any and all documents relating in any way
21 to Darryl Murray and/or relating to persons whom
22 you believe have been treated similarly or
23 dissimilarly to Mr. Murray, and that are in your
24 possession, custody or control. Did you bring any

Page 7

1  documents responsive to the subpoena?
2      A.   Just my statement.
3      Q.   Okay.
4      A.   It was the statement I had made at
5  the time.
6      Q.   Okay. And you've just handed me a
7  statement that's titled Affidavit of Irene Jones
8  and dated January 27, 2005; is that correct?
9      A.   Uh-huh.
10     Q.   I'll have this marked as Exhibit A.
11         (Exhibit A marked for
12 identification.)
13 BY MR. SULLIVAN:
14     Q.   Do you have any other documents
15 anywhere in your possession, do you know of any --
16 the existence of any other documents that would be
17 responsive to my subpoena?
18     A.   No, I don't.
19     Q.   Okay. I'll come back to the
20 affidavit soon. When did you last speak to
21 Mr. Murray before coming here today?
22     A.   January, same date as on -- last day
23 at work. I mean, man, that was back in 2005, how
24 long have you been gone there?

Page 8

1          MR. MURRAY: 2004.
2          MR. SULLIVAN: Wait. Mr. Murray
3  understand you are pro se, but --
4          THE WITNESS: 2004.
5          MR. SULLIVAN: -- you're not
6  supposed to testify or speak. You can makes
7  objections if you think something is
8  objectionable, but you're not supposed to speak
9  during the deposition, otherwise. Okay?
10         THE WITNESS: This was his last day
11 of work.
12 BY MR. SULLIVAN:
13     Q.   Okay. You haven't spoken to him
14 since then?
15     A.   No.
16     Q.   Okay. Where are you currently
17 employed?
18     A.   VA Medical Center.
19     Q.   Okay. And what do you do
20 what -- but let me just say for the record that we
21 are at the VA Medical Center in the regional
22 counsel's room today.
23     A.   Uh-huh.
24     Q.   What do you do at the VA Medical

Page 9

1  Center?
2      A.   Supervisor file clerk.
3      Q.   Okay. And what's your GS level?
4      A.   Seven.
5      Q.   How long have you been working at
6  the VA Medical Center?
7      A.   A month.
8      Q.   Where were you last employed?
9      A.   Federal Records Center, Midatlantic
10 Region.
11     Q.   For the National Archives and
12 Records Administration?
13     A.   Yes.
14     Q.   And what did you do there in your
15 last position?
16     A.   Archives technicians slash quality
17 control.
18     Q.   Okay. And were you a GS-6?
19     A.   Yes.
20     Q.   Were you in the customer service
21 division?
22     A.   Yes.
23     Q.   How long did you hold that position?
24     A.   Almost 18 years.

Page 10

1   Q.   Did you work in the same division as
2   Darryl Murray?
3   A.   No. Well -- no. While I was in the
4   customer service, he was in a different area. But
5   they was basically located in the same place.
6   Q.   Is that -- and now the records
7   center currently is on Townsend Road in
8   Philadelphia, correct?
9   A.   Yes.
10   Q.   When you say they were in the same
11   area we're in, that being the same area when you
12   were at Townsend Road?
13   A.   Yes.
14   Q.   Okay. Did you previously work at a
15   National Archives Record Center at -- on
16   Wissahickon Avenue in Philadelphia?
17   A.   Yes.
18   Q.   Okay. Were you and Mr. Murray in
19   the same part of that building as well?
20   A.   Yes.
21   Q.   Okay. How long did you hold the
22   position of archives technician quality control?
23   A.   Three years.
24   Q.   Okay. And what did you do before

Page 11

1   that?
2   A.   Well, I actually -- quality control
3   was the 5-6 I went for, but I was the archive
4   technician before then.
5   Q.   Okay. For how long?
6   A.   Ten years.
7   Q.   Okay. And did Mr. Murray work with
8   you at Wissahickon as well?
9   A.   Yes.
10   Q.   What job did you have before you
11   went to work for the National Archives at
12   Wissahickon Avenue?
13   A.   I did four years of college.
14   Q.   Okay. And where did you go to
15   college?
16   A.   Penn State University.
17   Q.   Did you get a degree from there?
18   A.   No.
19   Q.   Okay. What years did you attend
20   there?
21   A.   '79, '80, '81 and '82.
22   Q.   Okay. I'm going to go right to the
23   events of the date that we're most focused on here
24   today. That's the last occasion that you say that

Page 12

1   you saw Mr. Murray before today's deposition. Do
2   you remember the date?
3   A.   It's like November the 11th, 2004,
4   around -- somewhere around there.
5   Q.   But is this a date in which
6   Mr. Murray came to the records facility while he
7   was on administrative leave?
8   A.   Yes, I think so.
9   Q.   Okay. I'm just going to state for
10   the record it was September 22nd, 2004.
11   A.   Okay.
12   Q.   What did -- when did you come to
13   work that day?
14   A.   I was there six o'clock.
15   Q.   In the morning?
16   A.   Uh-huh.
17   Q.   And what was your schedule that day,
18   when was your lunch break scheduled for?
19   A.   My lunch break was 11:15.
20   Q.   Okay. And what had you been doing
21   in the morning?
22   A.   Working.
23   Q.   Okay. Before you left for your
24   lunch break, did you have any conversations with

Page 13

1   anybody regarding Mr. Murray?
2   A.   No.
3   Q.   Okay. What time did you leave for
4   your lunch break?
5   A.   Around 11:15.
6   Q.   Okay. Tell me where you walked
7   from, where you walked to, and then what happened?
8   A.   I walked out of the file to the
9   parking lot.
10   Q.   Okay. Why were you going to the
11   parking lot?
12   A.   I usually go outside and eat my
13   lunch.
14   Q.   Okay. And was there -- did you end
15   up seeing Mr. Murray?
16   A.   Well, when I went out in the parking
17   lot, he pulled up in the parking lot.
18   Q.   Where did he pull up?
19   A.   The front of the door.
20   Q.   How far was his car from the door.
21   He was in a car?
22   A.   Yeah. It was a couple of feet.
23   Q.   Okay. What color was his car?
24   A.   I'm not sure. I'm not sure.

Page 14

1   Q.   What time was it?
2   A.   It was about 11:20.
3   Q.   Okay. Was his car running at the
4   time?
5   A.   Yes.
6   Q.   What did you see when you arrived at
7   his car?
8   A.   It was just sitting there, sitting
9   there in the car with a baby in the back seat.
10  Q.   Was anybody else in the car?
11  A.   No.
12  Q.   Did you know at that time that he
13  was on administrative leave?
14  A.   No, I didn't.
15  Q.   Okay. Had anybody told you before
16  you saw him that he had called the workplace that
17  day?
18  A.   No, they didn't.
19  Q.   Did you go to him to speak to him or
20  did he call out to you? How did you initiate any
21  conversation --
22  A.   I walked up to him.
23  Q.   Okay. Was the window open?
24  A.   Yes.

Page 15

1   Q.   Okay. And what did you say?
2   A.   I asked him how he was doing. That
3   I didn't hear that he was suspended from the job.
4   I asked him about the baby in the back seat. He
5   said it belongs to a friend. He asked to speak to
6   one of my coworkers, which was one of his friends.
7   Actually, did I see him? Was he in that day? I
8   told him yes. I told him that he wasn't in the
9   area, he probably was back in the files. That
10  when I see him, I would let him know.
11  Q.   What was your tone of conversation?
12  Were you laughing, joking, was it serious?
13  A.   It was laughing, joking, like we
14  always do.
15  Q.   Then what happened after that?
16  A.   That was it. Just had a
17  conversation with him. You know, and that was it.
18  Q.   Did he tell you why he was
19  interested in speaking to your coworker?
20  A.   No. He just said that he wanted to
21  talk to him. You know, he had his phone number --
22  he had lost his phone number, wondering, you know,
23  could you get his phone number again.
24  Q.   Okay. And this is Mr. Hammond?

Page 16

1   A.   Yes.
2   Q.   Did you tell Mr. Murray that you
3   were going to do anything for him?
4   A.   I just told him that I would tell
5   him that. You know, if I see Warren, I would tell
6   him that he wanted to speak to him.
7   Q.   Did anybody else approach either of
8   you during the time you were there?
9   A.   In the parking lot?
10  Q.   Uh-huh.
11  A.   The guard.
12  Q.   Okay. What was the guard's name?
13  A.   James. I'm not sure of his last
14  name. His first name is James.
15  Q.   James Hughes, does that sound right?
16  A.   Yes.
17  Q.   Okay. At what point did Officer --
18  Mr. Hughes come over to your car?
19  A.   Well, after I had been standing
20  there for like ten minutes, he came over to the
21  car and told Mr. Murray that he didn't think that
22  he was allowed to be on the ground, that he would
23  ask Mr. McElroy, you know, was he allowed to be on
24  the grounds. And Darryl just said, well, I'm

Page 17

1   sorry, excused himself and he left.
2   Q.   Where were you standing at the time?
3   A.   At the car.
4   Q.   Where --
5   A.   On the passenger side.
6   Q.   Okay.
7   A.   In the front.
8   Q.   And the front of the car was facing
9   which direction, towards the entrance gate or the
10  other way?
11  A.   The entrance to leave.
12  Q.   Okay. So you were on the side of
13  the car facing the building?
14  A.   Yes.
15  Q.   Okay. And when Officer Hughes was
16  speaking to Mr. Murray, where was he standing?
17  A.   Like a few feet over my shoulder.
18  Q.   Behind you?
19  A.   Yeah. Right, like on the right side
20  of me.
21  Q.   Now, I have not yet seen the
22  investigative report from Federal Protective
23  Services, which is part of the Department of
24  Homeland Security, but I spoke with a

Page 18

1  representative of the agency yesterday. I'm going
2  to be getting the report soon. And he states that
3  in that report, the investigator for Federal
4  Protective Services states that you said to him
5  that you did not hear the substance of any of the
6  conversations between Officer Hughes and
7  Mr. Murray.
8      A.   Right.
9      Q.   Is it possible that you told an
10 investigator of that federal agency that you did
11 not hear the substance of the conversations
12 between Mr. -- Officer Hughes and Mr. Murray?
13     A.   I didn't -- I didn't hear the
14 conversation between them two. I don't know
15 whether he was out there before I got out there or
16 did he just walk out there, I don't know.
17     Q.   Okay.
18     A.   I just know when I walked out there
19 Darryl's car pulled up.
20     Q.   Okay.
21     A.   Now, I don't know had he been there
22 before I got out there or not, I don't know. I
23 don't know what conversation was between them two.
24     Q.   Okay. So there may have been

Page 19

1  conversations, just so I'm clear, between Mr.
2  Murray and Security Officer Hughes, that you did
3  not hear?
4      A.   Not that I know of.
5      Q.   Right. You don't know. It's
6  possible that they had conversations?
7      A.   I couldn't say.
8      Q.   They could have spoken before you
9  got out there?
10     A.   They might have.
11     Q.   Okay. So what you told -- if in
12 fact, the report from Federal Protective Services
13 states that you said that you did not hear the
14 substance of any of the conversations between
15 Hughes and Mr. Murray, that's true?
16     A.   Uh-huh.
17     Q.   Okay.
18     A.   Yes.
19     Q.   Apart from what you've already told
20 me that you heard Security Officer Hughes say to
21 Mr. Murray, did you hear Officer Hughes say
22 anything else to Mr. Murray?
23     A.   No. Other than I don't think you're
24 allowed on the grounds.

Page 20

1      Q.   Okay. Did you hear Mr. Murray say
2  anything to Officer Hughes?
3      A.   Nothing but "I'm leaving".
4      Q.   Okay. And you saw Mr. Murray leave?
5      A.   Yes.
6      Q.   How soon after Mr. Murray said what
7  you just said he said did he leave?
8      A.   Two minutes.
9      Q.   Did Officer Hughes go back in the
10 building?
11     A.   Yes. Because I walked away.
12     Q.   Where did you walk to?
13     A.   To the end of the grounds where I
14 usually eat my lunch at.
15     Q.   The picnic area?
16     A.   Yeah, close to there.
17     Q.   Okay. Where did -- when did Hughes
18 go back inside?
19     A.   After Darryl Murray pulled off.
20     Q.   Okay. Did he remain outside the
21 entire time after he came out?
22     A.   No. James, the guard?
23     Q.   James Hughes.
24     A.   No, no.

Page 21

1      Q.   What happened with Hughes? You said
2  he came out, he made the statement to Mr. Murray,
3  then what did he do?
4      A.   After that he went back in, Darryl
5  pulled off.
6      Q.   Did he come back out after that?
7      A.   Not -- I didn't see him come back
8  out.
9      Q.   Okay. Did you have any
10 conversations with Mr. Hughes?
11     A.   No.
12     Q.   None at all?
13     A.   None.
14     Q.   Did you exchange any words at all
15 with him?
16     A.   None.
17     Q.   Did you say anything to Mr. Murray
18 before he left?
19     A.   Nothing but, "I'll see you later".
20     Q.   Okay. Did you have any
21 conversations with Mr. Murray, other than what
22 you've already told us about today?
23     A.   No, I didn't.
24     Q.   What was Mr. Murray's tone of voice

6 (Pages 18 to 21)

Page 22

1  throughout, apart from the sort of conversational
2  tone you already referred to? Did it ever become
3  angry or did you --
4      A.   Never angry. Normal, soft voice he
5  always had. No anger, no hollering, no screaming.
6  Didn't sound like he was mad or angry or anything.
7      Q.   Did you at any time before
8  Mr. Murray left leave the side of the car?
9      A.   Did I leave? No.
10     Q.   If Mr. Murray said or states that he
11 made certain statements to Officer Hughes that
12 you're not recalling, is it possible that he made
13 those statements to Officer Hughes?
14     A.   He didn't make any statements to
15 Officer Hughes while I was there.
16     Q.   So if he's stating that he did or if
17 he has stated in the past he did make certain
18 statements to Officer Hughes, you're not saying
19 that he didn't make them, that he's lying about
20 that or that you lied about that, you just didn't
21 hear them during the brief period that you were
22 there. Is what you are saying; is that correct?
23     A.   Officer Hughes -- when I always saw
24 Officer Hughes and Darryl Murray together, they

Page 23

1  was always friends. He was always talking to him,
2  talking about his car. You know, what kind of car
3  he drove, what kind of car he had. They never had
4  no violent conversations, they was friends.
5      Q.   But what I'm saying is: If
6  Mr. Murray has stated that he has made certain
7  statements to Security Officer Hughes on that
8  occasion.
9      A.   How would I know that?
10     Q.   You don't have a basis for knowing
11 whether he did or not?
12     A.   No.
13     Q.   Okay.
14     A.   I wouldn't know that.
15     Q.   So you're not saying Mr. Murray
16 would be lying, then, you just didn't hear that,
17 correct?
18     A.   I was -- how would I have any idea
19 of that, if they had any violent conversations
20 with each other?
21     Q.   Okay.
22     A.   No.
23     Q.   How long total were you by the side
24 of the car?

Page 24

1      A.   About 20 minutes.
2      Q.   How long were you eating lunch after
3  the incident?
4      A.   For a half-an-hour.
5      Q.   Did anybody talk to you about what
6  had happened --
7      A.   No.
8      Q.   -- while you were eating? Excuse
9  me.
10          Did you return to work after that?
11     A.   Yes.
12     Q.   Did anybody during the course of
13 your work that afternoon, later that morning, that
14 afternoon, talk to you about Mr. Murray coming to
15 the building?
16     A.   No.
17     Q.   Did you talk to anybody about
18 Mr. Murray coming to the building?
19     A.   No.
20     Q.   Did you talk to Mr. Hammond about
21 it?
22     A.   Did I talk to him about it? No, I
23 didn't see him during that period, no.
24     Q.   When did you next speak to

Page 25

1  Mr. Hammond about Mr. Murray?
2      A.   Probably, like the next day.
3      Q.   And what did you speak about when
4  you spoke to Mr. Hammond?
5      A.   Just told him Darryl lost his phone
6  number and he wanted, you know, him to call him.
7      Q.   Did you speak to James Hughes that
8  day after Mr. Murray left, at any time?
9      A.   No.
10     Q.   Did you speak to James Hughes later
11 that week about Mr. Murray?
12     A.   No.
13     Q.   Did anybody in management talk to
14 you about Mr. Murray, his coming to the property
15 that week?
16     A.   That he was coming to the property
17 that week?
18     Q.   That he had come to the property.
19 And what happened that day.
20     A.   Did anybody ask me what happened
21 that day?
22     Q.   Yes.
23     A.   Yes. John McElroy.
24     Q.   When did he ask you that? On the

Page 26

1  same day?
2      A.   On the same day.
3      Q.   What time? Do you remember?
4      A.   Must have been between, I guess
5  12:00 or 12:15. I was called in like right after
6  my lunch was over.
7      Q.   Okay.
8      A.   Called into his office.
9      Q.   Did anybody, other than Mr. McElroy,
10 talk to you about Mr. Murray coming to the
11 workplace that day?
12     A.   No.
13     Q.   Okay. What did you talk about with
14 Mr. McElroy?
15     A.   He asked me what was the
16 conversation between me and the guard. The guard
17 said that I had witnessed him threatening some --
18 throwing out some threats. That I had witnessed
19 him saying that. I told him I didn't witness him
20 saying it.
21     Q.   So you told him you didn't hear any
22 threats?
23     A.   I didn't hear no threats.
24     Q.   Okay. What did Mr. McElroy say to

Page 27

1  you?
2      A.   He told me I was lying because I
3  wasn't looking him in the eyes when I said it.
4      Q.   Did he say anything else to you?
5      A.   That I told him why he called me in
6  the office if he wasn't -- he didn't believe what
7  I had to say. And I got up and left.
8      Q.   Did Mr. McElroy or anybody in
9  management talk to you about the incident after
10 that?
11     A.   Nobody but my supervisor, Pat Davis.
12     Q.   Okay. What's her full name?
13     A.   Pat Mary Davis.
14     Q.   When did she talk to you about it?
15     A.   Maybe like 15 or 20 minutes after
16 that.
17     Q.   What did she ask you?
18     A.   Saying that Darryl got himself into
19 something and he probably couldn't get himself out
20 of. And he's probably in a whole lot of trouble.
21     Q.   And what did you tell her?
22     A.   I told her that was definitely up to
23 whatever happened with him in the -- in the
24 center.

Page 28

1      Q.   Did she say anything more to you?
2      A.   No.
3      Q.   Did you talk to her any further
4  about that after that?
5      A.   No.
6      Q.   Did you have any conversations with
7  any investigators, any detectives, any police
8  officers about Mr. Murray coming to the workplace
9  that day, at any time?
10     A.   One detective called me on the phone
11 and asked me -- I don't know who he was -- asked
12 me for my phone number, my home phone number. If
13 I wanted to change my statement, you know, I could
14 give him a call.
15     Q.   Okay. Did he ask you questions?
16     A.   He asked me a few questions.
17     Q.   Okay. Do you remember if his name
18 was Pepe, P-e-p-e?
19     A.   That -- yeah, that sound like him.
20     Q.   Okay.
21     A.   That sounds like the name.
22     Q.   Do you remember when that
23 conversation happened?
24     A.   It happened like the next day.

Page 29

1      Q.   Okay. So the events were pretty
2  fresh in your mind still?
3      A.   Yeah, pretty much.
4      Q.   Okay. And were you honest with him
5  when you talked to him?
6      A.   Yes.
7      Q.   Okay. Did you make any notes at all
8  after -- wait -- it seemed to you maybe that there
9  was some concern among management about the events
10 of that day; is that correct? That they were --
11 they were raising questions about what Mr. Murray
12 might have said that day?
13     A.   Yeah. He told me that -- somebody
14 said that if I was covering up or something for
15 him, that I could lose my job, you know. I told
16 him, you know, I told him what I had -- what I had
17 to tell him. I asked him, was he threatening me?
18     Q.   Did you then make any notes for your
19 own records about what had happened about what
20 Mr. Murray had said?
21     A.   No.
22     Q.   Okay. Have you ever made any notes
23 regarding Mr. Murray and the events of
24 September 22nd, 2004?

Page 30

1   A.   No.
2   Q.   Okay. Do you believe that National
3   Archives management ever treated you differently
4   because of what you said to Mr. McElroy, Ms. Davis
5   after the events of September 22nd, 2004?
6   A.   Rephrase that again.
7   Q.   Do you believe that National
8   Archives management ever treated you differently,
9   based upon what you told Mr. McElroy following the
10  September 22nd, 2004 incident?
11  A.   Yeah, I got treated a lot
12  differently.
13  Q.   Okay. Explain.
14  A.   Well, I had one incident where I was
15  on light duty and I had a bad knee. And I was
16  taking medication that would keep the swelling
17  down but it would make me drowsy. And they
18  happened to see me sleeping and nodding, which I
19  got written up and suspended for three days after
20  that. And then after that happened I came back.
21  Then I still got treated wrong.
22  Q.   So are you saying you were not
23  sleeping when --
24  A.   They said -- they said I was fully

Page 31

1   sleeping, I was nodding. What they -- I told him
2   they had the letter, they had the medication that
3   I was taking and it say may cause drowsiness. And
4   they sent me on the dock, on a hot dock deck with
5   no heat, no fans, no air. And, of course, I was
6   going to fall off to sleep.
7   Q.   Okay.
8   A.   Nod off. But when they walked right
9   over to me, I woke right up.
10  Q.   Okay. So --
11  A.   And a couple incidents where I was
12  suspended. I was treated bad after that.
13  Q.   So you were caught sleeping then?
14  A.   Yeah.
15  Q.   In July of 2004?
16  A.   Yeah.
17  Q.   Is that right?
18  A.   Yeah.
19  Q.   Now, the incident happened September
20  of 2004 with Mr. Murray. This is before that?
21  A.   Right.
22  Q.   So how could management have been
23  treating you differently --
24  A.   And after that. There was a lot of

Page 32

1   incidents happened with me after Darryl Murray had
2   left.
3   Q.   But the incidents you've been just
4   referring to happened before then; is that
5   correct?
6   A.   Right, and it ran right over.
7   Q.   I'm sorry?
8   A.   It ran across that.
9   Q.   Were you upset with management based
10  upon the way they -- the way you feel they treated
11  you related to the sleeping on the job incident?
12  A.   It could have been. I just know I
13  wasn't treated fairly after I gave up my
14  statement.
15  Q.   Okay. And that was again before
16  Mr. Murray --
17  A.   Before he --
18  Q.   -- came to the workplace on
19  September 22nd --
20  A.   Right.
21  Q.   -- 2004?
22       Were you angry with management at
23  that point?
24  A.   No. I just knew what I had to do.

Page 33

1   It was time for me to go.
2   Q.   Okay. So you were already resigned
3   that you were leaving --
4   A.   No. I was working on getting out of
5   there.
6   Q.   Okay.
7   A.   Might have came down to me being
8   fired like he was.
9   Q.   Do you have any knowledge of the
10  incident to let -- that led to Mr. Murray being
11  placed on administrative leave around September
12  22nd -- I mean, excuse me -- September 16th, 2004
13  that would be about a week before he came to the
14  workplace, the time we just talked about?
15  A.   I know I heard some talk going
16  around saying that he was displaying some
17  religious beliefs. That they were offensive to
18  some people and others, you know, they wasn't
19  taking it very well. But that's about it.
20  Q.   Who did you hear that from?
21  A.   Just a couple of coworkers. But
22  ever since we worked with Darryl, he always
23  displayed stuff for religious beliefs. I didn't
24  find them offensive.

**Page 34**

1  Q. Which coworkers?
2  A. Everybody in the building that went
3  passed his area and just saw the pictures and
4  maybe the literature, everybody had that.
5  Q. Can you name a single person who
6  complained about it?
7  A. I didn't hear nobody complaining
8  that it was belligerent or they felt, you know,
9  degraded by or anything. No, nobody, nothing like
10 that.
11 Q. But did you hear through the
12 grapevine that somebody was concerned about it?
13 A. No. No, nobody but management.
14 Q. Okay. So you never heard that a
15 coworker was upset by anything?
16 A. No.
17 Q. Why is it your view that there was
18 concern about religious content to the postings
19 rather than other content?
20 A. Well, lot of supervisors we deal --
21 that we worked with had stuff of their religion.
22 Hanging up literature, pictures, you know. And
23 nobody never barked about or squalled about it
24 until Darryl started displaying his religious

**Page 35**

1  beliefs.
2  Q. How -- what was in his posting that
3  was religious as opposed to other content? What
4  did you see that was religious content?
5  A. Just the stuff on how black people
6  are. How things be happening with different
7  races; black, white, Indian, Spanish, you know,
8  just regular basic religious beliefs that people
9  have.
10 Q. But what about that is religious?
11 A. What about his religion?
12 Q. What about that kind of posting
13 would be religious?
14 A. I called it literature. I wouldn't
15 say it had anything to do with religion. I just
16 called it black literature.
17 Q. Did you see any particular, that you
18 can tell me about, religious content to any of his
19 postings as opposed to talking about race and
20 things, politics?
21 A. No.
22 Q. Okay. Did you ever observe any
23 content of any of Mr. Murray's postings that you
24 would consider disparaging to anybody else, any

**Page 36**

1  coworkers or anybody else?
2  A. No.
3  Q. Okay. Did you read Mr. Murray's
4  postings when they were up?
5  A. Some of them.
6  Q. Okay. Sometimes you didn't read
7  them?
8  A. No.
9  Q. Okay. Did you ever see a posting
10 referring, on Mr. Murray's workstation, referring
11 to two legged cockroaches?
12 A. Two legged cockroaches?
13 Q. Two legged cockroaches.
14 A. No.
15 Q. Did you ever see a posting that
16 stated low self-esteem, inferiority complex,
17 inflated ego, jealous and worthless losers,
18 nothing-ass employees?
19 A. No.
20 Q. Do you have any view as to whether
21 or not that was directed to a coworker or not?
22 A. No, I don't think so.
23 Q. Okay. If it was directed to a
24 coworker, would you consider that disparaging to

**Page 37**

1  the coworker?
2  A. If it was, none of them came up to
3  him and said anything about it.
4  Q. Okay. But if there is -- if there
5  was a posting that said worthless losers,
6  nothing-ass employees that was directed to a
7  coworker, would you consider that disparaging to
8  coworkers?
9  A. That depends on the person.
10 Q. Okay. Do you recall any coworker
11 ever having an issue with any posting of
12 Mr. Murray's?
13 A. No. Just, did you read the
14 literature that was on Darryl Murray's cubby
15 today? I was like no.
16 Q. Do you recall any incidents
17 Mr. Murray ever had with a coworker -- forgive me
18 if I don't pronounce the name right -- Hongdiep?
19 A. Did he have any --
20 Q. Am I pronouncing his name right?
21 A. Hongdiep.
22 Q. Okay. H-o-n-g-d-i-e-p?
23 A. Yeah, Hongdiep.
24 Q. Hongdiep.

Page 38

1  A.  Uh-huh.
2  Q.  Do you recall Mr. Murray ever having
3  any issues with that coworker?
4  A.  He can't hear.
5  Q.  Okay. Do you recall him having any
6  problems with that coworker or concerns?
7  A.  No.
8  Q.  Okay. Do you remember him having
9  any concerns or issues with any other coworkers?
10  A.  No.
11  Q.  Okay. You never had a conversation
12  with him where he complained about a coworker?
13  A.  Everybody complained about
14  coworkers.
15  Q.  Nothing out of the normal?
16  A.  Nothing out of the normal.
17  Q.  Do you remember -- do you ever --
18  did you ever refer to a group of employees at the
19  National Archives Federal Records Center as the
20  status quo clique?
21  A.  Yes.
22  Q.  Okay.
23  A.  There's a lot of them in there.
24  Q.  Is that a term that's generally

Page 39

1  used?
2  A.  Yes.
3  Q.  Who are they and why are they called
4  status quo clique?
5  A.  Because they said that they are
6  employees that are related, like aunts and uncles
7  and nephews and sisters and nieces. So you called
8  them there the clique because they always look out
9  for each other. They protect each other's back --
10  Q.  Who is --
11  A.  -- no matter what.
12  Q.  -- in the clique?
13  A.  What -- which clique? There's a
14  whole lot of them.
15  Q.  Okay. Is there a clique with
16  Mitchell Buffone, Vernel Tate?
17  A.  Not now. It was back then, but I
18  don't think now.
19  Q.  Okay. And who was in that clique?
20  A.  Reecee, Pat.
21  Q.  Can you give the full names?
22  A.  Pat Davis, Reecee Dawson,
23  Mitch Buffone, Tamika Gilliard, lot of them.
24  Q.  Were you in that clique?

Page 40

1  A.  No.
2  Q.  Okay.
3  A.  I'm a loner.
4  Q.  Okay. Did -- do you remember
5  Mr. Murray ever complaining about that clique?
6  A.  Yeah.
7  Q.  And what were his complaints?
8  A.  That they were stopping him from
9  moving on. Stopping him from being promoted.
10  Holding him back to the position he was in.
11  Q.  Okay. What -- did he give you any
12  specifics about what they were doing, in his view?
13  A.  They were just saying that they
14  wasn't going to promote him. They don't why he's
15  still here. He might as well leave. He's never
16  going to move on, you know, just like a little,
17  like, nitpicking. Something that would make you
18  mad.
19  Q.  And what was his reaction to that?
20  A.  I'm going to be here as long as I
21  want to be here.
22  Q.  Okay. Do you recall Mr. Murray ever
23  complaining to you that that clique or any other
24  coworker was ever responsible for making things

Page 41

1  disappear from his workstation?
2  A.  We all know they do -- people do
3  stuff like that.
4  Q.  Did Mr. Murray ever complain to you
5  about that?
6  A.  Not complain to me about it, no.
7  Q.  Okay. Did you ever have the view
8  that, that clique or any other coworkers were
9  taking things from Mr. Murray's workstation?
10  A.  Well, I know they're capable of
11  doing things like that, yes.
12  Q.  But you don't have specific
13  knowledge of that happening?
14  A.  No.
15  Q.  Okay. Did Mr. Murray ever state to
16  you his belief or his experience, excuse me, did
17  Mr. Murray ever state to you his experience with
18  having his car scratched or with pasta being
19  placed on his car?
20  A.  Yes.
21  Q.  Okay. Did he tell you who he
22  thought was responsible for that?
23  A.  No.
24  Q.  Okay. What was his reaction to that

Page 42

1 happening?
2   A.   He knew who it was, he knew who did
3 it.
4   Q.   But he didn't tell you who?
5   A.   No.
6   Q.   Did he ever state to you that he
7 sought to take any kind of revenge for any actions
8 that were taken against him in the workplace?
9   A.   No.
10   Q.   Okay. Why do you believe that
11 Mr. Murray was terminated?
12   A.   Because he did just the amount of
13 work he was supposed to do and they couldn't push
14 him to do no more. And they tried to agitate him
15 and nagging, the bothering, the -- do everything
16 that they could and he just wouldn't let them get
17 to him.
18   Q.   So you think it was based on his
19 performance with they wanted him to perform --
20   A.   More --
21   Q.   -- differently?
22   A.   They wanted him to perform more but
23 he did just what was required of him. He wasn't
24 giving them no more. So I think in that, because

Page 43

1 of that, they held him back.
2   Q.   Okay.
3   A.   Because he gave his 50 percent or
4 whatever he was supposed to do to meet quota and
5 that was it. They wasn't getting no more, but
6 they know he could do more and he wasn't giving
7 them no more.
8   Q.   Do you think there was any religious
9 component to his termination?
10   A.   Could have been.
11   Q.   You say "could have been," are you
12 just speculating?
13   A.   Well -- well, it was a lot of people
14 like Mitch Buffone displayed pictures that are
15 mobsters. And they didn't do anything to him. So
16 the minute he put up a picture, religious beliefs
17 or his articles, then it was a big thing.
18   Q.   Mr. Buffone put up a picture of
19 John Gotti?
20   A.   Yes.
21   Q.   Was he --
22   A.   Always had it up.
23   Q.   Was he required at some point to
24 take it down?

Page 44

1   A.   Not until after Darryl Murray left,
2 after they got him terminated.
3   Q.   Okay. Explain to me whether you're
4 saying that you believe there was a religious
5 component to Mr. Murray being terminated.
6   A.   Well, the religious stuff didn't
7 come down off of Mitch's Buffone area until they
8 made him move his. But the whole time he
9 displayed his, nobody complained about the mobster
10 pictures Mitch displayed, or the religious
11 pictures Reecee had in her cubby hole, you know,
12 the paraphernal, whatever they had up, nobody
13 never complained about them until they jumped on
14 Darryl. Then after they got Darryl out of there,
15 then everybody else's stuff came down.
16   Q.   What in the -- what in the postings
17 of Mr. Murray's, that he was cited for in 2004 had
18 religious content?
19   A.   Just the regular prayers, maybe the
20 regular sayings between different ethnic beliefs.
21 You know, like everybody's ethnic beliefs display
22 different things.
23   Q.   So when you say religion, are you
24 referring to racial issues?

Page 45

1   A.   I didn't find none of his things to
2 be racial, no.
3   Q.   Okay. When you're saying it's
4 religious, you're saying he had prayers up?
5   A.   Yes, they did too. Sayings.
6   Q.   You saw --
7   A.   Agendas.
8   Q.   You saw prayers?
9   A.   Sayings. I saw like a little --
10 like a couple of prayers, sayings up in Reecee's
11 cubby hole.
12   Q.   No, no. I'm asking you about
13 Mr. Murray's workstation. Did you, in 2004, see
14 prayers at Mr. Murray's workstation?
15   A.   I didn't see no prayers up there.
16   Q.   Okay. What specifically do you
17 recall had religious content?
18   A.   Just African-American, Chinese,
19 Puerto Rican pictures. Actually, it was
20 literature.
21   Q.   Okay. So it wasn't so much
22 religious as his beliefs generally, political,
23 sociological?
24   A.   No, nothing like that.

CLASS ACT REPORTING AGENCY, LLC
(215) 928-9760   (856) 235-5108

1ea0a61c-fe5a-4884-87ed-bf3588bb15cf

Page 46

```
 1   Q.   So what was religious about what you
 2  saw posted in his workplace?
 3   A.   That he just talk about different
 4  beliefs that people believed in.
 5   Q.   Okay.
 6   A.   And different religions.
 7   Q.   But you saw discussion in 2004 of
 8  specific postings that talked --
 9   A.   Not -- no specific ones.
10   Q.   Okay. Do you believe that there was
11  any religious basis for the decision to terminate
12  him based upon the incident in the parking lot?
13   A.   They been at Darryl's neck for
14  years.
15   Q.   But what I'm asking you is: You
16  said you thought that they were unhappy with his
17  performance?
18   A.   That too.
19   Q.   Okay.
20   A.   Because he wouldn't kneel down and
21  bow down to them. Because he wouldn't do what
22  they told him to do. A whole lot of things.
23   Q.   And so I'm asking you: Is there
24  anything that you believe had anything to do with
```

Page 47

```
 1  his religion, that had anything to do with his
 2  termination based upon the incident in the parking
 3  lot?
 4   A.   It could have been a combination of
 5  some of it all.
 6   Q.   Okay. You're guessing that it could
 7  have been?
 8   A.   I think it was.
 9   Q.   Okay. You think it was based on
10  what?
11   A.   On his religious beliefs, what he
12  believed in.
13   Q.   Okay.
14   A.   His work performance. All of the
15  above.
16   Q.   Okay. Did you ever hear any
17  conversation among management, by anybody in
18  management related to Mr. Murray's religion?
19   A.   Rephrase that.
20   Q.   Did anybody in management ever talk
21  to you about any belief or concern or view they
22  had regarding Mr. Murray's religion?
23   A.   No.
24   Q.   Apart from the reference you made to
```

Page 48

```
 1  Mr. Buffone having a picture of John Gotti up, do
 2  you recall anybody in the workplace at the Federal
 3  Records Center having anything with religious
 4  content that they were allowed to keep up that was
 5  offensive to others?
 6   A.   Yes. His picture of his mobster
 7  lawyer or friend or whoever he was.
 8   Q.   Are you talking about Mr. Buffone?
 9   A.   Yes. People didn't think that was
10  fair, that he could display his pictures and
11  Darryl couldn't display whatever he wanted to put.
12   Q.   Are you talking about Gotti, the
13  picture of John Gotti?
14   A.   Yes.
15   Q.   Any other pictures that Mr. Buffone
16  had?
17   A.   No.
18   Q.   Okay. Do you recall anybody else in
19  the workplace having anything else, apart from
20  that picture that Mr. Buffone had of Mr. Gotti,
21  that was religious in content and that a worker
22  was allowed to keep posted?
23   A.   No.
24   Q.   Okay. Did other coworkers have
```

Page 49

```
 1  prayers, bibles, things like that at their
 2  workstations?
 3   A.   Yeah.
 4   Q.   Okay. And they were allowed to keep
 5  those sorts of things, right?
 6   A.   Uh-huh.
 7   Q.   Okay. But, again, you're not --
 8  you're saying there wasn't anything that was
 9  religious in content that was viewed as offensive
10  that anybody was allowed to keep. It was just
11  those things like prayers and bibles?
12   A.   Yeah.
13   Q.   Okay. Do you recall anybody having
14  any political postings in their workstations?
15   A.   No.
16   Q.   Do you recall any coworkers ever,
17  during your time either at Wissahickon or Townsend
18  Road, ever making any threats towards management,
19  towards coworkers, towards the workplace that were
20  not addressed by management?
21   A.   No.
22   Q.   Do you recall anybody ever making
23  any threats?
24   A.   Uh-uh.
```

Page 50

1  Q. Did Mr. Murray ever complain to you
2  about physical or mental health issues?
3  A. Yeah, a few.
4  Q. Can you tell us what he complained
5  about?
6  A. Like he said something about he had
7  problems with his back.
8  Q. Okay. When did he start complaining
9  about those?
10 A. Well, that's as far as I've been
11 working there. I remember him saying that, that
12 something happened with him with his back.
13 Q. Okay. Any other complaints,
14 physical or mental?
15 A. No.
16 Q. Excuse me. Have you ever socialized
17 with Mr. Murray outside of work with friends or
18 anybody?
19 A. I might have seen him outside of
20 work; but as far as going out with him and hanging
21 out with him, no.
22 Q. And you haven't socialized with him
23 since he left --
24 A. Right.

Page 51

1  Q. -- employment with --
2  A. Haven't seen him. I was wondering
3  if he's all right.
4  Q. What's your religion, if any?
5  A. Baptist.
6  Q. Okay. Do you belong to
7  Elizabeth Washington's church?
8  A. No.
9  Q. Oh, you don't.
10 A. Uh-uh.
11 Q. Why did you leave the National
12 Archives Records Administration?
13 A. Well, they basically, they told us a
14 couple years ago that the place is not going to be
15 staying there long; and it's best if we all try to
16 find another job, generally speaking. And I went
17 as far as I could in there. Was no way I could be
18 a supervisor in there because I had a few people
19 ahead of me. And they had to wait for them to
20 retire or die. And that wasn't going to happen.
21 They've been there like 20 or 30-something years.
22 I had like three or four people in front of me to
23 become a supervisor. And I know I wasn't going to
24 become a supervisor in there. On the strength

Page 52

1  that, like, they had a lot of people that their
2  own cliques that wasn't going to let me get there.
3  So it was time for me to make my move.
4  Q. Any other reason why you left?
5  A. That's it.
6  Q. Have you ever been charged
7  criminally with anything?
8  A. No.
9  Q. Have you ever been party to a civil
10 lawsuit?
11 A. Nope.
12 Q. Never been a plaintiff or defendant
13 in a lawsuit?
14 A. No.
15 Q. Okay. You mentioned that you were a
16 deponent, you were deposed in a family matter?
17 A. Uh-huh.
18 Q. Have you ever been a witness in any
19 other kind of matter?
20 A. No.
21 Q. And, again, I'm showing you what's
22 been marked as Exhibit A in this deposition, your
23 affidavit.
24 A. Uh-huh.

Page 53

1  Q. If you could, just confirm that
2  that's your signature --
3  A. Yes, it is.
4  Q. -- on the last page.
5  A. Uh-huh.
6  Q. Okay. And this was true and correct
7  when you signed it?
8  A. Uh-huh.
9  Q. And for the record, if you could
10 just state your race?
11 A. African-American.
12 Q. Okay. I'm just going to step
13 outside with Mr. Davenport for a second and then
14 we will proceed. If you cannot just talk to each
15 other.
16      (Recess at 10:40 a.m.)
17      (Resumed at 10:41 a.m.)
18 BY MR. SULLIVAN:
19 Q. Ms. Jones, just one final set of
20 questions. Did you do anything to prepare for
21 today's deposition? Did you talk to anybody or
22 read anything?
23 A. No.
24 Q. Okay. Nothing at all?

```
                                          Page 54
1      A.   No.
2      Q.   Okay.
3           MR. SULLIVAN:  No further questions.
4      Mr. Murray, I turn it over to you.
5           MR. MURRAY:  No questions.
6           MR. SULLIVAN:  Okay.  Thanks very
7   much.
8           (10:41 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                          Page 55
1           I, Tracey L. Pinsky, Registered
2   Professional Reporter, certify that the foregoing
3   is a true and accurate transcript of the
4   deposition of IRENE JONES, who was first sworn by
5   me at the time, place and on the date herein
6   before set forth.
7           I further certify that I am neither
8   attorney nor counsel for, not related to or
9   employed by, any of the parties to the action in
10  which this deposition was taken; further, that I
11  am not a relative or employee of any attorney or
12  counsel employed in this case, nor am I
13  financially interested in this action.
14
15
16
17
18
            Tracey L. Pinsky,
19
20
21
22          Registered Professional Reporter
23
24
```

15 (Pages 54 to 55)