UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
CASE NO.: 05-cv-4557

- - -

DARRYL MURRAY, :

Plaintiff, :

vs :

ALLEN WEINSTEIN, Archivist of the United States, :

:

Defendants.

- - -

Tuesday, November 14, 2006
Philadelphia, Pennsylvania

- - -

Oral Deposition of WARREN HAMMOND taken pursuant to Notice, at the U.S. Attorney's Office, 615 Chestnut Street, Philadelphia, Pennsylvania commencing at approximately 2:06 p.m., on the above date, before Tracey L. Pinsky, CSR, RPR and Notary Public.

- - -

CLASS ACT REPORTING AGENCY, LLC
Registered Professional Reporters

1420 Walnut Street
Suite 1212
Philadelphia, PA 19103
(215) 928-9760

133H Gaither Drive
Mt. Laurel, NJ 08054
(856) 235-5108

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT
8

A P P E A R A N C E S:

GERALD B. SULLIVAN, ESQUIRE
U.S. Department of Justice
U.S. Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, Pennsylvania 19106
Counsel for the Defendants

A L S O P R E S E N T:

Darryl Murray, pro se
John E. Davenport, General Counsel

I N D E X

| WITNESS | PAGE |
| --- | --- |
| WARREN HAMMOND | |
| By Mr. Sullivan | 4,63 |
| By Mr. Murray | 63 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| A | Statement | 21 |

WARREN HAMMOND, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SULLIVAN:

Q. Are you ready, Mr. Hammond?
A. Yes.
Q. Okay. Mr. Hammond, excuse me, I have a cold today.
A. Uh-huh, yeah, me too.
Q. Oh. My name is Gerald Sullivan. And I'm the Assistant United States Attorney. I represent the National Archives and Records Administration in this lawsuit in which it has been sued by Mr. Murray --
A. Yes.
Q. -- as a result of his termination from employment. I'm going to ask you some questions today; but before we start, you understand that you are under oath?
A. Yes.
Q. And that obligates you to tell the truth and the whole truth?
A. Yes, I will.

Q. I know you told me that you will have a medical issue --
A. Uh-huh.
Q. -- that might require you to take breaks from time to time.
A. Uh-huh.
Q. If during the time of this short deposition --
A. Uh-huh.
Q. -- you need to do that at any time, let me know, okay?
A. Yes, sir. Uh-huh.
Q. Have you ever been deposed before?
A. What do you mean deposed -- fired?
Q. Under testimony in a room like this --
A. No.
Q. -- outside of court?
A. No.
Q. Okay.
A. Uh-huh.
Q. This is the first time?
A. Uh-huh.
Q. Okay. Well, I'm going to explain to

2fc9dc14-a023-42ff-bb99-4de0626f86ee

Page 6

you the protocol for a deposition.
A. Uh-huh. I had jury duty, that kind of thing, but --
Q. Okay.
A. -- that was, you know, I wasn't selected, though.
Q. Right. Well --
A. Yeah, that one time.
Q. For purposes of today, your testimony --
A. Uh-huh.
Q. -- is being taken down by the court reporter. And because --
A. Uh-huh.
Q. -- it's being taken down by hand, there's no video camera, it's important that your responses be in words. That they be oral --
A. Uh-huh.
Q. -- and not merely shrugs of the shoulder, nods of the head --
A. Okay.
Q. -- things like that, because she won't be able to pick those things up.
A. Yes, sir.

Page 7

Q. Okay. And I will certainly tell you if I see you doing that --
A. Uh-huh.
Q. -- but if you can make an attempt to do that --
A. Uh-huh.
Q. -- that will be great.
A. Okay. I'll try to be as helpful as I can.
Q. It's also important that we not speak over each other so --
A. Yes, sir.
Q. -- if you could let me finish my questions before you answer and I'll try my best, although I don't always succeed at this, to let you answer before I ask my questions --
A. Uh-huh.
Q. That helps the court reporter and helps the transcript.
A. Uh-huh.
Q. If you don't understand any question that I ask, please let me know and I'll repeat it and try to make it understandable to you. Okay?
A. Yes, sir.

Page 8

Q. I will assume if you do answer one of my questions, that you did understand it. Okay?
A. Yes.
Q. If you don't remember the answer to a question --
A. Uh-huh.
Q. -- if you don't remember the facts, just say I don't remember. If you don't know the answer to a question, you can certainly say I don't know. Okay?
A. Yes, sir.
Q. Okay. And if you could not say uh-huh because --
A. I'm sorry, I apologize.
Q. Yes. I mean, yes or no would be better for the record.
A. Uh-huh. Yes, sir.
Q. Are you on any medications today that would impair your ability to answer questions, to understand questions and answer them?
A. No.
Q. Okay. What's your full name?

Page 9

A. My name is Warren Ridgeley Hammond
Q. How do you spell Ridgeley?
A. R-i-d-g-e-l-e-y.
Q. Do you have a nickname?
A. Skip.
Q. S-k-i-p?
A. Yes.
Q. What's your Social Security number?
A. 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.
Q. And your street address, your home address?
A. 4920 Chestnut Street.
Q. Okay.
A. Second floor, rear.
Q. Okay. I'm showing you a copy of my subpoena to you. You'll see that it directs you to bring any and all documents relating in anyway to Darryl Murray and/or relating to persons whom you believe have been treated similarly or dissimilarly to Mr. Murray --
A. Uh-huh.
Q. -- that are in your possession, custody or control.
A. Uh-huh.

Q. Do you or did you -- have you at any time had any documents that would be responsive to that part of the subpoena?
A. No, sir.
Q. Okay. You don't have any documents related --
A. No.
Q. -- to Mr. Murray?
A. No, sir.
Q. Okay.
A. Not on me.
Q. Not on you. Anywhere?
A. No. No, sir.
Q. Okay. When, apart from the pleasantries you just exchanged with Mr. Murray, did you last speak to him?
A. Oh, boy. I'm trying to recollect. I don't understand -- well, I don't remember when he was terminated, I -- it's -- was it three years ago?
Q. Late 2004.
A. Okay. All right. I think I talked to -- I have talked to him, to the best of my recollection, I think the day after I had talked

to him on the phone.
Q. Okay.
A. I had called him.
Q. Okay.
A. Okay. And I didn't get an answer, but I got his answering service, I do believe.
Q. Okay.
A. He did come up to the National Archives, I think, with the intention of seeing me, but I didn't --
Q. And I'll talk to you --
A. It was a day I wasn't there.
Q. I'll talk to you about late 2004. Have you --
A. Yeah.
Q. -- spoken to him since late 2004?
A. I haven't talked to him since then.
Q. Okay. By phone or in person?
A. No, sir.
Q. Okay.
A. Uh-huh.
Q. Have you exchanged messages through third parties since late 2004?
A. I had talked to other coworkers, you

know, in casual speaking, You know, what had happened to him.
Q. Okay. Well, I'll talk to you a bit about that.
A. Uh-huh.
Q. Did you do anything to prepare for today's deposition, did you read anything, your former statement, anything to prepare?
A. No.
Q. Okay.
A. No, I didn't.
Q. Did you talk to -- did you talk to anyone to prepare?
A. No, I didn't. Other than, you know, that, you know, I had to come to jury, I mean, I had to come here, you know.
Q. Supervisors?
A. Yeah.
Q. Okay.
A. Yes.
Q. Where are you currently employed?
A. I'm at National Archives and Records Administration.
Q. At the Federal Records Center on --

A. Yes.
Q. -- Townsend Road?
A. Yes, uh-huh.
Q. Okay. What do you do there?
A. I'm an archives technician.
Q. Okay. And what GS level are you?
A. I'm an GS-4, Step 10.
Q. How long have you worked there?
A. I've been there since 1998, September 10th --
Q. Do you --
A. -- September 11th.
Q. So you were at the Wissahickon facility?
A. No, I wasn't there.
Q. Oh, you've only worked at Townsend Road?
A. Townsend Road. Yes, sir.
Q. Okay. How long have you been GS-4, Level 10?
A. When did I get my 10. I think I got it -- I got it, I think the first or second year that I came to the National Archives.
Q. Okay.

2fc9dc14-a023-42ff-bb99-4de0626f86ee

Page 14

A. It was before step 10.
Q. Who is your supervisor?
A. Currently?
Q. First level.
A. My first level supervisor is Aaron Swann.
Q. How about second level?
A. Dan Bettison.
Q. Have you had any different first level supervisors than Aaron Swann?
A. Liz -- Elizabeth Washington. They had a changeover, he's now my supervisor.
Q. When did your supervisor change from Ms. Washington to Mr. Swann?
A. I'm -- all right. Let me see if I can get this together. I would say in September, August -- September, if my memory is correct. Yeah, I think it was in September. I don't know the exact day.
Q. Of this year?
A. Yes, sir.
Q. Okay. What did you do before you worked for the National Archives?
A. I worked at Naval Air Technical

Page 15

Services Facility. I was a file clerk.
Q. And where is that located?
A. It was located on Robbins Avenue, 700 Robbins Avenue, but they have since moved to San Diego, California.
Q. Okay.
A. I was a union rep also, when I was employed with National -- with Naval Air Technical Service Facility.
Q. So your total years of federal services are how many?
A. Thirty-five, will be thirty-five come next week.
Q. Okay.
A. Yes.
Q. Did you work in the same division as Mr. Murray?
A. Yes, we did. Uh-huh, yes, I did.
Q. Okay.
A. Yes.
Q. Mr. Murray describes you as his team partner? In one of his statements. What's a team partner, is that a word that's used at the facility or is that just language?

Page 16

A. Well, he was a coworker and he was a friend on the job.
Q. Were you --
A. Yeah.
Q. -- doing similar tasks --
A. Yes, we were.
Q. -- on a daily basis?
A. Yes.
Q. Okay.
A. Yes, sir. Uh-huh.
Q. When did you first meet him?
A. When I first came here in October of 1998.
Q. Okay. Did you -- did the two of you ever socialize outside the workplace?
A. No.
MR. SULLIVAN: You -- unfortunately, you're not allowed to look to him for answers.
THE WITNESS: Yeah, okay.
MR. SULLIVAN: I apologize.
THE WITNESS: We were -- we had made plans to meet, you know. To go out like maybe have a drink or two or something like that, but it never transpired.

Page 17

BY MR. SULLIVAN:
Q. Okay. Were you, nevertheless, good friends with him throughout the time that you knew him?
A. I was very good friends with him. Yes.
Q. Okay.
A. Uh-huh. I -- we never had any arguments with him at all.
Q. Okay. I want to go right to the date --
A. Uh-huh.
Q. -- where your name comes up in this case the most.
A. Uh-huh.
Q. It's the date when Mr. Murray apparently came to the facility in his car --
A. Uh-huh.
Q. -- to the parking lot and then left, September 22, 2004. Can you tell me what you were doing early on that day in the morning?
A. I was out that day. When he came by, I was out that day.
Q. When you say, "you were out", what

do you mean?
A. I was on annual leave.
Q. The entire day?
A. The whole day.
Q. Okay. Just give me a second.
A. If you may, may I interject something?
Q. Sure.
A. I probably neglected to say when I had -- knew I was coming here, I -- I've casually mentioned that I, you know, had -- I had a deposition to come to and I had mentioned it to a lady I worked with. Bonnie Flemming -- Bonita Flemming and Diane Caruco.
Q. You mentioned it to two persons you work with?
A. Yes.
Q. Bonnie Flemming and --
A. Bonnie --
Q. How do you spell the second one?
A. Bonita Flemming. The second one?
Q. Yes.
A. Diane Caruco, Caruco, I think her last name is.

Q. Do you know how to spell that?
A. Yeah.
Q. Do you know how to spell that?
A. C-a-r-u-c-o, Caruco.
Q. Okay. And they do what at National Archives?
A. They're Archives aides, I would say.
Q. Okay. And you mentioned it to them for what reason and what did they say?
A. I can't remember. I can't recall.
Q. We --
A. They didn't say anything negative or positive, or detrimental, if I can use that terminology.
Q. Mr. Hammond, I don't really understand why you brought up their names. You said you mentioned what to them, that you were coming here?
A. Yeah, that I had to come here.
Q. Why did you mention it to them?
A. The reason why I did because I, you know, I assumed they were friends of Darryl's and they were friends -- coworkers of mine and they knew him. You know, and they knew him as a person

and upstanding.
Q. Okay. I haven't --
A. Yeah.
Q. -- asked you that question, so I wasn't --
A. Yeah.
Q. -- I didn't understand why you brought their names up. But --
A. Uh-huh.
Q. -- you have testified just now --
A. Uh-huh.
Q. -- that you were not working on September 22nd, 2004 --
A. Uh-huh.
Q. -- correct?
A. Yes, sir. Uh-huh.
Q. How did you verify that? How do you know that?
A. That I wasn't on that day?
Q. Yeah.
A. I put in a leave slip and I was off that day.
Q. And you have a clear memory about that?

A. About being off that day, yes, I do.
Q. Okay.
A. Uh-huh. Being off that day?
Q. I'm going to show you --
A. I'm trying to think.
Q. I'm going to show you what's been marked -- what I'm going to have marked as Exhibit A?

(Exhibit A marked for identification.)

BY MR. SULLIVAN:
Q. If you could take a look at that.
A. Uh-huh.
Q. Have you ever seen this before?
It's a document titled Affidavit of Warren Hammond, with a signature on the last page and the date of January 26th, 2005. I'll give you a chance in a second to look at the substance of it, but is this a document you've seen before? Is that your signature on the last page?
A. Yes.
Q. Okay.
A. Yes, sir.
Q. Okay. There are handwritten

2fc9dc14-a023-42ff-bb99-4de0626f86ee

Page 22

markings on the first page, is that your handwriting on the first page? And are those your initials on the first page at the bottom left -- right-hand corner?
A. Yes.
Q. Do you remember signing this document?
A. Yes, I do.
Q. Okay. And did you have a chance to review it before you signed it?
A. Yes, I did.
Q. Okay. And are your initials on each page?
A. Yes, sir.
Q. Okay. Directing you to Page 3 --
A. Uh-huh.
Q. There's a question, "did anyone in your office tell you on September 22, 2004 that Mr. Murray had called you about going out to lunch that day, if so, what were you told." And the answer that you gave "I got a message from Ms. Adams that Mr. Murray was going to come and see me. However, I was working the stacks and did not get the message until later." Is it still

Page 23

your position that you weren't working that day?
A. I'm mixing the days up. I'm trying to answer this as honestly as I can. I don't know if I was -- I think I was out half a day, I'm not really sure.
Q. Do you recall any --
A. Not really sure.
Q. -- interactions with anybody at the workplace on that date?
A. No. I can't -- not that I can recollect.
Q. So you may --
A. No, sir.
Q. -- you may have been working at the Federal Records Center that day?
A. Uh-huh. It might --
Q. You just can't --
A. -- have been half a day. I can't remember, that's what I'm saying. My mind is, you know -- I can't remember way back that far but I'm almost positive I worked half-a-day that day. I might have said I was off the whole day, but I'm not -- I'm not sure.
Q. All right. Well, if your memory

Page 24

comes back to you during the course of the deposition --
A. Uh-huh.
Q. -- please let me know.
A. Okay.
Q. Now, had you left a message for Mr. Murray at any time that week on his cell phone or his home phone?
A. I called -- I called him, I think, either the day that he was, the last day I saw him. Which was the day after he was terminated, and I had called him and I didn't get an answer. But I had asked him how was he doing, I was checking up on him to see how he was doing.
Q. When you say "the day he was terminated," you mean the day he was placed on administrative leave?
A. I think so, yeah.
Q. Okay. So that was before this date, September 22nd, 2004, when he came in his car to the work site? You're talking about --
A. I believe so, yeah.
Q. Okay.
A. Yes.

Page 25

Q. But in this -- in this same week period, about --
A. Uh-huh.
Q. -- the week before, some time during the week before?
A. You mean, did I talk to him then?
Q. Did you leave a message for him in -- at some point it was --
A. Uh-huh.
Q. -- before -- are you saying you left a message for him on his phone before the date that he came in his car to the parking lot?
A. I think it was -- yeah. I think it was the day before.
Q. Okay.
A. Yes, sir.
Q. Do you remember what you said in your message to him? Did you speak to him directly or did you leave a message?
A. On his answering service. I didn't speak to him directly --
Q. Okay.
A. -- I don't think.
Q. Do you remember what message you

2fc9dc14-a023-42ff-bb99-4de0626f86ee

left?

A. I just called to see how he was doing. Said I'm just calling just so you keep your head up.

Q. Okay.

A. And that was it.

Q. And your concern was because of what?

A. Because, you know, because of what he was going through.

Q. Based on being put on administrative --

A. Yes.

Q. -- leave?

A. Yes. Uh-huh.

Q. Did you later learn at any time that he had called the Federal Records Center workplace looking for you, inquiring for you?

A. I was told that he had called, but, as I said, I didn't receive the call personally, no.

Q. Okay. When were you told that?

A. I think the same day he called or the day after he called, I'm not sure.

Q. Okay. Do you know who told you that?

A. No.

Q. Okay. Did anybody ever page you, to your recollection, in the workplace to let you know that there was a call or Mr. Murray had called for you and was looking for you?

A. I was -- only a message that said -- well, I had got a message, I don't know whether it was -- I'm assuming it was by phone that he, you know, he was trying to call me or something like, you know, but, like I said, so far back I can't really remember. I think I did talk to someone; but, like I said, I don't know who that person was.

Q. Is there a system in place at the Federal Records Center for pages to be announced over a speaker system?

A. Yes.

Q. Okay. Do you recall any kind of page by a speaker for you regarding Mr. Murray calling you?

A. I think so. I'm not -- I'm not really sure.

Q. Okay. Okay.

A. I'm not really sure. I'm trying to remember way back then. My mind is kind of cloudy.

Q. But you do remember at some point getting the message --

A. Yes.

Q. -- and talking to someone about it?

A. Uh-huh.

Q. Do you remember who you talked to about it?

A. No. That's what I don't know.

Q. Okay.

A. Uh-huh. It might have been the receptionist, you know, but I can't be sure of that.

Q. What did the person tell you?

A. That he was trying to get in touch with me.

Q. Okay. And nothing --

A. That's all.

Q. -- more?

A. Nothing more.

Q. Were you surprised that he had come

to the workplace while on administrative leave to look for you?

A. No. I didn't even -- I didn't think of it. I didn't think anything about it.

Q. Okay. Is it common at the Federal Records Center for cars to park right up there in the front, right near the door and wait for people?

A. Yes.

Q. Okay.

A. Uh-huh.

Q. Does that happen every day?

A. All the time.

Q. Okay. And how many feet is that place where cars park from the door?

A. Oh, boy, let me see, maybe 10 feet, 15 feet, something like that.

Q. Okay. Had you heard rumors about what had happened on that date, or what was alleged to have happened on that date when Mr. Murray came to the workplace?

A. I didn't hear anything. I just stayed with my work.

Q. Did anybody tell you that Mr. Murray

had made any comments to the security guard that day?
A. There was talk of it, but nobody came to me, talked to me -- talked directly to me, though.
Q. Who was talking about it?
A. Everybody. I mean, you know, there was, you know, there was just -- I -- it was a lot of people talking about it. But I don't know who the people were. I can't -- I can't really say. I don't want to say this person said and that person said, I just heard rumors that was circulating around.
Q. What rumors did you hear?
A. That he -- that, you know, Darryl came to the job. You know, and they were talking about what had happened and everything, but you know, just everybody just generally talking, you know. I mean, like I said, I didn't say, at that time I was working and, you know, as a rule, you know, when I come to work I just come there and do my work. I don't usually get involved in, you know, a lot of hearsay that goes on in there. I just come and do my job.

Q. Were there any rumors that you heard about the content of what Mr. Murray said?
A. As to what? What did he say?
Q. Comments that he made about anything to the security guard?
A. Not that I know of, no.
Q. You didn't hear anything like that?
A. No, uh-uh. Understand, that's, you know, I'm trying to get this -- gather all this in my mind. It's been, you know, a while back.
Q. Now, in your statement that I've shown you in Exhibit A --
A. Uh-huh.
Q. -- you say you got a message from Ms. Adams. Is it possible you got a message from Vanessa Adams that Mr. Murray had called?
A. It might have been her. I'm not really sure.
Q. Okay.
A. If she was at the front desk, then I probably did.
Q. This statement that you gave was in January of 2005, correct?
A. Uh-huh.

Q. And that would have been four months after the incident, correct?
A. I believe so.
Q. Would the incident have been fresher in your mind at the time you gave this statement, than it is now?
A. I don't think so, no.
Q. Would -- what you think -- you don't think that the statements that you gave in January 2005 better represent what happened to you and what you knew in September of 2004 than your current memory?
A. Other than what I just told you, that's all.
Q. Did you make this statement that, "I got a message from Ms. Adams that Mr. Murray was going to come to see me, however, I was working the stacks and did not get the message until later."
A. I'm trying to remember, I'm trying to go -- if she was at the front desk, then chances are that I did.
Q. Is that why this statement that you've given says that?

A. It does -- that's what it says. I got a message from Ms. Adams that Mr. Murray was coming to see me. Right.
Q. So this written statement is accurate?
A. Yes, sir. Uh-huh.
Q. Okay. All right. So you got a message from --
A. All right.
Q. -- Ms. Adams, and Ms. Adams is what, the receptionist?
A. At the time she was.
Q. Okay.
A. I'm just trying to remember. I'm trying, like I said, to be as forthright as I possibly can.
Q. Sure. Sure.
A. You will have to understand, I'm trying to remember way back then.
Q. Right. And what I'm saying --
A. It's hard.
Q. What I'm saying, is this statement --
A. Really.

2fc9dc14-a023-42ff-bb99-4de0626f86ee

Q. -- is closer to the time of the incident.
A. Yes.
Q. Wouldn't this statement better -- if you're having trouble remembering the incident now, wouldn't this be a better embodiment of your memory because it's closer to the time?
A. Uh-huh.
Q. Would you say yes?
A. Yes.
Q. Okay. All right. Well, Ms. Adams has written that she paged you about three times that day and didn't get an answer. But you don't remember anything about that, correct?
A. When I -- when she called me, I went up and, you know, I didn't -- I didn't get a chance to speak to Darryl, on the phone or even in the stacks, for that matter. But I do -- I do recall going up to the front, if I can remember that back then, that he had called. He had tried to reach me.
Q. Okay.
A. And he couldn't.
Q. Okay.

A. Uh-huh.
Q. So she -- Ms. Adams has stated that you came to the front desk about a half-hour after Mr. Murray was up front and you asked her who had called for you. And she told you it was Mr. Murray but he left. She says that you said you would call Mr. Murray at home.
A. Uh-huh.
Q. Did you call him at home?
A. I talked, but I don't know if it was that day. I'm not sure if it was that day, but I know I did -- I did try to reach him on the phone.
Q. Okay.
A. But, like I said, I didn't get to talk to a live voice. If I talked to anything, I called -- I talked to his answering service.
Q. You left a message?
A. Yes.
Q. Do you recall what message you left?
A. Again, just to see how he was doing.
Q. Okay.
A. Yeah.
Q. Did he ever respond, did you ever talk to him?

A. I don't think so, no.
Q. Are you absolutely sure?
A. Yes, sir.
Q. Okay. So you haven't spoken to him since September 22, 2004, other than today?
A. Yes. I haven't talked to him since then. Uh-huh.
Q. Have you ever talked to Irene Jones about any of the events regarding Mr. Murray or about Mr. Murray since September 22, 2004?
A. I've talked to her -- see if I can get my memory together. I'm trying to say I think that the day I talked to her I talked -- I was called into the office, and John McElroy, who is the director, and he had asked -- I think he had asked me -- again, I don't know the dates. It might have been around that same time, if I had talked to you and I said yes, I have.
Q. I'm sorry, I didn't follow you there.
A. No.
Q. I was asking about Irene Jones and you were saying what? Could you restate your answer.

A. No, I was -- before I had mentioned to -- I had mentioned to Irene Jones that I had to -- that I had talked with John McElroy and I was called into his office. He had asked me if I had got in touch -- if I had talked to Darryl. And I told him I called him, yeah, to see how he was doing because he's a friend.
Q. When was that, at the same time --
A. At the same time.
Q. -- 2004?
A. It was around -- yeah, I don't -- like I said, I don't know the date, though.
Q. Okay.
A. But it was around the same time.
Q. So what was your -- the extent of your conversation with Irene Jones?
A. That I had to talk to -- that I had to talk to John McElroy.
Q. Have you talked to Irene Jones -- did you talk to her at that time in any more extensive way or have you spoken to her since about --
A. No. I just talked -- told her that I had to see, you know, that I talked to

2fc9dc14-a023-42ff-bb99-4de0626f86ee

John McElroy, that was it.
Q. You had --
A. That was the extent of the -- I think that was the extent of the conversation that I had with her.
Q. And you haven't spoken to Ms. Jones about Mr. Murray since September 22, 2004, apart from that?
A. I don't think so, no.
Q. Okay.
A. Honestly -- honestly speaking, I don't think so.
Q. Are you aware of Mr. Murray being in touch with any of your coworkers since September 22nd --
A. No.
Q. -- 2004?
A. I don't, no. Uh-uh.
Q. Okay. If you could turn to Page 2 of your affidavit.
A. Uh-huh.
Q. There is a question about postings that Mr. Murray had in his work space.
A. Uh-huh.

Q. And your response you state "I think some of the things on his wall might have been offensive to others but I was not concerned about what I saw. I only glanced briefly at what was there and did not take the time to look closely." Now, when you say "I think that some of the things on the wall might have been offensive to others," what do you mean?
A. You're on Page 2?
Q. Page 2, yes. I can show you where, if you'd like.
A. Again, I'm trying to remember what was on there. He had some writings on there, but as I stated, to me they weren't threatening, you know. I don't know -- the second paragraph it says that I think some of the things on the wall might have been offensive to others but, you know, to my recollection I didn't see anything, although it says it on here, I'm hoping that they didn't miss -- you know, put the wrong information on it that said I did when I didn't. But I honestly can't remember thinking say -- thinking that I said that I think that some of the things on the wall might have been offensive to others.

Q. You --
A. I didn't see anything.
Q. You had a chance to go through this statement after it was typewritten and make changes, correct?
A. Uh-huh.
Q. Correct?
A. Yes, sir.
Q. Okay.
A. I'm concerned with that one.
Q. Did you see any of his postings?
A. I seen postings on there, but I didn't stop and read them.
Q. Okay. You never stopped and read any of his postings?
A. No.
Q. Okay.
A. Uh-uh.
Q. Okay. You go on in your next answer there's a question "are you aware of any others who were offended by the things Mr. Murray wrote" and you state "I believe there were others who were upset, but I never talked to anyone personally or had them come to me about this."

Did you learn through the grapevine in any way about any particular person who was upset by any posting that he made?
A. Uh-huh. No, not anyone particular person, no.
Q. You never heard about anybody being upset about any posting?
A. Not this. I didn't hear anything. Can I -- is it okay if I interject something here?
Q. Sure.
A. Okay. The things that he had on his desk were things that he acknowledged, okay. Let me just say the place that I work at, it's a lot of tension there. It's a lot of tension there. It's a lot of tension there because we're on production, okay. And we're on production by the amount of work that we do. All right. That being said, if you don't meet a certain quota, you have this aura over your head that you're going to be terminated. Okay. That's the belief I had, that's why I basically kept my mouth shut and did my work. But it's a high tension area. It's a high tension place to work because you have to produce so much and you have to do it fast in

2fc9dc14-a023-42ff-bb99-4de0626f86ee

order to keep your job, you know. And, you know, it's -- it was -- it's -- like I said, it's tension that has been building since I've been there, okay. And I, myself, almost got terminated, you know, because of my work not being up to par and also I was -- I was -- I had injured myself on the job, you know. I mean, I know it's unrelated to the situation, but I'm just telling you the aura of that place.

Q. Uh-huh.

A. And the structure of it.

Q. You're telling me that for a reason, presumably. How do you think that what you just said helps me to understand Mr. Murray's postings?

A. Uh-huh. Well, he's been there for a long time. He's been there for a long time, and a low grade level --

Q. Uh-huh.

A. -- with a daughter in college, with responsibilities of owning a home, just getting a car, all those are big responsibilities.

Q. Uh-huh.

A. And I, as a coworker and as a friend on that job, you know, felt that he was being

mistreated that way.

Q. By whom?

A. Okay. By management. But --

Q. In what way?

A. You know, well not -- well, I mean, he works hard and just didn't -- I think give him his just due, you know. Treat him fairly as far as his promotion is concerned, you know, or promotions, or even step increases.

Q. Does all of that have any relationship in your view to the postings?

A. It's -- I would say -- when I want to -- going back to now I see, when I say -- want to say is that some of the wall things might have been offensive to others, you know, I think he's -- he's just stating how he felt.

Q. About coworkers?

A. About the treatment, mistreatment, you know, of not only him but black Americans on that job.

Q. Did you -- were you aware of some statements that were directed at coworkers? By the way, you said you never read the postings, right? So how do you know what was in the

postings?

A. Well, I mean, you know, just not reading -- not reading them, but understanding that, you know, why some of the posters were put up there, you know, in his mind, you know. It was -- it was like, you know, he was reaching out for somebody to understand what he's going through. That's determine -- that's the reason why -- like I said again, I didn't read a lot of the Post-its -- the Post-its on the desk because, you know, it was in passing. You know, I had went passed, you know -- you know, to go to my work site or what have you.

Q. Okay.

A. That's the only time that I saw those Post-its -- the Post-its that were up there --

Q. So how --

A. -- to the best of my recollection.

Q. How did you arrive -- if you didn't read the Post-its, how did you arrive at your understanding of what those postings were about? You mentioned racial issues, family issues?

A. I'm just perceiving what I saw on

there. You know, like I said, I didn't get to see them, read them personally, you know. But, like I said, I think they were -- they were -- they were beliefs that he had, you know, that he was being mistreated. That's the only thing I saw on there. I didn't see anything in there that was, you know, detrimental to either threaten somebody.

Q. But you said -- the thing that I don't understand is, you say you didn't see them. You didn't -- I mean, you didn't read any of them. So how do you have any understanding or any basis for perception as to what the postings were about?

A. I'm just using that as perception, what I, you know, what I -- like I said, I didn't see them.

Q. Were you guessing at what they were probably about, is that what you're saying?

A. Yes, uh-huh.

Q. Okay.

A. In my mind, that's all.

Q. Okay.

A. Yeah. Because I basically, I just, you know, basically did my job. But as a friend -- as a friend, you know, I just felt that

2fc9dc14-a023-42ff-bb99-4de0626f86ee

he was mistreated there.
Q. If there were postings there that had characterizations of the coworkers as to two legged cockroaches or worthless losers, nothing-ass employees, would that have bothered you in any way?
A. No.
Q. Okay. Do you think that was appropriate?
A. I didn't think anything about it, I didn't think anything of it.
Q. Would those, in your view, be disparaging of coworkers if they were directed at coworkers?
A. I would say in some instances, but not all instances.
Q. Did you recall any issues or incidents between Mr. Murray and, again, forgive the pronunciation -- the last deposition I was told the correct pronunciation -- I believe it's Hongdiep. Hongdiep, H-o-n-g-d-i-e-p.
A. Did he -- did he have run-ins with him?
Q. Or any issues, concerns about him,

to your knowledge?
A. He had issues, but I don't recall what they were.
Q. Okay.
A. That's my honest answer. I don't know.
Q. Did Mr. Murray ever complain to you about coworkers putting trash or other objects on his desk or removing items from his desk?
A. Yes, uh-huh.
Q. Do you remember what those were?
A. I don't know what they were. I don't know what kind of papers they were.
Q. Do you remember issues that he had with particular coworkers?
A. He had issues about the stuff that was on the desk. But I'm trying to recall -- I'm trying to remember back then, you have to bear with me.
MR. MURRAY: Change the form and maybe give him some names, he might recall it, it would be better for you, the form of the question.
BY MR. SULLIVAN:
Q. You can't remember at this time?

A. I'm trying to remember names that -- can I --
Q. Well, Hongdiep you don't remember.
A. Oh, yeah. Hongdiep, I understand he had run-ins, but I don't -- issues, but --
Q. But you don't recall --
A. I don't recall what they were.
Q. Okay.
A. About the things that were on his desk, I'm trying to remember, Mitch Buffone or somebody took them down or wanted them down or something, you know. I think that's, you know, when you talk about issues with other people --
Q. Uh-huh.
A. -- at that incident, that's the only person I can think of.
Q. Do you remember any, beyond what you sort of hinted at there, do you remember any other issues or incidents between Mr. Murray and Mr. Buffone?
A. No, no, other than -- it was -- Well, they had issues, but I can't specify what they were. But I know he didn't like some of the Post-its that were on the desk. And as to whether

he took them down, I don't know. I don't know who took them down, I'm assuming that he did.
Q. Mr. --
A. He wanted them down.
Q. Mr. Buffone.
A. Mr. Buffone.
Q. And Buffone, is that B-u-f-f-o-n-e?
A. Yes.
Q. Okay.
A. Uh-huh.
Q. Do you remember when that was? Was it the same year that Mr. Murray was terminated?
A. I don't know. I don't know --
Q. How do you --
A. But I think it was the same year.
Q. How did you come to know about Mr. Buffone's issues or concerns with Mr. Murray's postings?
A. I had talked with him.
Q. With who?
A. Darryl.
Q. Okay. What did Mr. Murray tell you?
A. That he didn't like the -- like the -- I'm trying -- I'm trying to put it all

2fc9dc14-a023-42ff-bb99-4de0626f86ee

together. He didn't like what was on his desk. And there was also some postings that Mr. Buffone had above his desk. And the post -- the postings that Mr. Buffone had on his desk was they were, you know, was still there. And the fact that he wanted the posters off of Mr. -- off of Daryl's desk, you know, it was, I think -- I guess you would call conflict of interest, if I can use that terminology.

Q. In your view?

A. Yeah.

Q. And you learned this all through Mr. Murray?

A. Uh-huh, yes, sir.

Q. Did you talk to -- just to anybody else at the workplace about that?

A. No. Uh-uh. Other than I just kept it in my own mind, that's all.

Q. Did you ever hear about any issues between Mr. Murray and Vernel Tate?

A. No.

Q. Okay.

A. Uh-uh.

Q. Can you recall any issues Mr. Murray

had with any other coworkers, issues of concern to Mr. Murray?

A. No, I can't recall. Uh-uh.

Q. Did Mr. Murray ever tell you anybody had ever put pasta on his car or scratched his car with a key in any way?

A. Yes, he did. He did tell me.

Q. Do you remember when he told you?

A. I don't remember. It might have been the same year, 2000. It might have been 2000.

Q. Did he have any suspicions that he expressed to you about who had done it?

A. I don't think -- I don't recall.

Q. Okay. In your experience with Mr. Murray, is he the sort of person who talks a lot about things of concern to him or not too much?

A. He is a person who talks a lot about his concerns to him.

Q. Okay. But he never took -- and you were a good friend of his?

A. Uh-huh. Well, on the job. But, like I said, I didn't do things off the job, just on the job.

Q. And --

A. We worked in the same department, in the same unit.

Q. Okay. But the only person he ever expressed any concern about to your memory is Mr. Buffone, right?

A. Mr. Buffone. It might have been John McElroy, you know, because I'm trying to get -- I'm trying to put this in my mind, I'm trying to remember way back then the person or people. Hongdiep, that's all I can remember. I can't remember anything else.

Q. Okay. But, again, you don't remember any particulars about Hongdiep, right?

A. No. He was -- he was, what is it, deaf, I think it was. Yeah, he was deaf. And I can't remember. I knew he had some issues with him, but I can't -- if you want me to go into it, I can't. Because I can't remember back then. I don't remember the issues.

Q. Okay. Are there what you would call cliques at the workplace?

A. I would say yes.

Q. Okay. Are you a part of a clique?

A. No.

Q. Was Darryl part of a clique?

A. No.

Q. Was Mr. Buffone part of a clique?

A. I think so.

Q. Okay.

A. Yes.

Q. What's -- who's in that clique?

A. Him, Dwayne Wilkinson, at the time. Who else? Some other people that I can't really say -- I can't recall who they were.

Q. Did Mr. Murray ever express views about that clique?

A. I don't think so, not to me personally, that I can recall.

Q. Okay.

A. Understand I'm answering these questions as honest as I can.

Q. You understand you're under oath, of course?

A. Yes, I understand that.

Q. Sure.

A. I'm trying to do the best I can.

Q. Sure. I appreciate that.

2fc9dc14-a023-42ff-bb99-4de0626f86ee

Mr. Murray has stated in writing that in September 2004 he called you and asked you to notify EO counselor Sean Walker that director John McElroy called staff creatures with privileges. Is that true? Did Mr. Murray call you and ask you to do that?

A. I don't remember that.

Q. Okay.

A. I don't remember.

Q. Do you recall calling Mr. McElroy and/or Sean Walker or anybody and discussing that?

A. No. No. I don't remember.

Q. Mr. Murray goes on to say: "Mr. Hammond indicated to me that he was being watched and working in fear. I sense from our conversation that Mr. Hammond was lacking courage and had lost his warrior spirit." Can you explain that? Were you -- did you feel at some point you were being watched and working in fear?

A. Only because I had befriended him on the job, that's the only reason why. And that -- and that, again, goes back to, you know, the work that we do. You know, because I have experienced, like I said, I've experienced myself, you know,

the knowledge of thinking you are going to be terminated because you're not, you know, up to par with your work habits or work ethics or what have you, you know, that was the only reason.

Q. Was this --

A. The only reason.

Q. -- a temporary feeling that you had of being?

A. Well, I still have that feeling today that, you know, because we're there to produce and have high numbers; and if we don't have them, we can be either written up or terminated or suspended.

Q. So is that -- is that something you felt the entire time you've worked for the Federal Records Center?

A. Uh-huh, I feel it -- yes.

Q. All right.

A. I feel it then. I feel it now. You know.

Q. Do you feel you are --

A. That's why I do my work.

Q. -- treated any differently at any time because of your association with Mr. Murray?

A. No. Just the same.

Q. Okay.

A. Keep in mind, like I said, as I'm there I don't, you know, I don't talk to people a lot in groups. I'm basically a loner on that job. You know, just come in and do my work. And I do talk to people, but I don't hang out with them. And I don't stand there and talk with them for long periods of time. I just come and do my job.

Q. Now, I know that -- so -- let me ask you this: Did you ever hear from anybody that it was alleged that Mr. Murray when he came to the workplace on September 22nd, 2004, had made threats to blow up the building?

A. No.

Q. No one ever told you that?

A. There were rumors circulated but, you know, I -- nobody came to me personally and said that, you know, he was coming there to do anything on the job. And I --

Q. We're not -- I'm not asking if anybody said that it happened, but rather that it was alleged that it happened.

Did anybody ever tell you that

somebody had alleged that it had happened?

A. No. Come to me and say they alleged happened, no.

Q. But you heard other people talking about it?

A. I heard other people talking; but for me to say who it was, I don't know.

Q. Okay.

A. I don't remember.

Q. Okay. And --

A. But that -- may I say something?

Q. Sure.

A. But this I can assure you. This is a man of upstanding. This is a college guy. And again, he has daughter in college; he has a house; he has lot of responsibilities. He has -- and I said this when he was -- you know, when he worked with me. He's intelligent, you know, he's a good man. He's a good man, you know. And, again, you know, as I said earlier in my testimony, you know, I feel that the way he was treated on the job was wrong, you know. And, you know, regardless of what he had or didn't have on his -- written on his desk, I still didn't think that that was

2fc9dc14-a023-42ff-bb99-4de0626f86ee

reason for him to -- put him to be terminated. Because he's a good worker. He taught me a lot of things when I came in.

Q. Now --

A. Yeah.

Q. -- you said -- I appreciate that.

A. Uh-huh.

Q. You said that you didn't see any of the postings, so you don't know what the content of them was, whether it was religious in any way, correct?

A. I didn't -- yeah, again, I didn't -- I knew they were up there, but I didn't look at the -- stand there and look real close at the things. I don't recall.

Q. So why do you think Mr. Murray was terminated?

A. I don't know. I don't understand why they terminated, other than the writings he had on his wall or the Post-its he had on his desk.

Q. And what was your understanding about what it was about those writings that caused the termination?

A. Maybe because was some of the things that were said on there. But, again, I can't, you know, even though it says there that I said some of the things might have been offensive, but that's only, you know, that's only in what other people have perceived it. But I didn't perceive it as being threatening, okay, at all.

Q. Do you believe that the termination of Mr. Murray from employment had anything to do with his religion?

A. I would say -- can I use a partial answer? Probably, yes.

Q. Okay. And what's the basis for your belief?

A. Because of -- because of his association with Islam.

Q. Okay. And what in particular? Did you ever hear anybody in management refer to his religion?

A. No.

Q. Okay.

A. No.

Q. Are you -- and you're not aware of anything in the postings that he posted that was

religious in content?

A. I didn't, again, I didn't stop, stand there and read them. It might have been religious, but I didn't stop and stand there and read them, though.

Q. And the alleged incident in -- on September 22nd, 2004, are you --

A. Uh-huh.

Q. -- aware of any religious component to that in any way?

A. No.

Q. Okay. So is this just your speculation about a partial basis for the termination? It's your guess?

A. Yes, that's my -- yes, that's my recollection.

Q. No, I didn't --

A. That's what I'm saying, I'm saying that that's the only aspect that I know of why, you know, why he was terminated. But, like I said, I don't know the whole story other than what I just told you.

Q. Okay. Have you ever been charged with any crime?

A. No. Uh-uh.

Q. Okay.

A. Uh-uh.

Q. Have you ever been a party to a lawsuit as a plaintiff or defendant?

A. No. Uh-uh.

Q. Have you ever been a witness in a lawsuit?

A. I can't recall, no.

Q. You don't think so?

A. No. Uh-uh.

Q. Okay. And if you could just state for the record your religion and your race? And if you don't have a religion, that's fine.

A. Baptist. Okay. And African -- black American.

Q. Okay. I'm just going to step outside for a second --

A. Uh-huh.

Q. -- with agency counsel --

A. Uh-huh.

Q. -- and we'll be right back. If you could just not talk to Mr. Murray during the break --

2fc9dc14-a023-42ff-bb99-4de0626f86ee

A. Uh-huh.
Q. -- that would be great.
A. I mean, I had -- let me say misdemeanors, but not no crime or anything like that.
Q. Well, let's just put it on the record. Tell me what those were and what years.
A. Oh, boy. I'm trying to remember. Oh, boy, it was a misdemeanor. What happened it affected my diabetes. I went to a -- I was out in Lancaster County, and I can't remember the dates. And I went looking for a rest room. Couldn't find one, so I went to -- went into a restaurant and I was looking for a bathroom and I thought I was in one, but it was actually it was a storage room. And I urinated on myself. And they said that I urinated on the floor which I didn't, but, you know, it was a fine that I paid. That's the only thing I remember.
Q. Anything else?
A. No.
Q. Okay.
A. Uh-uh.
Q. We will be right back.

(Recess at 2:57 p.m.)
(Resumed at 2:58 p.m.)
MR. SULLIVAN: We don't have any further questions -- I don't have any further questions. So I will turn it over to you, Mr. Murray.

EXAMINATION
BY MR. MURRAY:

Q. Okay. Can you remember back when we talked about someone had spit on your window in your car two different occasions. Do you remember telling me about that? We don't know who it was, but --
A. Yeah, uh-huh.
MR. MURRAY: That's it.

FURTHER EXAMINATION
BY MR. SULLIVAN:

Q. Follow-up question.
A. Uh-huh.
Q. When was that, was that in the period around when Mr. Murray was terminated?
A. I think it was around the same time. Uh-huh.
Q. Okay. Did you have any suspicion as

to who did it?
A. Yes, I did.
Q. Okay.
A. But I don't have any proof, I'm only going on assumptions.
Q. Okay. Who did you suspect did it?
A. Debbie Cannon. Debra Cannon is the one that I didn't see eye to eye with a lot of times, and I had thought she did it at that time. But, like I said, I don't have any concrete proof.
Q. Why would -- in your view, why would she have done it?
A. Well, I had a run-in with her before. I had an altercation with her on the job.
Q. Was it related to Mr. Murray in any way?
A. No, nothing to do with him at all.
MR. SULLIVAN: Okay. No further questions. Thanks.
(3:00 p.m.)

I, Tracey L. Pinsky, Registered Professional Reporter, certify that the foregoing is a true and accurate transcript of the deposition of WARREN HAMMOND, who was first sworn by me at the time, place and on the date herein before set forth.

I further certify that I am neither attorney nor counsel for, not related to or employed by, any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Tracey L. Pinsky,

Registered Professional Reporter

2fc9dc14-a023-42ff-bb99-4de0626f86ee