IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL MURRAY,                          :
                                        :
            Plaintiff,                   :
                                        :
      v.                                 :        CIVIL ACTION
                                        :        NO. 05-4557
ALLEN WEINSTEIN, Archivist               :
of the United States,                    :
National Archives and                    :
Records Administration,                  :
                                        :
            Defendant.                   :

---

## EXHIBIT "1" IN SUPPORT OF
## GOVERNMENT'S MOTION
## FOR SUMMARY JUDGMENT

---

*(THE GOVERNMENT'S SUMMARY JUDGMENT MOTION,
SUPPORTING MEMORANDUM, AND SUPPORTING EXHIBITS
2 THROUGH 10 WERE FILED ELECTRONICALLY
ON JANUARY 4, 2007. BECAUSE THE PACER
SYSTEM WOULD NOT ACCEPT THE ELECTRONIC FILING
OF SUPPORTING EXHIBIT "1," AND ITS ATTACHMENTS,
THOSE DOCUMENTS ARE BEING FILED
IN HARD COPY FORM ON JANUARY 5, 2007.)*

1    IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

2
3    DARRYL MURRAY,      : Civil Action
                       : NO. 05-4557

4        Plaintiff,      :
                       :

5          vs           :
                       :

6    ALLEN WEINSTEIN, Archivist  :
    of the United States,     :

7    National Archives and     :
    Records Administration,   :

8        Defendant(s).    :
                   - - -

9
10        Monday, November 20, 2006
        Philadelphia, Pennsylvania
              - - -

11
12      Oral deposition of DARRYL MURRAY,
13  taken pursuant to Notice, at the Office of the United
14  States Attorney, 615 Chestnut Street, Suite 1250,
15  Philadelphia, Pennsylvania, commencing at approximately
16  11:10 a.m., on the above date, before Renee Helmar,
17  Shorthand Reporter and Notary Public.

18
19
20
21
22      CLASS ACT COURT REPORTING AGENCY
23  1420 Walnut Street      133 Gaither Drive
    Suite 1212            Suite H
24  Philadelphia, PA 19103   Mt. Laurel, NJ 08054



GOVERNMENT
EXHIBIT

**Page 2**

1 APPEARANCES:
2    Darryl Murray, pro se
     By: DARRYL MURRAY
3    112 W. Champlost Avenue
     Philadelphia, Pennsylvania 19120
4
     pro se for Plaintiff,
5    Darryl Murray
6
7    United States Department of Justice
     United States Attorney's Office
     By: GERALD B. SULLIVAN, ESQUIRE
8    615 Chestnut Street
     Suite 1250
9    Philadelphia, Pennsylvania 19106
10   Counsel for Defendants,
     Allen Weinstein, Archivist of the
11   United States National Archives
12
13 ALSO PRESENT:
14   John E. Davenport, Sr.
15
16
17
18
19
20
21
22
23
24

**Page 4**

|   | EXHIBITS | | |
|---|---|---|---|
| 1 | | | |
| 2 | Murray-14 | Letter | 73 |
| 3 | Murray-15 | Letter | 78 |
| 4 | Murray-16 | Letter | 100 |
| 5 | Murray-17 | Document | 93 |
| 6 | Murray-18 | Letter | 117 |
| 7 | Murray-19 | Letter | 128 |

**Page 3**

1                    I N D E X
2
3 WITNESS                          PAGE
4
5 DARRYL MURRAY
6    By MR. Sullivan                 5
7
8              - - -
9         E X H I B I T S
10
| 11 | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| 12 | Murray-1 | Letter | 20 |
| 13 | Murray-2 | Document | 21 |
| 14 | Murray-3 | Document | 22 |
| 15 | Murray-4 | Document | 27 |
| 16 | Murray-5 | Letter | 29 |
| 17 | Murray-6 | Letter | 33 |
| 18 | Murray-7 | Letter | 36 |
| 19 | Murray-8 | Document | 42 |
| 20 | Murray-9 | Document | 44 |
| 21 | Murray-10 | Letter | 70 |
| 22 | Murray-11 | Letter | 92 |
| 23 | Murray-12 | Photographs | 73 |
| 24 | Murray-13 | Photographs | 108 |

**Page 5**

1         (Whereupon, the deposition
2         commenced at 11:10 a.m.)
3    ... Darryl Murray, residing at 112 W. Champlost
4 Avenue, Philadelphia, Pennsylvania, having been first
5 duly sworn by a Notary Public within the State of
6 Pennsylvania, was examined and testified under oath as
7 follows...
8              EXAMINATION
9 BY MR. SULLIVAN:
10    Q   Mr. Murray, my name is Jerry Sullivan, we
11 met, of course, before; I am the Assistant United
12 States Attorney, and in this lawsuit that you
13 brought against the National Archives and Records
14 Administration, I represent the agency.
15        You've certainly have been present at
16 other depositions in this case before, but let me
17 just go briefly through the preliminaries just so
18 that you understand, again, the protocol for the
19 deposition.
20        Do you understand that your testimony
21 is under oath today?
22    A   Yes.
23    Q   And that requires you to tell the truth,
24 and the whole truth?

2 (Pages 2 to 5)

Page 6

1    A    Yes.
2    Q    If you do not understand one of my
3    questions, please let me know, and I will try to
4    rephrase it in a way that is understandable to you;
5    okay?
6    A    Um-huh.
7    Q    If you do answer, I am going to assume
8    that you understood my question; okay?
9    A    Um-hum.
10   Q    You just said, um-hum twice, by that, did
11   you mean, yes?
12   A    Yes.
13   Q    Okay, and as you know, one of the
14   important things about a deposition, and one of the
15   important things to do is to make sure your
16   responses are oral in words, not shrugs of the
17   shoulder, not um-hum, but yes, no, or a substantiate
18   response; do you understand that?
19   A    Um-hum. Yes.
20   Q    The other thing is, we have to be careful
21   not to talk over each other; I have a tendency to do
22   that, please let me know that I am talking over your
23   answer, and I ask that you not speak over my
24   questions and you wait for me to finish before you

Page 7

1    respond; is that understandable?
2    A    Yes.
3    Q    Agreeable?
4    A    Agreeable.
5    Q    If you don't know the answer to a
6    question, you can certainly say, I don't know; do
7    you understand?
8    A    Understand.
9    Q    If you don't remember the answer, if you
10   don't remember what I am asking you about, you can
11   certainly say I don't remember; do you understand?
12   A    I understand.
13   Q    Are you on any medications today that
14   would impair your ability to understand, listen to
15   and respond to my questions?
16   A    No.
17   Q    Today present is John Davenport, Agency
18   Counsel, and you met him before?
19   A    Yes.
20   Q    Please state your full name.
21   A    Darryl Murray.
22   Q    Do you have any middle name?
23   A    No middle name.
24   Q    And what is your current address, resident

Page 8

1    address?
2    A    112 West Champlost Avenue, Philadelphia
3    PA.
4    Q    C-H-A-M-P-L-O-S-T?
5    A    Yes.
6    Q    What is your Social Security number?
7    A    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.
8    Q    Have you ever been deposed before?
9    A    Not personally; I have been at them with
10   other people, but I have never.
11   Q    You have never been deposed?
12   A    No.
13   Q    I am going to ask you some questions, to
14   speed -- in away that will speed things along. I
15   know a little bit about you from the file so, I am
16   going to ask you, for example, you graduated from
17   Germantown High School; is that correct?
18   A    Correct.
19   Q    What year?
20   A    1980.
21   Q    And did you then go to Temple University?
22   A    Yes.
23   Q    What year did you start there?
24   A    '82.

Page 9

1    Q    And how long did you attend?
2    A    Till '87.
3    Q    Were you full-time, or part-time?
4    A    Full-time.
5    Q    Did you get a degree from Temple?
6    A    Yes.
7    Q    What was your degree?
8    A    Bachelor of science.
9    Q    In what subject area?
10   A    Chemistry.
11   Q    Do you have any minor subject areas?
12   A    Mathematics.
13   Q    Were you ever married?
14   A    Yes.
15   Q    Are you married currently?
16   A    Separated.
17   Q    You are not divorced?
18   A    In the process.
19   Q    How many times have you been married?
20   A    Once.
21   Q    And were you married to Kathy Lynn Cross
22   L-Y-N-N C-R-O-S-S?
23   A    Yes.
24   Q    And is her date of birth, August 23rd,

3 (Pages 6 to 9)

1  1962?
2  A  Yes.
3  Q  And you were married on June 21st, 1982?
4  A  Yes.
5  Q  In Philadelphia?
6  A  Yes.
7  Q  And you say that you are in the process of
8  divorce, have the divorce papers been filed?
9  A  Not yet.
10  Q  Have you had any children with anybody
11  other than Miss Cross?
12  A  No.
13  Q  Does she go by Cross as the last name now?
14  A  Yes.
15  Q  You haven't had any children with anybody
16  other than her?
17  A  No.
18  Q  How many children have you had with her?
19  A  One.
20  Q  Okay, and is that a daughter?
21  A  That is a daughter.
22  Q  And she was born in 1981?
23  A  '81.
24  Q  Where is she living, currently?

1  A  With me.
2  Q  Does she work?
3  A  Yes.
4  Q  What does she do?
5  A  Some kind of State Department -- not State
6  Department, a State job, for the State.
7  Q  Do you know what the job is?
8  A  No.
9  Q  What is her age, currently?
10  A  24.
11  Q  Do you adhere to any religion, currently?
12  A  Not a practicing, but I believe in the
13  Islamic, but I am not a practicing; I don't attend
14  any services anywhere.
15  Q  How long have you held the Islamic
16  beliefs?
17  A  Over 20 years.
18  Q  You don't attend a Mosque, or any type of
19  formal religious group?
20  A  No.
21  Q  Are you a believer in any variation of
22  Islam?
23  A  No.
24  Q  Do you subscribe to the Views of the

1  Nation of Islam?
2  A  Some.
3  Q  Do you consider yourself Islamic?
4  A  Yes.
5  Q  When did you begin work for the National
6  Archives and Records Administration?
7  A  I believe the summer of 1987.
8  Q  Were you full or part-time, temporary or
9  permanent?
10  A  Part-time temp.
11  Q  And was the facility you were working at,
12  the Records Center?
13  A  Yes, it was.
14  Q  And where was that located at?
15  A  5000 Wissahickon Avenue.
16  Q  When did you become full-time?
17  A  Around '97, 1997.
18  Q  So between 1987 and 1997 you were
19  part-time?
20  A  Correct.
21  Q  What position did you begin working at the
22  National Archives?
23  A  As the archives aid.
24  Q  How long did you hold that position?

1  A  17 years.
2  Q  What grade level was that?
3  A  GS-2.  GS-2.
4  Q  And you, at some point, become a GS-3?
5  A  On conversion to being a perm.
6  Q  When was that, in 1997?
7  A  Yes.
8  Q  What was the position that you became that
9  was a GS-3 level?
10  A  State --
11  Q  Archives technician?
12  A  No, archives aid.
13  Q  How long did you keep the position of
14  archives aid?
15  A  From 1997 till November of 2004.
16  Q  So until you left employment at the
17  National Archives, you had that position?
18  A  Correct.
19  Q  After '97, or beginning in '97?
20  A  Correct. Yes.
21  Q  Did you, at some point, move from the
22  Wissahickon facility to another facility?
23  A  Yes, we relocated to 14,700 Townsend Road
24  in Northeast Philadelphia.

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1    Q    When did you move from the Wissahickon
2  Avenue to Townsend Road?
3    A    1997.
4    Q    What was the last work group that you
5  worked with at the record center?
6    A    That would be the Trust Fund Section.
7    Q    What does the Trust Fund Section do?
8    A    We serviced the bankruptcy case files for
9  the District Court.
10    Q    When did you start working for the Trust
11  Fund Section?
12    A    2003.
13    Q    What section did you work in before that?
14    A    General Records.
15    Q    In the Trust Fund Section, who was your
16  first line supervisor when you left for the National
17  Archives?
18    A    Elizabeth Washington.
19    Q    How long had she been your first line
20  supervisor?
21    A    About a year.
22    Q    Who was your first line supervisor before
23  that?
24    A    (No response.)

1    Q    Was it John McGee?
2    A    John McGee.
3    Q    M-c-G-E-E?
4    A    Yes.
5    Q    How long had he been your first line
6  supervisor?
7    A    About three years.
8    Q    And before he was your first line
9  supervisor, who was your first line supervisor?
10    A    Andrew Rouche (phonetic).
11    Q    You said that you were in General Records
12  before you were in the Trust Fund Section; how long
13  were you in General Records?
14    A    From 1997 until 2003.
15    Q    Before you were in General Records, what
16  section were you in?
17    A    General Records even from -- I was in
18  General Records from '87 up til '97, and then
19  continued on from '97 til 2003.
20    Q    In the Trust Fund group, how many
21  employees -- how many coworkers did you have?
22    A    Approximately 15.
23    Q    If you know, what was Ms. Washington's
24  race and religion?

1    A    African-American, Episcopal.
2    Q    What was the race composition of your
3  coworkers in the Trust Fund Section?
4    A    Well, I was the only Muslim, one Jewish
5  employee, I think one Catholic, and, I think, the
6  rest were all Christians.
7    Q    How many were African-American?
8    A    Out of the 15, I think 13.
9    Q    Okay.  Do you ever have a coworker at the
10  National Archives and Records Administration
11  Facility that is a different level?
12    A    Not a coworker.
13    Q    Now, if you could just describe briefly
14  for me in layman's terms what you, as an Archives --
15    A    Aid.
16    Q    -- aid would do on a daily basis?
17    A    Retrieve government case files, file
18  documents and refile documents.
19    Q    Might the United States District Court,
20  for example, make a request for a file in the record
21  section?
22    A    Yes.
23    Q    When you were in General Records, were
24  you, sometimes, responsible for retrieving United

1  States District Court files when they were requested
2  by the Court?
3    A    Yes.
4    Q    When you were in the Trust Fund, what
5  types of files did you retrieve?
6    A    Anything from A to Z, Justice Department,
7  FBI, Customs, Immigration, Food and Drug
8  Administration, DEA, IRS, the Federal Agency
9  Assistance.
10    Q    And were the record requests sometimes
11  time sensitive?
12    A    I mean, they usually wanted them pulled
13  the same day and sent out the same day, if possible.
14           (Whereupon, a brief recess was
15           taken.)
16  BY MR. SULLIVAN:
17    Q    Mr. Murray, you certainly seen reference
18  in the documents that have been produced in the case
19  so far in the events and allegations of 1995 and
20  1996 regarding materials that you were alleged to
21  have placed in a smoke room, or break room, while
22  you were at the Wissahickon facility; can you tell
23  me what happened?
24    A    The only thing that I can -- my

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1   understanding really is --

2       Q   And I should tell you, you've seen

3   Director Roland's November 2004 letter to summarize

4   this incident --

5       A   Yes.

6       Q   -- and he says in that letter to you that

7   the agency received a complaint from the Director of

8   Personnel, Veterans Administration Regional Office

9   that you had left photo copies of highlighted pages

10  of a Nation of Islam Publications in the Veterans

11  Administration Regional Office break room; now, at

12  that time did the National Archives Records Center

13  share a break room with the Veterans Administration?

14      A   No, two separate break rooms.

15      Q   Okay, but they were close to each other?

16      A   About 75 feet apart, I guess.

17      Q   Okay, so you were familiar with the

18  Veterans Administration break room at the time?

19      A   Um-hum.

20      Q   Mr. Roland went on to tell you -- to write

21  in the November 2004 letter that you had been

22  counseled, that you are not to display information

23  regarding your beliefs anywhere in the workplace, he

24  recounts that in April 1996 that you signed a

1   memorandum of agreement with the agency that you

2   agreed you would not post or distribute any

3   objectionable material in the work place, in return

4   the agency would cancel its decision to effect the

5   14-day suspension; what happened?

6       A   The best of my recollection with the

7   incident and the Veterans Administration Program, I

8   used to go there and just meet and have lunch,

9   sometimes, with Muslims that worked with the

10  Veterans Administration.  And one day when I was

11  finishing lunch and leaving, a gentleman asked me,

12  could he read some pages that I had, and I told him,

13  fine, you could have them, and then, I think, the

14  next day is when I was told something about, I left

15  information in the room that somebody was asking

16  for, and I didn't know what he was talking about,

17  except for, you know, the pages that I let the

18  gentleman read.

19      Q   Did you, at any time, in 1995, 1996 post

20  anywhere in the workplace, at the National Archives

21  Records Center, or the adjacent Veterans

22  Administration property, anything on any wall?

23      A   No.

24      Q   Nothing at all?

1       A   No, nothing.

2       Q   Did you ever distribute to anyone any

3   document related to any personal belief that you

4   have, other than the one that you just referred to?

5       A   No, none.

6       Q   I am going to have marked as Murray-1, a

7   letter that I will show you in a second, that is

8   dated March 23rd, 1995, it is from Gloria Grouzos,

9   G-R-O-U-Z-O-S, the chief of the service branch at

10  the record center, to you.

11              (Whereupon a document was marked

12              for identification as Exhibit

13              Murray-1.)

14  BY MR. SULLIVAN:

15      Q   Mr. Murray, could you take a quick look at

16  that?

17      A   I have seen it before.

18      Q   Okay, and this states that you displayed

19  in the break room posters, signs, flyers, newspaper

20  clippings and other forms of information relating to

21  the beliefs of the Nation of Islam.  These have

22  contained statements regarding the racial, political

23  and religious matters; is that true or untrue that

24  you did that?

1       A   It is untrue.

2       Q   In the second paragraph, about halfway

3   through it, you are directed to immediately stop

4   from distributing or posting any materials in the

5   workplace.  Your failure to comply will be the basis

6   for charging you with insubordination and taking

7   disciplinary action, which could include your

8   removal from Federal service; did you read this

9   letter in 1995?

10      A   Yes.

11      Q   And you understood that you were being

12  directed not to post such materials?

13      A   Yes.

14      Q   I am going to show you in just a second

15  what I will have marked Murray-2; it is a

16  March 13th, 1995 notice from Gloria Grouzos, again,

17  to you.

18              (Whereupon, a document was

19              marked for identification as

20              Exhibit Murray-2.)

21  BY MR. SULLIVAN:

22      Q   If you could take a quick look at that,

23  Mr. Murray, I would appreciate it.

24      A   The second document, I don't recall ever

6 (Pages 18 to 21)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 22

1  seeing this one.
2      Q   Murray-2?
3      A   Murray-2.
4      Q   This says that it is a notice to --
5  proposing to suspend you for a period of 14 calendar
6  days from your position, and as a basis for the
7  notice, it states an incident of misconduct relating
8  to distribution of a Nation of Islam publication;
9  you never seen this before?
10     A   No.
11         Excuse me, I requested some documents
12  be sent to me, that's when I saw it then.
13     Q   Okay.
14     A   I didn't see it before then.
15     Q   Did you see this in 1995?
16     A   No.
17     Q   Are you sure?
18     A   Sure.
19     Q   I am not going to mark this document yet,
20  I just ask you if you ever seen this document
21  before?
22     A   Yes.
23     Q   Okay, I will mark it as Murray-3.
24         (Whereupon, a document was

Page 23

1              marked for identification as
2              Exhibit Murray-3.)
3  BY MR. SULLIVAN:
4      Q   Where have you seen Murray-3 before,
5  Mr. Murray?
6      A   This was posted in the -- my -- the small
7  picture in the left, bottom corner, minus that
8  picture (indicating), this was posted in the mail
9  room at 5000 Wissahickon Avenue in the National
10  Archives and Records Administration office.
11     Q   Is any of the writing on this document
12  yours?
13     A   Yes, the notes in the corners are mine.
14     Q   In the top left-hand corner it says,
15  "Notice Them", and then it has a number of comments
16  beginning with 1 and going down to 9; are any of
17  those your notes, your handwriting?
18     A   Yes, numbers 1 through 20 are comments I
19  found -- this was in -- this one was in the mail
20  room, but there were copies of it through the
21  warehouse, and -- but I had listed here.
22     Q   Let me ask you this, what, on this
23  document is not something that you placed on it?
24     A   I copied these 20 comments from other

Page 24

1  pages that were in similar posters in the warehouse,
2  and the ones with the -- that are paler are my
3  comments.
4      Q   I'm sorry, there is handwriting on this
5  document, there is a series of numerated comments
6  beginning with 1, going down to 20, are those yours?
7      A   Those are mine.
8      Q   Okay. So, complexion, broad nose, et
9  cetera, et cetera, those are all yours?
10     A   That's correct.
11     Q   There is also a picture of, what looks
12  like Jesus Christ on the document; did you place
13  that picture on this document?
14     A   That is a picture of Vlad the Impaler.
15     Q   That is a picture of Vlad the Impaler?
16     A   Yes.
17     Q   Did you place that picture on the
18  document?
19     A   Yes.
20     Q   There are words written on that picture;
21  did you write those words?
22     A   Yes.
23     Q   The picture in the middle looks like a
24  picture of a mole, is that your understanding?

Page 25

1      A   Yes.
2      Q   In a suit?
3      A   (No response.)
4      Q   In a suit; is that correct?
5      A   Correct.
6      Q   Are you saying that that picture was
7  posted somewhere in the work place?
8      A   Yes.
9      Q   Do you know who posted it in the
10  workplace?
11     A   No.
12     Q   Why did you write on this document what
13  you wrote on this document and placed the picture of
14  Vlad the Impaler there?
15     A   I had asked Mr. Weber, was this some kind
16  of an insult regarding the African-American
17  employees there, and he said it wasn't; he said the
18  photograph was originally white, but from Xeroxing
19  it, that it became dark, and that was his
20  explanation.
21     Q   The picture of the mole?
22     A   The picture of the mole.
23     Q   So, in response to that, you did what?
24     A   I had put the picture on here to show him

7 (Pages 22 to 25)

**Page 26**

1  that if you Xeroxed it, it wouldn't get dark like
2  that. You couldn't, you know, blacken it out just
3  from Xeroxing it.
4      Q   Once you wrote these comments on this
5  picture and put the picture -- you are describing as
6  Vlad the Impaler on it, did you put this document
7  anywhere, or share it with anybody?
8      A   No. The last time I saw it, I think it
9  was in the smoke room when I must have handed it to
10  the gentleman when I handed him the paper about the
11  million man march, it must have been on the bottom
12  of it.
13      Q   So you handed this document to someone in
14  the breakroom?
15      A   It must have been, because I didn't have
16  it after that.
17      Q   And what was the intent of your comments?
18      A   Oh, the 20 comments weren't mine, I copied
19  those comments off of other postings that we had in
20  the warehouse, it was similar, identical pictures of
21  the black mole, in different places they had
22  comments about that.
23      Q   Who had put those comments there?
24      A   I have no idea.

**Page 27**

1      Q   I am going to have marked as Murray-4 --
2          (Whereupon, a document was
3          marked for identification as
4          Exhibit Murray-4.)
5  BY MR. SULLIVAN:
6      Q   The document that is entitled, Memorandum
7  of Agreement, signed by David Weber and you in April
8  of 1996; is that your signature on the second page?
9      A   Yes, it is.
10      Q   Do you recall this document?
11      A   Yes.
12      Q   And was this an agreement that you reached
13  with the agency regarding issues in part related to
14  your alleged posting distribution of materials at
15  the workplace in 1995 and 1996?
16      A   I guess it is related to it.
17      Q   And as part of the agreement, did -- does
18  the agreement state Mr. Weber, the deciding
19  official, has determined that the 14-day suspension
20  is for the efficiency of the service and should be
21  effected. However, this suspension will be held in
22  abeyance for one year from the date of this
23  agreement, subject to the following: execution of
24  the agreement and compliance with each of the

**Page 28**

1  provisions outlined below?
2      A   Yes.
3      Q   Okay. And then Provision C states that,
4  "Darryl Murray agrees that he will not post or
5  distribute any materials in the workplace, including
6  any work spaces which may belong to, or are shared
7  with other organizations. Darryl Murray understands
8  that this means that he may not distribute any
9  materials in the workplace even during lunch
10  periods, breaks, or before or after working hours."
11  Correct?
12      A   Correct.
13      Q   And what did you understand that promise
14  of yours to mean?
15      A   Not to bring any Islamic literature into
16  the workplace.
17      Q   It says, "Will not post or distribute any
18  materials in the workplace." Did you understand
19  that you were not to bring any, or post any
20  materials in the workplace?
21      A   Yes, but I had never done it, so I didn't.
22      Q   But you understood this was a binding
23  agreement on your part?
24      A   Yes.

**Page 29**

1      Q   Did you understand that if you did not
2  comply, that the suspension would you go into
3  effect?
4      A   Yes.
5      Q   Did you have any understanding that this
6  was ever not an agreement that was effective for
7  you?
8      A   No, I thought it was in effect for a year
9  like he said.
10      Q   Did you understand that it was a
11  commitment that you had, even beyond the year?
12      A   Oh, yes.
13      Q   So that was a requirement for the entire
14  time that you were at the facility?
15      A   Yes, definitely.
16      Q   Mr. Murray, I am going to have marked as
17  Murray-5, and I will ask you to take a look at it in
18  a second.
19          (Whereupon, a document was
20          marked for identification as
21          Exhibit Murray-5.)
22  BY MR. SULLIVAN:
23      Q   You can take a look at this. This is a
24  handwritten memo dated November 20, 2000 from Darryl

8 (Pages 26 to 29)

1  Murray, employee, subject: imminent violence in the
2  workplace. Is this your handwriting?
3      A   Yes, it is.
4      Q   The document states, "Recent intelligence
5  reports have revealed that the FRC clique, Mitchell
6  Buffone" someone Dawson --
7      A   Reather.
8      Q   -- "Reather Dawson, Hercules Robinson and
9  Pat Davis have declared war on myself and my
10  intelligence agents." Did you write that?
11      A   Yes.
12      Q   It also states, "Today I spoke to senior
13  members of the clique and encountered extremely
14  hostile reactions. The clique feels that I
15  represent a clear and present threat to their
16  authority and power. They will leave no stone
17  unturned in having me removed from Federal service."
18  Did you write that?
19      A   Yes.
20      Q   It also says, "The clique is currently
21  trying to provoke me into committing an act of
22  violence against one of it's members. They know the
23  violence that I am capable of, and hope that they
24  can use it against me." Did you write that?

1      A   Yes.
2      Q   You finally write, "I strongly recommend
3  that the clique be counseled before I decide to take
4  retaliatory measures. This situation requires your
5  immediate attention." Did you write that?
6      A   Yes.
7      Q   Who is this directed to?
8      A   I think I was sending it to -- I don't
9  know who the director was then, I think April.
10      Q   And you say this clique has declared war
11  on you and your intelligence agents; what do you
12  mean by that?
13      A   Mitchell Buffone had, like, declared war
14  on me and my associate friends in the workplace.
15      Q   How did he do that?
16      A   Just harassment and stirring up trouble,
17  starting rumors.
18      Q   Mitchell Buffone is a coworker?
19      A   Yes.
20      Q   Or he was?
21      A   Was a coworker.
22      Q   What GS level was he at the time?
23      A   At the time, he was GS-6.
24      Q   Your statement that the clique clearly

1  represents clear and present threats to their
2  authority in power; what did you mean by that, and
3  what was that based on?
4      A   The clique is used to bullying, picking on
5  people, harassing them, and I was always the
6  employee who would tell the other employees, you
7  don't have to take that; you can't talk to me like
8  this or that; they saw me as a -- interfering with
9  them having fun with the lower grade employees.
10      Q   You said the clique is trying to provoke
11  me into committing an act of violence against one of
12  its members; what do you mean by that?
13      A   Whatever the incident was then, I really
14  don't clearly remember it right now to speak on it.
15      Q   You say, they know the violence I am
16  capable of and hope that they can use it against me;
17  what do you mean, the violence that I am capable of?
18      A   I think I meant, being raised, raised in
19  the streets, I am quite capable of fighting back if
20  I have to.
21      Q   You mentioned a strong recommendation that
22  the clique be counseled before you decide to take
23  retaliatory measures; what retaliatory measures were
24  you considering?

1      A   Possibly a fist fight.
2      Q   Okay, did anybody in management -- you
3  actually gave this to Mr. Roland you think?
4      A   Yes.
5      Q   Did anybody in management ever respond to
6  this?
7      A   No.
8      Q   Mr. Murray, I am going to have marked as
9  Murray-6, a memo dated October 26th, 2001 from John
10  McGee to you, the subject of in-house counseling
11  letter.
12          (Whereupon, a document was
13          marked for identification as
14          Exhibit Murray-6.)
15  BY MR. SULLIVAN:
16      Q   Take a look at this document.
17      A   I recognize it.
18      Q   Okay, this refers to an incident, I
19  believe and I understand, from 2001 in which some
20  boxes ended up at the Social Security Administration
21  with red magic marker writing on them, some
22  statement that appears to be in Arabic; do you
23  recall that?
24      A   Yes.

9 (Pages 30 to 33)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

**Page 34**

1    Q   And is it true that you admitted to the
2   agency at some point you had written the comments on
3   the boxes?
4    A   Yes.
5    Q   What were the comments?
6    A   My name in Arabic, or a nickname, The
7   Great Mutah of High Akbar and --
8    Q   Could you spell that?
9    A   The Great Mutah, M-U-T-A-H, and
10  Allahu-Akbar, A-L-L-A-H-U - A-K-B-A-R.
11   Q   Did you write anything else on the boxes?
12   A   On that box, no. I think there was
13  another one I had written something on it that I was
14  going to put some personal papers in, dealing with
15  biology or something, Homo sapiens or something like
16  that.
17   Q   Was this right after September 11th, 2001?
18   A   Yes.
19   Q   Okay. Did Federal Protective Services
20  become involved in investigating this?
21   A   Yes.
22   Q   Why did you write the comments that you
23  wrote on the boxes?
24   A   Well, the boxes were intended for personal

**Page 35**

1   use; we have utility carts that we keep our supplies
2   in, and the employees, they write their names and
3   nicknames on them so that people would know not to
4   steal their property, or just to leave an extra pair
5   of shoes in, or smock, or gloves, or scissors, or
6   tape, stuff like that. So it wasn't -- the box
7   wasn't supposed to go out, and we have a lot of temp
8   employees that come in, and sometimes they will be
9   lazy and don't go get their own boxes; they see a
10  box on a cart and they will just take that box and
11  throw stuff in it. Once we send those boxes out to
12  Social Security, they take the files out of the
13  boxes and discard them in the trash, so the boxes
14  don't have to be in perfect condition, or, you know,
15  pristine clean. And I told my supervisor, I think
16  somebody took the box, you know, off my cart and
17  just used it, and that's how it ended up going out.
18   Q   Did you know before the boxes went to
19  Social Security that they were going to Social
20  Security?
21   A   No.
22   Q   Okay. What was your reaction when you
23  found out they had gone to Social Security?
24   A   I was a little upset, I felt that somebody

**Page 36**

1   got me in trouble, not intentionally, but just by
2   tampering with the box, using it. And after that, I
3   just made sure, you know, that I didn't put anything
4   on the box again.
5    Q   And did you then make a formal apology?
6    A   Yes.
7    Q   Mr. Murray, I am going to show you what I
8   will have marked as Murray-7, it is a memo from you
9   to Elizabeth Washington dated April 25, 2003.
10                (Whereupon, a document was
11                marked for identification as
12                Exhibit Murray-7.)
13  BY MR. SULLIVAN:
14   Q   Take a look at this, please, and let me
15  know if you've seen it before?
16   A   This is my handwriting, if I am recalling
17  all the information in it.
18   Q   But, feel free to take more time as we are
19  going through, I am going to ask you some questions.
20  This says, response to today's meeting; do you
21  recall meeting with Ms. Washington, your first line
22  supervisor in, or around April 2003, regarding your
23  being transferred?
24   A   I can't recall a meeting, but I know that

**Page 37**

1   I had to.
2    Q   Were you transferred around that time from
3   the General Records Section to the Trust Section,
4   Trust Fund Section?
5    A   Can't remember for sure.
6    Q   When were you transferred?
7    A   I think it was in 2003.
8    Q   Did you have concerns, at that time, about
9   the transfer?
10   A   I might have.
11   Q   Okay. Had your PE scores been dropping?
12   A   Yes.
13   Q   What is a PE score?
14   A   It is a numerical indicator of how much
15  work you've done on particular tasks by the hour, or
16  in an eight hour period.
17   Q   Did you have concerns about your scores
18  dropping, and the reasons for that -- the drop?
19   A   Yes.
20   Q   What were your concerns?
21   A   In the section that I was transferred to,
22  it required a lot more extensive walking over the
23  perimeter of the building, which is about three or
24  four City blocks inside, and I was having a problem

10 (Pages 34 to 37)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1  with my legs.
2  Q  What was your problem with your legs?
3  A  Doctors think that I have rheumatoid
4  arthritis.
5  Q  Did you express that concern with Ms.
6  Washington?
7  A  Yes.
8  Q  Did you express it with anybody else?
9  A  Mr. Roland.
10  Q  On Page 2 of this letter -- memo, you say,
11  "It is unclear at this time that if your decision to
12  recommend that I be placed in the PIP program, which
13  targets employees for termination, is for low PE
14  scores, for allegedly mislocating files or both."
15  Were you advised, at that time, that you would be
16  placed in a PIP program?
17  A  I think so.
18  Q  In an improvement plan?
19  A  Yes.
20  Q  And you were told that that was what,
21  because of what?
22  A  Low PE scores.
23  Q  And on Page 3, if you could turn one more
24  page, you state regarding the position of being in a

1  PIP program, that you would enter a second request
2  to return to the General Records Section; did they
3  think that you were asking that you'd go back to
4  General Records?
5  A  Yes.
6  Q  Do you recall meeting around that time
7  with Mr. Roland, and Mr. Roland, by the way, at the
8  time, 2003, would he be the Director of the Records
9  Center?
10  A  Yes.
11  Q  Do you remember meeting with him to
12  discuss any relating issues?
13  A  I don't think so.
14  Q  Did Mr. Roland speak to you at that time
15  about your use of the phrase in the workplace,
16  "going postal"?
17  A  Not at that time.
18  Q  When, if ever, did he?
19  A  Summer of 2003.
20  Q  Okay. Had you used that phrase, "going
21  postal" in the workplace?
22  A  No.
23  Q  How did Mr. Roland come to believe that
24  you had used it?

1  A  I had a falling out with Mitchell Buffone,
2  and I had wrote him a letter terminating our
3  friendship, and in it, you know, I said I understand
4  why and how people go postal in the workplace, but I
5  never voiced it to anyone.
6  Q  When did you write that letter to
7  Mr. Buffone?
8  A  Maybe February or March.
9  Q  2003?
10  A  2003.
11  Q  You said that you had a falling out with
12  him, what was that about?
13  A  Mr. Buffone is not a very trustworthy
14  person. He is capable of betrayal at the times that
15  you wouldn't expect him to be, and I felt as though
16  I had been trying to support him in being a work
17  coordinator, and looking out for his interest, and I
18  thought that he would do the same for me, and that I
19  found out that was not to be the case.
20  Q  In what ways did it turn out not to be the
21  case?
22  A  I had gotten Mr. Roland to help give a
23  friend of mine a temporary job for a couple of
24  weeks, and Mr. Buffone was instrumental in dropping

1  her from her employment, and I just thought that he
2  could have gave me a heads-up, a warning, saying,
3  you know, well, work is coming to a shortage now, we
4  are going to be letting your friend and other people
5  go, and he just did it without not even a day's
6  notice.
7  Q  You were upset with him?
8  A  Oh, yeah.
9  Q  Did your relationship with Mr. Buffone
10  change permanently after that?
11  A  Yes.
12  Q  Did it ever get better again?
13  A  No.
14  Q  In what ways -- well I will come back to
15  that.
16  Did Mr. Roland, when you met with him
17  in 2003, around April of 2003, did he advise you not
18  to petition other employees in forming cliques or
19  alliances?
20  A  Not to petition, no.
21  Q  Not to encourage them to form cliques or
22  alliances?
23  A  No.
24  Q  Were you responsible for forming any sort

6935fb57-a4a5-43c0-8b5c-95a64088a52d

**Page 42**

1  of clique or alliance at the Federal Records Center?
2  A   No.
3  Q   Did Mr. Roland ask you not to issue long
4  type written, what we call, manifestos?
5  A   I don't remember.
6  Q   You don't remember that?
7  A   No.
8  Q   I am going to have marked, now, as
9  Murray-8.
10           (Whereupon, a document was
11           marked for identification as
12           Exhibit Murray-8.)
13 BY MR. SULLIVAN:
14 Q   Which is styled a memo from you to David
15 Roland when he was in the position of assistant
16 regional administrator, dated May 12th, 2003; if you
17 could take a look, this is a cover document for a
18 set of documents.
19 A   I recognize this document.
20 Q   Okay. The second paragraph says, "My
21 current annual PE is 88, minimally successful. I
22 need to be reassigned, as soon as possible, to
23 receive a wage grade increase." Is that correct
24 that you had been graded minimally successful with a

**Page 43**

1  PE of 88 around that time?
2  A   That's correct.
3  Q   And is the reassignment that you are
4  requesting the one that you already referred to?
5  A   Yes.
6  Q   And Mr. Roland writes at the bottom,
7  Darryl, my decision is attached; is that correct?
8  A   Yes, that's correct.
9  Q   And then I am going to turn to the 4th
10 page of the 6 or 7 pages that I handed to you, it
11 says, Disposition of Reasonable Accommodation
12 Request; did you understand that you made a
13 reasonable accommodation request?
14 A   Yes.
15 Q   And who had you sent that to?
16 A   I think I was directed to give it to David
17 Roland.
18 Q   And it states here that your reasonable
19 accommodation request was to return to your former
20 position in the General Records Section; correct?
21 A   Correct.
22 Q   And that was being denied?
23 A   Yes.
24 Q   And on the next page, there are reasons

**Page 44**

1  given for the denial?
2  A   Yes.
3  Q   And it states that the physical
4  requirements for your former duties in the General
5  Records Section, and your current duties in the
6  Trust Fund are the same, moreover, the performing
7  standards are the same, therefore, if you are having
8  difficulty performing duties in the Trust Fund
9  Section, you would have equal difficulties doing so
10 in your former assignments in the General Records
11 Section; did you discuss this petition with Mr.
12 Roland?
13 A   No.
14 Q   Did you understand that he was saying that
15 there wasn't a significant physical difference
16 between to two jobs?
17 A   Yes.
18 Q   Did you ever challenge that further?
19 A   No.
20 Q   And the last document that I am going to
21 show you relating to these topics, I am going to
22 have marked as Murray-9.
23           (Whereupon, a document was
24           marked for identification as

**Page 45**

1           Exhibit Murray-9.)
2  BY MR. SULLIVAN:
3  Q   If you could take a look at this, this is
4  a July 21st, 2003 notice regarding your performance
5  during the appraisal period, October 1st, 2002 until
6  June 28th, 2003, sent to you by Elizabeth
7  Washington.
8  A   Yes, I recognize this one.
9  Q   It says that your performance during that
10 period of time was not at an acceptable level of
11 competence. Therefore, your within-grade increase
12 would not be granted, your overall rating is
13 minimally satisfactory, your PE score was
14 87 percent; do you recall receiving this?
15 A   Yes.
16 Q   And do you remember being told that you
17 were at a minimal acceptable level --
18 A   Yes.
19 Q   -- minimally satisfactory level during
20 this period?
21 A   Yes.
22 Q   Under Actions Necessary for Improvement on
23 Page 1, it says, "Rather than following agency
24 procedures, you sometimes make your own procedures

1 which sometimes do not work out. You also sometimes
2 work in a scattered manner, rather than working more
3 methodically by stack area." Did Ms. Washington
4 discuss with you that criticism?
5    A  Yes.
6    Q  Did you have a response?
7    A  Didn't totally agree with it, but I
8 understood what she meant. She was saying, we have
9 our building warehouse, it is divided up into
10 sections A, B, C, D, E, F, G, and instead of going
11 A, B, C, D, E, F, G, sometimes I would start in an
12 area that was less crowded, or where the work was
13 easier, and she might have thought that that had
14 something to do with being minimally satisfactory.
15    Q  Did you ever go above minimally
16 satisfactory after that point before you departed?
17    A  Yes.
18    Q  Did you ever get an within-grade increase
19 before you left?
20    A  Yes.
21    Q  How many times?
22    A  Once.
23    Q  When was this?
24    A  June 2004.

1    Q  Mr. Murray, going back to our discussion
2 about cliques, you've referred to a clique involving
3 Mr. Mitchell Buffone?
4    A  Yes.
5    Q  Who else was in that clique?
6    A  Mitchell Buffone, Pat Davis, Dwayne
7 Dixson, Darnel Tate and one or two people that had
8 one foot in and one foot out.
9    Q  Who were they?
10    A  That would be Reather Dawson and just
11 about anybody who needed them to get a promotion. I
12 mean, since they never did anything to me, or never
13 did anything to anybody that I know of, I don't feel
14 comfortable, you know, putting them in something, or
15 calling their name.
16    Q  And Mr -- and I don't know if the
17 pronunciation is right, Hong Diep, H-O-N-G D-I-E-P,
18 was he in that clique?
19    A  No.
20    Q  In a memo that you submitted to the judge
21 a few months ago, Judge Shapiro, you stated that you
22 had a falling out with Buffone, and you called him a
23 worthless loser, and Mr. Buffone retaliated with a
24 secret campaign of harassment by vandalizing your

1 desk and personal property for over a year; is that
2 what you referred to before, the falling out?
3    A  No. That worthless loser stuff started
4 coming about when personal items started
5 disappearing off my desk, my cart; someone had
6 slapped some spaghetti sauce or pasta sauce or
7 something on the side of my car, and I didn't know
8 who it was, but I knew that he was responsible for
9 it, but I don't know who actually did it, but I
10 think he did it.
11    Q  When did that start?
12    A  Shortly after I wrote him the letter
13 terminating our friendship, and that would be 2003.
14    Q  Okay, and your letter to the judge, your
15 memo to the judge, you referred to August 2003; does
16 that seem right?
17    A  Yes.
18    Q  Okay. What issues did you have with
19 Vernel Tate?
20    A  Poor Mrs. Tate was overage and over sexed;
21 middle aged woman who was attracted to me, and I
22 think that she thought because I had a good
23 friendship with all the female employees, that we
24 must have been having sex because we were so

1 friendly, and she used to talk like, she wanted a
2 piece of the action or something.
3       I don't know what her problem was.
4 She was just constantly harassing and complaining
5 about me not showing her and the clique enough
6 respect, or -- if anybody had anything negative
7 to say about me, she would try to hype it up and
8 boost it. She was just a nuisance, plainly.
9    Q  In your EEOC statement from November
10 18th, 2004 you state, I filed a complaint of sexual
11 harassment against Miss Tate; did you, in fact, file
12 a complaint of sexual harassment?
13    A  I filed a complaint with the director; I
14 didn't go through with it to the EEOC.
15    Q  And what were you alleging?
16    A  She was harassing me.
17    Q  In what way.
18    A  Verbal, sexual advances.
19    Q  I am going to come back to some of your
20 issues with the clique that you referred to in a
21 moment; what religious items, symbols, messages did
22 you see posted at the Records Center on Townsend
23 Road during your time there?
24    A  On some employees screen savers on their

13 (Pages 46 to 49)

## Page 50

1 computers, Christian crosses, Jewish Menorah
2 symbols, and then the same with -- on prayers, on
3 pieces of paper with prayers, like posting it on the
4 back of their desk or on their desk, and that is
5 about it.
6     Q   Anything else?
7     A   Not that was religious. So it might be
8 something political or something. Sometimes people
9 get religious and politics mixed up, so...
10     Q   Can you give me an example where religion
11 and politics were mixed up?
12     A   Probably with a magazine that someone was
13 reading with the Holocaust and the swastika or
14 something, that is about it.
15     Q   Who was reading it?
16     A   It was just on the desk, I don't know who
17 it belonged to, or if somebody was sharing it with
18 somebody.
19     Q   What was it saying, the magazine, about
20 the Holocaust?
21     A   It just had a picture of a swastika and
22 the word, Holocaust on top.
23     Q   Do you know what the article or subject
24 matter was?

## Page 51

1     A   No, I wouldn't touch anyone's property.
2     Q   You don't recall whose it was?
3     A   No.
4     Q   Apart from that, anything else you recall
5 seeing?
6     A   No.
7     Q   So you have told me every type of
8 religious items, symbols, messages that you recall
9 during your time at the Records Center on Townsend
10 Road?
11     A   Except for prayers out of the Bible, that
12 was it.
13     Q   How about while you were at the Records
14 Center on Wissahickon Avenue, anything beyond what
15 you just described?
16     A   No.
17     Q   Did you ever have a Koran in your work
18 station, or anywhere at the Records Center?
19     A   At Townsend Road facility.
20     Q   You did?
21     A   Yes.
22     Q   Did anybody ever ask you to remove that,
23 or put it somewhere?
24     A   No.

## Page 52

1     Q   Did you ever have any prayers, or anything
2 similar to a prayer posted at your work station, or
3 anywhere at the work facility?
4     A   No.
5     Q   Did anybody ever tell you that you were
6 not to have a Koran or prayer at your work station?
7     A   I think that when I made the agreement, I
8 probably shouldn't have brought it in because that
9 would be considered religious materials.
10     Q   But you did bring a Koran in?
11     A   Yeah, I kept it in my desk.
12     Q   And you were never told to remove it?
13     A   No.
14     Q   In his November 2004 letter to you,
15 Mr. Roland wrote that, you were suspended for three
16 days in August 2003 for neglecting duty and
17 inaccurately completing work and -- just one second.
18        He stated that you are suspended for
19 three days in August 2003 for neglected duty and
20 inaccurately reporting completed work and
21 carelessness; do you remember that, is that the Odum
22 (phonetic) file?
23     A   Yes.
24     Q   Okay. Can you tell me a little bit about

## Page 53

1 that?
2     A   I don't remember the exact date, but I had
3 pulled about 100 request for files that day.
4     Q   Were they bankruptcy files?
5     A   Yes.
6     Q   Okay.
7     A   And hers was about, maybe, somewhere
8 between 95 and 100 that I pulled.
9     Q   Now hers, being Ms. Odum's?
10     A   Ms. Odum.
11     Q   And Ms. Odum was, who?
12     A   A customer. A public customer.
13     Q   Okay.
14     A   I remember pulling the file out of the
15 box, putting the chart out slip in the box, putting
16 the file on my cart, and then going onto the next
17 one, going onto the next request. I remember taking
18 the files back to the service area where they are
19 supposed to be checked in, and Dwayne Wilkerson was
20 responsible from checking them in, and he did not
21 come into work that day, so they were left
22 overnight, unguarded and unchecked in, and sometime
23 later, I guess we discovered that her file was
24 missing. She indicated, I guess, she called in,

14 (Pages 50 to 53)

1  whatever.
2      Q   Do you remember if there was any urgency
3  in getting the file copied?
4      A   It wasn't noted on the actual request
5  slip, but usually they wanted it within a couple
6  days, if they can get it.
7      Q   Did you have any role to play in the file
8  being missing?
9      A   No, I don't think so.
10     Q   You are not sure?
11     A   I am 100 percent sure; I've never lost a
12  file in 17 years.
13     Q   You never lost any files?
14     A   No.
15     Q   So what happened next?
16     A   I think my supervisor notified me that it
17  was missing, and she assigned Dwayne Wilkerson to
18  try to see if he could find it, you know, he would
19  help me to look for it, and we searched the entire
20  stack area from where it was pulled.  I couldn't
21  find it, Dwayne Wilkerson couldn't find it, and I
22  think the supervisor notified the customer that we
23  couldn't, and then the customer called back and
24  asked to speak to somebody higher, and I think she

1  ended up on the phone with John McEvoy, and that is
2  how he ended up getting involved in it.  I don't
3  know how he got involved in it, he was the
4  supervisor on the loading dock at the time.
5      Q   Did the file end up being found?
6      A   Yes, it did.
7      Q   Who found it?
8      A   Vernel Tate.
9      Q   Where did she find it?
10     A   She told me that it was stuffed in the
11  back of the box that I had serviced subsequent to
12  the Tasha Odum box that I had.  When I left that
13  Tasha Odum's box, I went to another box that I
14  pulled a file out, and she said that she found it in
15  there, stuffed in the back.
16     Q   Is that possible?
17     A   Impossible.
18     Q   Why is it impossible?
19     A   Impossible because I was pulling boxes --
20  putting boxes -- pulling folders out of boxes, it
21  could have been possible if I had been doing re
22  files and putting two folders back in by accident,
23  they could have been stuck together, but since I was
24  taking them out, and once I was taking them out, I

1  would stack them in the cart, it doesn't make sense
2  to have something like this (indicating) to --
3      Q   Now, that is not showing up on the
4  transcript, so make sure that if you want something
5  described, you say it in words.
6      A   It is not likely that a folder as thick as
7  one or two of these (indicating), that are heavier,
8  to another location and then sit it in the back of a
9  box.  It is also kind of difficult to see that
10  because all of this folders in a given box, they are
11  usually the same color, and the folders were of a
12  different color.
13     Q   So you are saying that Ms. Tate lied?
14     A   Yes.
15     Q   Why would she lie about that?
16     A   I think right around that time she was
17  trying to question me about my relationship with
18  Mr. Buffone, and I -- my sixth sense just told me
19  that she is up to something, she was trying to get
20  something started, or she was about to -- let's be
21  engaged in some kind of devilish behavior.  And I
22  know from experience working there from other
23  employees who had similar incidents, they just
24  resigned or quit because they knew that they didn't

1  lose any work, or something like that, so I know
2  that I had become a victim of that same kind of
3  behavior.
4      Q   Did you ever raise that with management;
5  did you bring that to the attention of management,
6  your view of that?
7      A   I mentioned it to Miss Washington, but
8  without evidence, proof and the general hostile and
9  racial organization it would receive, it wouldn't do
10  any good.
11     Q   After that occurred in August 2003, was
12  there any greater tension between -- among you and
13  any other members of the clique?
14     A   No, I generally tried to avoid them all as
15  much as I could.
16         Yes, there was something.
17     Q   And what was that?
18     A   Dwayne Wilkerson had made several
19  complaints to Ms. Washington that my work habits
20  were sloppy or something, or that I was messy, and I
21  was in the file area.
22     Q   Did you and he discuss that?
23     A   She called me into the office, and he was
24  talking to her, and he had told her that he wasn't

15 (Pages 54 to 57)

1  going to say anything else to her, he was just going
2  to forget about the whole incident and leave it
3  alone, and that is just what he did, he never made
4  any more complaints after that.
5      Q   Did you and Mr. Buffone and Ms. Tate and
6  Mr. Wilkerson, anybody in that clique, have any
7  conversations between when these incidents happened
8  in August 2003, and when you left in 2004, that
9  involved any kind of threats or challenges?
10     A   No. No.
11     Q   In your EEO statement from February
12  2nd, 2005, you state that, approximately, four or
13  five months prior to my placement on administrative
14  leave, so that would be -- you are talking about the
15  beginning of, maybe, 2004, I experience a number of
16  thefts and personal documents beginning to disappear
17  from the top of my desk and from a locked cabinet
18  section of my desk. Someone started placing my
19  personal documents under the office door of my
20  supervisor, Ms. Washington, et cetera, et cetera.
21  What happened, and when did it happen?
22     A   I spend a lot of hours every day on the
23  Internet researching materials and printing them
24  out.

1      Q   While at work?
2      A   While at work, on my lunch break, and 15
3  minute break, or after work, and I make scratch
4  notes in the margin of different paper, and when I
5  come to work on Monday, my supervisor would have
6  them sitting in the chair and she wouldn't know if I
7  lost them, or what. Just couldn't make any sense --
8  someone to keep sliding them under her door, and --
9      Q   Had she told you that somebody had been
10  putting them under her door?
11     A   Yes. And it wasn't anything -- we
12  couldn't understand why somebody would do it, and
13  then when it finally happened again, she just took
14  them into Assistant Director Dan Bedesen's office.
15     Q   B-E-D-E-S-E-N?
16     A   S-E-N.
17         And then he called me in to ask me
18  about it, and I told him, stuff keeps disappearing
19  off my desk. And he asked me if I wanted these
20  papers that Ms. Washington brought to him, and I
21  said, no, at this point, I want to take a note off
22  of it, and he discarded them in the trash, and he
23  told me to try to lock up everything on my desk or
24  clear it out at the end of the day, you know, so to

1  prevent it from happening.
2      Q   Were the things that were placed under her
3  door of a certain subject matter?
4      A   Nothing particular, just Web site
5  addresses, or Web type linkages.
6      Q   The thefts that you are referring to, were
7  they just of those documents that were placed under
8  the door, or were there additional thefts?
9      A   Additional thefts.
10     Q   What types of theft?
11     A   My tooth brush, a bar of soap, deodorant,
12  sometimes office supplies, that's all.
13     Q   Did you have any suspicion as to who was
14  putting the documents under Ms. Washington's door?
15     A   Mr. Buffone was a suspect.
16     Q   You suspected him?
17     A   Yes.
18     Q   Did you ever confront him about that?
19     A   No.
20     Q   Did you ever have anything that verified
21  that it was he who was doing it?
22     A   No.
23     Q   Regarding the theft of your tooth brush,
24  soap, deodorant, the other things that you

1  mentioned, did you ever suspect anybody was
2  responsible for that?
3      A   Kind of thought he did too, Buffone did
4  it, too.
5      Q   Buffone?
6      A   Yes.
7      Q   Did you ever confront him about that?
8      A   No, I didn't have any proof.
9      Q   Did you ever come across anything that, in
10  your mind, verified that it was he, that was
11  responsible?
12     A   There is one incident where I was in one
13  stack, and my cart was in another, and he was
14  standing not to far from it, and he was -- it looked
15  like, from a distance that he was talking to someone
16  who was up in an aisle, but you couldn't see a
17  person standing in the aisle, and as I approached my
18  cart, he walked away, and I noticed -- looked all
19  the way down at the other end of the aisle, I seen
20  Dwayne Wilkerson leaving out the other end, but --
21  if I don't catch your hand on something, I am not
22  going to accuse you of doing something.
23     Q   When did the paper under the door
24  incidents begin, when did they end?

16 (Pages 58 to 61)

1    A    I really don't know.

2    Q    Was it after August of 2003?

3    A    Yes.

4    Q    Did the theft of your tooth brush, soap

5    happen around the same time?

6    A    Yeah, over a period of about six months

7    this stuff happened.

8    Q    Beginning, when?

9    A    Say, six months prior to the three-day

10   suspension that I got, so count back.

11   Q    So, six months prior to --

12   A    August the 3rd.

13   Q    So, around March 2004, do you think?

14   A    Yes.

15   Q    In your November 18th, 2004 EEO statement,

16   Page 8, you state, Mr. Buffone complained to Mr.

17   Dave Roland that he feared for his life around me.

18   Shortly after this incident, I began having

19   problems, personal items of mine started

20   disappearing, somebody started dumping trash on top

21   of my desk every other day, and over the weekend

22   when the clique was working on Saturday, and I just

23   laughed. Is this comment and complaint that Mr.

24   Buffone made to Mr. Roland something different from

1    what you had already talked about?

2    A    No, this would be when I wrote him the

3    letter dissolving our friendship, he gave it to, I

4    think, the regional administrator first, and then

5    she gave it to Roland, but there wasn't any threats

6    made, but I guess she assumed that I was threatening

7    him, but there wasn't any threats for him to do

8    that. I assume that he must have thought that I was

9    going to hurt him or something.

10   Q    That was back in 2003?

11   A    Yes. Yes.

12   Q    So you are saying shortly after that, you

13   started having items missing, trash underneath your

14   desk, is that in 2003 when those items were

15   disappearing, when the trash was on your desk, or

16   was that in 2004?

17   A    The trash, I think, was more in 2003, and

18   maybe the end of 2003, beginning of 2004 was when

19   the items started missing.

20   Q    The items missing, are they the ones that

21   you were referring to before?

22   A    Yes.

23   Q    The trash, did you suspect anybody of

24   putting the trash on your desk?

1    A    I suspected Mr. Buffone and Dwayne

2    Wilkerson.

3    Q    Did you ever see them do that?

4    A    No.

5    Q    Did you ever confront them, or did you

6    ever have anything that verified that for you?

7    A    No, I just know their personalities, and I

8    know that what they were capable of doing. Anything

9    childish, you can bet money on it, it would be them.

10   Q    So the trash that was on your desk, you

11   think, late 2003, early 2004, or did it continue

12   into 2004?

13   A    I think it continued.

14   Q    When was the last time Buffone put trash

15   on your desk in a way that you think was

16   intentional?

17   A    Um -- maybe -- maybe three or four months

18   before August 2003.

19   Q    Okay. In your EEO Affidavit, and I will

20   pull it out at some point -- when I am making a

21   reference to one of these documents and you want to

22   actually take a look at it, just let me know, if

23   anything that I am saying you think isn't consistent

24   with what you recall, but just to move things along,

1    I will refer to it this way. In your EEOC Affidavit

2    on Pages 2 and 3, you state that in the weeks before

3    August 17th, 2004, you had quote, "Posted things

4    while things were going on. The first thing I

5    thought was a problem, that somebody had put pasta

6    on my new white car, that happened quite awhile ago.

7    There was, subsequently, an incident where somebody

8    took a key and put a big scratch on my new car. I

9    thought, at the time, that was just practical jokers

10   just trying to provoke me to violence or

11   misconduct." When you referred to the pasta issue

12   before, your EEO Affidavit seems to suggest that

13   this was something that happened right before you

14   put up your August 2004 postings; is that right?

15   A    What happened just before I put the

16   postings up, or the reason why I would pull them up,

17   it really had come to a head when someone had

18   scratched my car.

19   Q    So that happened before the pasta, the

20   scratch?

21   A    The pasta happened before the scratch.

22   Q    Do you remember when the pasta incident

23   happened?

24   A    End of 2002, beginning of 2004.

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 66

1    Q   So quite awhile before --

2    A   Yeah. Yes.

3    Q   Where was your car at the time when the

4  pasta was placed on it?

5    A   In the parking lot near the loading dock

6  doors, open doors.

7    Q   Parking lot at Townsend Road?

8    A   Townsend Road.

9    Q   And what was done -- where was the pasta

10  placed?

11    A   On the -- by -- just around the rear

12  window on the driver's side.

13    Q   Did you witness anybody placing it there?

14    A   No.

15    Q   When did you discover what happened, what

16  time of day?

17    A   I know when I came out to go to lunch,

18  which tells me someone did it before lunch, or

19  either when the food truck came, at quarter of nine

20  in the morning.

21    Q   Did you suspect anybody of doing it?

22    A   I couldn't understand that at all. I

23  don't understand why anybody would do something like

24  that, so...

Page 67

1    Q   It was before your falling out with

2  Mr. Buffone?

3    A   Yes.

4    Q   So you didn't know who had done it?

5    A   No.

6    Q   Did you ever confront anybody about it?

7    A   No.

8    Q   The scratch of your car happened after

9  that?

10    A   Yes.

11    Q   When did that happen?

12    A   The scratch happened September 2004.

13    Q   Are you sure it was September?

14    A   August or September.

15    Q   Is it possible that it was before you put

16  up your August posting?

17    A   I think the worthless loser one was about

18  the items missing and the trash, and --

19    Q   But we will go back to the posting -- we

20  will go through the postings, and if it comes back

21  to you, let me know, but you are not absolutely sure

22  when the scratches were, but you believe they were

23  in the late 2004, middle to late 2004?

24    A   It was September of 2004.

Page 68

1    Q   Okay. Where was the scratch on your car?

2    A   On the -- just below the grill.

3    Q   The grill, being?

4    A   The front grill where the emblem usually

5  is.

6    Q   How big was the scratch, how long?

7    A   About 2 inches.

8    Q   When did you first see the scratch, and

9  where were you when you first saw it; where was the

10  car?

11    A   The car was in the parking lot, and when I

12  came out at the end of the day, at 2:30, I saw it.

13    Q   Did you see anybody scratch your car?

14    A   No.

15    Q   Did anybody else report to you that had

16  seen anybody scratch your car?

17    A   No.

18    Q   Did you have any suspicions about who had

19  done it, or did anybody report to you suspicions who

20  had done it?

21    A   I -- they thought, maybe -- that I thought

22  might have been, maybe, Hong Diep.

23    Q   H-O-N-G D-I-E-P?

24    A   Yes.

Page 69

1    Q   Why did you think Hong Diep?

2    A   Again, I am trying to take childish

3  actions and assign it to people's personality. What

4  a person is capable of doing, and it just would fit

5  with him, but I can't offer any evidence.

6    Q   I am going to come back to Mr. Diep and

7  your issues with him shortly, and we may have to

8  take a break in a few minutes so you could go put

9  the money in the meter.

10        Did you ever confront Mr. Diep, or

11  anybody about that scratch?

12    A   No.

13    Q   Did you ever complain to management about

14  the trash on your desk?

15    A   No.

16    Q   Did you ever complain to management about

17  the pasta on your car, or the scratch on your car?

18    A   No, I thought that I had mentioned it to

19  Liz. I thought that I told a couple of coworkers,

20  but I never took it to upper management. Beyond

21  that, just to Liz, she is a friend.

22    Q   You told her just as a friend?

23    A   Well, because she is a friend.

24    Q   Did you ever mention the personal items

18 (Pages 66 to 69)

1  that you believed had been stolen, your tooth brush,
2  your soap, things like that, did you ever mention
3  any of those thefts to management?
4      A   I think in passing, I think I told Liz; I
5  didn't make a great big issue out of it, the way
6  they would, the way the clique would, it was just,
7  there is some worthless nothing behind people in
8  here, it was what I was thinking, so it wasn't like
9  a large complaint or, you know --
10     Q   Why did you not make a more formal
11 complaint about this, the theft and putting trash on
12 your desk, and the abuse of your car that you
13 alleged?
14     A   I didn't know who did it, and the way that
15 management felt about me, it wouldn't make a
16 difference; they would be indifferent about it. And
17 not having any evidence, there is nothing anybody
18 could do so-- it wasn't like the end of the world,
19 it was just being a nuisance, so I just tried to be
20 as mature as possible about it.
21             (Whereupon, a document was
22             marked for identification as
23             Exhibit Murray-10.)
24 BY MR. SULLIVAN:

1      Q   I had this marked Murray-10, in the memo
2  that you sent to Shawn Walker, S-H-A-W-N
3  W-A-L-K-E-R, on November 17th, 2004, the EEO
4  proceeding.
5          Mr. Murray, is this your handwriting
6  on this document?
7      A   Yes.
8      Q   And this is the statement that you
9  submitted to Mr. Walker in the EEO proceeding; is
10 that correct?
11     A   Yes, that is correct.
12     Q   On Page 1, looks like the 3rd paragraph,
13 it says, "I know that I have made several veiled
14 comments or threats about wishing someone do
15 something drastic to force management to change the
16 injustices and inequality meeted out to the lower
17 grade GS-3 employees and the clique who brown-noses
18 management daily." What veiled comments or threats
19 did you make?
20     A   A couple times, just in talking to James
21 --
22     Q   James Hughes?
23     A   Yeah.
24     Q   And he was the security officer at the

1  facility on Townsend Road?
2      A   Yes. Somebody would drop something on
3  managements head or something, just, you know,
4  cartoons, kind of, veiled incidents, comments.
5      Q   Did you ever say what should be dropped on
6  management's head?
7      A   Boxes or something like that.
8      Q   And that was because you were concerned
9  about, what?
10     A   Just the way management seems to let the
11 clique get away with anything. Whatever the clique
12 wants to do with the lower grade employees,
13 management will just -- they accept anything that
14 the clique says as heart, facts or evidence, and it
15 was just expressing that, just discontent with it.
16     Q   Did you ever make any other, what you
17 referred to as veil comment or threat in
18 Mr. Hughes's presence regarding any of that?
19     A   No. No.
20     Q   That is all you remember?
21     A   That is all I can remember now.
22     Q   Okay, you may have said some other things
23 and you don't recall?
24     A   Yes.

1      Q   This is a good time for you to put money
2  in the meter, it looks like it is about 12:35; is
3  that agreeable?
4      A   Yes.
5              (Whereupon, a brief recess was
6              taken.)
7              (Whereupon, a document was
8              marked for identification as
9              Exhibit Murray-14.)
10     MR. SULLIVAN:  We are back on the record
11 about 1:00 p.m., Mr. Murray had to put some
12 money in his meter about 25 minutes ago.
13         He has just informed me that he received a
14 phone call from home about a medical emergency
15 and doesn't believe that he is going to be able
16 to continue today, after, approximately, 2:15
17 p.m., and I asked him shortly before then to
18 call home again just to make sure he is needed,
19 and -- why don't we go off the record for a
20 second.
21              (Whereupon, a brief discussion
22              was held off the record.)
23     MR. SULLIVAN:  All right, so if that is
24 necessary, when we get close to 2:15, we will

19 (Pages 70 to 73)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 74

1    come up with another date.
2                (Whereupon, a document was
3                marked for identification as
4                Exhibit Murray-12.)
5    BY MR. SULLIVAN:
6        Q    Mr. Murray, I want to turn now to August
7    of 2004, and I am going to start by showing you what
8    I have had marked as Murray-12, it is a series of
9    colored photographs, and if you could just page
10   through them quickly, there are seven pages of
11   photographs.
12               Are these photographs of your
13               work station in August of 2004?
14       A    Yes.
15       Q    On or before August 17th, 2004, before you
16   were asked to remove postings?
17       A    Yes.
18       Q    And are these photographs of anything that
19   you had posted at your work station at the National
20   Archives on Townsend Road?
21       A    Yes.
22       Q    I would like to start with the first page
23   and I am going read that together with the second
24   page, because some of the statements begin on the

Page 75

1    second page and carry over to the first page. Am I
2    correct that at the top, on the left side, it says,
3    "Osama did not do it, or didn't do it"?
4        A    Yes.
5        Q    And under that is a picture from the
6    Michael Moore film, Fahrenheit 9/11?
7        A    Yes.
8        Q    And below that is the statement, Allahu
9    Akbar, A-L-L-A-H-U A-K-B-A-R?
10       A    Yes.
11       Q    And on the right side, at the top in red
12   is, "Who are the real terrorist", singular, question
13   mark; correct?
14       A    Correct.
15       Q    And below that, "Guidance in a time of
16   trouble to America and the world" a picture of Louis
17   Farrakhan, and his name below that; is that correct?
18       A    That's correct.
19       Q    And below that, "Osama totally exonerated
20   an innocent man"?
21       A    Correct.
22       Q    Did you write the handwritten statements
23   here?
24       A    Yes.

Page 76

1        Q    And did you put those pictures up, the
2    movie and Mr. Farrakhan, the posting?
3        A    Yes.
4        Q    Okay, when did you post these comments and
5    these photographs?
6        A    I think shortly after the movie came out,
7    my coworkers and I was discussing it at my desk at
8    lunch one day, and at that time, I hadn't yet seen
9    the movie, so it had to be after the movie came out.
10       Q    The movie being, Fahrenheit 9/11?
11       A    Correct.
12       Q    Did you post these before August 2004?
13       A    (No response.)
14       Q    Let me ask it to you this way, how long
15   had they been up by the time that you were asked to
16   remove them?
17       A    Two weeks.
18       Q    Not a month?
19       A    I don't thing so.  Couple of weeks.
20   Couple of weeks.
21       Q    Why did you post these particular sayings?
22       A    Well, after I did see Fahrenheit 9/11, I
23   had got the impression that the movie was trying to
24   say that he didn't do it, and I was just discussing

Page 77

1    that amongst my coworkers.
2        Q    So these were aimed at your coworkers,
3    these comments?
4        A    Yes.
5        Q    What does Allahu-Akbar mean?
6        A    God is great.
7        Q    And why did you post that statement there?
8        A    Because I thought that Michael Moore was
9    showing that Osama bin Laden was just a scapegoat.
10       Q    Did you subscribe to that belief at the
11   time that you made these postings?
12       A    Yes.
13       Q    And did you subscribe to the belief that
14   Osama bin Laden was an innocent man as stated on the
15   postings?
16       A    That's what the movie was trying to say.
17       Q    At the time that you posted these
18   comments, did you believe that they were allowed
19   under the agreement that you had reached with
20   management in 1996?
21       A    I didn't see anything threatening or
22   offensive -- that they, basically, don't bring
23   anything in here that's threatening or racial or
24   religious, what do they call it, overtones or

20 (Pages 74 to 77)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

**Page 78**

1 things, but this was just about a movie.
2    Q    Let me just show you briefly, Murray-15.
3         (Whereupon, a document was
4         marked for identification as
5         Exhibit Murray-15.)
6 BY MR. SULLIVAN:
7    Q    Take a look at this, this appears to be a
8 statement from the EEO proceeding that you gave to
9 Joyce Savage, the EEO Counselor, where you referred
10 to her as an EEO Counselor, and on Page 1 it is
11 dated February 8th, 2005, about the fourth paragraph
12 down you say, "I do believe that it might have been
13 inappropriate to display anything promoting Osama
14 bin Laden's innocence where patriotic Caucasian
15 Americans might interpret the wrong way. I believe
16 that the document -- the documentary was attempting
17 to exonerate Osama and reflect Islam in a more
18 positive way." Is it your belief that this posting
19 was inappropriate?
20    A    I think, after reading Affidavits by
21 management, collected by EEOC, I think they believe
22 that he did it, and I was trying to not agree with
23 the official news version and president, and they
24 would get offended. And I thought that they would

**Page 79**

1 ask me, I would just say it was what the movie was
2 trying to reflect -- I didn't, you know, afterwards,
3 then I said, well, some people believe everything
4 that you see on the news and every word that comes
5 out of the president's mouth. Those people could
6 possibly be offended in thinking that I wasn't
7 concerned, or I didn't care about the people that
8 died in the towers, and that was the case.
9    Q    And you could see how coworkers, others
10 might find this offensive?
11    A    Well, afterwards, I didn't, you know --
12 really being up here, me and my friends discussing
13 it, a guy named Tom, he was a white guy that told me
14 about the movie. It was kind of their opinion about
15 the same thing, so everybody else that is not really
16 into politics or --
17    Q    You stated that this was directed at your
18 coworkers; correct?
19    A    Yes. Coworkers that I was discussing it
20 with, not all the coworkers in the building.
21    Q    As of today, do you believe that the
22 writings and comments are inappropriate for the
23 workplace?
24    A    No.

**Page 80**

1    Q    If you could turn to Page 3 of Murray-12,
2 these appear to be handwritten postings stating,
3 "Low self esteem, inferiority complex, inflated ego,
4 jealous/envious, worthless losers, nothing ass
5 employees"; did you write these comments?
6    A    Yes.
7    Q    And what was your intention of putting
8 these up on your workstation; who were you referring
9 to?
10    A    Status quo clique.
11    Q    Meaning, who?
12    A    Mitchell Buffone and Dwayne Wilkerson,
13 primarily.
14    Q    Why did you put these comments up?
15    A    It was kind of -- to let them know that I
16 knew what they were doing as far as my items missing
17 and trash under my desk. I couldn't accuse them
18 outright, not seeing them, but I was letting them
19 know by putting up adjectives that best described
20 their personality and known character.
21    Q    You were letting them know, what?
22    A    Basically, that I knew that they were
23 behind it, because these things only applied to,
24 basically, those people.

**Page 81**

1    Q    I believe you stated before that you
2 understood that the memorandum of the agreement that
3 you reached in 1996 directed you not to post
4 anything in your workstation; isn't that correct?
5    A    Not to post anything with racial or
6 religious or political, offended somebody's
7 political party, somebody of another race or
8 religion.
9    Q    Pages 1 and 2 that we just went through,
10 is it your belief they didn't have any racial or
11 religious content?
12    A    No.
13    Q    I'm sorry?
14    A    No.
15    Q    They did no have any racial or religious
16 content?
17    A    No.
18    Q    None?.
19    A    No.
20    Q    Are you saying, no content -- no racial or
21 religious content?
22    A    No racial or religious slurs or derogatory
23 comments.
24    Q    Or content at all?

21 (Pages 78 to 81)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 82

1   A   No.
2   Q   So it is your view that you didn't violate
3   any understanding that you had, or any agreement
4   that you had reached in 1996 because none of the
5   postings that you made in August of 2006 had any
6   religious content?
7   A   Correct.
8   Q   And they didn't have any racial content?
9   A   Correct.
10  Q   If you could turn to Page 4; is this an
11  article that says, "The Government's War on Black
12  Family"; did you post it on your workstation in
13  August of 2004?
14  A   Yes.
15  Q   What was your purpose in posting this?
16  A   Didn't get a chance to go over the whole
17  thing, and I put it up -- I was researching the
18  possible origin of dysfunctional families,
19  especially in America, surfing the net, and this
20  came up, and I didn't have time to print the whole
21  thing out, so I was going to get back to it.
22      And I wanted to go back to when I had
23  said I had posted the stuff, different -- different
24  -- these postings were done over a period of time,

Page 83

1   they didn't always go up -- I didn't sit down and go
2   1, 2, 3, 4. Every day, whenever I came across
3   something, and it was on my desk -- and I think --
4   because stuff was kept -- disappearing off my desk,
5   I felt maybe if I tape it up, it won't disappear. I
6   didn't just put it -- they don't go together is what
7   I am trying to say.
8   Q   Were they all there by August 17th, 2004
9   when you were asked to take them down?
10  A   Yes.
11  Q   So they went up piecemeal, but --
12  A   Right.
13  Q   -- they were all there at the time that
14  you took them down?
15  A   Right. Correct.
16  Q   Was the article, The Government's War on
17  Black Family directed at any coworkers, management
18  anybody?
19  A   No, it had nothing to do with them.
20  Q   You can turn to the next page, and I am
21  going to read that page, which is 5, 6 and 7
22  together, because some of the items overlap from
23  page to page; there is a picture there, and I can't
24  make it out, can you tell me what that picture is

Page 84

1   of? It looks like it is a blue and red picture.
2   A   He is a deceased member of the Nation of
3   Islam.
4   Q   Okay, and what was your purpose in putting
5   that picture up?
6   A   Just when I came across it on the
7   Internet, I wanted to read more about what it was,
8   and I just took the first page, some of these
9   articles are 50, 60 pages long, and I don't have
10  time to print everything out.
11  Q   And the handwriting on the right of that
12  picture in red, states what?
13  A   That is Allahu-Akbar, again, God is good;
14  God is great.
15  Q   Why did you put that there?
16  A   That -- you know how people put, God is
17  love, or God is good or great, just Christians
18  putting it around their desk, that is a saying, you
19  know, that God is good; God is great; no special
20  significance.
21  Q   Below the picture it says, "Federal Record
22  Center is not an equal opportunity employer"; did
23  you write that?
24  A   Yes.

Page 85

1   Q   Why did you write that?
2   A   One day I observed Mr. Buffone and Dwayne
3   Wilkerson sitting at the computer all day, just
4   looking at clothes and sneakers, and I busted my
5   tail, and these guys are sitting there looking at
6   sneakers. So that is the only thing that it refers
7   to.
8   Q   You consider them to be lazy?
9   A   For them to be lazy?
10  Q   Is that what you are saying?
11  A   Yes.
12  Q   What does whether the Record Center is an
13  equal opportunity employer have to do with that?
14  A   Oh, some people don't have to work, they
15  don't have to work, the work is not equal. I am
16  killing myself, and these guys are looking at
17  sneakers on the Internet.
18  Q   Below that comment, there is a white
19  sheet, it appears to say, "Revenge is a dish best
20  served cold"; did you write that?
21  A   Yes.
22  Q   And why did you write that?
23  A   I wrote that after I found my car
24  scratched.

22 (Pages 82 to 85)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 86

1   Q   So how long had that been on your desk, at
2   your station?
3   A   A couple of days, I guess.
4   Q   Was that directed at anybody?
5   A   Whoever scratched my car, but I don't know
6   who.
7   Q   And what was your purpose in putting that
8   comment up?
9   A   To let whoever was scratching my car --
10  they wouldn't know, but I couldn't put a name on
11  anything.
12  Q   What did you mean, revenge is a dish best
13  served cold?
14  A   If I find out, you know, who scratched my
15  car, I am going to scratch their car back.
16  Q   Anything else that you would do?
17  A   No, I am not going to shoot anybody over a
18  scratch on a car; I am not going to give my freedom
19  up for that.
20  Q   There is a paper next to that one, on the
21  left of that one, do you remember what that states,
22  and what the purpose of it is?
23  A   Yeah, that is the beast is coming, oh, the
24  beast is coming after you.

Page 87

1   Q   Between the beast is coming after you and
2   revenge is a dish best served cold, there is another
3   sheet, do you know what that was?
4   A   That is something work related.
5   Q   Now, the beast is coming after you; did
6   you write that?
7   A   Yes.
8   Q   Did you post that there?
9   A   Yes.
10  Q   And what was the intent of that?
11  A   That was when I first seen the movie
12  trailer about The Predator, the movie coming out.
13  Q   When did that movie come out; do you
14  remember?
15  A   August 2006.
16  Q   Did you have a picture of -- from that
17  movie posted at your desk as well?
18  A   Yes.
19  Q   And why did you put the comment, "The
20  beast is coming after you" on your desk?
21  A   That is just referring to the movie.
22  Q   Did you, in any way, intend for that to be
23  directed at the clique, or anybody, coworkers --
24  A   Oh, no. Me and my friend was just

Page 88

1   discussing when the movie is coming out, and we said
2   the beast is coming.
3   Q   In your view, did any of the postings --
4   were there any other postings that you had in August
5   of 2004 apart from what you see depicted in these
6   pages, Murray-12; do you have any other postings
7   apart from the Preditor picture?
8   A   No.
9   Q   In your view, did any of these postings
10  have religious content?
11  A   I don't see it, you know, to say that the
12  movie might have been dealing with religious
13  figures, but --
14  Q   Which movie?
15  A   Fahrenheit 9/11, discussing Muslim
16  involvement.
17  Q   Why, in your view, if it had some content
18  or had some discussion with religious figures, was
19  it not a violation of your agreement from 1996?
20  A   Well, it didn't defame, or ridicule, or
21  slur anybody's religion, I think that's what they
22  were concerned about, they didn't want me -- even
23  though I didn't do it back then, but I assumed that
24  is what they were talking about. Their thing said

Page 89

1   racial, religious or politically offensive material.
2   Q   Mr. Murray, if I could just direct you
3   back to Murray-4, which is the agreement that you
4   reached in 1996; we went through Paragraph C on Page
5   1 before, again, it says, "Mr. Murray agrees that he
6   will not post or distribute any materials in the
7   workplace including any work spaces which may belong
8   to, or are shared with other organizations. Mr.
9   Murray understands that this means that he may not
10  distribute any materials in the workplace even
11  during lunch periods, breaks, or before and after
12  working hours." That refers to any material, why
13  isn't it your understanding that the agreement was
14  so limited?
15  A   I was limited to offensive speech
16  involving race, religion or politics, I think that's
17  pretty much what they are stating.
18  Q   Is there any document that you have, or
19  that you've seen that says that the agreement was so
20  limited just to what you mentioned, offensive items?
21  A   If it was meant beyond that, they didn't
22  state it.
23  Q   If you look back at Murray-1, there is a
24  memo dated March 23rd, 1995, first paragraph states,

23 (Pages 86 to 89)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 90

1  this is Ms. Grouzos's memo to you, "During the past
2  several weeks you have displayed in our break room
3  posters, signs, flyers, newspaper clippings and
4  other forms of information relating to the beliefs
5  of the Nation of Islam. These have contained
6  statements regarding racial, political and religious
7  matters. I have requested that you desist from
8  displaying such information."
9      The next paragraph goes on, "No
10 documents should be posted without prior management
11 approval. You are further directed to immediately
12 stop from distributing or posting any materials in
13 the work place. Your failure to comply would be the
14 basis for charging you with insubordination, and
15 taking disciplinary actions, which could include
16 your removal from Federal Service." Did you
17 understand that you were not to display any
18 religious, political content?
19     A   Offensive, political content.
20     Q   And is it your view that that was your
21 understanding, then, that it had to be offensive?
22     A   Yes.
23     Q   Offensive to whom?
24     A   I would assume, since Catholics made the

Page 91

1  complaint that it would be something that they said
2  -- they never said it was, they just had an
3  anti-Catholic theme. The never said --
4      Q   Who said anti-Catholic theme?
5      A   The VA. It was the theme -- nothing I had
6  menaced any Catholicism or Judaism or Hinduism, they
7  just said that the theme could have been --
8      Q   Is it your view that nothing in the
9  postings from Murray-12 from August 2002 could be
10 viewed by coworkers or management as offensive?
11     A   I don't think it was. I think that is the
12 pretext. How they could be offended -- they could
13 be offended by a documentary.
14     Q   How about, Osama totally exonerated an
15 innocent man, you don't see how that could be
16 offensive?
17     A   No, not if there is evidence to support
18 it.
19     Q   How about the comments directed at
20 coworkers; do you see how that can be offensive to
21 coworkers?
22     A   Nope. No names were called out.
23     Q   I am going to show you what has been
24 marked as Murray-11, if you could take a look at it.

Page 92

1
2          (Whereupon, a document was
3          previously marked for
4          identification as Exhibit
5          Murray-11.)
6  BY MR. SULLIVAN:
7      Q   This is an August 17th, 2004 letter from
8  Elizabeth Washington to you regarding the display of
9  the items that we just looked at in August of 2004;
10 did Ms. Washington present this letter to you?
11     A   Yes, she did.
12     Q   And that is your signature at the bottom?
13     A   Yes, it is.
14     Q   And that acknowledges that you had
15 received it on August 17th, 2004?
16     A   Yes.
17     Q   Did Ms. Washington sit down with you to
18 discuss this letter?
19     A   No.
20     Q   Did anybody sit down with you to discuss
21 the letter?
22     A   No.
23     Q   Mr. Murray, I am going to have marked as
24 Murray-17, your Affidavit in the EEO proceeding.

Page 93

1          (Whereupon, a document was
2          marked for identification as
3          Exhibit Murray-17.)
4  BY MR. SULLIVAN:
5      Q   If you could just page briefly through
6  this and tell me if you recognize it?
7      A   Yes, I do.
8      Q   And is this your Affidavit from the EEO?
9      A   Yes, it is.
10     Q   And is that your signature on the last
11 page?
12     A   Yes.
13     Q   And did you sign this on January 31st,
14 2005?
15     A   Yes.
16     Q   There are handwritten comments throughout
17 the document, are those your handwritten comments?
18     A   Yes, they are.
19     Q   So those are changes you made to the
20 document to make it accurate, in your view?
21     A   Yes.
22     Q   On Page 2, towards the bottom, you state
23 that on August 17th, Ms. Washington brought you a
24 letter, she told you that you needed to read it, and

24 (Pages 90 to 93)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1   to ask -- you would let her know if you didn't
2   understand something in the letter, you told her
3   that you did, and started taking items down from
4   your work area; is that correct?
5       A   That's correct.
6       Q   And you had some brief discussion about
7   the letter with Ms. Washington then?
8       A   Well, she stood at the top of me when I
9   read it, and I said, okay, no problem, and signed it
10  and gave it to her.
11      Q   On Page 8, you state in the first
12  paragraph that has an A before it, she, Miss
13  Washington, let me know that I should put away
14  everything personal, not put anything in my work
15  area that was political or religious or about race;
16  did you have a conversation with her then about the
17  letter and what was required of you?
18      A   Before that day was over.
19      Q   Was that before, or after you took things
20  down?
21      A   After I took things down.
22      Q   Did you have a meeting with her then after
23  you took things down?
24      A   No, just general conversation going back

1   and forth in that office.
2       Q   What did you discuss?
3       A   She asked me if I remembered to get
4   everything down by 2:30, and I told her that I had
5   taken it down as soon as she walked way.
6       Q   Did you discuss anything else?
7       A   This is just a little bit closer to the
8   time. Yeah, towards the end of the day, before I
9   left, she checked to make sure that everything was
10  down; she had walked away before I started taking
11  them down.
12      Q   Did you have any conversations beyond what
13  you already talked about?
14      A   No.
15      Q   The letter states in the second big
16  paragraph, this is not the first time that you
17  engaged in this type of behavior, it refers to the
18  incident with the Social Security Administration,
19  and then proceeds to say that you are ordered to
20  immediately remove, by 2:30, all the materials from
21  the work area, and never to display them, or
22  anything similar, in any work area at the National
23  Archives; did you read that at the time?
24      A   I'm sorry, what number?

1       Q   I'm sorry, this is Murray-11, the August
2   17th, 2004 letter.
3       A   Okay.
4       Q   I guess on that theme, you read this
5   letter on August 17th, 2004; is that correct?
6       A   Yes.
7       Q   And you understood that management was
8   saying that your postings was offensive to
9   coworkers, security force and management?
10      A   Yes.
11      Q   And it says that this was not the first
12  time that you had posted similar types of material;
13  is that correct?
14      A   Correct.
15      Q   And then stated in the second to the last
16  main paragraph, you are ordered, immediately, to
17  remove, no later than 2:30 p.m. today, all of these
18  materials from your work area, and never to display
19  them or anything similar in any work area at the
20  National Archives; you read that, correct?
21      A   Yes.
22      Q   And did you, then, remove all of the
23  materials?
24      A   Yes, I did.

1       Q   "To be clear, you are to display no
2   materials that make reference to race, religion,
3   political views, or that make disparaging remarks in
4   any way, at any location at the National Archives;
5   did you read that, that day?
6       A   Yes.
7       Q   Okay. And you read that it said that you
8   weren't to post anything further that referred to
9   race; is that correct?
10      A   Yes.
11      Q   And you read that you were not to post
12  anything further that related to religion; correct?
13      A   Yes.
14      Q   And you read that you were not to display
15  anything further that could be viewed as political
16  views; correct?
17      A   Yes.
18      Q   And you read that you are not to post
19  anything further that made disparaging remarks in
20  any way; correct?
21      A   I really didn't know what she was talking
22  about, but to make my supervisor -- make her job
23  smooth, I just, you know, agreed, whatever, anything
24  that they figure that is to keep confusion down.

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 98

1 Q Well, you read that you are not to make
2 any disparaging remarks in any way, or make any
3 postings or letters or disparaging remarks?
4 A Correct.
5 Q And it said, if you fail to follow this
6 order you will be charged with insubordination,
7 which will form the basis for removal from the
8 Federal Service?
9 A Correct.
10 Q And you understood that that was the
11 position of the agency on August 17th, 2004?
12 A Correct.
13 Q Did you ask Ms. Washington, or anybody in
14 management any questions after you received this and
15 what the intention was, or what the meaning of this
16 was?
17 A No.
18 Q You thought that it was pretty obvious?
19 A I thought it was a harassment, but you
20 don't have any clout, you have no choice but to
21 comply.
22 Q You knew what they were saying?
23 A I knew that Mitchell Buffone had
24 complained, because when he saw the inferiority

Page 99

1 complex, which he is known to have, that -- nobody
2 said anything, specifically, I just took everything
3 down; it might have been only one thing. It might
4 not have even been that, it might have been
5 something else, I don't know, but just to make
6 things go smoothly at work, I took everything down.
7 Q Was it unclear to you, in any way, what
8 management was saying to you in this letter?
9 A My interpretation and understanding of the
10 letter was, something up there was offensive, it was
11 causing someone mental stress, and I, kind of,
12 recognized that it was probably Mitchell Buffone
13 recognizing the comments about him, and that is,
14 basically, what I thought it was.
15 Q Okay, but you understood that in the
16 future, you weren't to display any of these sorts of
17 materials again, or you would be in trouble with
18 management?
19 A I understood not to display anything that
20 was offensive.
21 Q Now, did you have the belief that this
22 letter arose from a complaint that Mr. Buffone, or
23 somebody had made to management?
24 A That was my perception.

Page 100

1 Q Basically, on what?
2 A Nothing up there really was directed
3 toward anybody else; I get along with everybody else
4 at work, and since me and my friends were discussing
5 Fahrenheit 9/11, and I never had any problems with
6 John McGee or Beneson who walked past my desk, so it
7 had to be anybody but him.
8 Q Mr. Murray, I am going to have marked
9 Murray-16, a memo from you to Mr. Shawn Walker in
10 the EEO proceeding dated October 6th, 2004.
11        (Whereupon, a document was
12        marked for identification as
13        Exhibit Murray-16.)
14 BY MR. SULLIVAN:
15 Q Is this the statement that you made in the
16 EEO proceeding?
17 A Yes.
18 Q Is this your handwriting?
19 A Yes.
20 Q You state on Page 1, and the way this is,
21 the same page is copied twice because the top
22 appears on the first page, and the bottom appears on
23 the second page, so it is a little hard to read at
24 first. At the bottom of the first page which is the

Page 101

1 first full paragraph, it says, "For over a year now,
2 Mr. Hong Diep has been referencing -- I mean,
3 playing practical jokes on me for some unknown
4 reason. Mr. Hong is responsible for some personal
5 items of mine, such as: tooth brush, hairbrush,
6 deodorant, et cetera. I have never caught him in
7 the act, but all evidence points to Mr. Diep.
8        Knowing full well that Mr. Diep is
9 handicapped and functionally illiterate, I decided
10 to retaliate by posting such statements on my desk
11 as; two legged cockroach, two legged rat, revenge is
12 a dish best served cold. These statements were
13 intended to embarrass Mr. Diep."
14        You just mentioned that you believed
15 that Mr. Buffone, I believe, was the source of a
16 complaint that led to the August 17th, 2004 letter;
17 have you, from time to time, believed that Mr. Diep
18 was the source?
19 A He was primarily stealing boxes, and then
20 I, kind of, wondered if he would do that, but I know
21 that he was taking, for a fact, boxes and supplies,
22 because they were showing up on top of his desk and
23 under his desk, and --
24 Q Mr. Diep is deaf and mute; is that

26 (Pages 98 to 101)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 102

1  correct?
2      A   Yes.
3      Q   Okay.
4      A   So, I am, kind of -- I am, kind of,
5  convinced that him and Buffone, together, without
6  actually clarifying who would do what.
7      Q   Going back to Murray-12, for example,
8  revenge is a dish best served cold; you are saying
9  that referred to Mr. Diep, D-I-E-P, did it refer to
10  Mr. Diep or Mr. Buffone, or both?
11      A   It could be both because I don't know who
12  scratched the car.
13      Q   But you had concerns about Mr. Diep in
14  August of 2004?
15      A   Yes.
16      Q   Did you ever confront him about those
17  concerns?
18      A   No, he can't speak, and he can't hear, and
19  I wouldn't want to do anything that would make him
20  think that I was trying to scare him.
21      Q   And you say, I decided to retaliate by
22  posting those scary statements that referred to; is
23  that your goal to retaliate against Mr. Diep, or
24  whoever you thought responsible for these actions by

Page 103

1  posting those statements?
2      A   Yes.
3      Q   Did you ever come to learn that somebody
4  was the source of a complaint about you that led to
5  the August 17th, 2004 letter?
6      A   Just what everyone generally believes;
7  there is no hard evidence, but everyone at work
8  believes that it was him, also.
9      Q   I'm sorry, who?
10      A   Everyone believes that the source of the
11  original complaint was Mr. Buffone.
12      Q   So it is your understanding then -- was it
13  your understanding in August 2004, that someone,
14  regardless of whether you think they had a basis or
15  not, that someone had claimed that they were
16  offended by these statements that you had posted?
17      A   Yes.
18      Q   I won't mark this right now, but in
19  October 6th, 2004 statement, you are referring to --
20  if you want to see, just let me know, the evil eye
21  was given to Mr. Diep after an almost altercation
22  between Mr. Diep and myself; can you explain that?
23      A   We were in an area designated as Stack D,
24  and we have ladders that allows us to climb about

Page 104

1  14 feet in the air to get boxes -- retrieve boxes
2  from a shelving, and there was a ladder sticking out
3  of the aisle, and as I was walking over to it, it
4  was half-way in the aisle, and I didn't know that he
5  was going to be standing at the very top of it, and
6  I just went to pull it out, and he was on top of it,
7  and since he can't talk, he just started kicking his
8  foot at me, and just gave me, like, a real nasty
9  look, and I just looked at him, too.
10      Q   When you were saying that you were giving
11  him the evil eye, what do you mean by that?
12      A   I was letting him know, don't kick your
13  foot at me; I was staring at him.
14      Q   When was that?
15      A   Just before I went out on administrative
16  leave.
17      Q   Was it before or after the August postings
18  were removed?
19      A   Before.
20      Q   Apart from your statement that you believe
21  that possibly the Fahrenheit 9/11 documentary
22  portrayed a figure who had a religious aspect to
23  him, is there anything else that you posted in
24  August that you believe had religious content; this

Page 105

1  is Murray-12.
2      A   No.
3      Q   Okay, do you agree that you did end up
4  posting some more document, then again, after August
5  17th, 2004 at your work station?
6      A   Yes.
7      Q   Why would you post anything again after
8  you received the August 17th, 2004 letter from Ms.
9  Washington?
10      A   There was nothing else regarding racially,
11  or religious, or politically offensive tenures. I
12  mean, other people have postings on their desk, use
13  paper clippings that might deal with something --
14  copies of Time Magazine, News Week that deals with
15  racial and politics, but the difference would be,
16  the stuff was not offensive. It was not that I
17  can't put my Karon on the desk, but they can't --
18  they didn't bother me about that because you can't
19  say that somebody's bible is special.
20      Q   Ms. Washington in her EEO Affidavit
21  stated, I found at times when I gave Mr. Murray
22  instructions about things, he sometimes had
23  difficulty following what I wanted him to do; I
24  found that sometimes he had very strong opinions and

27 (Pages 102 to 105)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1 wanted to do things his own way, rather than doing
2 what I asked him to do; did Ms. Washington ever
3 state her view of you that you would not always
4 follow her instructions and would be strong minded
5 in doing your own thing?
6 A No, but she wasn't trying to see things --
7 I got more experience in refiling work and keeping
8 track of things. Sometimes employees will write the
9 wrong chart out information on a folder, chart out
10 information is the box number that it came out of,
11 the assession number and the location, and when they
12 do that, then when it comes time to do the refiling
13 of the box, it will go back in the wrong box, and I
14 was just trying to explain to her, I am not
15 disagreeing with you, but I have been out at this
16 location, I looked through the box, and the file
17 number is not matching up, and all she knows is that
18 the information on there -- put it back, and even
19 though somebody out ranks me, if they are doing
20 something wrong, I am going to have a strong opinion
21 about it, but, you know, not in the negative way.
22 Q Did she ever say that she had a broader
23 concern about you that she would give you
24 instructions, generally, and you would not follow

1 them --
2 A Oh, no.
3 Q -- and do your own thing?
4 A No. Not at all.
5 Q Is it your position then, based on what
6 you just told me, that nothing that you posted in
7 September of 2004 had any religious content?
8 A Correct.
9 Q That is your position?
10 A That is my position.
11 Q Is it your position that nothing that you
12 posted in September of 2004 had any racial
13 components to it?
14 A True. Correct, my position.
15 Q Do you know how the September 2004
16 postings were discovered?
17 A It seems as though Mr. Buffone called Mr.
18 McEvoy and told him to go back and look at them.
19 Q Called Mr., who?
20 A Mr. McEvoy, John McEvoy.
21 Q How do you know that?
22 A I don't, it is just an assumption.
23 Q Okay. Did you see Mr. McEvoy observing
24 your work station?

1 A No.
2 Q Do you know if Mr. McEvoy was with
3 somebody else when he observed your work station?
4 A No.
5 Q Mr. Murray, I am going to mark as --
6 actually, let me just go through this first. You
7 can take a look at what we've marked as Murray-13, I
8 would appreciate it.
9 (Whereupon, a document
10 previously marked for
11 identification was submitted as
12 Exhibit Murray-13.)
13 A I recognize this.
14 Q Okay. There are eight pages; are these
15 photographs of postings that you had on your
16 cubby-hole workstation in September of 2004?
17 A Yes.
18 Q And is all of this material that you had
19 posted between August 17th, 2004 and September 16th,
20 2004?
21 A Yes.
22 Q Is there anything on these pages that you
23 did not post on your workstation?
24 A I think everything here is mine.

1 Q Let's go through page by page. The first
2 page in blue writing, handwriting, "It is just a
3 matter of time now. Be patient." Is that your
4 handwriting?
5 A Yes, it is.
6 Q And what does that refer to?
7 A The Predator Versus Alien movie is coming
8 out.
9 Q If you could take a look at Murray-16, it
10 is your October 6th, 2004 EEO statement.
11 A Got it.
12 Q If you could look at Page 3 of the
13 statement, turn to Page 3.
14 A (Witness complies.)
15 Q About midway down, it says referring to,
16 it is just a matter of time now. Be patient. This
17 refers to the upcoming presidential election; is
18 that true?
19 A That is true.
20 Q So it did refer to the election?
21 A Yes. Both. Well, the election wasn't
22 going to be then, at the time of the movie, but when
23 I put it up, I was talking about the election.
24 Then, when I was scanning the Internet and I seen

28 (Pages 106 to 109)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1 Preditor thing, that was on my mind, too. It won't
2 be long.
3    Q  And below on Page 1, going back to Page 1
4 of Murray-13, the photographs, it says, vote
5 November 11, 2004, Kerry; what was that a reference
6 to?
7    A  I had to redo -- register to vote, remind
8 myself.
9    Q  So did it refer to the upcoming election?
10    A  Well, I am going to register to vote for
11 the upcoming election.
12    Q  If you could look at Murray-16, which is
13 your EEO Affidavit. No, the typewritten EEO
14 Affidavit.
15    Mr. Murray, now in previous
16 references to the Affidavit, it should be Murray-17,
17 and I am directing you to Page 3, you state there,
18 my note; it is just a matter of time now. Be
19 patient, referred to the upcoming election. I was
20 hoping that John Kerry would be elected president,
21 and that is what I meant there. I put up a note to
22 remind myself to register to vote in the
23 presidential election?
24    A  Yes.

1    Q  So your note about, it is just a matter of
2 time now. Be patient; referred to your hope that
3 Kerry would be elected president; correct?
4    A  Yeah, and when I put that up there, too,
5 this was referring to the movie coming out.
6    Q  Let me ask you, now, the August 17, 2004
7 letter, which is Murray-11 said, to be clear, you
8 are to display no materials to make reference to
9 political views; why did you put up these postings
10 after you received that letter?
11    A  That wasn't offending or offensive to
12 anybody's political -- it wasn't making fun of any
13 candidates, or degrade somebody's political party.
14    Q  Who told you that the August 17th, 2004
15 letter only referred to what you would characterize
16 as offensive or degrading to other people in terms
17 of their politics?
18    A  Well, I was scanning in my mind about why
19 something like this would come up, and the only
20 thing that I could think of was, the original letter
21 about the offensiveness, and they were using that so
22 they were referring to offensiveness, say, even if
23 they didn't put offensive in it, but I can't see
24 anyone complaining about someone having democrats or

1 republicans or something on a Time Magazine cover
2 sitting on a desk being a problem, so, someone had
3 to be offended. Something has got to be in that,
4 that you are hurting somebody's feelings or
5 something.
6    Q  So that was the test that you used,
7 whether in your mind that you were hurting
8 somebody's feelings?
9    A  Yes.
10    Q  Below the November 11th, 2004 note, it
11 says, beware of the snitch committee; what does that
12 refer to?
13    A  That is just between, gossiping and rumors
14 between me and friends and a couple of us in the
15 workplace.
16    Q  I'm sorry, it was directed at, who?
17    A  Friends and the coworkers, people -- my
18 friends and associates discussing personal issues
19 about people dating, and talking people's business.
20    Q  Who were you telling to be aware?
21    A  Different girls about their business going
22 around. See, I never wanted to put anybody's name
23 up, because I don't want to -- anyone to take
24 something the wrong way, and it is my understanding

1 of something, I will just put a general comment out
2    Q  Below that it says, two legged cockroaches
3 --
4    A  Now --
5    Q  -- who did that refer to?
6    A  -- that was Hong because he took six white
7 boxes off my desk that I prepared to re-box and
8 busted boxes up, and I had to fix them up.
9    Q  So this was meant, when you were using the
10 words you used before, this was meant to retaliate
11 against him?
12    A  Yeah.
13    Q  Was it meant as a warning to him?
14    A  No, it was just mocking him, like,
15 cockroaches, they run off with your stuff when you
16 are not looking, and that is what he was doing.
17    Q  To the left of that statement there is a
18 picture, is that from the movie, Preditor?
19    A  Yes.
20    Q  And if you go to the third page of the
21 photographs, there is a better picture of the
22 Preditor image and the word, Preditor, and below
23 that is a Chapter, it says, Chapter 782,
24 disciplinary and adverse actions; why did you place

6935fb57-a4a5-43c0-8b5c-95a64088a52d

## Page 114

1  that posting regarding to disciplinary and adverse
2  actions?
3      A    Something that I was looking at in the
4  spacesaver.
5      Q    Was that related, in any way, to the
6  Preditor imagine?
7      A    No, that was a government issued thing;
8  that is nothing to do with anything else on there.
9      Q    Going back to the first page, is that your
10  writing saying, American Government versus American
11  people (human race)?
12      A    Yes.
13      Q    And what did you mean by that?
14      A    We have college students come in in the
15  summer and work with us, and they had noticed that I
16  did a lot of research on the Internet about race,
17  religion and politics, and they had recommended that
18  that book would be on Amazon dot com, or something,
19  and this is interesting to somebody like me, might
20  be interested in reading.
21      Q    What book?
22      A    American Government versus American
23  People.
24      Q    Who wrote the book?

## Page 115

1      A    Oh, I still got to go in and look it up.
2      Q    You are saying that is the actual title,
3  American Government versus The American People of
4  Human Race?
5      A    Um-hum.  No, now, the human race thing, he
6  was saying there was something about the feature of
7  the human race thing, so, I am not sure that is
8  actually part of the title or not.
9      Q    Below that statement, there are three
10  pieces of paper with yellow highlighting and
11  handwriting on them, did you put those there as
12  well?
13      A    Yes.
14      Q    I think there are better pictures I found,
15  the first one is on Page 6 of the photographs, on
16  that you apparently written, "separate and unequal"
17  underneath that; is that correct?
18      A    Yes.
19      Q    And that is a memo regarding Bill Cosby's
20  wife, gave something in a function; do you remember
21  what that memo refers to?
22      A    It was sent to one of my coworkers, and
23  she had gave it to me to read, and it was something
24  to do with voting, voting rights, acts or something.

## Page 116

1      Q    And why did you put that posting up with
2  the highlighting about the voting rights of
3  African-Americans?
4      A    These papers were, like, flat down on my
5  desk, and just to take up space, you know, so they
6  wouldn't disappear, like, I wanted to see if I
7  started taping stuff to my desk, would it not just
8  disappear versus me just having it laying down flat.
9      Q    And I am going to ask you to follow the
10  questions on -- the second document is more
11  decipherable on Page 7 of this Exhibit; it looks
12  like a memo to personnel from John McEvoy, you,
13  apparently have highlighted something referring to
14  NARA three or four absence and leave; it is a memo
15  that is signed by John McEvoy, and down at the
16  bottom is your signature; it is your signature,
17  correct?
18      A    Yes.
19      Q    Acknowledging received?
20      A    Yes.
21      Q    And you wrote on this document, "None dare
22  call it conspiracy"; correct?
23      A    Correct.
24      Q    And then the final document is better

## Page 117

1  viewed on Page 5 of those photographs that is
2  August 17th, 2004 letter from Ms. Washington to you,
3  correct?
4      A    Correct.
5      Q    And you have written an arrow from John
6  McEvoy's name up to -- in reference to an article
7  entitled, The Government's Assault on the Black
8  Family; correct?
9      A    Correct.
10      Q    And you've written, "the plot thickens" in
11  red magic marker at the bottom of this document;
12  correct?
13      A    Yes, on another day, not the same day.
14      Q    And I am going back to those indirectly by
15  having marked, first, the letter from your Union
16  Representative James Cassedy, C-A-S-S-E-D-Y, to
17  David Roland, dated October 21st, 2004, if I could
18  have that marked Murray-18.
19              (Whereupon, a document was
20              marked for identification as
21              Exhibit Murray-18.)
22  BY MR. SULLIVAN:
23      Q    Mr. Murray, if you could take a look at
24  Murray-18, have you seen this letter from your union

30 (Pages 114 to 117)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1 representative to Mr. Roland from October 2004
2 before?
3 A Yes.
4 Q Did you have a chance to consult with your
5 union representative before he consulted with Mr.
6 Roland?
7 A No.
8 Q He didn't discuss this with you before he
9 sent it out?
10 A No.
11 Q Have you reviewed it since he sent it out?
12 A Yes.
13 Q Do you believe that the letter is
14 accurate?
15 A Parts, not everything.
16 Q Mr. Cassedy, in discussing your September
17 2004 posting says, Mr. Murray hung other official
18 issuances from NARA managerial staff, as well as
19 personal letters that he received from management,
20 and labeled them with statements that indicated his
21 feelings about NARA workplace conditions. For
22 instance, one item governing workplace rules was
23 hung with the rubric, "None Dare Call it
24 Conspiracy". Did you discuss those topics with Mr

1 Cassedy before you sent this letter out?
2 A No.
3 Q You didn't discuss it at all?
4 A No.
5 Q In your statement on these three postings,
6 separate and unequal, none dare call it conspiracy,
7 the plot thickens; referred in any way to the
8 documents that you wrote these subjects on?
9 A No.
10 Q So the resemblance, or the similarity
11 between the comments and the letter is
12 circumstantial, in your view?
13 A The similarities?
14 Q Yes, if there is any correspondence
15 between the comments and the documents that they are
16 on, is that just accidental?
17 A No, they -- some of the letters I am not
18 sure -- but one of them is, but it is nothing that I
19 wrote that is related to it, the comment about the
20 letters.
21 Q Separate and unequal, why is that written
22 there, on the document that it is written on?
23 A That is involving separate and unequal
24 voting rights issues, or something that another one

1 of the college students was familiar with.
2 Q How about, none dare call it conspiracy;
3 why did you write that on that document?
4 A That is the name of another book.
5 Q Why did you write it on that particular
6 document?
7 A I was at the computer at the time when he
8 told me about it, and that was a piece of paper that
9 was available.
10 Q Why did you highlight the document as you
11 did?
12 A Which one?
13 Q The one that has, none dare call it
14 conspiracy, you highlight, NARA three or four
15 absence.
16 A That was highlighted at a much different
17 date.
18 Q Why did you post that document?
19 A Again, just -- documents that I didn't
20 want to be disappearing from my desk, so I just
21 started hanging them up, to see -- I wanted to know
22 if somebody was going to take them down and still
23 stick them under my supervisor's door.
24 Q You are saying, None Dare Call it

1 Conspiracy is the name of a book?
2 A Oh, it is, that one I know for sure.
3 Q Who wrote the book?
4 A I don't know, it is on the Internet.
5 Q And the third document is the August 17th,
6 2004 letter; why did you write, the plot thickens on
7 that document?
8 A That's -- actually, I wrote the wrong
9 thing down, it is supposed to be the Passover plot.
10 Q It is supposed to be, what?
11 A The Passover Plot.
12 Q Why did you write what you wrote, or --
13 A I got the title wrong.
14 Q Why did you write something on the
15 document?
16 A Again, just scratch paper, and I was on
17 the Internet, and somebody asked me to check out, or
18 look something up for them, I would just write it
19 down on whatever I had available.
20 Q Did your statement relate at all to the
21 events of August 2004, or the subject matter of the
22 letter?
23 A I am not following you.
24 Q You say that the plot thickens, is your

31 (Pages 118 to 121)

**Page 122**

1  misstatement of the title of a book?
2  A   Correct.
3  Q   Did whatever you wrote, or intended to
4  write on that document relate at all to the letter
5  that it was written on?
6  A   No.
7  Q   Again, looking at the document image on
8  Page 5 of the photographs, you have an arrow pointed
9  from John McEvoy's name up to the reference to
10 article entitled, The Government's Assault on the
11 Black Family; why did you make that arrow?
12 A   When Mrs. Washington handed it to me and I
13 was reading it, just going up and down with it just
14 to make sure that I, you know, read it from
15 beginning to end, and then I couldn't understand why
16 his name was on it, so I just was going to ask him
17 whenever he asked me during the time to go over with
18 me in more detail.
19 Q   Do you understand how somebody reviewing
20 these, or seeing these documents could view the
21 statements that you wrote on the documents as
22 relating to the documents?
23 A   I guess if they didn't know me or didn't
24 ask me, they could assume anything.

**Page 123**

1  Q   Do you see how management could view these
2  as challenges to management, or an attack on
3  management?
4  A   No.
5  Q   Do you recall that the August 17th, 2004
6  letter states, that you are to display no materials
7  that make disparaging remarks, in any way, at any
8  location at the National Archives; correct?
9  A   Correct.
10 Q   Do you see how the reference to, two
11 legged cockroaches could be viewed as disparaging?
12 A   If it was directed at a person that there
13 was a name attached to it, other than that it could
14 be words that were attached on an advertisement or
15 something.
16 Q   But you said that it referred to Mr. Diep;
17 correct?
18 A   Only I knew that.
19 Q   But you did intend it to refer to him?
20 A   I did intend it to refer to Mr. Diep.
21 Q   So it was disparaging to him?
22 A   He would never know that.
23 Q   But you know that?
24 A   I knew that.

**Page 124**

1  Q   The documents and the statements that you
2  had handwritten, do you see how those could be
3  disparaging to management, the plot thickens, none
4  dare call it conspiracy?
5  A   What would they have to do with that?
6  Q   Do you see how somebody in management
7  couldn't see documents that management is written
8  with you writing, none dare call it conspiracy, or
9  the plot thickens; although it could be seen as
10 disparaging to management?
11 A   As management thinking that I am referring
12 to the contents of the letter?
13 Q   Yes.
14 A   It seemed like if they thought that, they
15 would ask me about it. Nobody ever asked me that.
16 Q   Did you consult with anybody in
17 management, or any place about whether the postings
18 that you made in September were in violation of the
19 August 17th, 2004 directive?
20 A   No. The papers that were being placed
21 under my supervisor's door were like these, and
22 Mr. Beneson seen them; didn't make any sense to him
23 if he say he didn't want them and ripped them up and
24 threw them in the trash. It didn't bother him.

**Page 125**

1  Q   On this part of my questioning, I just had
2  a few more questions, but I know that it is about
3  2:10 right now; do you have a few minutes before you
4  need to make a call home?
5  A   Yes. I will wait because they told me to
6  call back at 2:15.
7  Q   Do you contend that there was any
8  religious discrimination against you when you were
9  directed to remove the August 2004 postings from
10 your work station?
11 A   Probably, because of the word, Allahu. It
12 seems like every time that word is on -- written
13 anywhere, someone sees it, that they get -- seem to
14 get upset about it. Something about that is
15 intimidating to them, I think. I don't understand
16 why, knowing me, I never displayed any violent
17 tendencies or behavior in the workplace, ever. But
18 I don't -- so I think that is just an excuse to
19 harass me; I think it is just an excuse.
20 Q   Is that your speculation that -- when that
21 reference is on a posting, that it was a problem for
22 you, or did someone actually say something to you
23 that led you to that belief?
24 A   Just what I surmised from -- it seems like

32 (Pages 122 to 125)

Page 126

1  whenever that was up -- because when these things
2  were posted over different days and nobody never
3  said anything, so I thought, maybe, when I wrote
4  that on there, they were -- because I didn't write
5  -- the Arabic was on there, I didn't put it up, it
6  was up, and then later, as I was thinking about it,
7  I was -- might write that, so I thought, since I
8  wrote that, and if I didn't write the Arabic on
9  there, that they might not have made the complaint.
10     Q  Do you believe that there was any
11 religious discrimination against you related to the
12 directive that you remove the September 2004
13 postings in it, was there any action taken against
14 you in September 2004, based upon your postings in
15 September 2004?
16     A  I think the religious discrimination is
17 that, they don't want any Arabic materials, or
18 Islamic materials on my desk, or around it, or
19 anything, but if you want to put up anything from,
20 like, the Christian religion, it is fine, it is all
21 right, but Islamic is not welcomed in this country.
22     Q  What, in the September 2004 postings that
23 you put up had any kind of Arabic or Islamic
24 content?

Page 127

1      A  Allahu-Akbar, the words.
2      Q  And where was that in the September 2004
3  postings?
4      A  In August.
5      Q  I asked you about September 2004.
6      A  I'm sorry.
7      Q  Do you remember, is there -- was any
8  religious discrimination against you regarding any
9  action that was taken against you based on the
10 September 2004 postings?
11     A  No.
12     Q  Okay.  So your contending only that there
13 was a religious discriminatory aspect to the
14 direction in August of 2004 that you remove your
15 postings?
16     A  Correct.
17     Q  And not September 2004?
18     A  Correct.
19     Q  Your union representative, in his letter
20 that I showed you, Murray-18, says regarding the two
21 legged cockroach posting, "Mr. Murray acknowledges
22 that this attempt at humorous revenge was not an
23 appropriate way to handle this conflict with Mr.
24 Diep." Is that true; did that come from you?

Page 128

1      A  Yes.
2      Q  Okay, so you believe that was not an
3  appropriate way to deal with Mr. Diep?
4      A  Yes.
5      Q  Do you believe that your comments in the
6  August postings, revenge is a dish best served cold
7  and similar references is not an appropriate way to
8  deal with Mr. Diep or Mr. Buffone?
9      A  Yes, I regret lowering myself to acting on
10 their level and on their age, but knowing that I was
11 never going to harm anybody, and I was just trying
12 to figure out some way to get them to stop, and I
13 figured if other people knew that it was him, too,
14 then they would feel bad about doing it, and they
15 would, eventually, stop.
16            (Whereupon, a document was
17            marked for identification as
18            Exhibit Murray-19.)
19 BY MR. SULLIVAN:
20     Q  Mr. Murray, this is a November 18, 2004
21 EEOC statement that you made; correct?
22     A  Correct.
23     Q  You can turn to Page 13, please.
24     A  (Witness complies.)

Page 129

1      Q  You remember that in your August posting,
2  Page 5 of Murray-12, you wrote that Federal Records
3  is not an equal opportunity employer, and here on
4  Page 13 you say, "Calling NARA a nonequal
5  opportunity employer on a posting on my desk was my
6  way of getting their attention and initiating
7  dialogue which they refused to do." Was that
8  comment aimed at getting management to talk to you?
9      A  Well, I thought if they would ask me about
10 it, I would tell them, you know, without being a
11 direct, what I call a snitch, telling them about
12 people being on the computer all day.  If they would
13 ask me, I would try to explain to them that I didn't
14 think it was appropriate for them to be on the
15 computer all day long, and that's what they were
16 doing.
17     Q  Were some of the comments that you posted
18 in August and September aimed at getting management
19 to talk to you about issues and concerns that you
20 had?
21     A  Not except for the unequal one.
22     Q  How about the three letters and the
23 September postings that you can see on the first
24 page of the September 2004 photographs; did you put

33 (Pages 126 to 129)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

Page 130

1  them there, in any way, to try to get management to
2  respond?
3     A  No.
4     Q  Mr. Murray, I want to turn next to what
5  happened when these September postings were
6  discovered, and I don't know if you want to make the
7  call that we referred to earlier.
8     A  Yes.
9           (Whereupon, a brief recess was
10          taken.)
11      MR. SULLIVAN:  Just for the record, it is
12  about 2:20 in the afternoon, and Mr. Murray has
13  told us that he has got an emergency at home
14  and that he needs to get to.
15      I still need to cover issues regarding
16  September 2004 and some follow-up material as
17  well; so we will do that when we resume, and
18  let's talk today and tomorrow when you get back
19  to me about when we could reschedule; okay?
20      THE WITNESS:  Okay.  Sorry.
21      MR. SULLIVAN:  I understand.  I have about
22  an hour-and-a-half left.
23     A  Okay, no problem.
24           (Whereupon, the deposition

Page 131

1           concluded at approximately 2:14
2           p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 132

C E R T I F I C A T E

1
2
3      I, RENEE HELMAR, a Shorthand Reporter, and
4  Notary Public, certify that the foregoing is a true and
5  accurate transcript of the proceedings of DARRYL
6  MURRAY, who was first sworn by me at the time, place
7  and on the date herein before set forth.
8      I further certify that I am neither attorney,
9  nor counsel for, nor related to or employed by, any of
10  the parties to the action in which this deposition was
11  taken, and further that I am not a relative or employee
12  of any attorney or counsel employed in this action, nor
13  am I financially interested in this case.
14
15
16
17
18           Renee Helmar
19
20
21
22           Shorthand Reporter
23
24

34 (Pages 130 to 132)

6935fb57-a4a5-43c0-8b5c-95a64088a52d

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                        - - -
3    DARRYL MURRAY,              : Civil Action
                                 : NO. 05-4557
4            Plaintiff,          :
                                 :
5              vs                :
                                 :
6    ALLEN WEINSTEIN, Archivist  :
     of the United States,       :
7    National Archives and       :
     Records Administration,     :
8                                :
            Defendant(s).        :
9                        - - -
10           Tuesday, November 28, 2006
             Philadelphia, Pennsylvania
11                   VOLUME II
12                       - - -
13           Oral deposition of DARRYL MURRAY,
14   taken pursuant to Notice, at the Office of the United
15   States Attorney, 615 Chestnut Street, Suite 1250,
16   Philadelphia, Pennsylvania, commencing at approximately
17   11:00 a.m., on the above date, before Renee Helmar,
18   Shorthand Reporter and Notary Public.
19
20
21
22          CLASS ACT COURT REPORTING AGENCY
23   1420 Walnut Street          133 Gaither Drive
     Suite 1212                  Suite H
24   Philadelphia, PA  19103     Mt. Laurel, NJ  08054

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 134

1  Darryl Murray, pro se
   By: DARRYL MURRAY
2  112 West Champlost Avenue
   Philadelphia, Pennsylvania 19120
3
   pro se for Plaintiff,
4  Darryl Murray
5
   United States Department of Justice
6  United States Attorney's Office
   By: GERALD B. SULLIVAN, ESQUIRE
7  615 Chestnut Street
   Suite 1250
8  Philadelphia, Pennsylvania 19106
9  Counsel for Defendants,
   Allen Weinstein, Archivist of the
10 United States National Archives
11
12 ALSO PRESENT:
13 John E. Davenport, Sr.
14
15
16
17
18
19
20
21
22
23
24

Page 135

## I N D E X

WITNESS                          PAGE

DARRYL MURRAY
    By MR. Sullivan              136

    - - -

## E X H I B I T S

NUMBER        DESCRIPTION      PAGE
Murray-20     Letter           154
Murray-21     Document         156
Murray-22     Document         158
Murray-23     Document         167
Murray-24     Letter           182
Murray-25     Letter           183
Murray-26     Document         208

## REQUEST FOR PRODUCTION
Page 195      Line 20
Page 249      Line 9
Page 249      Line 11
Page 252      Line 2
Page 262      Line 8
Page 262      Line 10

Page 136

1      (Whereupon, the deposition
2      commenced at 11:00 a.m.)
3      ... Darryl Murray, residing at 112 West
4  Champlost Avenue, Philadelphia, Pennsylvania, having
5  been first duly sworn by a Notary Public within the
6  State of Pennsylvania, was examined and testified under
7  oath as follows...
8      EXAMINATION
9  BY MR. SULLIVAN:
10     Q    Mr. Murray, you understand that you are
11 still under oath now?
12     A    Yes.
13     Q    And are there any of my initial
14 instructions to you that you want me to go over
15 again, before we start today?
16     A    No, I am pretty straight.
17     Q    Okay.
18          Mr. Murray, when we stopped a few
19 days ago, we were talking about some of your
20 postings that you had made in September and August
21 2004; correct?
22     A    Correct.
23     Q    Is it your testimony that you continued to
24 post materials at your workstation after

Page 137

1  August 17th, 2004, that's when you got the letter
2  regarding the August postings, because you felt that
3  only offensive subject matter was disallowed?
4      A    Correct.
5      Q    And you didn't feel what you were posting
6  was offensive?
7      A    Correct.
8      Q    Why did you, then, stop posting all
9  religious and racial content posting after the
10 August 17th, 2004 letter?
11     A    Just to make my life, and my supervisor's
12 life easier.
13     Q    Okay.  Did anyone ever tell you that any
14 material that you deemed offensive was prohibited?
15     A    Did anyone ever tell me that I think --
16     Q    No, I'm sorry.  Did anyone ever tell you
17 only material that you deemed was offensive,
18 prohibited?
19     A    No.
20     Q    So, who -- in whose view would material
21 have to be offensive to be prohibited, would it be
22 management; would it be coworkers; who would it be?
23     A    Have to be Catholics, from my
24 understanding.

2 (Pages 134 to 137)

Page 138

1    Q   It would have to be --
2    A   Catholics and Christians.
3    Q   -- perceived as offensive to Catholics?
4    A   Catholics.
5    Q   Catholic coworkers, Catholic management,
6    who?
7    A   Catholics in general.
8    Q   Okay.  After you got the August 17th, 2004
9    letter, you thought that that letter stated that you
10   were prohibited from posting certain sorts of
11   material if it would be offensive to Catholics in
12   general?
13   A   No.  When I got the 2004 letter, I thought
14   it was stemming from the 1995 letter which involved
15   Catholics, so I just, kind of, thought it was a
16   continuation of the same, but it didn't.  The letter
17   on November the -- in 2004 didn't, specifically, say
18   it, but I assumed it was in reference to 1995.
19   Q   So you were saying that you interpreted
20   the August 17th, 2004 letter as banning you from
21   posting material with religious, political, racial,
22   disparaging remarks, comments only that would be
23   offensive to Catholics in general?
24   A   Yes.

Page 139

1    Q   And did anyone ever tell you that the
2    letter was to be so limited?
3    A   No.
4    Q   In your view, what type of material would
5    be offensive to Catholics in general, and when you
6    say Catholics, do you mean only Christians who are
7    Catholics, or other Christians as well?
8    A   No, by me being friends with the
9    Catholics, I thought that it had to be offensive to
10   the Catholic hierarchy, not actually the Catholic
11   people, but the institution of Catholicism.
12   Q   You are referring, specifically, to the
13   Catholic church, not to Protestants?
14   A   Right.
15   Q   Your understanding of what was prohibited
16   under the August 17th, 2004 letter was what type of
17   offensive material then?
18   A   I'm sorry, just repeat that.
19   Q   In your view, what type of material would
20   have been banned by the August 17th, 2004 letter
21   that would be offensive to Catholics?
22   A   Again, going back to '95, anything that
23   would shed light on the Catholic church involvement
24   in slavery, because that was what the 1995 issue was

Page 140

1    mainly about.
2    Q   Why, then, in your view would the August
3    17th, 2004 letter ban you from posting political
4    statements?
5    A   Well, the Catholic church is also a
6    political institution.
7    Q   And you never discussed your view that the
8    ban was just on material offensive to Catholics with
9    anyone?
10   A   No, like I said, I had highlighted and
11   drew arrows on what I was going to discuss with
12   Mr. McEvoy, just the types of issues that you are
13   bringing up now, because I didn't see how they were
14   offensive, but they never interviewed me or never
15   got around to discuss it with me.
16   Q   So you never approached Mr. McEvoy?
17   A   Never had time, no.
18   Q   And you, then, went ahead and posted new
19   materials in September?
20   A   Now, in September I didn't think anything
21   up there had to do with racially offensive -- it was
22   just offensive, you know, you didn't think that it
23   had anything to do with the August 16th letter.
24   Q   Did you ever discuss any of your

Page 141

1    interpretations of the letter, or your concerns with
2    Ms. Washington?
3    A   No, she didn't quite understand what the
4    problem was either, and just like I said, if someone
5    has power over you and harassing you, the best thing
6    to do is try to appease them in the best way that
7    you can.
8    Q   Now, if your interpretation was wrong
9    about what the August 17th, 2004 letter intended to
10   prohibit, if it wasn't intended to be limited to
11   just material that would be offensive to Catholics,
12   if it was intended to include any religious,
13   political, racial, disparaging remark content that
14   would be offensive to anybody in management, or to
15   coworkers at the Federal Records Center, if that is
16   the proper interpretation that the interpretation of
17   management meant, do you agree that some of the
18   content would fall about the August 17th, 2004
19   letter?
20   A   No, I don't think so.  Like I said, my
21   former supervisor, John McGee is management, and he
22   would definitely, you know, tell me if something was
23   offensive to management.  Well, it would be just one
24   person in management feels one way, and everybody

3 (Pages 138 to 141)

Page 142

1  else ignored it like I perceived it.
2      It is my intention that nothing up
3  there -- just this whole incident involves
4  harassment.
5      Q  But your answer is that, even if your
6  interpretation of what management intended by the
7  August 17th, 2004 letter is wrong, and that the
8  prohibition was broader than you understood it, you
9  still don't see the content of any of your postings
10 in August and September being of a nature that would
11 be offensive to any of your coworkers or management?
12     A  Correct.
13     Q  Do you understand after you removed the
14 postings on August 17th, 2004 that because you had
15 removed them, you were not going to be disciplined
16 for those postings unless you posted new information
17 that was prohibited under the August 17th --
18     A  Yes, I understand that.
19     Q  So if that was the case, if you were not
20 going to be disciplined for your August 17th posting
21 unless you posted some new materials that were in
22 violation of the August 17th letter, how was it that
23 there was religious discrimination against you based
24 on the August 17th, 2004 postings?

Page 143

1      A  I am basing it on harassment, because I
2  think, again -- the court, when I first started the
3  lawsuit, that it is harassment with religious
4  overtones. I think that the fact that I am Islamic
5  is the origin of the others. I think if I were a
6  member of any of the Christian denominations, it
7  wouldn't have been an issue, but being Islamic, and
8  they are discriminating saying, you don't have a
9  right.
10     See, in reality it doesn't have
11 anything to do with race, religion or politics, that
12 is just a prefix that management was using to try to
13 enforce their will on me, or something. So, it is
14 -- it is kind of hard to understand where religious
15 discrimination -- how anything comes into play in
16 this case, except that it just boils down to
17 harassment.
18     Q  So your view is that, at its core, what
19 happened to you, was just harassment as a person
20 without there being a religious basis, or a racial
21 basis?
22     A  Well, the basis is -- would be Islam. You
23 can harass a person without discriminating against
24 them, and then you can, also, harass them by

Page 144

1  discriminating against a person.
2      My problem with the National Archives
3  with one or two individuals is purely personal, they
4  just personally don't like me as a person. I think
5  it is our Catholics, they feel the same way.
6      Q  Who are those people?
7      A  John McEvoy and Mitchell Buffone,
8  exclusively.
9      Q  But you believe the main reason why the
10 action that was taken against you was for personal
11 reasons, that these individuals didn't like you?
12     A  More so. More so.
13     Q  More than for religion or race?
14     A  Yes.
15     Q  Okay.
16     I want to turn to what happened on
17 September 16th, 2004, let's just take a second here.
18     Tell me what happened after the
19 postings were discovered at your work station on
20 September 16th, 2004; tell me what happened that day
21 at the workplace?
22     A  It is my understanding that John McEvoy
23 and David Roland, evidently, came into the building
24 prior to normal operating hours, probably between 5

Page 145

1  and 6, and discovered the items on my desk, and felt
2  that there was something threatening, and by the
3  time that I arrived at the building, I was given the
4  letter of September 16th. Turned in some items, and
5  I signed it, agreeing with it only that I hadn't
6  been charged with anything. It was just, you know,
7  doing an investigating -- like I said before, I
8  assumed that it had something to do with Hong Diep.
9      Q  So that was 5 or 6 a.m. in the morning --
10     A  Yes.
11     Q  -- before you arrived for work?
12     A  So, what happens the rest of the day,
13 after I left --
14     Q  Tell me what happened while you were
15 there; what did you do; what did people say
16 to you; where were you?
17     A  When I arrived in the building about ten
18 minutes to six, took my bags into where I usually
19 pick up my work at. My supervisor, Liz Washington,
20 approached me and said John McEvoy wants to see you
21 in his office. I walked her into his office; we sat
22 down; he handed me the paper; I read it; I was
23 waiting for him to start discussing it, and he just
24 continued on like he was working on something else;

4 (Pages 142 to 145)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

1   I signed it and I looked at my supervisor and just
2   turned in my badge and everything. Went out to my
3   locker and cleaned that out. I think that I told my
4   supervisor it will be straightened out, I should be
5   back real soon.
6       Q   Your supervisor, Ms. Washington?
7       A   Miss Washington, and I noticed Dan Bedesen
8   came up near the front door, just to watch and see
9   what I was doing.
10      Q   And Dan Bedesen at the time was, what?
11      A   Assistant director.
12      Q   You saw him, then what happened?
13      A   I handed my supervisor, Liz Washington,
14  the keys to my locker, told her it would be okay,
15  things will get straightened out; I should be back
16  soon, and just got in the car, went home, and fell
17  asleep watching TV.
18      Q   Did Mr. McEvoy say anything to you beyond
19  what you already said?
20      A   No.
21      Q   Did Mr. Bedesen say anything to you beyond
22  -- well you said he didn't say anything to you that
23  day?
24      A   He didn't say anything.

1       Q   Did Ms. Washington say anything to you
2   that day beyond what you already told us?
3       A   No.
4       Q   Did you talk to any other folks in
5   management, or any coworkers before you left that
6   day?
7       A   No.
8       Q   I am showing you what has been previously
9   marked Murray-14, the September 16th, 2004 letter
10  from John McEvoy to you, signed by John McEvoy, and
11  then also signed by you at the bottom; is that the
12  letter that you are referring to?
13      A   Yes.
14      Q   And that states you will be on
15  administrative leave until further notice; correct?
16      A   Yes.
17      Q   That means that you will be paid your
18  regular salary until notice; correct?
19      A   Correct.
20      Q   And at this time, you should turn in your
21  NARA personal identification badge and any NARA
22  property that you have in your possession?
23      A   Correct.
24      Q   And you did do that?

1       A   Yes.
2       Q   It says, "In order to remain in the paid
3   status, you are ordered to call me, McEvoy, every
4   Wednesday at 10 a.m. If I am not available when you
5   call, you must leave a telephone number where you
6   could be reached"; correct?
7       A   Correct.
8       Q   And then you sign it, that letter, that
9   you had read it and understood it?
10      A   Correct.
11      Q   Were you told anything about whether you
12  were permitted to return to the property while you
13  were on leave?
14      A   No.
15      Q   Did you have any beliefs at that time
16  about your ability about whether it was okay for you
17  to return to the property?
18      A   No, I hadn't made any plans.
19      Q   Now, before we turn from the issues of the
20  postings onto the next stage in the case, had you
21  observed while you were still working at the Federal
22  Detention Center (sic), any postings --
23      A   Federal Detention Center?
24      Q   Excuse me, while you were working at the

1   Federal Records Center, any postings that were
2   similar to yours in terms of the political content?
3       A   No.
4       Q   Now, any that were similar to your
5   postings in August or September of 2004 in terms of
6   their political content, and your answer to that is?
7       A   No.
8       Q   Had you, during that time or any time,
9   observed at the Records Center, any postings that
10  were similar in religious content to the postings
11  that you posted in August 2004, that you say have
12  religious content?
13      A   Only someone's screensaver had something
14  Jesus and posting similar, like Allahu, that means
15  God is good or great, and other people had God is
16  good or great in English. That's about it.
17      Q   So, statements about their faith?
18      A   (Witness shakes head.)
19      Q   Did you, at any time, while you were at
20  the Federal Records Center observe any postings by
21  any coworkers or managers that made disparaging
22  remarks toward any coworkers?
23      A   If it did, I didn't see it, or if I did
24  see it, I wouldn't know it was disparaging unless it

**Page 150**

1  had someone's name attached to it, something mocking
2  someone's weight, or whatever, unless it has a
3  person's name attached.
4  Q  Do you recall any comments that did not
5  have a person's name attached that was disparaging
6  toward coworkers?
7  A  No.
8  Q  During your time at the Federal Detention
9  Center (sic), did you see anybody else post
10  anything, any other postings -- did I say Detention
11  Center?
12  A  Um-huh.
13  Q  I'm sorry, I have that case fresh in my
14  mind, Federal Records Center, did you see anybody
15  else post any material that had racial content that
16  was similar to the material that you posted in
17  August or September 2004 that had racial comment?
18  A  No.
19  Q  Have you told -- is there anybody's
20  posting at the Federal Records Center in any of the
21  years while you were there, that had religious,
22  racial, political, disparaging remark content that
23  you think was similar to what you posted?
24  A  Not that I can really recall.  The only

**Page 151**

1  thing that ever disturbed me and a few other people
2  was the depiction of the Archives mole.  Other than
3  that, I can't think of any.
4  Q  And you referred in the past to the
5  picture of John Gotti that Mr. Buffone had?
6  A  Yes.
7  Q  Did Mr. Buffone remove that picture when
8  he was told to do so?
9  A  I don't have any knowledge of it.
10  Q  Do you have any knowledge that at some
11  point it was removed?
12  A  I think -- reading the EEOC documents, I
13  believe some time after I left that it was removed.
14  Q  After you left?
15  A  After I was placed on administrative
16  leave.
17  Q  Do you know whether after Mr. Buffone took
18  down the picture of John Gotti, he put it back up,
19  or any similar material?
20  A  I don't know.
21  Q  And you also referred to a magazine on a
22  Jewish employee's desk that you referred to in your
23  Affidavit and you testified to during your previous
24  deposition testimony that you said that you thought

**Page 152**

1  there was a depiction of a swastika in the magazine;
2  is that correct?
3  A  Now, I -- some of the students, not
4  students, some of the employees who come through in
5  the summer will use other people's desk, so I can't
6  really say who the magazine belonged to; I can't
7  really say there was anything offensive in it, I
8  didn't read it.
9  Q  Couldn't the magazine have been critical
10  of the Holocaust?
11  A  Could be.
12  Q  You don't know?
13  A  No.
14  Q  Is there anybody that you believe was
15  treated more favorably then you, who posted
16  materials with a religious, racial, political,
17  disparaging remark content that you believe is
18  similar to the sort of material you posted, that you
19  were required to take down?
20  A  Only Mitchell Buffone was good for posting
21  John Gotti, Joey Merlino, Mafia type figures from
22  magazines and newspaper articles, not only on his
23  desk, but he would put them on a government posting
24  board where you could stick those pins into it, he

**Page 153**

1  would put those articles up there.
2  Q  Where, at his desk?
3  A  They were right in back of his desk,
4  overtop of, or near the Xerox machine.
5  Q  When did he do that?
6  A  Over the years since I've known him.
7  Q  Do you recall him posting anything of a
8  religious content?
9  A  No.
10  Q  And you were not aware of him posting
11  those materials after he was told to take them down?
12  A  No.
13  Q  No, you are not aware?
14  A  No, I am not aware.
15  Q  Okay.  I want to turn to September 22nd,
16  2004, did you get a call from Warren Hammond while
17  you were on administrative leave beginning September
18  16th, 2004?
19  A  Yes.
20  Q  You got that on your cell phone?
21  A  On the cell phone.
22  Q  And is Warren Hammond's nickname Skip?
23  A  Yes.
24  Q  When did he leave that message for you?

6 (Pages 150 to 153)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 154

1    A    It would have to have been sometime
2    between the September 16th, 2004, and
3    September 22nd, somewhere in between then.
4    Q    Was it before the 22nd?
5    A    I believe it was.
6    Q    Mr. Murray, I am going to mark as
7    Murray-20, a document that I believe you attached to
8    your Affidavit in this case, the EEO level, and if
9    you could take a look at it.
10   A    (Witness complies.)
11                (Whereupon, a document was
12                marked for identification as
13                Exhibit Murray-20.)
14        THE WITNESS: I recognize it.
15   BY MR. SULLIVAN:
16   Q    Is it a reference to a customer -- it is a
17   Sprint PCS cell phone call log; is that correct?
18   A    Correct.
19   Q    And there is a reference to a customer,
20   Mrs. Brenda J. Murray, is that your mother?
21   A    Yes.
22   Q    And this is the cell phone that you use?
23   A    Yes.
24   Q    Do you see Mr. Hammond's number; do you

Page 155

1    know what Mr. Hammond's number was?
2    A    No.
3    Q    Is this your handwriting on the document?
4    A    Yes.
5    Q    Did you annotate here, anywhere which call
6    was from Mr. Hammond?
7    A    No.
8    Q    And you can't tell from looking at this
9    which one is from him?
10   A    No, I -- what I was going by was, when I
11   checked the E-mail, it comes up on here as incoming
12   I believe, but I know when I answer it -- when I
13   listen to it, it tells you that they -- I think that
14   the call comes in --
15   Q    Okay, let me ask you this, does this log
16   reflect, anywhere, a call that you made to
17   Mr. Hammond?
18   A    No.
19   Q    It doesn't?
20   A    No.
21   Q    What did Mr. Hammond say in his message?
22   A    Give him a call. Just calling to see how
23   you are doing; don't know what's going on; take
24   care; give me a call.

Page 156

1    Q    And when did you first hear that message?
2    A    On September 22nd, about 11:00 a.m.
3    Q    Okay. I want to jump backwards a little
4    bit and talk about how your day began on September
5    22nd, 2004, and to sort of set that up, I want to go
6    through a few letters and statements with you; the
7    first will be a letter that David Roland sent to you
8    on November 9th, 2004; I will mark it as Murray-21.
9                (Whereupon, a document was
10               marked for identification as
11               Exhibit Murray-21.)
12   BY MR. SULLIVAN:
13   Q    Mr. Murray, this is a letter that
14   Mr. Roland sent to you, again, on November 9th,
15   2004, and if you could turn to Page 5, Mr. Roland
16   states, "On September 22nd you left a message for
17   John McEvoy at 9:58 a.m. as instructed for remaining
18   in a paid administrative leave status." Again, you
19   testified you understood that you were to call
20   Mr. McEvoy each Wednesday, around 10:00 while you
21   were on administrative leave; correct?
22   A    Correct.
23   Q    And Mr. Roland stated that during that
24   call you stated, quote, "Hey Johnny, it's ah, this

Page 157

1    is, ah, Darryl Murray calling, ah, the paper said to
2    call you every Wednesday at 10:00, ah, I'm having
3    some problems with my passport, trying to get a
4    flight back, but you can call me, ah, on
5    215-681-8924. There might be a little disturbance
6    on the plane, but I still should be able to still
7    get a signal. Talk to you later Mr. McEvoy."
8                Mr. Roland proceeded to say, quote,
9    "During the call to Ms. Washington at 10:38 a.m. you
10   specifically alluded to leaving Mr. McEvoy a
11   message and stated that you had taken 'a little
12   flight overseas,' but were experiencing some
13   'passport problems,' and that you 'should be back in
14   town by Friday' (presumably the 24th) once you got
15   your passport issues resolved." And I will have
16   your comment on this in just a second, but you
17   received this letter from Mr. Roland; correct?
18   A    Correct.
19   Q    I am going to turn, now, to your Affidavit
20   at Page 14, your EEO Affidavit, and I will show you
21   in a minute, this is Murray-17, I believe, and,
22   again, this is your Affidavit, Mr. Murray, from the
23   EEO proceeding?
24   A    Correct.

7 (Pages 154 to 157)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

**Page 158**

1    Q   And, again, I am showing you Murray-17,
2   and you state there, and you can tell me if I am
3   correct or not in stating what you state there, "I
4   was told to call Mr. McEvoy to report in each
5   Wednesday morning while I was out on administrative
6   leave. I made one call on the morning of
7   September 22nd, 2004 just after I woke up while a
8   friend was there. I wanted my female companion to
9   hear me complaining about my passport problems; to
10  get her off my back about flying across the Atlantic
11  for a vacation while I was on an administrative
12  leave. I am terrified about planes and flying." Do
13  you state that in your EEO Affidavit?
14   A   Yes.
15   Q   And I just want to show you one more
16  statement of yours.
17         (Whereupon, a brief discussion
18         was held off the record.)
19         (Whereupon, a document was
20         marked for identification as
21         Exhibit Murray-22.)
22  BY MR. SULLIVAN:
23   Q   Mr. Murray, I am showing you what I am
24  going to mark as Murray-22, this is an EEO statement

**Page 159**

1   that you made on November 15th, 2004; correct?
2    A   Um-hum. Yes.
3    Q   And is this your handwriting on the
4   document?
5    A   Yes.
6    Q   On Pages 1 and 2, and I only gave you two
7   pages, but it states, beginning on the second
8   paragraph on Page 1, "Since my divorce 11 years ago,
9   I have been dating a lot of Hispanic and Middle
10  Eastern women. My lady friends have been nagging me
11  for quite some time, traveling to their homeland in
12  Puerto Rico, Dominican Republic, Jordan and Syria.
13  I don't have any intentions on going to any of those
14  places, but I can't tell my lady friends that.
15        I wanted one of my friends to hear me
16  discussing passport problems on the phone when she
17  discovered I was going to be off from work for
18  awhile.
19        You can tell from the verbatim
20  transcript that it sounds like I am half asleep, on
21  drugs, or making up the story as I was going along.
22        My girlfriend woke me up to make my
23  designated 10:00 a.m. call into Mr. John McEvoy to
24  continue receiving my paycheck.

**Page 160**

1         I don't remember exactly what I said
2   on the message, but I know I did not threaten
3   anyone. I also had no intentions on visiting NARA
4   that day." Is that a correct summary of what you
5   state in this document?
6    A   Yes.
7    Q   And you wrote that?
8    A   Yes.
9    Q   And I should say, in our supplemental
10  production of documents to you, we are going to be
11  producing to you a copy of the voice recording that
12  Mr. Roland refers to. You will have that by next
13  week.
14        Mr. Murray, is it correct that you
15  did leave a message for Mr. McEvoy on the morning of
16  September 22nd, 2004, on or before 10:00 a.m.?
17   A   Correct.
18   Q   And wasn't it, in fact, the case that you
19  had a girlfriend that wanted you to go to her
20  country while she (sic) was on leave, but you didn't
21  want to go?
22   A   Correct.
23   Q   And so did you manufacture the white lie
24  about a passport problem because of your personal

**Page 161**

1   situation?
2    A   Correct.
3    Q   Okay, so you told some white lies in the
4   voice messages for personal reasons?
5    A   Correct.
6    Q   So what you stated to Mr. McEvoy and Ms.
7   Washington in those messages was not entirely true;
8   is that correct?
9    A   Correct.
10   Q   And is this -- are these statements
11  accurate representations of your intentions in what
12  you stated?
13   A   Yes.
14   Q   I want to talk about -- by the way, in
15  your one statement, November 15th, 2004, you say
16  that you can tell from the transcript that it sounds
17  like I am half asleep on drugs when making up the
18  story of what's going on; were you on drugs at the
19  time?
20   A   My arthritis medication.
21   Q   Anything else?
22   A   No.
23   Q   What happened next in your day, after you
24  made this call?

8 (Pages 158 to 161)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

1   A   My friend had a doctor's appointment.

2   Q   What is your friend's name?

3   A   Jihada Mohammed.

4   Q   Can you spell that?

5   A   J-I-H-A-D-A Mohammed.

6   Q   And Jihada is a female?

7   A   A female.

8   Q   How old is she?

9   A   Now, 29 or 30.

10  Q   Could you excuse me for a second.

11          (Whereupon, a brief recess was

12      taken.)

13  BY MR. SULLIVAN:

14  Q   So you were telling me about what happened

15  during your day after you made the call in the

16  morning, go ahead and tell me.

17  A   My friend had got up and took her daughter

18  to school and came back and said that she had a

19  doctor's appointment up on Grant Avenue next to 55th

20  Street.

21  Q   When you say she, your daughter or her

22  friend?

23  A   The friend. And her son is a very lively

24  little fellow, and I didn't want to be caught with

1   having to watch him for two or three hours, so I

2   just decided to go along with them. And I ended up

3   getting stuck with him because he fell asleep in the

4   car.

5   Q   The son is how old?

6   A   He is five now, he was three at the time.

7   Q   So, whose car were you in?

8   A   Her car.

9   Q   What color was the car?

10  A   White.

11  Q   And you went to a doctor's appointment

12  then?

13  A   Yes.

14  Q   And it was for her?

15  A   For her.

16  Q   And she went into the doctor's office?

17  A   Yes.

18  Q   Did you go in with her?

19  A   No, I stayed in the parking lot.

20  Q   Was the son already asleep?

21  A   Um-hum.

22  Q   Then happened?

23  A   I was trying to think about where I could

24  go and spend some time -- in the mall or something

1   and I said, no, because he is asleep. And then I

2   checked my cell phone, and there was a couple of

3   messages on there; I hadn't answered it in a couple

4   of days, and then when I got to Skip's phone

5   message, I said -- well, I looked at my watch, it is

6   just about lunchtime, maybe I will swing past there

7   for a minute and let him and my other friends know

8   that, ah, I am okay; things are fine; I am still

9   getting my full pay, so I am not financially

10  strapped or anything, and then I called Vanessa, who

11  is operating as a receptionist that morning --

12  Q   Receptionist where?

13  A   At the National Archives, the Records

14  Center.

15  Q   Vanessa Adams?

16  A   Vanessa Adams.

17          And asked her to page Skip to tell

18  him to meet me out front in about 5 or 10 minutes, I

19  will stop past.

20  Q   And when you say lunchtime, you mean

21  lunchtime at the Federal Records Center?

22  A   Lunchtime at the Federal Records Center.

23  Q   Which would be when; when is their lunch

24  hour?

1   A   11:15 to 11:45, and people who come in

2   later, if they want to, can take a lunch between 12

3   and 12:30.

4   Q   Okay, but it was what time that you made

5   that call to Vanessa Adams?

6   A   11, 11:05.

7   Q   And directing your attention back to

8   Murry- 20, which is the phone log, does this log

9   reflect your call to Vanessa Adams?

10  A   Yes.

11  Q   And which call was that; which entry

12  number, is there 40 to 80 on this page?

13  A   Number 53, I believe.

14  Q   53 is your call to Vanessa Adams?

15  A   Um-hum.

16  Q   And that would be at 11:08 a.m.; is that

17  correct?

18  A   Correct. And number 52 was me checking my

19  voice mail.

20  Q   At 10:55 a.m.?

21  A   10:55.

22  Q   So is that when you would have picked up

23  Mr. Hammond's message?

24  A   Yes.

9 (Pages 162 to 165)

Page 166

1    Q   Okay. So you called Ms. Adams and she
2  told you what?
3    A   She paged him, and --
4    Q   That she would page him?
5    A   Yep.
6    Q   And no further discussions?
7    A   No.
8    Q   Okay. Then what happened?
9    A   I drove there, I drove to the Federal
10 Records Center, pulled up near the front door --
11   Q   You drove, was anybody with you?
12   A   The three-year-old child.
13   Q   Was anybody else with you?
14   A   No.
15   Q   Was your friend with you?
16   A   No, she is in the doctor's office.
17           (Whereupon, a brief discussion
18            was held off the record.)
19 BY MR. SULLIVAN:
20   Q   Mr. Murray, I am going to show you a
21 document that you submitted to Judge Shapiro in this
22 case, it is your style, it is a Statement of Facts;
23 it is a 15 page document, and I will mark it as
24 Murray-23.

Page 167

1           (Whereupon, a document was
2            marked for identification as
3            Exhibit Murray-23.)
4  BY MR. SULLIVAN:
5    Q   Do you recognize this document?
6    A   Yes.
7    Q   And is it something that you submitted to
8  Judge Shapiro this year?
9    A   Yes.
10   Q   And if you could turn to Page 8, the 4th
11 paragraph, it states, "On September 22, 2004 I was
12 in the vicinity of NARA around lunchtime, and I
13 stopped by to see inquiring coworkers concerned
14 about my whereabouts. I had a female companion and
15 her three-year-old son as passengers and only
16 expected to be there a hot minute." Is that what it
17 states?
18   A   Yes.
19   Q   Why did you state here that you had a
20 female companion with you as a passenger when you
21 went to the workplace?
22   A   I had been referring to when I left out of
23 the house, must have been.
24   Q   So it is not correct that you had a female

Page 168

1  passenger with you?
2    A   Correct -- not correct.
3    Q   Are you sure?
4    A   Yes, she was still inside.
5    Q   Okay. You said that you came to the
6  workplace, you were in the white car; correct?
7    A   Correct.
8    Q   Did you park your car when you arrived?
9    A   No. I put it in park, but I didn't pull
10 up into a parking spot, thought Skip would be coming
11 out and I would only be there --
12   Q   Mr. Hammond?
13   A   Mr. Hammond. Maybe a hot minute or so, so
14 I didn't pull into a divided line parking spot.
15   Q   Where did you pull up the car, or where
16 did you put the car?
17   A   Perpendicular where the car was --
18 perpendicular to the front door, it is about 30 feet
19 from the door.
20   Q   When you say perpendicular -- why don't
21 we, without marking it, just go off the record for a
22 second so you could draw me a little diagram.
23           (Whereupon, a brief discussion
24            was held off the record.)

Page 169

1  BY MR. SULLIVAN:
2    Q   Mr. Murray, so is it your testimony that
3  the front of your car was facing the building?
4    A   The front of it was facing the front gate
5  of it, the side of my door, the side of the
6  passenger door was parallel to the building
7  (indicating).
8    Q   But the front windshield was looking
9  directly into the Federal Records Center?
10   A   No, the front windshield was facing away.
11   Q   Let's go off the record.
12           (Whereupon, a brief discussion
13            was held off the record.)
14 BY MR. SULLIVAN:
15   Q   Mr. Murray, is it true that at the front
16 of the Federal Records Center there is a little
17 vestibule with two doors in it?
18   A   Yes.
19   Q   And there is one door on the left, and one
20 door on the right as you are approaching the
21 building?
22   A   Correct.
23   Q   Was your car right outside of that little
24 vestibule?

10 (Pages 166 to 169)

Page 170

1   A   About 30 feet from it, up a little past
2   it, not directly -- if you exited my car, you would
3   have to go up on an angle to get back. It would be
4   a 30-degree angle.
5   Q   And your car was parallel to the front of
6   the building?
7   A   Right.
8   Q   And the front of the car was facing the
9   front entrance gate to the Records Center?
10  A   Correct.
11  Q   So the passenger's side window would be on
12  the side of the building?
13  A   Correct.
14  Q   And the driver's window would be facing
15  away from the building?
16  A   Right.
17  Q   Did you remain in your car the entire time
18  that you were at the Federal Records Center that
19  day?
20  A   Yes.
21  Q   And state, again, why you are there?
22  A   Just going to notify Warren Hammond, Skip
23  and my other friends that I was all right, that I
24  was on administrative leave, and hope to be back

Page 171

1   soon.
2   Q   How soon after you made the call to
3   Vanessa Adams did you arrive?
4   A   That is about a 10 minute drive.
5   Q   When you arrived, did the lunch hour
6   already begun?
7   A   People were coming out of the front door
8   and the side cafeteria door.
9   Q   And that would be 11:15 lunch hour -- half
10  hour?
11  A   Correct.
12  Q   Without telling me the content of any
13  conversations that you had with anybody, I just want
14  to get more context here, what happened next, and,
15  again, don't tell me the conversations that you had,
16  but, who did you see; what did you do? The child
17  was still asleep in the car?
18  A   The child was still asleep.
19  Q   In the back seat?
20  A   Back seat, in a car seat, and by the time
21  that I put it in park and took my foot off the
22  brake, James Hughes emerged from the building and
23  stood right in front of the front door.
24  Q   The car was running at the time?

Page 172

1   A   Yes.
2   Q   When you say, Mr. Hughes was at the front
3   door, there is two doors, again, one would have been
4   facing the rear of your car, and one would have been
5   facing the front; is that correct?
6   A   I think that I understand what you are
7   saying, there is a double door at the front, and
8   once you go through that, then there is another
9   entrance side door, I think that is what you are
10  trying to get at, and I hope that we are talking
11  about the front double doors.
12  Q   And where did you see him?
13  A   Standing right at the front double doors.
14  Q   Did he, then, come out of the building?
15  A   Yeah, he had to be out of the building to
16  be coming through that door.
17  Q   Oh, you are saying that he is outside the
18  door?
19  A   Yeah, outside the door.
20  Q   Had you talked to anybody else before you
21  saw him?
22  A   No.
23  Q   Had you seen any of your coworkers before
24  you saw him?

Page 173

1   A   No.
2   Q   What happened next, and don't tell me any
3   conversations, I just want to know what happened
4   next, you can tell me if there was a conversation if
5   that is what happened next.
6   A   There was -- I made a statement to him.
7   Q   To Officer --
8   A   Officer Hughes, and he went back into the
9   building, and while he was away going back into the
10  building, that's when coworkers started coming out
11  of the building.
12  Q   Okay, and did you talk to any of those
13  coworkers?
14  A   I talked to Irene Jones, and I spoke to
15  Larry — well, I waved to Larry.
16  Q   Larry who?
17  A   I don't know his last name, he is
18  relatively new.
19  Q   Coworker?
20  A   Coworker.
21  Q   But you spoke to Miss Jones?
22  A   Yes.
23  Q   So you didn't see Miss Jones, or speak to
24  her until Security Officer Hughes went back into the

11 (Pages 170 to 173)

1  building?
2  A    Correct.
3  Q    And before he went back into the building,
4  you had made a statement to him?
5  A    Correct.
6  Q    Had he made a statement to you?
7  A    No.
8  Q    When did you first see Miss Jones, where
9  was she?
10  A    She was exiting the front of the doors.
11  Q    And then what did she do?
12  A    Walked over to my car.
13  Q    Where did she walk -- which part of your
14  car?
15  A    She came over to the passenger's side rear
16  window.
17  Q    Rear window; was the window up or down?
18  A    Might have been half-way up. Might have
19  been.
20  Q    Was it down -- do you know for sure
21  whether it was down at all?
22  A    For sure, I don't know.
23  Q    Were any of your windows down at the time?
24  A    The front two windows, driver and

1  passenger side were down.
2  Q    Are you sure about that?
3  A    Yeah.
4  Q    She went to the side, the passenger side
5  rear, and then what did she do; don't tell me the
6  content of any statement yet.
7  A    She questioned me about the little boy.
8  Q    The little boy?
9  A    Yes.
10  Q    Did you have a discussion about that?
11  A    Yes.
12  Q    Did she remain at the rear passenger
13  window during that discussion?
14  A    Yes.
15  Q    And then where did she go, or what was the
16  next move?
17  A    That's when James Hughes re-emerged from
18  the building the second time.
19  Q    And where did he go when he re-emerged?
20  A    He just stuck his head out of the double
21  doors.
22  Q    Were you able to hear him when he came
23  out?
24  A    Yes.

1  Q    Did he ever re-emerge beyond just putting
2  his head out?
3  A    No.
4  Q    And where was Miss Jones when he did that?
5  A    At the rear passenger side door.
6  Q    She stayed there the entire time?
7  A    Yes.
8  Q    Then what happened?
9  A    There was more dialogue between me and
10  Mr. Hughes at that particular time.
11  Q    Where was he when that occurred?
12  A    Sticking his head out the front double
13  doors.
14  Q    Could you hear him during that dialogue?
15  A    Yes.
16  Q    Then what happened?
17  A    More people were coming out to go to
18  lunch, getting in their cars, and when I made my
19  last statement to him --
20  Q    To him, being Officer Hughes?
21  A    -- Officer Hughes, I put the car in drive
22  and left the facility.
23  Q    And did you exit out the main gate?
24  A    Yes.

1  Q    So let's get into some of the specifics.
2  By the way, before you exited, did Miss Jones ever
3  leave the rear passenger side of your car?
4  A    No, not that I remember.
5  Q    Was Officer Hughes's head still poking out
6  the door at the time that you exited the property?
7  A    Yes.
8  Q    Did you speak to anyone else other than
9  Miss Jones and Security Officer Hughes while you
10  were on the Federal Records Center property that
11  day?
12  A    Just people I waved to.
13  Q    Did you speak words to anybody else?
14  A    No verbal to anybody.
15  Q    I want to show you your EEO Affidavit
16  which is Murray-17; if I could direct your attention
17  to Page 10, this is your Affidavit; correct?
18  A    Correct.
19  Q    You will see there where I highlighted,
20  you state that, "After Miss Jones and I talked for
21  awhile, I believe that she left and was gone when
22  Security Guard Mr. Hughes came out to approach me."
23  Is that your statement, your EEO statement, is that
24  what you stated?

12 (Pages 174 to 177)

39c7ee2a-0a03-47a0-ab80-2ad9bc1a0d21

1    A  I don't see it.

2    Q  (Showing witness.)

3    A  Yeah, she was there the whole time, I

4 don't know why I said she left, maybe because she

5 was talking to other people going to lunch, she

6 might have turned away, that's what I meant.

7    Q  So is it your testimony that she didn't

8 come out until -- does that remain your testimony

9 that she didn't come out of the building until after

10 Officer Hughes went back into the building the first

11 time?

12    A  Right.

13    Q  But then after she came out, you are

14 saying that she turned away for a period?

15    A  Yes.

16    Q  So that she was not, in any way,

17 participating in the conversation with you and

18 Officer Hughes?

19    A  Correct.

20    Q  And you don't know whether she heard

21 everything that the two of you -- that Officer

22 Hughes and you were discussing?

23    A  I don't know.

24    Q  Now, at that time when you came to the

1 Records Center before you had any conversation with

2 Security Officer Hughes, did you feel that he was a

3 friend of yours?

4    A  Oh, yeah. Yes.

5    Q  Did you feel that he was a confidante,

6 somebody that you could confide in?

7    A  Yes.

8    Q  Did you feel that your conversations with

9 him that day were confidential?

10    A  Yes.

11    Q  You didn't believe that he would be

12 reporting what you said to management?

13    A  No.

14    Q  So you felt at liberty to talk to him?

15    A  Yes.

16    Q  And we'll talk in a second about what the

17 conversations were, but during the course of the

18 conversations you learned that you were being told

19 to leave the property; correct?

20    A  Correct.

21    Q  And is it true that at that point you felt

22 humiliated?

23    A  Very.

24    Q  Embarrassed?

1    A  Yes.

2    Q  Okay. You were angry?

3    A  Yes.

4    Q  I want to go through a couple of your

5 statements first and then cover some topics.

6       Let's turn, first, to your Statement

7 of Facts, which I showed you a moment ago, I think

8 you still have it, it is Murray-23.

9    A  Um-hum.

10    Q  If you could turn to Page 8, beginning at

11 the bottom and going on to 9; do you have that?

12    A  Yes.

13    Q  It says, "Shocked and humiliated, I

14 confided in James that I thought 'somebody ought to

15 blow that place up.'" Again this is the statement

16 you gave to Judge Shapiro this year; did you write

17 that?

18    A  Yes.

19    Q  And you sent that to Judge Shapiro?

20    A  Yes.

21    Q  And is it true that -- what you believed

22 to be in confidence to James stated, somebody ought

23 to blow that place up?

24    A  That's correct.

1    Q  Okay. And on the next page you say, you

2 were referring to harassment, exploitation and

3 oppression suffered by the poor ignorant employees

4 at the hand of management; what do you mean by that?

5    A  It is my opinion that because the vast

6 majority of our employees come from special

7 education schools, which I was told, I don't know

8 for a fact, and because their behavior is very

9 ignorant, that they -- to me they provide a source

10 of humor or entertainment for management, and I

11 think -- ah -- they -- ah -- are exploited due -- or

12 as the result of their ignorance -- ignorant

13 behavior and being ignorant intellectually. You

14 know, they don't care too much about themselves, so

15 it is, kind of, understandable to see -- you can't

16 really get mad at anyone else for not expecting

17 them, or treating them like human beings. Very

18 seldom do a lot of them act like human beings.

19    Q  So at that time you were angry about what

20 you saw as harassment exploitation that these

21 employees suffered at the Federal Records Center?

22    A  Yeah, I have been upset about it, the way

23 people are treated. But, like I say, I understand

24 it at the same time. It is understandable.

Page 182

1    Q   Okay.
2        (Whereupon, a document was
3        marked for identification as
4        Exhibit Murray-24.)
5  BY MR. SULLIVAN:
6    Q   Mr. Murray, this is a memo to Judge
7  Shapiro from you dated March 30th, 2006; it is two
8  pages; is that correct that it is something that you
9  submitted to the judge this year?
10   A   Correct.
11   Q   And on Page 2, the second to the last
12  paragraph you state, "I only commented to my friend
13  of two-and-a-half years, in confidence, that
14  somebody ought to nuke the place for their
15  mistreated and exploitation of the African-American
16  employees."
17   A   I didn't use the word nuke.
18   Q   I'm sorry?
19   A   I didn't use the word nuke when I --
20   Q   You said, blow up?
21   A   Yeah.
22   Q   Okay.  Changing nuke to blow up, is that
23  correct that is what you told him in -- you believed
24  to be in confidence?

Page 183

1    A   Correct.
2    Q   I will direct you to another statement.
3        (Whereupon, a document was
4        marked for identification as
5        Exhibit Murray-25.)
6  BY MR. SULLIVAN:
7    Q   Mr. Murray, am I correct that this is an
8  April 3rd, 2006 memo that you submitted to Judge
9  Shapiro --
10   A   Correct.
11   Q   Directing you to the fourth page, it looks
12  like you numbered it Page 6B, the fourth page that
13  I've given you.  The last paragraph you said, "This
14  caused me to make the inappropriate comment to my
15  former friend of two-and-a-half years, Security
16  Guard James Hughes that, 'somebody ought to knock
17  down the building.'  I never dreamed that he would
18  repeat that to anyone."  Is that a statement that
19  you made to Officer Hughes?
20   A   Correct.
21   Q   And you thought that he wasn't going to be
22  repeating that to anybody; is that correct?
23   A   Correct.
24   Q   By the way, and I can show you this

Page 184

1  statement if you want, one of your statements to the
2  judge, and there might be another statement as well;
3  in your statement that you called the Douglas Factor
4  Statement, I can show it to you if you want, you
5  referred to be being in a road rage at the time;
6  were you in a rage when you made the statements that
7  you made to Security Officer Hughes?
8    A   Yes.
9    Q   So let's talk about how you got to that
10  point, and then we will come back to a couple of the
11  other statements that you made.  You said before
12  that Officer Hughes came out of the building when
13  you first arrived, what did he say to you at that
14  time?
15   A   Hey, how's it going.
16   Q   And what did you say?
17   A   Ah, just stopped past to see Skip for a
18  second.
19   Q   Did you say anything else at that point?
20   A   No.
21   Q   He went back in the building; he came back
22  out; what did he say to you then?
23   A   Darryl, they said that you are not
24  welcomed on the property.

Page 185

1    Q   And is that the point at which you had the
2  emotions that you described?
3    A   Yes.
4    Q   Did the fact that you had the
5  three-year-old in your car have anything to do with
6  it?
7    A   Somewhat.
8    Q   Was he still sleeping at the time?
9    A   Yeah.
10   Q   I'm sorry, you were saying?
11   A   I went in, I was in shock thinking about a
12  harmless visit with a small child, and I am standing
13  and talking to friend -- I don't understand why I
14  had to leave.  I was only going to be there -- not
15  like I tried to sign in, or come in the building or
16  anything.  I was hurt and shocked.
17   Q   So is that the time at which you made the
18  statement that you testified to already?
19   A   Correct.
20   Q   Did Mr. -- excuse me, Security Officer
21  Hughes say anything else to you?
22   A   No.
23   Q   Did you say anything else to him -- I will
24  go through some of your statements in a second, but

14 (Pages 182 to 185)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 186

1  at this point do you recall saying anything else to
2  him?
3      A   The very last thing I said to him was, I
4  didn't come up here to start any trouble, I don't
5  want you to get in any trouble over me, and took
6  off.
7      Q   I am going to direct your attention, now,
8  to what we already marked as Murray-16, it is an
9  October 16th, 2004 EEO statement that you made, and
10  I am going to direct you to Page 7, so if you could
11  just confirm that this is an EEO statement that you
12  made in October of 2004?
13     A   Correct.
14     Q   And take a look at Page 7?
15     A   (Witness complies.)
16     Q   And isn't it the case that you state here
17  that after Officer Hughes re-emerged from the
18  building he said, Darryl, you have to leave, they
19  don't want you in the building or premises?
20     A   Correct.
21     Q   And then you say, "I look at Irene Jones
22  in shock and anger.  I then said, somebody needs to
23  blow that M-O-T-H-E-R F-U-C-K-E-R up."
24     A   Correct.

Page 187

1      Q   And you then say no one knows who or what
2  I was referring to.  I am the only one who knows
3  that I was referring to Mr. Hong Diep, H-O-N-G
4  D-I-E-P; is that what you state there?
5      A   Correct.
6      Q   Now, as you testified to already you said,
7  you were -- you said you made a reference to the
8  building at the time; correct?
9      A   Correct.
10     Q   But you are saying what you were intending
11  to refer to was Mr. Hong Diep; can you explain that?
12     A   At the time I thought it was the whole
13  incident was revolving around something that he
14  might have said to management; I thought he was the
15  source of it.  But he was the reason why the whole
16  incident was taking place.
17     Q   So is it your statement that in your
18  moment of rage, you made that statement in part to
19  reference to Mr. Hong Diep, D-I-E-P?
20     A   In part.
21     Q   I am going to redirect your attention to
22  your Affidavit, Pages 10 to 11.  If you can, follow
23  where I am directing you, just let's go down here.
24  You, again, refer to being angry; correct?

Page 188

1      A   Correct.
2      Q   And you were angry at the time?
3      A   Correct.
4      Q   And you say that you were cursing; is that
5  correct?
6      A   Correct.
7      Q   And you say, "I recall saying that I might
8  need to bring Johnnie Cockran and the dream team
9  back with me"; correct?
10     A   Correct.
11     Q   What did you mean by that?
12     A   I was just kidding with James about
13  bringing -- to get the law involved in the whole
14  thing.
15         I knew Johnnie Cockran was dead at
16  the time, I was just being facetious I guess.
17     Q   Now, do you remember when you gave your
18  EEO Affidavit statement, did you sit down with
19  somebody to do it, did you do it over the phone?
20     A   I sat down with someone.
21     Q   And they recorded what you were saying to
22  him or her?
23     A   Yes.
24     Q   And then after they did that, they sent it

Page 189

1  to you for approval and you made some handwritten
2  comments?
3      A   Yes.
4      Q   And the handwritten comments on the
5  approval are the ones that you made when you
6  reviewed it?
7      A   Yes.
8      Q   You also state here that you said, I think
9  someone or somebody needs to blow that M -- I think
10  you might have spelled the word out, then M
11  underscore, F underscore up; the Affidavit at the
12  initial type had building in it, and then you
13  deleted the word building, and you wrote that I
14  never used the word building or place; you testified
15  today as you were recollecting, you did use the word
16  building; correct?
17     A   The curse word up, up was the very last
18  word in the statement.
19     Q   But you stated in your EEO statement to
20  the judge that you used the word building or place?
21     A   Yeah, that's what I meant -- I said up.  I
22  didn't say it, but that is what I am referring to.
23     Q   But you state in these statements that you
24  did refer to it though; am I correct?

15 (Pages 186 to 189)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 190

1    A    Correct.
2    Q    Okay. And that is correct?
3    A    Correct.
4    Q    You then state, "I heard from a friend
5    that Mr. Hughes did not go and talk to management
6    about what I said right away, but that he talked to
7    someone who had approached him to ask what I wanted
8    when I came to the building." Who did you learn
9    that from, or who did you hear that from?
10    A    I think it was Miss Kim Parker, I am not
11    100 percent sure.
12    Q    Who is Kim Parker?
13    A    She -- ah -- is an employee who keys in
14    our daily production logs into the computer system,
15    I think.
16    Q    You talked to her after September 22nd,
17    2004, or on September 22nd, 2004?
18    A    Ah -- on September 23rd she called me to
19    ask me what was going on; why did I come to the
20    building, that there was a rumor going around, and I
21    told her that I don't know what they are talking
22    about.
23    Q    You didn't tell her about what had
24    happened on September 22nd?

Page 191

1    A    I just told her that I came up to see Skip
2    for a minute, and that was it.
3    Q    What did she tell you about what she
4    observed on September 22nd?
5    A    I don't think she observed anything.
6    Q    You said that I heard from a friend that
7    Hughes did not go and talk to management about what
8    I said right away, but he talked to somebody that
9    approached him, you said that you heard that from
10    her?
11    A    Her or she heard it from someone. They
12    were saying, I think they were trying to express the
13    point that they got it from James, the only thing I
14    could think -- understand how they could have
15    knowledge of that, and he was telling someone that
16    John McEvoy approached him. When he did arrive at
17    the building that day, he didn't have anything to
18    say to him, and he approached him and asked him
19    about the whole incident. And not knowing just what
20    was what, they didn't go any further than that.
21    Q    So you didn't get a name of anybody that
22    Security Officer Hughes talked to after you arrived?
23    A    No.
24    Q    Security Officer Hughes has stated, and if

Page 192

1    you don't recall stating it, just let me know, that
2    when he initially spoke to you through the front
3    door, he said, Darryl what are you doing here and
4    you replied, I am here to blow up the building, and
5    then said, I am here to see Skip; is it possible
6    that your statement at that time when you had the
7    initial back and forth, I am here to blow up the
8    building?
9    A    No, he never asked me what I was doing
10    there.
11    Q    Are you sure?
12    A    100 percent.
13    Q    And he stated to you -- you also said, I
14    am going to bring my people up here, and you know
15    what that means; did you ever make that statement?
16    A    I was telling him that I was going to
17    bring Johnnie Cockran back, but that was it.
18    Q    Do you recall saying anything else?
19    A    No.
20    Q    Do you have -- you stated that you were in
21    a state of rage at the time, because you were in
22    that state, do you think that might have affected
23    your ability to remember everything that was said at
24    the time?

Page 193

1    A    No.
2    Q    Do you feel like you have a solid memory
3    of what was stated?
4    A    Yes.
5    Q    Now, Mr. Murray, in your Affidavit and in
6    one of your EEO statements, you referred to being
7    interviewed by law enforcement after the September
8    22nd, 2004 incident; do you recall being
9    interviewed?
10    A    Yes.
11    Q    Do you remember who interviewed you?
12    A    I got something with their names on it; I
13    don't have their card, but if they gave me the
14    number --
15    Q    You are referring to the FBI's Joint
16    Terrorist Task Force?
17    A    Correct.
18    Q    Why did you use that as the investigative
19    agency?
20    A    When I answered the door, that's how they
21    identified themselves.
22    Q    Is it possible that they were Department
23    of Homeland Security Federal Protective Services?
24    A    I understand they are all the same.

16 (Pages 190 to 193)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

1    Q    You don't know?

2    A    No.

3    Q    So you are not absolutely sure it was the

4  FBI, it could have been Department of Homeland

5  Security?

6    A    It could have been anybody.

7    Q    Okay. When did that investigative team,

8  or investigators come to your house?

9    A    September 23rd, about 10 a.m. in the

10  morning.

11    Q    Were you ever interviewed regarding the

12  September 22nd, 2004 incident at the Federal Records

13  Center?

14    A    While I was at the Records Center, no.

15    Q    Was the only time and place that you were

16  ever interviewed was September 23rd, 2004, at your

17  home?

18    A    Correct.

19    Q    And no investigators ever interviewed you

20  anywhere else?

21    A    No.

22    Q    Regarding that incident?

23    A    No.

24    Q    How many persons came to your home on

1  September 23rd, 2004?

2    A    Total of three.

3    Q    Did they identify themselves?

4    A    Yes, they said where they were from, and

5  their first names.

6    Q    And you are reaching into your bag, what

7  are you looking for?

8    A    A piece of paper they left with me with

9  their names and numbers on it.

10        (Whereupon, a brief recess was

11        taken.)

12  BY MR. SULLIVAN:

13    Q    Are you looking for one of your own

14  statements, or something they left with you?

15    A    A piece of paper that they left. A piece

16  of legal paper.

17    Q    Well, have you produced it to me yet in

18  this case?

19    A    No.

20    Q    Would you do so before the discovery

21  period ends?

22    A    Sure.

23    Q    You said there were three individuals, how

24  many male, how many females?

1    A    Two males, one female.

2    Q    Were they all from the same agency?

3    A    I am supposing they were.

4    Q    Do you remember one being from the

5  Philadelphia Police Department?

6    A    No, they all looked alike.

7    Q    Okay. What did they ask you?

8    A    Um --

9    Q    Was there one person that conducted the

10  questioning, or did they ask you questions?

11    A    Mostly one guy, and every now and then,

12  someone --

13    Q    Do you remember the name, Drew Pepe?

14    A    Yes, he was the main questioner.

15    Q    Okay, and I can tell you that they were

16  investigators with the Federal Protective Services,

17  which is the Department of Homeland Security.

18    A    Oh.

19    Q    So he was the main questioner?

20    A    Correct.

21    Q    And what did he ask you about?

22    A    He was trying to ascertain my identity.

23  He said that someone escaped from prison in Chicago

24  and they were trying to find that person; that is

1  how the questioning started off.

2    Q    Did they say that they were trying to

3  figure out if you were Darryl Murray that had been

4  involved in some activities in Chicago?

5    A    Yes.

6    Q    And did you explain that you are not that

7  person?

8    A    Yes.

9    Q    And then did the questions proceed to

10  focus on National Archives employment and what had

11  happened the day before?

12    A    Just what was going on with problems at

13  work, I think that is the way he put it.

14    Q    Okay, and then what did you discuss; what

15  did he ask?

16    A    I started telling him about -- that I was

17  on administrative leave, and expected to return back

18  to work, I think, in a week or two, and that is just

19  about the gist of that conversation, as far as --

20    Q    And they talked about the basis for that

21  and the postings, and the -- why you were on

22  administrative leave?

23    A    No, they showed me -- ah -- the one about

24  -- they showed me a posting about my desk top,

17 (Pages 194 to 197)

Page 198

1  Fahrenheit 9/11, that is the only one.
2      Q   Okay, so there were some discussion about
3  the postings?
4      A   Yes.
5      Q   Did you talk about the events of September
6  22nd?
7      A   No.
8      Q   Not at all?
9      A   No.
10     Q   Did they ask you what had happened on
11  September 22nd, 2004?
12     A   No.
13     Q   Nothing?
14     A   Nothing.
15     Q   I am going to show you your Affidavit.
16  Starting here at the bottom of Page 5 and move on to
17  Page 6 here, you state that these investigators came
18  out to my home to talk to me. They came to talk to
19  me because they wanted to investigate my identity --
20  remember we already talked about the Chicago issue,
21  and then they eventually got into talking about my
22  employment at NARA. I answered all kinds of
23  questions about my personal family background. They
24  asked me what was going on with my job, and I told

Page 199

1  them that I was on administrative leave because I
2  was having social problems. He asked me if I ever
3  threatened to blow up any buildings, specifically,
4  at the Records Center -- specifically at the Records
5  Center. I told them that I thought I would be going
6  back to work soon, and that I had a lot of friends
7  there. They advised me that I should not go there
8  any more. I did not see any signs that they were
9  concerned about my activities after we talked; so
10  they did ask you, then, if you had ever threatened
11  to blow up any buildings, including the Records
12  Center?
13     A   Yes.
14     Q   Did you tell them on that occasion about
15  the comment that you had made to Officer Hughes?
16     A   No.
17     Q   Why not?
18     A   Because they didn't ask me.
19     Q   But they asked you if you ever made any
20  threats; correct?
21     A   Asked me if I ever threatened to do it,
22  that's what they asked me.
23     Q   Did you tell them about any of the
24  comments that you made to Officer Hughes?

Page 200

1      A   No.
2      Q   You didn't feel that it was important to
3  their investigation to know what you had said?
4      A   I didn't -- they asked me if I, personally
5  -- I was taking it as if I, personally, threatened
6  to blow up any buildings, and I said no.
7      Q   Did they ask you whether you had
8  threatened anyone, or anything?
9      A   No.
10     Q   If their record and their file, and we
11  will talk about the connection of that in a second,
12  if it says that they did ask you about that and you
13  denied threatening anyone or anybody; is that
14  correct?
15     A   They asked me if I ever threatened to blow
16  up any buildings, and I said no.
17     Q   Did they ask you whether you had ever
18  threatened anybody?
19     A   Maybe they did, I don't.
20     Q   But you didn't tell them about the
21  comments from the previous day that you made to
22  Officer Hughes?
23     A   No.
24     Q   Did you tell those officers, those

Page 201

1  investigators that you went to see Warren Hammond
2  regarding a small debt?
3      A   Did I tell them about that; I don't -- I
4  don't know if I told them about that.
5      Q   Did you go to see Mr. Hammond regarding a
6  small debt on September 22nd, 2004?
7      A   No. I wanted to let him know that I was
8  all right. I don't remember if he owed me a couple
9  of dollars, or if I owed him a couple of dollars, so
10  I might have brought that up, but that wasn't the
11  reason why I went there.
12     Q   It wasn't the reason?
13     A   No.
14     Q   In one of your statements, and I can show
15  you these if you want, it says, only a fool would
16  make blatant, incriminating comments about blowing
17  up a government facility since the terrorists attack
18  on 9/11; would you agree that it is legitimate for
19  federal employers to be increasingly vigilant in the
20  wake of September 11th, 2001?
21     A   Yes.
22     Q   Okay. You also state in your October 6th,
23  2004 EEO statement, I agree that management should
24  have the upper hand in all matters related to

18 (Pages 198 to 201)

Page 202

1  workplace violence and misconduct. I believe that
2  management is sending a strong message concerning
3  threats of violence in the workplace; is that your
4  opinion?
5      A  Yes.
6      Q  Your union representative, Mr. James
7  Cassedy in his October 2004 letter, which is an
8  Exhibit in this deposition, I can show you, again,
9  if you want to see it. Mr. Murray deeply regrets
10 the inappropriate use of language. In the present
11 climate of high security at Federal Centers, he
12 acknowledges that the inappropriate use of language
13 can have an alarming affect; is that the case, do
14 you regret using the language that you used on
15 September 22nd, 2004?
16     A  Yes.
17     Q  And you understand the sensitive nature of
18 the post 9/11 world?
19     A  Definitely.
20     Q  You state, and I can show this to you, in
21 February 8th, 2005 EEO statement, I do not blame
22 John McEvoy or David Roland for feeling the way that
23 they do, or for taking the action to remove or
24 pursue terrorists. After reading James Hughes's

Page 203

1  Affidavit, I would have taken the same action to
2  secure the building and the employees; is that your
3  view that a manager being presented with
4  Mr. Hughes's statement, would have in your view,
5  reasonably taken the actions that John McEvoy and
6  David Roland took in this case?
7      A  I would have done the same thing, but I
8  would have gave the person a chance to make an oral
9  statement, and they didn't let me do it.
10     Q  Let me ask you about that, you had
11 mentioned before that Mr. Cassedy -- Mr. Cassedy
12 stated an entire oversight to your views; is that
13 correct?
14     A  Correct.
15     Q  He submitted that letter in October of
16 2004; correct?
17     A  Correct.
18     Q  Which was before Mr. Roland sent you with
19 his final decision letter in November of 2004;
20 correct?
21     A  Correct.
22     Q  And you didn't make any further statement
23 to Mr. Roland to the National Archives before
24 Mr. Roland issued his November 2004 statement

Page 204

1  distancing yourself from James Cassedy's statements
2  on your behalf; correct?
3      A  No, I didn't.
4      Q  Why not?
5      A  They -- you have to know the kind of
6  people that I worked with. Once management gets an
7  idea set in their head, there is no turning them
8  around, no talking to them at all, because when I
9  had asked a lady, Mrs. Camp that I wanted to speak
10 to someone about resolution, she said that it
11 doesn't sound like they are willing to listen or
12 hear anything, and I think that was before
13 Mr. Cassedy wrote up his statement.
14     Q  You testified today that if you were in
15 Mr. McEvoy's and Mr. Roland's position, and had been
16 presented with James Hughes's statements, you would
17 have taken the same action that they took, yet you
18 are alleging religious discrimination not only to
19 the postings issue, but also related to this issue
20 regarding the threats and the action that was taken
21 based on those threats; is it that you really
22 believe to be religious discrimination component to
23 the decision to terminate you based on the threats,
24 or that you don't really understand what the basis

Page 205

1  was, and you are looking for a reason?
2      A  I am trying to --
3      Q  Let me -- I will ask you to answer that in
4  a second. You stated in one of your EEO statements
5  from November 18th, 2004; the entire staff was
6  confused as to why I have been terminated. The only
7  clue is my religion of Islam; so what I am asking
8  you, you are trying to search for a reason, and so
9  that is why you are picking the religious
10 discrimination basis?
11     A  Yeah, I am trying to search for a reason
12 why, after 17 years, they wouldn't allow me to make
13 an oral statement, and I think I believe that its
14 the religious component involved in the case, is the
15 outstanding feature of why they are so adamant about
16 not letting me make a statement or explain anything,
17 I think that is based upon religion.
18     Q  So as to the threat and the termination
19 based on the threat, you are saying that the only
20 reason why you are attributing religious
21 discrimination to that decision is that you were not
22 allowed to make an oral statement regarding what
23 happened, to explain the circumstances?
24     A  That, and -- this case had gotten kind of

19 (Pages 202 to 205)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 206

1  intertwined with the original complaint about the
2  postings, and then the second complaint about the
3  threat. It is kind of taking on a second character,
4  which they should be dealt with separately, but they
5  used the second incident with the threat to
6  reinforce the first complaint about the postings.
7  If I had never went there that day, on September
8  22nd, I don't think -- I don't think -- I think if
9  Mr. McEvoy would have went for a termination, I
10  don't think personnel would have --
11    Q   You are saying just the postings --
12    A   Yeah.
13    Q   But turning back to threat, what about the
14  termination based on the threats, do you think it
15  was religious discrimination?
16    A   I think it has -- ah -- I think they took
17  it more seriously because it involved a person of
18  the Islamic religion.
19    Q   But you are saying that you would have
20  done the same thing if you would have been in their
21  position, if those statements had been presented to
22  you --
23    A   Yeah, I would have made the proposal and
24  followed through, but I would have gotten more

Page 207

1  statements, and I would have questioned the person
2  involved rather than just -- they did what they were
3  supposed to do, but then only partly did they do
4  what they were supposed to do, they never really
5  conducted a complete investigation.
6    Q   But you agree that your union
7  representative did make a statement on your behalf
8  in October 2004 before the final decision was made;
9  correct?
10    A   Yes, he made a statement.
11    Q   You read that statement after it was sent
12  out, you read it in October?
13    A   Yes.
14    Q   And you never wrote to the National
15  Archives to correct anything in the statement;
16  correct?
17    A   Correct.
18    Q   And you never made an additional statement
19  before Mr. Roland made his final statement; correct?
20    A   I knew that it had to be more than just an
21  alleged -- ah -- threat that there was more to it,
22  and I believe that the religious factor was
23  something that was having them go for the -- ah --
24  what I seen and call the death penalty, is when they

Page 208

1  go to terminate an employee, because there is so
2  many other options, and they call it this Federal
3  manager's guide. And I thought they would want the
4  death penalty without ascertaining all the facts or
5  taking into consideration the aggravating
6  circumstances.
7    Q   Mr. Murray, I am going to mark as
8  Murray-26.
9        (Whereupon, a document was
10        marked for identification as
11        Exhibit Murray-26.)
12  BY MR. SULLIVAN:
13    Q   Mr. Murray, this is a September 24th, 2004
14  letter notice, style of notice from John McEvoy to
15  you stating to promote the efficiency of the
16  Service, I propose to remove you from your position
17  and it states the instance of misconduct,
18  insubordination as one, it is alleged, and making
19  threatening remarks. On the final page, there is a
20  statement that I will refer to in a moment; do you
21  remember receiving this letter?
22    A   This?
23    Q   Yes, this letter.
24    A   Yes.

Page 209

1    Q   And did you receive it in September of
2  2004?
3    A   Yes.
4    Q   It states on the third full paragraph on
5  the last page, within 15 calendar days of your
6  receipt of this notice, you may reply in writing, in
7  person or both to David Roland, Assistant Regional
8  Administrator, setting forth any pertinent facts or
9  extenuating circumstances or other information you
10  desire to submit. You may also submit Affidavits in
11  support of your reply and may be represented by an
12  attorney or other representative. In addition, you
13  may designate a union representative in this matter;
14  did you read this letter?
15    A   Yes.
16    Q   Did you, in response, do anything other
17  than authorize your Union Representative, James
18  Cassedy, to submit a reply on your behalf?
19    A   I contacted a lady by the name of Miss
20  Elizabeth Kim, who handles alternative dispute
21  resolution, and she didn't have any kind of success
22  with trying to set up a meeting for us to discuss
23  it.
24    Q   But you read this, yet you didn't submit

20 (Pages 206 to 209)

1  anything beyond having your union representative
2  submit the October 2004 letter; correct?
3      A   There was an issue with them, and anything
4  that I wrote would have been a waste of time, in my
5  opinion.
6      Q   You knew you had the opportunity just --
7  to make additional information, but you didn't think
8  it was going to make any difference?
9      A   Yeah, I don't think that I had anything to
10 submit at that time.
11     Q   Mr. Murray, I am showing you, again, what
12 has been marked as Murray-16, which is your October
13 6th, 2004 EEO statement, pages -- Page 9, you state,
14 I don't have a motive or grievance with management
15 that would cause me to harm anyone.
16         I even informed Assistant Regional
17 Director David Roland that I considered him to be a
18 Messiah to the poor African-American employees. Mr.
19 John McEvoy is the best regional director I have had
20 the honor of servicing under; did you make those
21 statements?
22     A   Yes.
23     Q   And did you view David Roland and John
24 McEvoy in those ways?

1      A   Ah -- initially -- ah -- as time went on,
2  I think as Mr. Roland started moving up from
3  director to assistant regional administrator, and I
4  think his folds and sights were set above that. I
5  started to feel he was, maybe, a little less
6  interested in the employees, and I understood at the
7  same time that he didn't have as much time, but --
8  ah -- me and some other people started thinking that
9  Mitchell Buffone had too much influence. Some
10 people even thought that Mitchell Buffone had some
11 kind of dirt on him, or something, because anything
12 that comes out of Mitchell's mouth, seems like
13 management -- I mean, that handles all authority,
14 were only his opinion or views had any merit to
15 them.
16     Q   But there was at least a time when you
17 thought about --
18     A   Oh, yeah.
19     Q   -- they were all this way?
20     A   Yeah.
21     Q   And then there was a time when you felt
22 about John McEvoy this way?
23     A   Yeah, in the beginning.
24     Q   And is there any religious discrimination

1  basis, in your mind, regarding the actions that were
2  taken following your threat, your alleged threat,
3  that you haven't already testified to?
4      A   Well, I think it is everything that was
5  motivated and brought on because of the initial
6  incident in '95. I don't think if anything would
7  have happened in '95 if they would have brought up
8  the letters of August 16th, 2004, and there wasn't
9  no religious element to the whole incident. I think
10 -- I think there fears and ignorance about other
11 people's faith has been tainted by the media, and it
12 is understandable.
13         I just feel as though I have been
14 here so long, everybody knows that I am completely
15 American. I don't like what is going on in the
16 country. Nobody is keeping me from leaving.
17     Q   So is that your speculation, then, about
18 --
19     A   Yeah.
20     Q   -- why things were done, it's not based on
21 what anybody ever told you, what Mr. McEvoy ever
22 said to you --
23     A   Speculation.
24     Q   And is there any comment that anybody ever

1  made, Mr. McEvoy, Mr. Roland, anybody else that you
2  based your view on that you were being discriminated
3  against your religion?
4      A   For some reason, I don't have any
5  evidence, but the pictures of Osama bin Laden that
6  started popping up in the male locker room, I got a
7  real suspicion that John McEvoy might have done it
8  even though he is upper management, because I never
9  -- nobody ever brought anything -- ah -- like that,
10 Islamic, in the -- ah -- workplace before he came,
11 and it happened right around the time that he came,
12 but I don't have evidence, so...
13     Q   These were posters you said?
14     A   Yeah.
15     Q   And what did the posters say?
16     A   Ah -- one of them was Osama bin Laden
17 decapitated and it just -- ah -- and it says,
18 justice served.
19     Q   Did it say, Osama bin Laden wanted dead or
20 alive; something to that effect?
21     A   Yeah.
22     Q   When were they posted in the men's locker
23 wash room, did you say?
24     A   The men's -- ah -- locker room, wash room.

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 214

1  It is actually the wash room.
2  Q   When were they posted there, what year?
3  A   2001.
4  Q   Okay. Were they there in 2002?
5  A   I took them down every time I saw them.
6  Q   Did you see them there in 2002?
7  A   I don't think I seen any more in the men's
8  room.
9  Q   So you saw them there only in 2001?
10  A   Yeah.
11  Q   Was it after or before September 11, 2001?
12  A   After.
13  Q   Okay. Do you know for a fact who posted
14  them there?
15  A   No.
16  Q   You were just guessing, then?
17  A   Yeah.
18  Q   Do you know why they no longer appeared
19  after 2001?
20  A   People got tired of taking them down.
21  Q   Did you ever bring there presence to
22  management?
23  A   No, just coworkers, I think. I don't know
24  if coworkers brought it to Mr. Roland's attention.

Page 215

1  Q   So you don't know whether management ever
2  took any action to make sure those posteds were no
3  longer posted?
4  A   No. Not knowing who it was, you couldn't
5  stop it.
6  Q   And you don't know if management took any
7  action?
8  A   No.
9  Q   But for sure they didn't appear, again,
10  after 2001?
11  A   I don't recall seeing them.
12  Q   Did they have any religious statements on
13  them?
14  A   No.
15  Q   Tell me each and every person who you
16  believe was treated more favorably then you were for
17  stating things similar to what you stated at the
18  workplace on September 22nd, 2004?
19  A   Well, I have observed employees in heated
20  arguments -- ah -- almost near fights, throwing
21  furniture, and Mr. Buffone would -- ah -- because
22  they involved people in the clique or whatever, he
23  would try his best to cover it up, or if someone did
24  take it back to management, he would intervene some

Page 216

1  kind of way.
2  Q   Can you tell me about any specific
3  comments that anybody ever made at the Federal
4  Records Center in Philadelphia that was similar to
5  the sorts of comments that you have testified to
6  today, that you made on September 22nd, 2004?
7  A   Oh, I don't know no one -- I never heard
8  anybody making any -- any threats, that is, somebody
9  should be --
10  Q   Did you ever make any kind of request to
11  management to accommodate your religious beliefs in
12  any way?
13  A   No, I thought it would be best to just try
14  to keep -- ah -- religious materials, newspapers,
15  whatever, just out of the workplace.
16  Q   Okay, so the answer is no to that?
17  A   No.
18  Q   Okay. And, again, in your EEO Affidavit,
19  this is Murray-17, there is a question here at the
20  bottom of the page, has anyone in management made
21  any remarks to you that you believe represents
22  discrimination; you reply on the next page, Page 12,
23  other than Mr. McEvoy's written order to remove some
24  writings from my desk, no. I do not often interact

Page 217

1  with managers. I just did my work and kept to
2  myself; is that correct?
3  A   Correct.
4  Q   Okay. Apart from what you testified to
5  today -- and you tell me when you have to go for a
6  break. Have you had any issues with Mr. David
7  Roland; did you have any issues with Mr.
8  David Roland during your time at the National
9  Archives?
10  A   No.
11  Q   Apart from what you testified to in this
12  deposition, do you -- did you have any issues with
13  John McEvoy during your time at the National
14  Archives?
15  A   No.
16  Q   Apart from what you testified to so far in
17  this deposition, did you, during your time at the
18  National Archives, have any issues with David
19  Bedesen, B-E-D-E-S-E-N?
20  A   No.
21  Q   All right. In one of your EEO statements,
22  I can show it to you if you want, you referred to
23  Mr. Weber as quote, "A notorious racist." This is
24  David Weber I am referring to; what was his position

22 (Pages 214 to 217)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 218

1  in '95, '96?
2    A   Director.
3    Q   You referred to him as a notorious racist
4  and persecutor of the black race. Mr. Weber was
5  removed from his position due to his racist beliefs
6  and attitude. Mr. Weber is responsible, more than
7  any other person, from blocking my promotion to the
8  GS-4 level. Can you explain what the basis of those
9  comments are?
10   A   Sure, but can I do it right after I come
11  back?
12   Q   Yes.
13           (Whereupon, a brief recess was
14        taken.)
15  BY MR. SULLIVAN:
16   Q   Mr. Murray, before we broke for you to go
17  out to the parking meter, we were talking about
18  Mr. David Weber, and I stated, restated one of your
19  EEO statements regarding him, do you want me to
20  repeat it, or do you want to tell me what you
21  remember?
22   A   I think I remember it pretty well.
23        I think -- ah -- David Roland has
24  partly been accused more than anybody else of being

Page 219

1  racist and --
2    Q   No, I was talking about David Weber, you
3  are talking about David Roland.
4    A   Oh, David Roland, I said David Weber.
5  David Roland has no connection with David Weber.
6    Q   I'm sorry. So you are not talking about
7  Mr. -- Weber -- has been accused more than anybody
8  else about what?
9    A   Being a racist or discriminating against
10  employees. Just from hearsay, I think he's had a
11  lot of complaints from my coworkers who filed formal
12  complaints, and I think he was involved in a
13  lawsuit, but -- um --
14   Q   Do you know who made those accusations?
15   A   I think Kim Parker had one formal lawsuit,
16  or at least a complaint about something.
17   Q   Anybody else?
18   A   Nobody likes him, but I don't know what
19  they've done about it in their personal --
20   Q   Are you talking about employees of --
21   A   Employees.
22   Q   -- of a particular race, or general?
23   A   I think generally; I think even Mitchell
24  Buffone hates him probably more than anybody else.

Page 220

1    Q   Has Mr. Weber ever said anything to you
2  that you consider racist or inappropriate?
3    A   No, I never had any problems with anybody
4  directly bringing that kind of stuff to me.
5    Q   Did you ever have any issues yourself with
6  Mr. Weber?
7    A   Yes, back in '93 or '94, 1993 or 1994.
8  When our workload was low, we had a system where we
9  were given a number and to call in on it and the
10  answering machine would see whether or not you
11  should come in if there was work. And Mr. Weber
12  would always put my name in on two different days,
13  every week, it wouldn't be the same, and I would
14  only come in for an hour, and then I would be sent
15  home. He does a lot of nitpicking, and anything
16  that he can think of to harass you and irritate you.
17  And then he tried to get rid of me for not coming
18  in, answering the machine; and I told him, well, if
19  there is no work, why don't I just leave for a
20  period of time and try to find something else
21  instead of being tied to the phone each night. That
22  was a big problem.
23   Q   This is all in '93, '94?
24   A   Ah -- around that time, yeah.

Page 221

1    Q   And he was in what position at that time?
2    A   He was director then.
3    Q   Of the Federal Records Center?
4    A   Yes. And other than the nitpicking thing,
5  anything he can do to irritate you.
6        I think he was raised to be the way
7  he is. He said that his father -- he didn't tell
8  me, he told a close friend of mine, that his father
9  was a racist and he was raised up to be that way,
10  but he tried all of his life not to be that way.
11   Q   He is -- what is his race?
12   A   Caucasian.
13   Q   Do you know what his religion is?
14   A   Ah -- atheist now.
15   Q   Do you know what he was formally.
16   A   Catholic.
17   Q   You were saying about his father?
18   A   Um -- his father raised him to be -- but
19  he tried all his life not to be. But I don't think
20  that he tried hard enough.
21   Q   Do you have any basis for believing that
22  when you characterized harassment or nitpicking had
23  any racial or religious component to it?
24   A   I think he liked to harass and nitpick on

23 (Pages 218 to 221)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 222

1  the employees because of the low intelligence. I
2  remember a situation, once, where an employee by the
3  name of Lee Robinson -- ah -- Mr. Weber was telling
4  him -- like mocking him, to think hard, now; before
5  you answer the question, think; because he was
6  making fun of him because he is kind of slow.
7      Q   Mr. Robinson is what race?
8      A   Mr. Robinson is Afro-American.
9      Q   And you are saying that the nitpicking,
10 harassing that he did it, of you and others in your
11 view was based upon just him seeing employees as
12 having low intelligence?
13     A   Yes, and I think that he based the fact
14 that they all had low intelligence, because they
15 were of African descent.
16     Q   You said that Caucasian employees also did
17 not like him?
18     A   Ah -- just -- ah -- Mr. -- Buffone didn't
19 like him, he tried to, I think that he tried to fire
20 him quite a few times. Each time was Mr. Buffone's
21 fault, though, but that is in the same category.
22 But a lot of times you characterize or I might
23 characterize people being racist or discriminating
24 against people who have some serious issues within

Page 223

1  themselves, and it comes out in the workplace.
2      Q   And that is your speculation, then, that
3  some of this -- in your mind, had a racial basis?
4      A   Yes.
5      Q   Did he ever state anything to you that
6  indicated a racist attitude?
7      A   To me, I could never understand why he was
8  so mean and laughing and irritable the way he was,
9  and the reasons why he would try to block me from
10 advancing. And I didn't have any feelings about him
11 one way or the other, and I just started to search
12 in myself and try to figure out why this man acted
13 this way; why is he going this; and the first thing
14 that always comes to a so called, my Murray's mind,
15 when they are having problems, white people, the
16 first thing that comes to their mind that it has to
17 be race, not always that, but it is one of the first
18 things that comes to mind.
19     Q   Now, you said that he blocked you, in what
20 way did he block you?
21     A   Influencing the status quo people, like --
22 really, the director or whoever is in charge of
23 hiring the person, promoting them, will get advice
24 from his supervisors, or work coordinators who are

Page 224

1  mostly status quo people, and at times they, they
2  of, let me know that they got to do what they are
3  told, or vote a certain way without, you know, being
4  too incriminating. But everybody knows that it is
5  up to a director who gets the promotion or not,
6  because --
7      Q   So you are saying that he blocked you from
8  promotion?
9      A   Yeah. Normally, he would go out and tell
10 whoever he wants to get a promotion, to put in for
11 it, and usually that person would get it. People
12 who are not in the status quo clique knows that
13 unless management tells you to put in for it, you
14 are wasting your time putting in for it, they
15 already got a person lined up for it regardless of
16 their qualifications or whatever.
17     Q   Did he ever state anything to you stating
18 that he was keeping you from a promotion, or is this
19 your speculation as to what happened?
20     A   Everything is, generally, speculation
21 because nobody comes right out there, no one comes
22 out and states too much. They have people -- they
23 have -- their philosophy or motto is, don't get mad,
24 get even. I heard the status quo and people talk

Page 225

1  like that. Actually, openly come out and attack
2  you; they do everything from behind the scenes, and
3  that is how things are able to go on for such a long
4  time, because if no one actually says anything to
5  you, or attacks you, in turn, the only person that
6  you can turn to is management or the director, and
7  he happens to be the puppeteer, then you got no
8  choice but to just try to get through the day and
9  get your paycheck and get out of there at the end of
10 each day.
11     Q   Now when you say Mr. Weber was removed
12 from his position due to his racist beliefs and
13 attitude, what is your basis for that?
14     A   Oh, I think right around that time, when
15 he was removed, I think -- I think Kim Parker was
16 the person who had filed some kind of complaint
17 against him relating to racist or discrimination; I
18 didn't get into the personal specifics of the case.
19     Q   What year was that; do you remember?
20     A   '94, '95 -- no, no, this would be '96,
21 '97, sometime around there.
22     Q   And Mr. Weber went to what position at
23 that point?
24     A   Ah -- what is his title? They just stuck

24 (Pages 222 to 225)

1  him in the corner and told him not to have any -- I
2  remember somebody saying that he was not to have any
3  contact with African-Americans or minorities.
4  Q    Who said that?
5  A    (No response.)
6  Q    A coworker?
7  A    Uh -- a coworker.
8  Q    And this was around the same time that Kim
9  Parker had made an allegation, about the same time?
10  A    Um-hum.
11  Q    What is you basis for believing that the
12  two are connected, your speculation or --
13  A    Yeah, my speculation.
14  Q    You didn't hear from management or anybody
15  --
16  A    No.
17  Q    -- that there was a relationship?
18  A    No. I remember when David Roland first
19  came, we talked and I just said that I can't work
20  under this guy or with this guy, and he told me not
21  to worry about him because he is going to be out of
22  the picture for good. So he -- I, kind of, picked
23  up on some of the different things that people would
24  say.

1  Q    Now, was John McGee previously your first
2  line supervisor?
3  A    Yes.
4  Q    He was in a position that Elizabeth
5  Washington was in --
6  A    Correct.
7  Q    -- with regard to you at a later time?
8  A    Correct.
9  Q    Do you have issues with John McGee?
10  A    None.
11  Q    You liked him?
12  A    Very much.
13  Q    Good supervisor?
14  A    Yes.
15  Q    Have you had any issues with Elizabeth
16  Washington?
17  A    None.
18  Q    Good supervisor?
19  A    Good supervisor.
20  Q    Can you tell me every contact that you
21  have had, by phone, in writing, in any way with
22  Warren Skip Hammond since September 22nd, 2004 at
23  11:00 in the morning, apart from when you saw him at
24  his deposition in this case?

1  A    Prior to the time of his deposition would
2  have been September 2004, when I called him to ask
3  him about, did he hear John McEvoy calling the
4  employees creatures with privileges.
5  Q    Do you remember when you made that call?
6  A    The very end of September 2004, the very
7  end.
8  Q    Late September?
9  A    Yeah, late September 2004.
10  Q    You called him on his phone?
11  A    Yes.
12  Q    Did you actually speak to him?
13  A    Yes.
14  Q    And I will talk to you about that in a
15  second.
16      Have you had any other contact with
17  Mr. Hammond since September 22nd, 2004 at 11:00 in
18  the afternoon?
19  A    No.
20  Q    Apart from the day of his deposition?
21  A    Apart from the deposition.
22  Q    None at all; none in writing?
23  A    Uh-uh.
24  Q    None in person; none by telephone?

1  A    Uh-uh.
2  Q    Okay. In late September 2004, tell me
3  what your conversation was with Mr. Hammond?
4  A    I had asked him, did he hear, was he
5  present at the meeting when John McEvoy called the
6  staff nothing but creatures with privileges. Ah --
7  I don't recall whether he said he was or wasn't, but
8  I, kind of, picked up that he was kind of scared to
9  say anything, because I had mentioned it to Shawn
10  Walker at EEOC, and he said that he would send an
11  investigator out if one person would come forward.
12  Everyone was too scared.
13  Q    And I will come back to that.
14      Did you discuss anything else with
15  Mr. Hammond in that call; did you discuss in any way
16  the events of September 22nd, 2004, the issues with
17  your postings, anything?
18  A    No, it was just about the incident where
19  he called people creatures, and that was it. We
20  were on the phone for about five minutes before
21  something happened and we got disconnected and we
22  didn't resume.
23  Q    So he didn't say, gosh, I'm worried about
24  what happened on September 22nd; I've heard things

Page 238

1 in violation of the letter; correct?
2    A  (No response.)
3    Q  In violation of the letter that you would
4 later receive?
5    A  I didn't follow you on that.
6    Q  You understood the letter, August 17th,
7 2004 letter to prohibit the type of material that
8 you had posted in August 2004; correct?
9    A  It sounds like you are saying that I
10 understand the letter from August 2004 is related to
11 the postings?
12    Q  No.  You understood, am I correct, that
13 the August 17th, 2004 letter prohibited you from
14 posting the sort of material that you had taken down
15 that day?
16    A  Yes.
17    Q  And as we've testified to before in
18 Murray-12, which is photographs what you had been
19 required to take down in August, there are comments
20 related to -- that you directed to your
21 co-employees; correct, worthless loser, et cetera?
22    A  Correct.
23    Q  So you understood the letter to prohibit
24 you from having similar sort of postings in the

Page 239

1 future?
2    A  Correct.
3    Q  Revenge is a dish best served cold; same
4 thing?
5    A  Correct.
6    Q  Mr. Murray, as the final main subject area
7 of the deposition, I want to go over your discovery,
8 and I can pull them out if you want to refresh your
9 memory.
10        I -- in my fist couple of
11 Interrogatories, I asked you about what employment
12 you sought since leaving the National Archives since
13 you have been terminated, and you, in your November
14 2nd, 2006 response to Interrogatory number 1, you
15 stated that you have current applications for
16 employment on file with the Department of Treasury,
17 the FBI, the DEOC and the Department of State.
18        Can you tell me what the status is of
19 those applications?
20    A  Still waiting.  The Department of State
21 wants, I believe -- someone with a higher score got
22 that one, and the other ones are still opened and I
23 have another current one since we last spoke, with
24 the U.S. Marshalls.

Page 240

1    Q  Any others pending?
2    A  I think there might be one more with the
3 government.  I don't have it with me.  I have it at
4 home, but I don't have it with me.
5    Q  Have you applied since being terminated
6 from the National Archives for any positions other
7 than the ones that you identified here for your
8 Discovery responses?
9    A  No.
10    Q  Had you any interviews with any potential
11 employers?
12    A  No.
13    Q  Have any of these potential employers
14 stated to you any issues or concerns they have
15 regarding you?
16    A  No.  I would imagine they have some,
17 though, with my termination.
18    Q  They haven't stated anything to you?
19    A  No.
20    Q  Interrogatory number 2 asks you whether
21 you have been employed, or, otherwise, performed any
22 compensated work since leaving the National
23 Archives; and I will just ask you now, have you
24 worked outside the home since September 22nd, 2004?

Page 241

1    A  Yes.
2    Q  Okay.  And Interrogatory says that you
3 worked for Snelling Personal Services from March
4 2005 to July 2005, you attached the Snelling
5 Personal Service document referring to a start date
6 at Kun-Crest, K-U-N - C-R-E-S-T Services of May 3rd,
7 2005 and evaluating you on May 10th, 2005; did you
8 work with Snelling Personal Services during that
9 period?
10    A  Yes.
11    Q  Have you worked with them during any other
12 period?
13    A  No.
14    Q  And through Snelling Personnel Services,
15 did you obtain some work at Kun-Crest Services?
16    A  Yes.
17    Q  What kind of work was that?
18    A  Janitorial.
19    Q  And was your period there -- tell me what
20 your period was, there at work?
21    A  I think I was there for five or six months
22 on a 20-hour a week detail.
23    Q  Do you remember the months?
24    A  (No response.)

28 (Pages 238 to 241)

3c7fea2a-0a03-47a0-8b80-2ad9bc1a0d21

CLASS ACT REPORTING AGENCY, LLC
(856) 235-5108    (215) 928-9760

## Page 238

```
 1     in violation of the letter; correct?
 2  A  (No response.)
 3  Q  In violation of the letter that you would
 4     later receive?
 5  A  I didn't follow you on that.
 6  Q  You understood the letter, August 17th,
 7     2004 letter to prohibit the type of material that
 8     you had posted in August 2004, correct?
 9  A  It sounds like you are saying that I
10     understand the letter from August 2004 is related to
11     the posting?
12  Q  No. You understood, am I correct, that
13     the August 17th, 2004 letter prohibited you from
14     posting the sort of material that you had taken down
15     that day?
16  A  Yes.
17  Q  And as we've testified to before in
18     Murray-12, which is photographs what you had been
19     required to take down in August, there are comments
20     related to -- that you directed to your
21     co-employees; correct, worthless loser, et cetera?
22  A  Correct.
23  Q  So you understood the letter to prohibit
24     you from having similar sort of postings in the
```

## Page 239

```
 1     future?
 2  A  Correct.
 3  Q  Revenge is a dish served cold; same
 4     thing?
 5  A  Correct.
 6  Q  Mr. Murray, as the final main subject area
 7     of the deposition, I want to go over your discovery,
 8     and I can pull them out if you want to refresh your
 9     memory.
10     I -- in my fist couple of
11     Interrogatories, I asked you about what employment
12     you sought since leaving the National Archives since
13     you have been terminated, and you, in your November
14     2nd, 2006 response to Interrogatory number 1, you
15     stated that you have current applications for
16     employment on file with the Department of Treasury,
17     the FBI, the DEOC and the Department of State.
18     Can you tell me what the status is of
19     those applications?
20  A  Still waiting. The Department of State
21     wants, I believe -- someone with a higher score got
22     that one, and the other ones are still opened and I
23     have another current one since we last spoke, with
24     the U.S. Marshalls.
```

## Page 240

```
 1  Q  Any others pending?
 2  A  I think there might be one more with the
 3     government, I don't have it with me. I have it at
 4     home, but I don't have it with me.
 5  Q  Have you applied since being terminated
 6     from the National Archives for any positions other
 7     than the ones that you identified here for your
 8     Discovery responses?
 9  A  No.
10  Q  Had you any interviews with any potential
11     employers?
12  A  No.
13  Q  Have any of these potential employers
14     stated to you any issues or concerns they have
15     regarding you?
16  A  No. I would imagine they have some,
17     though, with my termination.
18  Q  They haven't stated anything to you?
19  A  No.
20  Q  Interrogatory number 2 asks you whether
21     you have been employed, or, otherwise, performed any
22     compensated work since leaving the National
23     Archives, and I will just ask you now, have you
24     worked outside the home since September 22nd, 2004
```

## Page 241

```
 1  A  Yes.
 2  Q  Okay. And Interrogatory says that you
 3     worked for Snelling Personal Services from March
 4     2005 to July 2005, you attached the Snelling
 5     Personal Service document referring to a start date
 6     at Kun-Crest, K-U-N - C-R-E-S-T Services of May 3rd
 7     2005 and evaluating you on May 10th, 2005; did you
 8     work with Snelling Personal Services during that
 9     period?
10  A  Yes.
11  Q  Have you worked with them during any other
12     period?
13  A  No.
14  Q  And through Snelling Personnel Services,
15     did you obtain some work at Kun-Crest Services?
16  A  Yes.
17  Q  What kind of work was that?
18  A  Janitorial.
19  Q  And was your period there -- tell me what
20     your period was, there at work?
21  A  I think I was there for five or six months
22     on a 20-hour a week detail.
23  Q  Do you remember the months?
24  A  (No response.)
```

1  about it, why don't you tell me what happened; he
2  didn't ask you any questions like that?
3     A   No.
4     Q   And you didn't say, somebody might contact
5  you regarding my termination, my EEO complaint,
6  anything like that?
7     A   No.
8     Q   No discussion about September 22nd, 2004?
9     A   Uh-uh.
10    Q   About the possible involvement of Mr.
11 Hammond and your EEO case?
12    A   No.
13    Q   Regarding the statement that you say John
14 McEvoy made about certain employees being creatures
15 with privileges; what kind of meeting was that made
16 at?
17    A   Um -- a meeting where, I think, management
18 was notifying them that no one would be allowed in
19 the building after 4:30 any more. I guess it was a
20 safety or security issue they had.
21    Q   In the wake of --
22    A   Right.
23    Q   -- what happened on September 22nd?
24    A   Right.

1     Q   And who told you what happened at that
2  meeting?
3     A   I was talking to different coworkers,
4  girls here and there, I would bump into them on the
5  street. I don't know if it was Diane or Bonnie that
6  I seen.
7     Q   Are they coworkers of yours?
8     A   They are coworkers.
9     Q   What is Diane's last name?
10    A   She's Hispanic or --
11    Q   How about Bonnie?
12    A   Fleming.
13    Q   Do you know whether it was one of those
14 two that had told you what had happened at the
15 meeting?
16    A   I can't be 100 percent sure, but I've seen
17 them on the street, once or twice since then. But
18 that's why -- their names are coming -- back around
19 that time, but I don't know for sure.
20    Q   What did they tell you about who was at
21 the meeting; what did whoever reported to you about
22 the meeting tell you about the meeting?
23    A   Just a staff meeting.
24    Q   All staff, or just staff of a particular

1  race?
2     A   Everybody. Everybody.
3     Q   So that would include people of different
4  races and religions?
5     A   Correct.
6     Q   And Mr. McEvoy said what?
7     A   I don't remember the whole conversation, I
8  only think they told me that he had made the comment
9  that they were just nothing but creatures with
10 privileges.
11    Q   They meaning, all staff?
12    A   Yeah.
13    Q   What did you find offensive about that?
14    A   Calling them and being creatures, I don't
15 know why he couldn't just call them employees or
16 human beings.
17    Q   I'm sorry, did you say Henry Bean?
18    A   No, why he couldn't call them human
19 beings, or why he couldn't call them employees or
20 just, people. Creatures seems like some type of
21 lower life form or something.
22    Q   Is it possible that you don't know that
23 Mr. McEvoy said creature comforts, that he was
24 referring to creature comforts rather than saying

1  creatures with privileges?
2     A   I don't know.
3     Q   You weren't there; right?
4     A   No, I wasn't there.
5     Q   Would you have a problem if he was
6  referring to employees having creature comforts?
7     A   There is something about the word,
8  creature, that doesn't sit too well. I guess a
9  person could use it in a non-harming way. I guess
10 it could be used that way.
11    Q   So in your view, it is just derogatory
12 toward employees generally not with regard to race
13 or generally?
14    A   Generally, yeah.
15    Q   Tell me every single contact that you had
16 with Irene Jones since September 22nd, 2004
17 afternoon, after 12:00 noon that day, apart from
18 when you talked to her at her deposition in this
19 case?
20    A   When I left the parking lot on September
21 22nd, 2004, I haven't talked to her since.
22    Q   Have you had any contact in writing with
23 Ms. Jones?
24    A   No.

26 (Pages 230 to 233)

## Page 242

1  Q  2005?

2  A  2005.

3  Q  Do you remember when you started?

4  A  No, but I remember finishing up at the --

5  after the 4th of July, so about five or six months

6  back, up to July.

7  Q  Have you worked there since?

8  A  No.

9  Q  And you didn't work there before that?

10  A  No.

11  Q  Have you had any other compensated work

12  since leaving the National Archives in September

13  2004, apart from Snelling Personal Services and

14  Kun-Crest Services?

15  A  Yes.

16  Q  Can you tell me about those?

17  A  I worked for a couple of weeks at a place

18  called Interstate -- Interstate Brand, it is a

19  Wonder Bread Bakery, but I think the official name

20  of the company was Interstate Brand, I believe it

21  was.

22  Q  What is the address that you worked at?

23  A  It is up on Bluegrass Road. I got it at

24  home.

## Page 243

1  Q  What city or town?

2  A  Northeast Philadelphia.

3  Q  And you said that you worked there for

4  three weeks?

5  A  Yeah.

6  Q  What did you do there?

7  A  Worked in the bakery, packing -- packing

8  bread. That was my title, bread packer.

9  Q  What year was that?

10  A  2005; my last day was the first week in

11  January 2005, so it would have to be just before --

12  from November 2004 till January 2005.

13  Q  And you haven't work there since?

14  A  No.

15  Q  Have you had any other compensated work

16  other than Interstate Brand, Wonder Bread, Kun-Crest

17  Service and Snelling Personal Services since

18  September 2004?

19  A  No, that is it.

20  Q  Have you submitted any applications for

21  employment apart for anything that you submitted to

22  those employers and those that you identified in

23  your Interrogatory responses?

24  A  No, the last one was with the U.S.

## Page 244

1  Marshalls.

2  Q  I am going to turn a little bit to issues

3  regarding your medical history; you've stated, I

4  believe, that your seeking to recover medical

5  expenses in this case; is that correct?

6  A  Correct.

7  Q  And could you explain why, in this case

8  involving your termination from the National

9  Archives for the reasons that are known to you, you

10  believe that you are entitled to recover medical

11  expenses?

12  A  At the time of my termination, I was under

13  a doctor's care for rheumatoid arthritis, and I was

14  placed on medication for the rest of my life, and as

15  the result of my termination, I lost my health

16  insurance and had to pay for the medication out of

17  pocket.

18  Q  Have you had any health insurance at all,

19  any medical coverage at all since leaving the

20  National Archives?

21  A  No.

22  Q  When you visited doctors, what has the

23  payment arrangement been with the doctors you've

24  seen?

## Page 245

1  A  It's only $30 for office visits.

2  Q  This is your same physician that you've

3  seen before you were terminated?

4  A  Yes.

5  Q  And he accepts the $30 payment?

6  A  Um-hum.

7  Q  Who is that doctor?

8  A  Dr. Joel Jaffe.

9  Q  J-A-F-F-E?

10  A  Correct.

11  Q  And where is he located?

12  A  711 North Fairmount Avenue, Philadelphia

13  PA.

14  Q  What kind of doctor is Dr. Jaffe?

15  A  D.O. at the end of his name.

16  Q  When did you first see Dr. Jaffe?

17  A  December of '99.

18  Q  Do you see Dr. Jaffe for general medical

19  treatment, or for specialized treatment?

20  A  General.

21  Q  He is your general practitioner?

22  A  General practitioner.

23  Q  How infrequently do you see Dr. Jaffe?

24  A  Once a month.

29 (Pages 242 to 245)

**Page 246**

1    Q    And that has been the case for many years?
2    A    Since 1999.
3    Q    Is he your only general medical
4    practitioner since '99?
5    A    Correct.
6    Q    Have you seen any other doctors within the
7    past three years?
8    A    No, the last was 2000. The last time that
9    I seen a different doctor.
10    Q    So for your musculoskeletal issues that
11    you've been talking about, for fibromyalgia, I
12    believe; correct?
13    A    Yes.
14    Q    Have you seen any doctors, therapists,
15    anybody other than Dr. Jaffe for medical treatment?
16    A    Not that -- Dr. Papau.
17    Q    And is Dr. Papau at the same -- can you
18    spell it?
19    A    No, he is Albert Einstein Arthritis
20    Center.
21    Q    Can you spell his last name?
22    A    P-A-P-A-U.
23    Q    Do you know Dr. Papau's first name?
24    A    Ramesh, R-A-M-E-S-H.

**Page 247**

1    Q    Dr. Papau is a he?
2    A    Yeah.
3    Q    And he is at Albert Einstein Arthritis
4    Center?
5    A    Arthritis Center. The rheumatology
6    department.
7    Q    Is that in Albert Einstein Hospital?
8    A    Correct.
9    Q    When did you first see Dr. Papau?
10    A    January of 2000.
11    Q    You saw Dr. Papau for what?
12    A    The arthritis leg pain.
13    Q    What kind of doctor is Dr. Papau?
14    A    Rheumatologist.
15    Q    How often have you seen Mr. Papau since
16    January of 2000?
17    A    I haven't been back since there isn't no
18    cure for what I have. The pain symptoms get worse
19    with age; it is degenerative.
20    Q    So just one visit?
21    A    Um-hum.
22    Q    Have you seen any other doctors, medical
23    practitioners since January 2000, since Dr. Papau
24    and Dr. Jaffe?

**Page 248**

1    A    No, I was in a car accident and I seen Dr.
2    -- what is his name; I have it on the tip of my
3    tongue. It will come to me.
4    Q    When were you in a car accident?
5    A    2003. December 2003.
6    Q    Were you the driver of the car?
7    A    Yes.
8    Q    Did you collide with another car?
9    A    I got hit from the rear and sandwiched in
10    and pushed into another car.
11    Q    Where did that occur?
12    A    That occurred on North Broad Street.
13    Q    Were you injured?
14    A    Just some back pain; hit my head, but I
15    don't think it -- I don't think it knock anything
16    loose.
17    Q    And you saw a doctor after that?
18    A    Yes.
19    Q    And is that a doctor that Dr. Jaffe or
20    Dr. Papau referred you to?
21    A    No, he is a neighborhood doctor.
22    Q    How did you decide upon going to him?
23    A    He handles therapy.
24    Q    Did anybody refer you to him?

**Page 249**

1    A    No, I saw him on my own.
2    Q    What did you see him for, and how many
3    occasions did you see him?
4    A    About a month. He just put heat pads on
5    my back and shoulders.
6    Q    What is his name?
7    A    I don't know that, I have it at home and I
8    have it on the tip of my tongue.
9    Q    Would you send that to me?
10    A    Sure.
11    Q    And when you send that, if you could just
12    give me the address and phone number for Dr. Jaffe's
13    office and Dr. Papau's office, or I can try and find
14    them myself. That is the only one that we were
15    asking for.
16          Have you seen any doctor or any
17    medical practitioner of any sort, other than
18    Dr. Jaffe, Dr. Papau and the doctor that you just
19    referred to since January 2000?
20    A    No.
21    Q    And just so I am clear, your only basis
22    for seeking medical expenses in this case is not
23    that you believe that your termination resulted in
24    any medical condition --

30 (Pages 246 to 249)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

1    A   Right.

2    Q   -- but rather that you lost your medical

3  insurance?

4    A   Correct.

5    Q   And you believe that you were wrongfully

6  terminated, therefore, you should have had medical

7  insurance; correct?

8    A   Correct.

9    Q   Have you since, 2000, seen, consulted with

10  anybody for any mental health condition, any

11  psychiatrists, phycologists, social worker regarding

12  any mental health issues?

13    A   No.

14    Q   In your November 6th, 2006 letter to me

15  you said, please forgive me, I was incorrect when I

16  stated new medical expenses since October 1st, 2004,

17  no claim for compensation is requested.  I had

18  expenses for -- I have had no expenses for

19  psychiatric or psychological treatment.  I am only

20  requesting compensation for monthly office visits

21  and existing medical expenses.  You can disregard

22  the release form.

23          Now I am going to have you sign the

24  release form, but when you stated that there are no

1  claims for compensation, and there are no new

2  medical expenses since October 1st, 2004, what do

3  you mean?

4    A   Oh, I thought that the question was asking

5  me, as a result of me getting fired, did I go seek

6  any doctors like psychologist or psychiatrists, but

7  I didn't.

8    Q   But you have seen Dr. Jaffe?

9    A   Yes.

10    Q   And you are seeking reimbursement of the

11  money that you paid to him?

12    A   Correct.

13    Q   And that would be $30 a month,

14  approximately?

15    A   Yes.

16    Q   And if you could particularize for me

17  what, exactly, what you paid to Dr. Jaffe and any

18  other medical practitioners to the extent that you

19  haven't already done so --

20    A   Yeah.

21    Q   -- that you are seeking reimbursement for;

22  you don't have to do that here, just when you send

23  me the information, make sure if you haven't already

24  given me the back-up documentation, the itemization

1  of those expenses that you are seeking reimbursement

2  for, please send that to me; okay?

3    A   Okay.

4    Q   That is part of the initial disclosures

5  that we sharing with each other.

6          Have you had any new medical problems

7  since October 1st, 2003?

8    A   No.

9    Q   Have you received any Social Security

10  disability, or Social Security benefits?

11    A   No.

12    Q   Ever?

13    A   No.

14    Q   In my Interrogatory number 9, National

15  Archives Interrogatory number 9, we asked you

16  whether you have received any of various sorts of

17  benefits, worker's compensation, FECA, various

18  others, you responded negative; does that mean that

19  you haven't received any of those --

20    A   No.

21    Q   -- that we asked about?

22    A   Uh-uh.

23    Q   And regarding welfare benefits, you

24  attached a September 27th, 2005 not eligible notice

1  and a written notice for general assistance; is that

2  correct?

3    A   Correct.

4    Q   You had applied for general assistance but

5  never received it?

6    A   Right.

7    Q   Have you ever received any medicare or

8  medicaid benefits since September 22nd, 2004?

9    A   No.  New laws make me ineligible.

10    Q   I asked you if you have any original

11  documents that you posted at your workstation at any

12  time in 2004, and you responded that you did not; is

13  that correct?

14    A   Correct.

15    Q   Have you ever been a party, a plaintiff or

16  a defendant to any lawsuit other than this one?

17    A   No.

18    Q   Resulting from your car accident in 2003,

19  was there ever a lawsuit filed by the other

20  plaintiff?

21    A   No, just therapy that was it; that's all I

22  needed.

23    Q   Did you file -- did you ever retain a

24  lawyer in that?

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

Page 254

1    A    No.
2    Q    Did anybody ever sue you?
3    A    No.
4    Q    Did your insurance company, or somebody
5    else's insurance company ever have any kind of legal
6    proceeding regarding that accident?
7    A    No.
8    Q    So you've never been involved in any civil
9    lawsuit, ever, other than this one?
10    A    Right.
11    Q    Have you ever been charged with anything
12    criminally?
13    A    No.
14    Q    So you've never been convicted of anything
15    criminally?
16    A    Criminal -- is simple assault criminal?
17    Q    Tell me what you've been --
18    A    Ah -- I --
19    Q    Let me just show you first, quickly, your
20    Affidavit which is Murray-17 -- this was already
21    marked as Murray-19 at the November 18th, 2004 EEO
22    statement that you made in this case, just take a
23    look at it; is that your statement?
24    A    Yes.

Page 255

1    Q    And you submitted that in the EEO
2    proceeding?
3    A    Correct.
4    Q    Directing your attention to Page 13, is it
5    correct that you state there, the only thing that I
6    have been convicted of in the past 42 years of my
7    life is a parking ticket?
8    A    Correct.
9    Q    You did state that?
10    A    Yes.
11    Q    Is it true?
12    A    Again, I thought that convictions were for
13    criminals were felonies, I didn't know that a
14    misdemeanor, or being found guilty of a parking
15    ticket was criminal, but a simple assault or
16    fighting is criminal, then yes.
17    Q    Then yes, what?
18    A    I was found guilty of simple assault.
19    Q    When was that?
20    A    I was 22 years old.
21    Q    Where was that; what court?
22    A    City Hall.
23    Q    Philadelphia Common Pleas Court?
24    A    Um-hum.  Yes.

Page 256

1    Q    Were you convicted of any -- charged with,
2    or convicted of any felony?
3    A    No.
4    Q    Were you charged with, or convicted of any
5    aggravated assault?
6    A    No.
7    Q    Are you absolutely sure?
8    A    The judge told me he was not going to give
9    me any felonies, because he did not want to ruin my
10    record if I wanted to go to school; that's what he
11    told me.
12    Q    Were you charged or convicted of
13    possession of an instrument of crime?
14    A    No, that is simple assault -- I mean a
15    misdemeanor.
16    Q    Were you charged or convicted of reckless
17    endangerment?
18    A    I was charged with everything, charged
19    with all those things, only convicted of --
20    Q    So you were charged with aggravated
21    assault?
22    A    Correct.
23    Q    Charged with possession of an instrument
24    in a crime?

Page 257

1    A    Correct.
2    Q    Charged with reckless endangerment?
3    A    Correct.
4    Q    But you were only convicted of simple
5    assault?
6    A    Correct.  I had one year of non-reporting
7    probation.
8    Q    Did you serve any time in jail?
9    A    No.
10    Q    Okay.  So it was one year probation?
11    A    Yes.
12    Q    And this arose from what incident?
13    A    I got into a fight with my wife's two
14    brothers.
15    Q    Okay.
16    A    Social -- domestic dispute.
17    Q    This was in 1983, around 1983?
18    A    Yeah.
19    Q    So your explanation for saying that you
20    have never been convicted of anything in 42 years in
21    this statement is what?
22    A    No felonies.
23    Q    Okay.  You've never been to Chicago?
24    A    No.

32 (Pages 254 to 257)

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

1    Q    You submitted to us as part of your
2    initial disclosure federal procedures 26A1, you tend
3    to rely upon, or you may rely upon, do you have any
4    additional persons that you want to add to that
5    list; and you have until the end of the discovery
6    period, is there anybody else that you can tell me
7    that you will, at this time, that you intend to add?
8    A    I don't know, I may call one other person.
9    Q    Do you know who?
10    A    Vanessa Adams. I don't know. I don't
11    think that she would be too much help, and I don't
12    want to make any more people go through this
13    process.
14    Q    And I mentioned to you in the hallway
15    here, that we will be making supplemental
16    disclosures probably next week where you will
17    probably be identifying, as I mentioned, John Shako
18    who is also referred to in the letters that you
19    received, who is in the human resources capacity for
20    the National Archives, and Investigator Louis Pepe,
21    who we referred to in this deposition as well. But
22    we will be making some supplemental disclosures to
23    you next week, in addition to some additional
24    documents.

1            One thing that I wanted to ask you
2    just before closing, if the Department of Homeland
3    Security does okay or produce to you part, or all of
4    the investigative file regarding you -- regarding
5    September 22nd, 2004, and the statements that you
6    made on September 23rd, 2004; do you consent to our
7    producing that information to you, and using some,
8    or all of the Exhibits in this case?
9    A    I guess not.
10    Q    You agree to that or --
11    A    Yeah. Okay.
12    Q    And that would include any trial before
13    Judge Shapiro?
14    A    Correct.
15            (Whereupon, a brief discussion
16            was held off the record.)
17    BY MR. SULLIVAN:
18    Q    Just a couple more questions, Mr. Murray;
19    did you, after your car accident in December of
20    2003, fill out an authorization for the National
21    Archives to release records to either a law firm or
22    some entity in the wake of your car accident?
23    A    I think so.
24    Q    Do you remember the entity to whom you had

1    those records sent?
2    A    Rand Spear.
3    Q    Can you spell that?
4    A    R-A-N-D S-P-E-A-R.
5    Q    What is Rand Spear?
6    A    He is an attorney.
7    Q    Oh, it is the name of an attorney?
8    A    Yes.
9    Q    Where is he located?
10    A    Walnut Street.
11    Q    You contacted him with reference to your
12    car accident?
13    A    Yeah, I wanted to make sure that the car
14    that I got pushed into, I wasn't going to have to
15    pay for it since I got pushed into the back.
16    Q    Did Mr. Spear, then, represent you in any
17    way related to this accident?
18    A    I think so, yeah.
19    Q    What did he do for you; I don't want you
20    to tell me about any conversations you had with him
21    in confidence, but you can tell me what he did for
22    you.
23    A    He made sure that the therapy bills got
24    paid, and that I didn't have to pay for the woman

1    whose car I rear ended.
2    Q    Did you have to pay Mr. Spear any money?
3    A    No.
4    Q    Did Mr. Spear or you get any monetary
5    recovery from anybody related to the car accident?
6    A    No.
7    Q    What did you give to the other driver, or
8    the people in the other car, if anything?
9    A    He handled that; I didn't give them
10    anything.
11    Q    Was there a settlement that was worked
12    out?
13    A    I think to get the car fixed.
14    Q    You didn't pay Mr. Spear anything; what
15    did he get out of representing you?
16    A    I don't know. I never been involved in --
17    this is my first car accident, so I don't know how
18    it all works. Somebody said to just get a lawyer
19    and have him handle the paperwork in case they
20    decide to use.
21    Q    Did you sign any kind of settlement
22    agreement to that?
23    A    No.
24    Q    Did you receive any papers at all from

39c7ea2a-0a03-47a0-ab80-2ad9bc1a0d21

1 Mr. Spear?
2   A   Any cash?
3   Q   Any documentation about what he was doing,
4 what was going on in the case?
5   A   Yes.
6   Q   Do you have that at home?
7   A   I think so.
8   Q   Would you please produce that for me?
9   A   Yes, sure.
10   Q   And I want each and every document that
11 you received from Mr. Spear, or any other attorney
12 related to the car accident, as well as anything
13 that you sent to Mr. Spear, a copy of anything for
14 the car accident; okay?
15   A   Um-hum.
16   Q   You mentioned that Dr. Jaffe has been your
17 doctor for quite some time, and that even after you
18 lost your federal medical insurance that you've been
19 giving him almost $30 for each visit; correct?
20   A   Correct.
21   Q   What medical insurance did you have while
22 you were at the National Archives, at least in 2004?
23   A   Federal Employees Blue Cross/Blue Shield.
24   Q   And while you had Blue Cross/Blue Shield

1 or whatever insurance you had in 2004 when you
2 visited Dr. Jaffe that year, how much would you pay
3 him while you had the insurance, per visit?
4   A   $20.
5   Q   That was your co-pay?
6   A   Co-pay.
7   Q   When did you learn that Dr. Jaffe would
8 require you to pay only $30 even without any kind of
9 insurance?
10   A   Someone in the office told me what it
11 would cost without the insurance.
12   Q   And they said that was special
13 arrangements made for you, or was this standard
14 procedure?
15   A   Standard procedure if you didn't have
16 insurance, this is what his office visits are, only
17 $30.
18   Q   And that is for a full office visit?
19   A   Yeah.
20   Q   And there has been nobody that has
21 financially contributed to your medical treatment by
22 Dr. Jaffe since you lost your federal insurance?
23   A   Correct.
24       MR. SULLIVAN:   I have no further

1 questions; you are certainly welcomed to ask
2 your sub questions.  If you had a lawyer, your
3 lawyer might choose to ask you some questions;
4 doesn't always happen, it is up to you.  You
5 can certainly do that, but before I turn it
6 over to you, though, is there anything that you
7 want to clarify in terms that you stated in
8 your deposition so far?
9       THE WITNESS:   I had made notes, but I left
10 them at home, so...
11       MR. SULLIVAN:   Is there anything that you
12 wanted to clarify; is there anything that you
13 think you stated incorrectly that you want to
14 change?
15       THE WITNESS:   No.
16       MR. SULLIVAN:   Do you want to ask yourself
17 some questions now, and I will turn it over to
18 you.
19       THE WITNESS:   No, I had some stuff that I
20 wanted to discuss, but --
21       MR. SULLIVAN:   Do you need a moment to
22 collect your thoughts?
23       THE WITNESS:   Yes.
24       (Whereupon, a brief recess was

1       taken.)
2       THE WITNESS:   No questions.
3       MR. SULLIVAN:   All right, we are on the
4 record, and you don't want to proceed and ask
5 any questions of yourself?
6       THE WITNESS:   No.
7       MR. SULLIVAN:   Thank you for coming.
8       (Whereupon, the deposition
9       concluded at approximately 2:14
10       p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

34 (Pages 262 to 265)

1      C E R T I F I C A T E

2

3      I, RENEE HELMAR, a Shorthand Reporter, and

4  Notary Public, certify that the foregoing is a true and

5  accurate transcript of the proceedings of DARRYL

6  MURRAY, who was first sworn by me at the time, place

7  and on the date herein before set forth.

8      I further certify that I am neither attorney,

9  nor counsel for, nor related to or employed by, any of

10  the parties to the action in which this deposition was

11  taken, and further that I am not a relative or employee

12  of any attorney or counsel employed in this action, nor

13  am I financially interested in this case.

14

15

16

17

18          Renee Helmar

19

20

21

22          Shorthand Reporter

23

24

39c7ea2a-0a03-47e0-ab80-2ad9bc1a0d21