Sprint PCS
www.sprintpcs.com

MRS BRENDA J. MURRAY (continued)
215-681-8524

## Voice Call Detail

| | Date | Time | Phone Number | Call Destination | Rate Type | Minutes Used | Airtime Charges | LD/Additional Charges | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 40 | 9/21 | 8:26 P M | 215-324-0853 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 41 | 9/21 | 10:30 P M | Incoming | | | 2.0 | included | 0.00 | 0.00 |
| 42 | 9/22 | 7:42 A M | 267-303-7320 | Phila, PA | | 2.0 | included | 0.00 | 0.00 |
| 43 | 9/22 | 8:20 A M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 44 | 9/22 | 8:25 A M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 45 | 9/22 | 8:28 A M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 46 | 9/22 | 9:38 A M | Incoming | | | 2.0 | included | 0.00 | 0.00 |
| 47 | 9/22 | 9:52 A M | 215-305-2040 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 48 | 9/22 | 9:54 A M | 215-305-2016 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 49 | 9/22 | 9:54 A M | 215-305-2020 | Phila, PA | | 2.0 | included | 0.00 | 0.00 |
| 50 | 9/22 | 9:56 A M | 215-305-2005 | Phila, PA | | 2.0 | included | 0.00 | 0.00 |
| 51 | 9/22 | 9:58 A M | 215-305-2040 | Phila, PA | | 2.0 | included | 0.00 | 0.00 |
| 52 | 9/22 | 10:55 A M | 215-681-8524 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 53 | 9/22 | 11:02 A M | 215-305-2020 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 54 | 9/22 | 11:29 A M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 55 | 9/22 | 11:25 A M | 215-927-5137 | Phila, PA | | 1.9 | included | 0.00 | 0.00 |
| 56 | 9/22 | 11:27 A M | Incoming | | | 3.0 | included | 0.00 | 0.00 |
| 57 | 9/22 | 11:30 A M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 58 | 9/22 | 11:30 A M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 59 | 9/22 | 11:40 A M | 267-688-8348 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 60 | 9/22 | 11:51 A M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 61 | 9/22 | 11:52 A M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 62 | 9/22 | 12:06 P M | 215-927-5137 | Phila, PA | | 3.0 | included | 0.00 | 0.00 |
| 63 | 9/22 | 12:09 P M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 64 | 9/22 | 12:38 P M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 65 | 9/22 | 12:52 P M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 66 | 9/22 | 12:56 P M | Incoming | | | 2.0 | included | 0.00 | 0.00 |
| 67 | 9/22 | 2:26 P M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 68 | 9/22 | 2:49 P M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 69 | 9/22 | 3:16 P M | Incoming | | | 2.0 | included | 0.00 | 0.00 |
| 70 | 9/22 | 3:25 P M | 267-303-7320 | Phila, PA | | 2.0 | included | 0.00 | 0.00 |
| 71 | 9/22 | 5:17 P M | Incoming | | | 3.0 | included | 0.00 | 0.00 |
| 72 | 9/22 | 5:52 P M | Incoming | | | 6.0 | included | 0.00 | 0.00 |
| 73 | 9/23 | 8:22 A M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 74 | 9/23 | 11:26 A M | 267-303-7320 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 75 | 9/23 | 3:31 P M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 76 | 9/23 | 8:22 P M | Incoming | | | 1.0 | included | 0.00 | 0.00 |
| 77 | 9/24 | 8:47 A M | 215-849-5495 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 78 | 9/24 | 9:02 A M | 215-548-1510 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 79 | 9/24 | 9:49 A M | 215-324-0853 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |
| 80 | 9/24 | 10:03 A M | 215-548-1510 | Phila, PA | | 1.0 | included | 0.00 | 0.00 |

*Handwritten annotations:*

→ Checking My Voicemail

11,08
Iphone
Vanessa
Adams
Front Desk
Receptionist
Warren
Hammond
(Skip)
That
I'll be
In The
Parking Lot
At 11.15

I make this phonecall
From Roosevelt Blvd &
Grant Ave

000122

EXHIBIT
Murray - 30
11.28.06



SENT VIA FEDEX , SIGNATURE REQUESTED, and FIRST CLASS MAIL

Mr. Darryl Murray
112 W. Champlost Avenue
Philadelphia, PA 19120

November 9, 2004

Dear Mr. Murray



unsigned copy

The notice of September 24, 2004, from John McEvoy, Director, Record Center Operations, Mid Atlantic Region, informed you of a proposal to remove you from your position of Archives Aid, GS-1421-3, and from the National Archives and Records Administration no earlier than 30 calendar days from your receipt of that notice for insubordination and making threatening remarks. Details supporting the proposal were stated in that notice.

Mr. James Cassedy, Representative with the American Federation of Government Employees Council 260 (AFGE 260) asked that you be given an extension of time in which to make a response. This was granted, and we informed Mr. Cassedy that he had until October 22, 2004 to respond.

Mr. Cassedy submitted a letter to me dated October 21, 2004 on your behalf.

You were charged with 2 serious offenses and I would like to address each separately.

## Charge of Insubordination

The charge of insubordination has its genesis in a letter which your first-line supervisor, Elizabeth Washington gave you on August 17, 2004. In that she letter she gave you an unambiguous order in which she directed you to immediately remove objectionable materials from your work area and to never display them or anything similar in any work areas at the National Archives in the future.

Specifically, she told you in the August 17, 2004 letter that she received a complaint from a coworker that you were exhibiting offensive posters and other written material at your work station.

These include an article entitled "The Governments Assault on the Black Family" and postings such as:

16

"Who are the real Terrorists? "Osama Totally Exonerated An Innocent Man."

"This center is a non-equal opportunity employer"

"Worthless losers nothing ass employees."

In his response, to the proposed removal, Mr. Cassedy said that your position is that these signs and postings were decorations reflective of your personal religious and political beliefs. The response said that you are "...a follower of the Nation of Islam, which believes that the Federal Government is raging war against the 'black family'." In addition, you believe that the movie Fahrenheit 9-11 supports the supposition that Osama Bin Laden is not guilty of heinous crimes of which he is accused." Ms. Cassedy says that if you believe that "NARA is not an equal opportunity employer," or that NARA treats its employees "as worthless losers," then it seems to you that you can decorate your personal workspace to reflect your beliefs, in accordance with NARA Interim Guidance 94-167.

NARA Interim Guidance 94-167 is entitled "Care of the Archives II Facility" and specifically referred to the opening of the new Archives building in College Park, Maryland in February, 1994. It has nothing to do with the Philadelphia Records Center. Most importantly, although an employee may decorate offices to reflect their personalities, it does not give the employee license to post materials with objectionable messages – particularly when the employee has been specifically ordered not to do so and disregards that order.

As stated in Mr. Cassedy's letter, you did remove the objectionable postings on August 17, 2004 after you received the letter from Ms. Washington. Mr. Cassedy's letter states that you believe that the reason you were asked to remove the postings on August 17, 2004 was because "...someone found them to be politically and religiously offensive."

As is clear from the record, you were not disciplined for these postings, because you did take them down on August 17, 2004 as ordered.

Rather the proposed removal is based in part on the charge of insubordination when you failed to follow the order of Ms. Washington of August 17, 2004 after you initially complied on August 17, 2004.  To reiterate, she told you on August 17, 2004:

> "You are ordered to immediately remove (no later than 2:30 p.m. today) all of these materials from your work area *and to never display them or anything similar in any work area at the National Archives. To be clear, you are to display no materials that make reference to race, religion, political views or that make disparaging remarks in any way at any location at the National Archives."* [italics added].

When we walked through the Record Center on September 16, 2004, John McEvoy and I found that you had again posted documents on your bulletin board and wrote disparaging

or political remarks on the documents or on tape around these documents. These included statements such as:

"It's Just a Matter of Time Now. Be Patient."

"Vote Nov. 11, 2004 Kerry "

"Beware of the Snitch Committee"

"Two-Legged Cockroaches"

American Government vs. American People (Human Race)

"Separate and Unequal"

"None Dare Call it Conspiracy"

"The Plot Thickens!"

In his response, Mr. Cassedy says that these postings were "...not expressive of your political views or religious beliefs, as were the postings which were taken down on August 17 2004. They were of a more personal nature."

Specifically, in his response, Mr. Cassedy says that the "Two legged cockroach" remark refers to a colleague and was "your attempt at humorous revenge." The letter says that you admit that this was not an appropriate way to handle a conflict. This remark is in fact a disparaging remark and is in defiance of Ms. Washington's order which said that you were not to post disparaging remarks.

Mr. Cassedy further states that the postings "None Dare Call it Conspiracy" "The Plot Thickens" and "Separate and unequal" were a "protest message" and your "non-violent protest of working conditions at the NARA facility."

You did not have the liberty of posting disparaging signs in the workplace under guise of "non-violent protest." particularly when you specifically were ordered not to do so.   If you believed that NARA was not treating you fairly, you had other avenues of redress rather than the path you choose to follow which was to defy an order given to you.

In addition, the "Vote Nov. 11, 2004 Kerry" posting was of a political nature and clearly failed to conform to Ms. Washington's order.

In summary, you failed to follow a lawful order when you exhibited disparaging and/or political postings at your work station, and this forms part of the basis for the proposed removal.

## Threatening a Security Guard

The other charge which forms the basis for this proposal to remove is the very serious charge of making threatening remarks. Specifically, on September 22, 2004 at approximately 11:10 AM, after being placed on administrative leave while the insubordination charge was being investigated, you drove to the Townsend Road facility and told the security guard, James Hughes, "I'm here to blow up the place. I'm here to see Skip." Further when Mr. Hughes told you to "watch what [you] say," you said "I'll bring my people up here and you know what that means." Later, you said "When I come back, 'I'm blowing the place up."

In his response, Mr. Cassedy says that your remarks were a joke. Specifically he says:

> "It seems fairly evident that Mr. Murray intended only to speak with his friend, Mr. Hammond (a.k.a "Skip"). Any reference to 'blow up the place' was at worse a bad, off hand, attempt at humor."

Further, Mr. Cassedy says that your remark "I'll bring my people up here and you know what that means" was not a serious threat but:

> "...probably humorous posturing. Mr. Murray, again, at worse, makes a bad, off hand attempt at humor," according to Mr. Cassedy.

Therefore, although Mr. Cassedy admits that you made the above statements, he claims that they were jokes and therefore presumably acceptable.

However, Mr. Cassedy says that you deny saying "When I come back, I'm blowing the place up."

Rather, he alleges that you said "somebody ought to blow this place up." He says that you made this remark -- not as a joke – but because you were "shocked, humiliated and angry" when you learned that you could not enter the building. Mr. Cassedy says this was "a statement that should not have been made."

Although with the exception of the latter remark, your comments to the security guard are characterized as jokes by Mr. Cassedy, NARA does not take these remarks lightly. NARA takes very seriously the matter of security and does not accept this defense. Specifically, NARA Interim Guidance 300-19 clearly states that comments made to security guards -- even if they were intended as a joke will not be tolerated.

Further, management at the Record Center have taken your comments very seriously as evidenced by the fact that we immediately contracted an extra guard for the facility and mandated that no one can stay at the facility beyond 4:30 p.m. These latter changes in security are still in effect.

Additionally, I do not find your statement that you did not say "When I come back, I'm blowing the place up" credible. The security guard heard you say this, and I have no

reason to doubt his credibility, whereas I have reason to doubt the credibility of your response. For example, Mr. Cassedy says that in a conversation of October 20, 2004, "Ms. Elizabeth Washington, the immediate supervisor of Mr. Murray, stated that she had never felt threatened by Mr. Murray." However, Ms. Washington reports that in an answer to a question from Mr. Cassedy as to whether she ever felt threatened by you, she stated "No, not until the bulletin board incident."

Another example of your lack credibility was your phone voice mail messages to both Elizabeth Washington and John McEvoy on Wednesday, September 22, 2004.

On September, 22 you left a message for John McEvoy at 9:58 AM, as instructed for remaining in a paid (administrative leave) status. During that call you stated:

> "Hey Johnnie, it's ah, this is ah, Darryl Murray calling, ah, the paper said to call you every Wednesday at 10 o'clock, ah, I'm having some problems with my passport trying to get a flight back, but you can call me, ah, on 215-681-8924. There might be a little disturbance on the plane but I still should be able to still get a signal. Talk to you later Mr. McEvoy."

During the call to Ms, Washington at 10:38 AM you specifically alluded to leaving Mr. McEvoy a message and stated that you had taken "a little flight overseas," but were experiencing some "passport problems," and that you "should be back in town by Friday" (presumably the 24th) once you got your passport issues resolved.

Yet you arrived at the Townsend Road facility less than an hour later at approximately 11:10 am

In conclusion, I find it that it is unacceptable to the agency that you should be in the workplace after the threats that you made.

As the deciding official, I have thoroughly reviewed all of the evidence of record which formed the basis for the proposal. I have also considered the October 21, 2004 letter that Mr. Cassedy submitted on your behalf.

After careful consideration, it is my finding that the charges are supported by the preponderance of evidence and are sustained. Having sustained the charges as proposed, it is my conclusion that you should be removed from your position and the National Archives and Records Administration, November 16, 2004.

In making my decision, I have considered the Douglas factors as follows:

1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.

As stated above, there were two offenses: insubordination and threatening a security guard. Both of these charges are very serious.

I will address the insubordination charge first.

Insubordination in itself is sufficient cause to justify discharge from federal service on a first offense - even for an exemplary employee, which you are not.

Management directives are to be followed. It is clear from Mr. Cassedy's response that your posting the objectionable material was intentional and not inadvertent because you believed that it was justified as a form of protest.

Moreover, the August 17, 2004 incident was not the first time that you were involved with posting unacceptable material.

In October, 2001, I discovered a box of Social Security Administration (SSA) files in the mailroom, ready for shipping to SSA which contained graffiti written in red magic marker. I reported this to John McGee, who was your supervisor at the time. A short time later, I was contacted by the SSA in Wilkes Barre, Pa and informed that in one of NARA's daily shipments to the SSA were two boxes that contained similar writings. Written in red magic marker was:

> 10-15-101
> The Great Mutah
> Allah
> Akbar
>
> 10-15-01
> Homo-Sapiens –
>  Sapiens
> Thinking Man?

The SSA official believed that in light of the September 11, 2001 terrorist attacks, that this incident needed to be reported to the authorities. The Federal Protection Service (FPS) were then involved and sent photographs of the boxes to the agency. After reviewing the photographs and reflecting on your past history, it was suspected that you were responsible for the markings on these boxes. You were showed the photographs of the boxes and you admitted that you were responsible. You wrote a memo to John McGee, in which you said in part:

> "I would like to apologize to my co-workers, management a: ROI000294
> Social Security Personnel for alarming them with Slogans or

Perceived Offensive material. The boxes marked with so-called
graffiti were intended for personal use and Trash. I was just
exercising my Brain Cells."

In 1996, you received a proposal to suspend you for 14 days for
insubordination. The charges which formed the basis for that suspension
were similar to the current charges. The agency received a complaint
from the Director of Personnel, Veterans Administration Regional Office
(VARO) that you had left photocopies and highlighted pages of The Final
Call, a Nation of Islam publication, in the VARO break room. You had in
that instance also been counseled that you were not to display information
regarding political beliefs anywhere in the workplace.

In April 1996, you signed a Memorandum of Agreement with the Agency
in which you agreed that you would not post or distribute any
objectionable material in the workplace. In return, the agency agreed to
cancel its decision to effect the 14-day suspension.

Therefore, it is clear that this latest incident was not inadvertent. You
unfortunately have a history of this type of misconduct as evidence by the
SSA incidents in 2001 and the 1996 incident.

Regarding the threat charge, as stated in Interim Guidance 300-19 threats
directed to NARA security guards – even if intended as a joke as is alleged
by Mr. Cassedy - cannot be tolerated. Therefore, frequency of the
misconduct is not at issue here. Even one instance of a threat is grounds
for removal on a first offense.

2) The employee's job level and type of employment, including supervisory or
fiduciary role, contacts with the public and prominence of the position.

You are employed as an Archives Aid, GS-1421-3. The position does not
normally have public contact and is not a prominent one nor is it
supervisory or fiduciary in nature.

3) The employee's past disciplinary record:

You were suspended for three days in August 2003 for neglect of duty and
inaccurately reporting completed work and carelessness.

In July, 1997, you were suspended for 14 days for falsification of your
daily work log and neglect of duty.

4) The effect of the offense upon the employee's ability to perform at a satisfactory
level and its effect upon supervisors' confidence in the employee's ability to perform
assigned duties:

As a result of these two very serious charges, the agency has no confidence in your ability to perform your regularly assigned duties.

5) Consistency of the penalty with those imposed upon other employees for the same or similar offenses:

> NARA has removed employees who were charged with insubordination or made threatening remarks to a security guard as a first offense.   You are the first employee who has been charged with both offenses.

6) Consistency of the penalty with any applicable agency table of penalties:

> The penalty of removal for these two serious offenses fall within the parameters of NARA's disciplinary regulations (Personnel 300, Chapter 752).

7) The notoriety of the offense or its impact upon the reputation of the agency;

> The agency was fortunate that there was no public notoriety, although there was the potential of notoriety if there had been loss of life, injury, or destruction of irreplaceable documents had you followed through with your threats to the security guard.

8) The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.

> You were put on clear notice by the letter of August 17, 2004 from Elizabeth Washington that if you failed to follow the order that you were not to display political or disparaging materials in the workplace that you would be charged with insubordination and that this will form the basis for removal from the federal service.

> All employees have access to NARA notices – including Interim Guidance 300-19, Violence in the Workplace.   The notices are posted on an employee bulletin board when issued.

9) Potential for rehabilitation:

> As the above shows, you have a history of difficult behavior, particularly as it relates to posting material in the workplace which expresses your political and/or offensive views.   I find that you lack the potential for rehabilitation for this reason.

10) Mitigation circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment harassment, or bad faith, malice or

provocation on the parts of others involved in the matter:

> I do not find these to be mitigating circumstances.

11) The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others:

> I do not believe that a lesser penalty is sufficient given the serious nature of your offenses and your unwillingness to take responsibility for them or efforts to make light of them.

12) The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability:

> In making my determination I have considered your 12 years of federal service. However, your serious misconduct substantially outweighs any mitigation as it relates to your length of service. In addition, your performance has not always been satisfactory. In 1998 and 2003, you were denied a Within Grade Increase (WGI) because of Minimally Satisfactory performance.

You have the right to file an appeal with the Merit Systems Protection Board (MSPB), Northeastern Regional Office, Room 501, Second and Chestnut Streets, Philadelphia, PA 19106-2987. Facsimile No. 215-597-3456. Your appeal must be filed during the period beginning with the day after the effective date of this action and ending on the 30th day after the effective date. If you do not submit an appeal within the time set by statute, regulation or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown. A copy of the appeal form and the Board's regulations are enclosed.

If you appeal, you may be represented by an attorney or other representative of your choosing. You may contact Joan Janshego, NARA Human Resources Services Division on 301-837-1844, if you desire additional information on how to pursue an appeal. You may, as an alternative to filing an appeal with the MSPB, choose to use the negotiated grievance procedure by submitting a grievance in accordance with the NARA/AFGE Labor-Management Agreement. You cannot choose to challenge this action through both procedures because the election of one procedure will preclude proceeding in the other.

If you wish to allege discrimination because of your removal, you may address that issue in any appeal to the MSPB, or you may file a discrimination complaint with NARA's Office of Equal Employment Opportunity (EEO), but you may not do both. If you wish to file a complaint with NARA alleging discrimination because of race, color, religion, sex, national origin, handicap, or age, you must first contact an EEO counselor. You must contact a counselor within 45 calendar days of the effective date of your removal if you choose to follow the discrimination complaint procedure.

In summary, if you elect to challenge this removal, you must choose between (1) an appeal to the MSPB,   (2) the negotiated grievance procedure or (3) a discrimination complaint through NARA.   Whichever type of action is filed first shall be considered an election to proceed in that forum.

Sincerely,


DAVID ROLAND
Assistant Regional Administrator
Mid Atlantic Region)


Attachments:
MSPB regulations and appeal form; extra copy of decision letter MARKED FOR UNION

Memo

To: Shawn Walker  EEOC
National Archives
8601 Adelphi Road
College Park, MD 20740-6001

From: Darryl Murray

Date: Nov. 15, 2004

Subject: Tape recorded message I
left on Mr. John McEvoy
answering machine

I just want the opportunity to
clear some things up. I might have
to expose some of my personal business
in doing so.

Since my divorce 11 years ago, I
have been dating a lot of Hispanic
and Middle Eastern women. My
lady friends have been nagging me for
quite sometime traveling to their
homeland in Puerto Rico, Dominican
Republic, Jordan, and Syria.

I don't have any intentions on going
to any of those places, but I can't
tell my lady friends that.

I wanted one of friends to hear
me discussing passport problem
on the phone when she discovered
I was going to be off from work
for a while.

000129

EXHIBIT
MURRAY - 22
11-28-06   KM

Page 2 of 2

You can tell from the verbatim transcript that it sounds like I'm half asleep, on drugs, or making up the story as I was going along.

My girlfriend woke me up to make my designated 10:00 am call into Mr. John McEvoy to continue receiving my pay check.

I don't remember exactly what I said on the message, but I know I did not threaten anyone. I also had no intentions on visiting NARA that day.

I wasn't planning on running to NARA blowing the place up and then running to the airport to make my escape. This is somebody elses synthesis of events.

I believe Mr Dave Roland and Mr John McEvoy are terrified of muslims or hate them because of the 911 event of 2001 and are taking it out on me.

They don't want to see me or talk to me after knowing me four years of polite, courteous, and friendly relations between us.

Mr. Warren Hammond (Skip) did not call me on the morning in question. I called the job to confirm that he was there. Only after listening to his voicemail 3 or 4 days prior to Sept 22, 2004, 11:10 am I was uninformed about my restriction on government property after 17 years

000130

MURRAY-23
1-28-06

1

Memo

Response: NARA's Final Decision
Case No. 0502PA
Allen Weinstein  Deciding Official

Sec III.  Statement of Facts

A. In 1987 I was appointed to a position as a GS-1421-03 Archives Aid. I remained at this entry level status for a period of 17 years as a result of the racist discriminatory practices of Director David. S. Weber, Mr. Weber was ultimately removed from his position for his practices.

B. On March 23, 1995 I was accused of posting and distributing materials containing racial, political, and religious statements. The only evidence NARA furnished to support their allegations was an article from an Islamic newspaper discussing slavery and the lynching of African Americans. Nothing was ever distributed or posted anywhere at NARA facility. I have no knowledge of any racial, religious, or political materials.

c. In 1996 NARA received a complaint from the Veterans Administration that I had displayed and distributed religious information in their breakroom.

Once again no evidence was provided to support their claim. I do recall a Caucasian gentlemen approaching me in the Veterans Administration's breakroom and standing over me while I was reading and article left their for me by a friend entitled, "Willie Lynch and the Million Man March."

The gentlemen asked me if he could have a copy of the article. I told him him he could have mine when I finished reading it. I gave him the article and he walked away. I never saw him again.

I received a counseling letter in March 1995. Several months later NARA relocated to a new facility and the hostile Director David S. Weber proposed a 14-day suspension for insubordination for letter dated Mar. 1995. The Asst. Director Dan Bennett and I were able to convince Mr. Weber of my innocence and he dropped his proposal to suspend.

2

The complainant from the old facility stated in his letter, to David S. Weber dated 2-16-96, that, except for the one time in 1995 he never observed me leaving any materials in the smoke room.

Mr. Weber's proposal to suspend were motivated by personal reasons. He and I had been at odds since 1989 over his racial discriminatory practices.

This is the real reason I was barred from ever receiving a promotion from Archives Aid to Archives Tech GS-4 after 17yrs of service

I believe NARA's, that I am racist and anti-Catholic are charges baseless. I believe the United States constitution guarantees all Americans the right of freedom of expression. I have an excellent working relationship with the Catholic employees at NARA.

NARA is using racial and religious offensiveness as an excuse to punish me for exposing their racist actions and policies. Their grudge against me is more personal than professional.

3

D.     The 14-day suspension in July 1997 was masterminded by Director David S. Weber because he thought I had violated are agreement not to bring religious material into the workplace. A female friend and co-worker had borrowed on religious doctrines from my library at home. I didn't know she was carrying the book around in her pocketbook to read on her lunchbreak.

Mr. Weber asked me to do a special assignment for him with no time limitation. The next day he accused me of lying about the time I spent performing the assignment. He told the new director who was replacing him that I falsified my daily work log. He told me that he would take draconian measures to punish me if I violated our agreement.

This was an unfortunate misunderstanding I believe a 14-day suspension for a 1st offense charge of falsifying a daily work log was a violation of NARA's disciplinary guide.

Notice the 14-days matches exactly the length of the original proposal for the false charge of insubordination. This was the first draconian attack on my job.

4

Over the course of 14 years I began to see that false charges of misconduct against free-spirited employees. Freedom of any kind was not tolerated by the status quo clique or management. They believe that the lower grade employees are robot drones to be exploited and oppressed similar to the biblical Israelites under Pharoah.

E.    In Nov. 2001 I had two boxes on my utility cart containing personal items and work supplies. The boxes were marked with Arabic inscriptions to identify them as personal property. Management considered this to be offensive to Catholics and Christians.

I explained the situation and was let off with a minor warning letter because the boxes had found their way into our mailroom. I believe the boxes were used harmlessly by a coworker or new temporary employee. Management accepted this explanation The inscriptions had been perceived as offensive by the Social Security Administration because one and only one box had the muslim word for god-Allah inscribed on it. Quite understandable after 9/11.

5.

I believe the aspiring director John McEvoy wanted to exterminate the Islamic threat from the workplace as early as Nov. 2001. I sensed nothing but hostility and negative energy whenever I was in his presence.

The incident was investigated by the Federal Protective Services and dismissed without further incidents.

These incidents would later be used by Director John McEvoy in Aug 16, 2004 to justify his proposal to remove me from Federal Service.

F.   In Aug 2003 John McEvoy proposed a 3-day suspension for me an inaccurate count of completed work.

The hostile status quo clique Kingpin Mitchell Buffone claimed he found 7 pieces of my unfinished work assignment on another employee's cart. Mr. Buffone is an expert at smear campaigns. We had a falling out over his disloyal nature. He was infuriated and offended by my

6.

exposing his betrayal of our working relationship. I informed the entire Staff of his secret that he was a two-legged rat.

I spoke in parables calling him a worthless no good lazy bum, and a six time loser with the ladies. He is a 47yr old special education employee with no wife, girlfriend, or children. He hasn't touched a woman in over 10 years according to his own testimony.

Mr Buffone retaliated with a Secret campaign of harassment by vandalizing my desk and personal property for over a year.

I believe he later conspired with John McEvoy to acquire a disciplinary action against me for simple acts of misconduct; Mr. Buffone furnished John McEvoy with the 7 pieces of uncompleted work giving McEvoy a reason to propose his 3-day suspension.

Vernell Tate another status quo clique employee supplied Mr. McEvoy with another piece of fabricated evidence a month earlier. A fact she later admitted to in front of a witness.

7.

C.    On Aug 17, 2004 John McEvoy wrote a warning letter after he received a complaint from Mr. Mitchell Buffore that I was displaying offensive comments about him that created a hostile work environment for him.

Mr. McEvoy had my supervisor sign the letter and present it to me. The letter stated that a coworker, the security guard and management were all offended by something unnamed displayed in my cubby area.

This may be the basis for the security guard James Hughes false report that I threatened to blow up the building on Sept. 22, 2004.

Mr. McEvoy ordered me to remove all materials that made a reference to race, religion, or political views. I complied even though none of the three supervisors or staff could find anything offensive.

Futhermore, there were no disparaging remarks mentioning anyone posted on my cubby. This was harassment, plain and simple.

8

On Sept. 16, 2004 I was placed on administrative leave for 30-days even though no specific reason was given, a violation of NARA's disciplinary guide.

I did not know that management feared for their life around me. My supervisor was completely in the dark.

A secret conspiracy was underway to remove me from federal service.

On Sept 22, 2004 I was in the vicinity of NARA around lunch time, and I stopped by to see inquiring coworkers concerned about my whereabouts. I had a female companion and her 3yr old son as passengers and only expected to be there a hot minute.

While waiting in the parking lot for my team partner Warren "Skip" Hammond to exit the building, my friend/associate security guard James Hughes, informed me that management requested that I leave the premises. Shocked and humiliated I confided in James that I thought, "SOMEBODY OUGHT TO BLOW THAT PLACE UP."

I was referring to the harassment, exploitation and oppression suffered by the poor ignorant employees at the hands of management. I was not threatening James, management or the building literally.

I told James I was leaving to avoid his involvement in any confusion. This can be confirmed by coworker and eyewitness Ms. Irene Jones. I do not know what motivated to exaggerate his story about a threatening remark. He may have been coached along by John McEvoy. Mr. McEvoy tried to coach Ms Jones into lying, even threatening her with termination.

This tells me that John McEvoy was actively seeking my termination and was not interested in anything that had to do with my innocence. As far as management knows James Hughes and I could have had a knock down drag out fight over the previous weekend. James could have an axe to grind with me over a woman he might be interested in at NFARA.

The mystery of James Hughes fantastic story may never be known

10

Allen Weinstein, Archivist of the United States based his final decision to remove me from my employment with NARA on unsubstantiated allegations of misconduct and misdemeanor charges from a documented racist director, David S. Weber

A draconian methodology used by officials and long term employees involves the accumulation of minor offenses used to control employees and weaken their will to resist domination.

Suspensions are a powerful tool used to punish and control illiterate employees who live hand to mouth yearly.

H.   On Nov 9, 2004 Asst. Regional Administrator David Roland informed me by letter that he was removing me from federal service due to the preponderance of evidence against me.

I suppose he was referring to John McBroy photos of my desk, two previous suspensions, and security guard James Hughes affadarit.

In this country a man is innocent until proven guilty by a jury of his peers not his

11.

enemies or hostile slanderers. My 1st line
supervisors have never participated or
supported the disciplinary actions taken
against me by directors John McEvoy and
David S. Weber.

Allen Weinstein, Archivist of the United
States failed to mention one piece of evidence
collected by the EEOC supporting my innocence.

After a careful consideration of the facts
in this case, I believe I was the victim of
racial and religious harassment motivated
by ignorance, hatred, envy, and discriminatory
policies of individuals who have abused
their power and authority.

The belief that I am white therefore I am
right is an institutional policy at NARA.

12.

Sec V.   Discussion and Analysis

Allen Weinstein concurs that I provided a substantial amount of testimony (via affadavits) for EEOC's report of investigation.

My affadants may not provide conclusive evidence of a prima facie case of discrimination, but they do provide evidence of harassment based hatred from the officials at the NARA.

Directors John McElroy and David S. Weber have never provided any evidence of racial, religious, or politically disparaging remark made by me.

Their charges of insubordination are based on their fear and lack of understanding of my thoughts committed to paper-

They choose to condemn me rather than confront me. Management should never fear employees and employees should never fear management.

13

Mr. Weinstein claims that my comments are inconsistent with or contradict sworn testimony and other evidence contained in the report of investigation. Mr. Weinstein fails to cite a single instance of this.

The affadants of Irene Jones, Vanessa Adams, Warren "Skip" Hammond, and supervisor Elizabeth Washington refute the allegations of David Poland, John McEvoy and security guard James Hughes.

Mr. Weinstein believes that I have a history of behavior problems that outweighs the affidavits of those individuals that know me the best. Mr. Weinstein agrees with the racially polarized directors at NARA that in my 17 years of service that I failed to accumulate one ounce of credibility.

I suppose my letters of recommendations and cash awards from my immediate supervisors including their positive comments made on my annual appraisals are worthless in the eyes of NARA's officials.

14.

NARAs belief in Security guard James Hughs credibility is based on their fear of me rather than sound reason or judgement.

I have no history of violence, no motive to threaten NARA, or an innocent harmless security guard who has always been cordial and respectful towards me.

Apparently management and the security guard James had some fears about my potential for violence after being placed on administrative leave. A simple investigation into an instance of misconduct not specified is no reason to threaten to kill people by blowing up a building

NARA has a history of provoking me to reprisal with false charges of simple misconduct.

I knew from John McEvoy's letter of Sept 16, 2004 that he had no evidence against me of any misconduct. NARA is required to be very specific in their allegations and to interview all parties involved in an incident.

My knowledge, skills, and abilities were sufficient to refute and embarrass John McEvoy's draconian assault on my career.

15.

Mr. James Hughes false testimony that, I said, "I am here to blow up the place.", and "When I come back, I'm blowing up the place," are incredible

If I was there to "blow up the place", why would I need other people or need to return. Upon my return I would surely have been shot and killed or arrested and in sent to prison-

I dont-know how James Hughes, a bible carrying Christian can sit in church and sleep at night knowing his lies have ruined my life. His lies have done what management was unable to do with their lies against my character and reputation,

Mr. Weinstein admits the most damaging incident attributed to me is Mr. Hughes allegations. Mr. Hughes has robbed me of the opportunity to challenge religious harassment in the Federal workplace,

Mr. James Hughes is the real defindant in my civil case against N.A.R.A.

EXHIBIT

MURRAY 24

11-28-4   X 17

1 - 2

Memo

To:   Honorable Judge Norma L. Shapiro
United States District Court
10614 U.S. Courthouse
601 Market Street
Philadelphia, PA. 19106-1765

From:  Darryl Murray

Date    Mar 30, 2006

Subject    Murray vs Weinstein et al.
Civil Action No 05-4557-

Please note that the National Archives and
Records Administration failed to identify a
single offensive item displayed on my desk
when interviewed by the EEOC at my request

I believe the charge of insubordination
will be found to constitute nothing but
harassment motivated by a fear and hatred
of Muslims and the Islamic religion

I further believe that the charge of
making a threatening remark will be found
questionable if not incredible due to

eyewitness testimony as well as the fact that my former associate/friend security guard James Hughes failed to notify the official in charge Assistant Director Dan Bedesim of the Federal Protective Service at the time of the incident; Mr. James Hughes opted to wait several hours for Director John McEvoy to arrive at the workplace.

Mr. John McEvoy approached the security guard after learning that I visited the building that day, asking him why I was there. Mr. James Hughes then alleged that I threatened to blow up the place and return to the facility.

I only commented to my friend of 2½ years, in confidence, that somebody ought to nuke the place for their mistreatment and exploitation of the African American employees.

I never threatened to do any such thing and cannot understand why he would misquote me and betray my confidence knowing that I needed my job to support my family. I can only speculate as to him motives.

Memo                                    Apr 3, 2006

To:    Honorable Judge Norma L. Shapiro
       Senior Judge, U.S. District Court
       10614 United States Courthouse
       601 Market Street
       Philadelphia, PA. 19106-1765

From:  Plaintiff Danyl Murray

Re:    Murray vs Weinstein et al
       Civil Action No. 05 cv-4557

EXHIBIT

MURRAY-25
11-28-06 KH

There is no documentary evidence to support the allegation that I repeatedly ignored instructions by NAIPA officials to cease posting in the workplace posters, signs, flyers, newspaper clippings, and other materials containing racial, political and religious statements that were offensive.

A former employee Ms Gloria Gruzas was given a letter dated Mar 23, 1995. This letter was prepared by Human Resources and former Director David S Weber. Poor Ms Gruzas was forced to sign this letter and retaliated by transferring back to NAIPA in St Louis where she originally worked to avoid coercive misconduct by David S Weber.

Poor Ms Gruzas never even presented me with this letter, I respect her for that.

Former Asst Director Daniel Bennett was given the assignment to present the letter to me. Mr Bennett was a good friend of mine; I don't remember if I ever signed a receipt that I received. The allegations in the letter are false. I left one Islamic Newspaper article on a desk in another agency's breakroom after eating lunch.

On April 12, 1996 Mr. David's with and I made an agreement that I would no longer place any more Islamic newspaper articles in the workplace to keep the Catholics off my personal business.

Mr. Sullivan's assertion that I continue to post offensive items to Catholics on Aug 17, 2004 when I was ordered yet again, 9 years later -- this time by my new supervisor Ms. Elizabeth Washington, is untrue.

This time Director John McEvoy had Human Resources prepare a letter for him and a Catholic coworker I was feuding with. Mr. McEvoy had Ms. Washington sign the letter and present to me. I have always had an excellent relationship with everyone of my immediate supervisors who have been Catholic and Jewish. My annual appraisals and cash awards testify to this fact.

In Ms. Washington's affidavit to EEOC she stated that she knew nothing about the letter. She signed or any complaints coming thru the chain of command.

My beloved supervisor Ms Washington previously notified Director Schulte Essig that the Catholic complainant an IT-1 had developed a bad relationship (She called it a personality conflict), and were on bad terms.

The complainant notified Mr McEvoy, another Catholic that he was offended that I would claim Osama bin Laden was a patsy and framed for the 9/11 attack.

The complainant and Mr McEvoy then secretly and maliciously conspired to deprive me off my livelihood!

My placement on administrative leave and being ejected from the facility's parking lot after responding to my coworkers concern for my welfare.

This caused me to make the inappropriate comment to my former friend of 9½ years security guard James Hughes that I would immediately leave the premises to prevent further confusion.

Page 6, cont

I requested several meetings with
NARA officials to explain and apologize
for the inappropriate comments to security
personnel regardless of my personal
relationship with Mr. James Hughes.

Fear and hatred of Muslims and Islam
is no justification for destroying a 17yr
federal employee's life under these
circumstances.

NARA officials violation of agency policy,
my constitutional rights, and National
agreement to allow me to make an oral response
when facing termination has affected the
morale in the workplace. NARA is no longer
believed to be an Equal Opportunity Employer
in the Federal government.

Giving me the death penalty with the
extenuating circumstances involved with this
case after 17 years of dedicated service
evidenced by 17 annual appraisals and cash
awards for my contribution to the efficiency
of the service is a crime of unjust bigotry.
Until "Protected Classes" are better represented
in the federal workplace at NARA, the court
system and the US Attorney must help us.



*National Archives and Records Administration*

MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-1025
www.archives.gov

September 24, 2004

<u>SENT VIA FEDERAL EXPRESS AND FIRST CLASS MAIL</u>

Mr. Darryl Murray
112 W. Champlost Avenue
Philadelphia, PA 19120

Dear Mr. Murray:

This is notice that, to promote the efficiency of the Service, I propose to remove you
from your position of Archives Aid, GS-1421-3, and the National Archives & Records
Administration no earlier than 30 calendar days from your receipt of this letter for the
reasons stated below.

INSTANCE OF MISCONDUCT:  Insubordination

> On August 17, 2004, I had a complaint from a coworker that you were
> exhibiting offensive posters and other written material at your work station.
> These include an article entitled "The Governments Assault on the Black
> Family" and postings such as :

>> "Who are the real Terrorists? "Osama Totally Exonerated An Innocent
>> Man."

>> "This center is a non-equal opportunity employer"

>> "Worthless losers nothing ass employees."

> I informed your first-line supervisor, Elizabeth Washington, about this
> unacceptable situation. She issued you a letter on August 17, 2004, which put
> you on notice that these materials create a hostile work environment and will not
> be tolerated. The letter of August 17, 2004 specifically said:

>> "This is not the first time that you have engaged in this type of
>> behavior. In the past, you have been counseled about scrawling
>> offensive graffiti on a box that was delivered to the Social Security
>> Administration who called the Federal Protective Service to conduct an

**EXHIBIT**

Murray - 26
11-28-06  RTT

ROI 000273

OFFICE OF REGIONAL REC.

14

investigation.

You are ordered to immediately remove (no later than 2:30 pm today) all of these materials from your work area and *to never display them or anything similar in any work area at the National Archives. To be clear, you are to display no materials that make reference to race religion, political views or that make disparaging remarks in any way  at any location at the National Archives.* [emphasis added].

*If you fail to follow this order, you will be charged with insubordination, which will form the basis for removal from the federal service.* [emphasis added].

You complied with the order to remove the offensive material on August 17, 2004.

However, on a walk-through of the Record Center on September 16, 2004, I passed your work station and found that you had again posted various documents on your bulletin board and wrote unacceptable remarks on the documents or on tape around these documents.  These included statements such as :

"It's Just a Matter of Time Now.  Be Patient."

"Vote Nov. 11, 2004 Kerry "

"Beware of the Snitch Committee"

"Two-Legged Cockroaches"

American Government vs. American People (Human Race)

"Separate and Unequal"

"None Dare Call it Conspiracy"

"The Plot Thickens!"

ROI000274

You failed to comply with the order of Ms. Washington of August 17, 2004 in which you were told that "you are to display no materials that make reference to race, religion, political views or that make disparaging remarks in any way at any location at the National Archives." You were clearly told in the letter that if you failed to follow this order, you would be charged with insubordination, which would form the basis for removal.

You are charged with insubordination on September 16, 2004 for failure to follow this order.

## INSTANCE OF MISCONDUCT: Making Threatening Remarks

By letter of September 16, 2004, you were informed that management was consulting with Human Resources Services Division concerning misconduct on your part and that you would be on administrative leave until further notice.

On September 22, 2004, you came to the Record Center and attempted to enter the facility. The Security Guard, James Hughes, was aware that you were not permitted in the building and asked you why you were there. You stated, "I'm here to blow up the place. I'm here to see Skip."

Mr. Hughes told you to "watch what [you] say." You then said, "I'll bring my people up here and you know what that means." Mr. Hughes went to Dan Bedesem, Supervisor Archives Specialist, to get confirmation that you were not permitted to be on the property. When he got confirmation from Mr. Bedesem, he informed you that you must leave, and you did so. However, before going you said "When I come back, "I'm blowing the place up"

Your threatening remarks were so disturbing that management called the Federal Protective Service, put on an extra guard at the facility and mandated that no one can stay at the facility beyond 4:30 p.m.

NARA Interim Guidance 300-19 clearly states that NARA will not tolerate violence in the workplace, including threats. The guidance further specifically states that "NARA does not tolerate comments concerning weapons or bombs or other threats directed to NARA security guards – even if the comment was intended as a joke" and that employees who make such remarks are subject to disciplinary action, criminal penalties, or both.

You are charged with making threatening remarks on September 22, 2004.

The above described instances of misconduct will not be tolerated because they adversely affects the efficiency of the Federal service.

Moreover, this is not your first instance of misconduct. You were suspended for three days in August 2003 for neglect of duty and inaccurately reporting completed work and carelessness.

Within 15 calendar days of your receipt of this notice, you may reply in writing, in person or both to David Roland, Assistant Regional Administrator, National Archives and Records Administration, Mid Atlantic Region Northeast (Philadelphia), 14700 Townsend Road, Philadelphia, PA 19154 (telephone 215-305-2003) setting forth any pertinent facts or extenuating circumstances or other information you desire to submit. You may also submit affidavits in support of your reply and may be represented by an attorney or other representative. In addition, you may designate a Union representative in this matter.

The documents on file supporting this proposal will be sent to you under separate cover by NARA's Human Resources Services Division.

If you do not understand your rights concerning this proposed removal, you may contact Joan Janshego, NARA Human Resources Services Division on 301-837-1844.

Your reply will be given full consideration before a final decision is made.

You will remain in paid status until further notice. You should call me every Wednesday at 10:00 am in order to remain in paid status.

Sincerely,

JOHN McEVOY
Director, Record Center Operations
Mid Atlantic Region

```
*********************************
                                    *
DARRYL MURRAY                       *
        Complainant,                *
                                    *
                                    *
vs.                                 *      NARA #0502
                                    *
NATIONAL ARCHIVES AND               *
RECORDS ADMINISTRATION,             *
        Defendant                   *
                                    *
*********************************
```

## AFFIDAVIT OF ELIZABETH WASHINGTON

Q:    Are you aware that the accepted issue for the above EEO complaint is:  Termination of

      Mr. Murray's employment on the bases of race (African American) and religion (Islam)?

A:    Yes.

Q:    For the record, what are your race and religion?

A:    I am an African American, and am Pentecostal.

Q:    What is your current position, and how long have you been in that position?

A:    I am the Supervisor of Customer Service, a GS-9 position.  We handle work relating to

      bankruptcy files.  There are 4 sections that report to me.  We are part of the Mid-Atlantic

      Region's Record Center Program Facility at the National Archives and Records

      Administration.  I work in Philadelphia, Pennsylvania.  I have worked for National

      Archives for about 7 years.

Q:    Who is your current supervisor, and how long have you worked for him?

A:    I have worked for Daniel Bedesem ever since he started working here last year.

Q:    Who is your second level supervisor, and how long have you worked for him or her?

A:    That is John McEvoy, the head of Operations.  I have worked for him for about the past 2



years.

Q:    Please describe briefly your assignments as they relate to this investigation.

A:    We provide overall customer service. Mr. Murray worked in the Trust Fund area, one of my sections. There is a Trust Fund room in which Mr. Murray would pull out case files and give them to employees in TECRS room. He would put things back after the requester of the file was finished with it. We either mail, fax, or give files to walk-in customers upon request. People pay for this service.

Q:    How would you describe your working relationship with Mr. Murray?

A:    We did not have any problems.

Q:    Where is your office in relationship to Mr. Murray's work area?

A:    I work right across the hall from where he worked.

Q:    What knowledge do you have about the statements that Mr. Murray had posted in his work area on September 16, 2004?

A:    He posted things in his cubby area. I did not know too much about this until he was told that he was going to go out on administrative leave. I had given him a notice previously that he needed to clean out things that he had there. Mr. McEvoy gave me both notices and told me to give them to Mr. Murray. I want to note that he did clean out his cubby the first time, but then a short time later, he put more things up. I was told that someone had complained about the things that he had posted.

When I gave him the September 16, 2004 notice, he did not appear to be surprised. He just said OK, and did not appear to be hostile. He turned in his badge and cleaned out his locker, and then left the facility. I am not aware that he tried to gain entrance to the facility again until September 22, 2004.

2

Q:    What do you recall about the previous situation that led to your giving Mr. Murray a notice on August 17, 2004 that he needed to remove some materials from his work area because they created a "hostile work environment" for one of his coworkers?

A:    I am not sure why the notice was given. I am not aware of who the employee was who might have complained. Mr. McEvoy gave me the notice and told me to give it to Mr. Murray.

Q:    Are you aware of any difficulties in the relationship between Mr. Murray and his coworker, Hong Diep?

A:    Mr. Diep does not work in our section. He works in the General Records section. He and Mr. Murray may have worked in the same areas in the stacks on occasion. However, it usually only takes about 15 minutes to pull a file from the stacks, so they would not have too much time to interact. I was not informed if there were problems between Mr. Diep and Mr. Murray.

Q:    Mr. Murray described various situations in his workplace that he believes represented harassment of him by his coworkers, although he could not say specifically the source of any of the problems he noted. Did you observe any situations in which Mr. Murray was being subjected to improper treatment by his coworkers?

A:    I do not recall hearing about things like this, except that Mr. Murray once told me that he thought that people did not like him. I just told him that he should do his work and then leave at the end of the day and forget about work.

I did not hear anything about his car being scratched or pasta being put on it. I do not recall him telling me about trash being placed on his desk.

There was a time when he complained to me that he thought that he was not being

3

treated fairly with regard to being able to work overtime. I indicated to him that if he had a problem relating to working overtime, he should talk to Mr. McEvoy.

Q:     Have you observed anything similar to the statements Mr. Murray put up in his work area in another employee's work area?

A:     I have not observed anyone else in my sections doing similar things.

Q:     Have you ever been afraid of Mr. Murray for any reason?

A:     No.

Q:     Have you observed religious symbols of other faiths posted in the work areas of Mr. Murray's coworkers?

A:     I have a Bible in my office. I have not observed anything other than the normal decorations that people sometimes put up around Christmas.

Q:     Is there a policy relating to what employees can post in their offices or on the walls?

A:     No.

Q:     Have you ever observed any of Mr. Murray's coworkers making negative statements about the Muslim/Nation of Islam faith?

A:     There was one time when he had some Muslim-type preaching on rather loud, and I had to ask him to get headphones because it was too loud. I told him that the noise was very distracting, and he needed to either turn it off or get some headphones so others would not hear it.

I did not complain to Mr. Murray because of the subject matter, but because of it being too loud and distracting. I have also had similar situations with employees playing music loudly, and again, asked the employee to either turn it off or wear headphones in each case. The music I objected to was rap music.

4

Q:   What is your reaction to Mr. Murray's allegation that this situation represents discrimination based on his race and/or religion?

A:   I do not think that is the case.  He was given one notice about taking things down, and he did so, but then put things back up again.  I was not the person who told Mr. McEvoy that things were posted either time.

Q:   Is there anything else that you believe would be helpful for this investigation?

A:   I found at times that when I gave Mr. Murray instructions about things, he sometimes had difficulties following what I wanted him to do.  He worked here for a long time, and was here before I came.  I found sometimes that he had very strong opinions and wanted to do things his own way, rather than doing what I asked him to do.

Q:   Is there anything else that you want to add?

A:   No.


I have read this statement consisting of 5 pages, and it is true and correct.  I have signed or initialed each page.  I have been given an opportunity to make corrections or additions, which I have initialed.  I understand that the information I have given is not to be considered confidential; that it may be shown to the interested parties; and that it may be used in evidence.

I hereby swear that the foregoing is accurate to the best of my knowledge.


Elizabeth Washington

Date _ 4/26/05

Sworn and subscribed on _____ January 26 _____, 2005.

5

C00179

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARRYL MURRAY,                          :
                                        :
          Plaintiff,                    :
                                        :
     v.                                 :     CIVIL ACTION
                                        :     NO. 05-4557
ALLEN WEINSTEIN, Archivist              :
of the United States,                   :
National Archives and                   :
Records Administration,                 :
                                        :
          Defendant.                    :

## AFFIDAVIT OF JOAN M. JANSHEGO, NARA HUMAN RESOURCES SPECIALIST

     I, Joan M. Janshego, having been duly sworn under

oath, depose and state as follows:

     1.   I am, and have been since 1985, a Human

Resources Specialist (Employee Relations) in the Human

Resources Division of the National Archives and Records

Administration ("NARA").  I work at NARA's Archives II

facility at 8601 Adelphi Road, College Park, Maryland,

which, among other things is the headquarters of NARA's

Human Resources Division.  I service, in matters that

concern employee relations, NARA's: (a) Washington

D.C./College Park, Maryland offices; (b) Presidential



GOVERNMENT
EXHIBIT
3

Libraries on a nationwide basis; and (c) Mid-Atlantic region.

2. As a Human Resources Specialist in employee relations, I am responsible for guiding and directing managers at these facilities regarding employee performance and discipline. On a nationwide basis, I also train managers in employee relations and provide guidance on NARA notices and guidances. I have been responsible for employee relations in NARA's Mid-Atlantic Region, which includes the Federal Records Center in Philadelphia, since approximately 1995.

3. From about 1995 until Darryl Murray's termination from employment in November 2004, I was the NARA Human Resources Specialist who was responsible for directing and guiding -- and I in fact directed and guided -- management at the Federal Records Center in Philadelphia on performance, discipline, and related issues concerning Darryl Murray. I am therefore familiar with, among other things: (a) Mr. Murray's history of performance and discipline at the Federal Records Center in Philadelphia, including the bases for the decision to remove him from NARA

2

service in late 2004, a decision in which I took part;
(b) NARA guidances and policies that touch in any way upon
employee relations; (c) federal statutes and regulations
that govern disciplinary and adverse actions that NARA may
take against its employees, and related NARA policies and
procedures; and (d) the extent to which other NARA employees
in the Mid-Atlantic Region have engaged in conduct similar
to the conduct for which Mr. Murray was terminated, and
NARA's response(s) to any such conduct.

    4.  On August 17, 2004, John McEvoy, the Director
of Operations for the Federal Records Center in
Philadelphia, forwarded to me photographs of Mr. Murray's
work station.  The photographs revealed statements that were
posted on Mr. Murray's work station such as: "Worthless
Losers, Nothing Ass Employees"; "Low Self Esteem;
Inferiority Complex; Inflated Ego; Jealous/Envious";
"Federal Record Center Is Not An Equal Opportunity
Employer"; "Revenge Is A Dish Best Served Cold"; "The Beast
Is Coming After You"; "Osama Didn't Do It"; "Who Are The
Real Terrorists?"; and "Osama Totally Exonerated An Innocent
Man."  Mr. McEvoy asked me for guidance on what, if any,

disciplinary action was appropriate.  In response, I advised
that, with Mr. McEvoy's concurrence, I would prepare a
letter to Mr. Murray that would be signed by his supervisor
and that would: (a) state that his comments created a
hostile work environment that would not be tolerated;
(b) order him immediately to remove the posted materials and
never again to display them or anything similar in any NARA
work area; (c) clarify further that he was to display no
materials that make reference to race, religion, or
political views or that make disparaging remarks in any way
at any NARA location; and (d) advise him that, if he failed
to follow such order, he would be charged with
insubordination, which would form the basis for his removal
from the federal service.  I prepared this letter, which was
reviewed and concurred in by Mr. McEvoy and Mr. Murray's
first-level supervisor, Elizabeth Washington, who signed the
document.  This was sent to Mr. Murray on August 17, 2004.
I attach a copy of the letter hereto as Exhibit "A."

     5.   On September 16, 2004, Mr. McEvoy telephoned
to advise me that he had discovered more postings at Mr.
Murray's work station.  That same day, Mr. McEvoy forwarded

to me photographs of those postings, which revealed posted statements such as: "It's Just a Matter of Time Now -- Be Patient"; "Vote Nov. 11, 2004 Kerry"; "Beware of the Snitch Committee"; "Two-Legged Cockroaches"; and "American Gov't vs. American People (Human Race)."  The photographs also depicted documents, including the August 17, 2004 letter from Ms. Washington, and a memo from John McEvoy, on which Mr. Murray had written statements such as "None Dare Call It Conspiracy!" and "The Plot Thickens!"  I advised Mr. McEvoy that I would immediately prepare a letter, addressed to Mr. Murray, that would state: (a) that he (Mr. McEvoy) was in the process of consulting with my office about these postings, which would be the subject of an imminent letter; (b) in accordance with law, Mr. Murray would be placed on administrative leave with pay until further notice; (c) Mr. Murray should turn in his NARA badge and any federal government property in his possession; and (d) Mr. Murray should contact me, not Federal Records Center management, should he have any related questions.  I prepared the letter and sent it to Mr. McEvoy for his review and approval.  Mr.

McEvoy, on September 16, 2004, sent Mr. Murray such a letter, a copy of which I attach as Exhibit "B" hereto.

      6.   On September 22, 2004, Mr. McEvoy telephoned me and advised that Mr. Murray on that date, while on administrative leave, had parked his car in front of the Federal Records Center entrance.  According to Mr. McEvoy, James Hughes, who was the security guard at the facility, then asked Mr. Murray why he was at the NARA site. According to Mr. Hughes, Mr. Murray responded: "I'm here to blow up the place.  I'm here to see [a coworker]."  It was further reported to me that: (a) Mr. Hughes advised Mr. Murray to "watch what [you] say," upon which Murray stated: "I'll bring my people up here and you know what that means"; (b) Mr. Hughes then went to get confirmation from management that Mr. Murray was not to be present on the property; (c) when Mr. Hughes received such confirmation and conveyed it to Mr. Murray, Murray replied, "When I come back, I'm blowing the place up"; and (d) Mr. Murray then left the property.  Mr. McEvoy told me that as soon as he learned about Mr. Murray's remarks he reported them to Federal Protective Services of the United States Department of

Homeland Security and made arrangements for extra security
at the Records Center.

       7.   Between September 22 and 24, 2004, Mr. McEvoy
was in frequent telephone discussions with me about how NARA
should respond both to Mr. Murray's recent workplace
postings and to his September 22, 2004 threatening remarks.
Under my direction, guidance, and review, we agreed that
NARA would immediately write to Mr. Murray and propose to
remove him within 30 days from his position of Archives Aid,
GS-1421-3, and from NARA altogether.

       8.   Based on the information that Mr. McEvoy
provided to me, I prepared a proposed removal notice that
was based upon two separate instances of misconduct that
adversely affected the efficiency of NARA operations.
First, the proposed removal letter that I prepared was based
upon Mr. Murray's insubordination in failing, by posting the
materials that he posted in September 2004, to comply with
the August 17, 2004 order that directed him "to display no
material that makes reference to . . . political views or
that makes disparaging remarks in any way" and that warned
him that any such further postings would result in a charge

7

of insubordination, which would form the basis for removal.
Second, the proposed removal letter that I prepared was
based upon Mr. Murray's threatening remarks on September 22,
2004, which violated NARA Interim Guidance 300-19, a copy of
which I attach hereto as Exhibit "C." That guidance states,
in part, that: "NARA will not tolerate comments concerning
weapons or bombs or other threats directed to NARA security
guards -- even if the comment was intended as a joke." The
guidance adds that employees who make such remarks are
subject to disciplinary action, criminal penalties, or both.

9. I included in the letter proposing Mr.
Murray's removal: (a) a statement that these were not his
first instances of recent misconduct but, rather, that he
had in fact been suspended for three days in August 2003 for
neglect of duty and for inaccurately reporting completed
work and carelessness; and (b) a statement that Murray was
to contact me if he had questions or concerns about his
rights relating to the proposed removal.

10. I sent the proposed removal letter to Mr.
McEvoy for his review and full approval. Mr. McEvoy, on

8

September 24, 2004, sent Mr. Murray such a letter, a copy of which I attach as Exhibit "D" hereto.

11.  The letter proposing Mr. Murray's removal invited Mr. Murray to make a written reply and advised him that he could designate an attorney or other representative. The only reply that Mr. Murray made was by way of October 21, 2004 letter from his union representative, James Cassedy, to Mr. David Roland, Assistant Regional Administrator for NARA's Mid-Atlantic Region and the deciding official, a copy of which I attach as Exhibit "E" hereto.  Mr. Roland promptly shared Mr. Cassedy's letter with me.  Mr. Roland gave it full consideration in consultation with me.

12.  In his letter, Mr. Cassedy referred Mr. Roland to NARA Interim Guidance 94-167, which states that "private offices may be decorated to reflect the occupant's personality."  That guidance expressly applied and applies, however, only to the Archives II facility in College Park, Maryland, where I work, and not to the Federal Records Center in Philadelphia.  I advised Mr. Roland that I would

9

explain this in the final decision letter that I would prepare for Mr. Roland's signature.

13.  I also advised Mr. Roland that the final decision letter that I would prepare would emphasize to Mr. Murray: (a) the consequential and qualitative difference between mere workspace decorations, on the one hand, and the posting of materials with objectionable messages after an employee has been ordered specifically not to post them, on the other hand; and (b) that Mr. Murray was not being disciplined for his August 17, 2004 postings (because he had removed them as ordered) but for his insubordination in failing to follow the August 17, 2004 order when in September 2004 he posted additional materials with political and disparaging content.

14.  After reviewing Mr. Cassedy's October 21, 2004 response letter, Mr. Roland and I were of the view that Mr. Murray, in September 2004, had posted political and disparaging comments that were in direct violation of the August 17, 2004 order prohibiting the posting of such content.  Mr. Cassedy did not suggest that the "Vote Nov. 11 2004 Kerry" posting was apolitical.  He conceded, moreover,

10

that the posted "two legged cockroach" comment referred to
Mr. Murray's colleague and was Mr. Murray's "humorous
attempt at revenge." Mr. Cassedy added that the posted
comments "None Dare Call It Conspiracy," "The Plot
Thickens," and "Separate and Unequal" were Mr. Murray's
"protest of working conditions at the NARA facility." I
therefore viewed those comments as disparaging of the NARA
workplace and in violation of the August 17 order and so
informed Mr. Roland.

15. Further, after reviewing Mr. Cassedy's letter,
Mr. Roland and I were of the view that Mr. Murray, on
September 22, 2004, had made threatening remarks directed at
the Federal Records Center and/or employees of that
facility. In fact, Mr. Cassedy did not suggest that Mr.
Murray had not referred to "blowing up the place" but,
rather, only that such a reference "was at worse . . . a
bad, off hand attempt at humor." Also, Mr. Cassedy admits
that Mr. Murray stated that "somebody ought to blow this
place up" during a moment when he was "shocked, humiliated
and angry." Based on all of the known circumstances, I
advised Mr. Roland, as the deciding official, that the final

11

decision letter should state that Mr. Murray's stated
defense to the charge of threatening remarks was
unacceptable because, among other things, the stated
remarks, even if intended as a joke, were in violation of
NARA Interim Guidance 300-19 and were of serious concern.

16.  In determining appropriate disciplinary and
adverse actions against NARA employees, my office strives to
adhere to, and to guide managers on: (a) NARA directives on
the requirements and procedures for taking such actions; and
(b) the related NARA penalty guide.  These NARA directives
and penalty guide are found in NARA Interim Guidance 300-1,
Personnel 300, Chapter 752, and Appendix 752A, which I
attach hereto as Exhibit "F."  My understanding is that
these are authorized by federal statute and federal
regulations.

17.  In addressing Mr. Murray's August and
September 2004 conduct, I advised Mr. Roland as to the
appropriate response based upon those directives and that
penalty guide.  In fact, directives in this Interim Guidance
-- Chapter 752, Part 3, Paragraphs 2.52 and 2.54 --
expressly require a proposing official such as Mr. McEvoy

12

and a deciding official such as Mr. Roland to "obtain advice
and assistance from [my office]" in order "to ensure that" a
notice proposing removal from federal service and a final
decision notice of removal from federal service "meet[] the
procedural and other requirements for taking" such actions.
My normal procedure is, while in discussions with the
manager(s), to advise a course of action, to prepare the
notices, and to send them to management for suggested
changes and/or concurrence.

18.  In providing such direction to Mr. McEvoy and
Mr. Roland, I relied in part upon NARA Interim Guidance 300-
1, Personnel 300, Chapter 752, Part 1, Paragraph 6, which
provides that "disciplinary and adverse actions require
careful consideration but when the circumstances call for
such action, it should be taken promptly."

19.  Under NARA Interim Guidance 300-1, Personnel
300, Chapter 752, Part 3, Paragraph 30a, the deciding
official is directed to ensure that final decision notices
proposing an employee's removal from NARA service
"[c]onsider only the reasons specified in the proposed
notice, the employee's answer, and the relevant mitigating

13

factors in making a decision." Accordingly, I guided Mr.
Roland in limiting his final decision to the charges of
insubordination and making a threatening remark that formed
the basis for Mr. McEvoy's notice proposing Mr. Murray's
removal. I also guided Mr. Roland in assessing any
mitigating factors, at which time he could consider other
factors not listed in the notice of proposed removal letter.

20. In determining an appropriate penalty for Mr.
Murray's offenses, I advised Mr. Roland that he should rely
upon the NARA penalty guide, which is Appendix 752A to NARA
Interim Guidance 300-1, Personnel 300. Specifically, I
relied upon the penalties for listed offenses number 5 and
number 7b. Listed offense number 5 is "Insubordination:
direct or indirect refusal to comply with instructions
issued by a supervisor; disrespect, insolence, and similar
behavior." This corresponds to the first offense that was
stated in the notice of proposed removal and in the notice
of final decision that Mr. Murray received. The penalty
guide states the penalty range for a first such offense is
"official reprimand to removal," and the penalty range for a
second such offense is "suspension to removal."

14

21.   Listed offense number 7b in the Penalty Guide
is "Disorderly Conduct: Fighting, or threatening, attempting
to inflict, or inflicting bodily injury on another person."
This corresponds to the second offense -- making threatening
remarks  -- that was stated in the notice of proposed
removal and in the notice of final decision that Mr. Murray
received.  My office viewed this "offense category" 7b in
the light of NARA Interim Guidance 300-19 ("Violence in the
Workplace"), which states that NARA takes seriously all
threatened and actual incidents of violence, whether oral or
physical conduct, and I so advised Mr. Roland.  Because of
the uniquely serious nature of Mr. Murray's conduct in
making threatening remarks, I and my office, in determining
the penalty for those remarks, were also mindful of NARA
Interim Guidance 300-1, Personnel 300, Chapter 752, Part 1,
Paragraph 8a, which states that:

> Managers are not required to fit a
> specific instance of misconduct into one
> of the stated offenses.  If the actual
> offense is not specifically listed, the
> employee should be charged with the
> actual offense.  Penalties for offenses
> not listed should be consistent with the
> penalties listed for offenses of
> comparable seriousness.

15

The penalty listed in the penalty guide for a first offense of offense number 7b is "official reprimand to removal," and for a second such offense is "removal."  I advised Mr. Roland that these penalties corresponded to Mr. Murray's threatening remark offense.

22.  I therefore advised Mr. Roland that, even viewing the offenses individually rather than together, the penalty guide authorized the agency to remove Mr. Murray from service.  Although even first such offenses would alone have been a basis for Mr. Murray's removal, I determined, in consultation with Mr. Roland, that Mr. Murray's offenses were in fact second offenses because he had been suspended for 3 days in August 2003 for neglect of duty and for inaccurately reporting completed work and carelessness.  (I attach as exhibit "G" hereto the July 30, 2003 notice proposing Murray's suspension and the August 14, 2003 notice of suspension.)  I advised Mr. Roland that, when he considered the appropriate penalty for Mr. Murray's misconduct, he (Roland) should not consider Murray's 14-day suspension in 1996 as a prior offense because it occurred too long in the past.

23.  I advised Mr. Roland that he should, however, rather than viewing Mr. Murray's insubordination offense and threatening remark offense individually, view the offenses together and give weight to the seriousness of the offenses. In doing so, I advised Mr. Roland that such consideration would be based in part upon NARA Interim Guidance 300-1, Personnel 300, Chapter 752, Part 1, Paragraph 8c of that Part, which provides that:

> The penalty should take into account the number of offenses, the nature of each offense and the extent to which the offenses indicate a pattern of unacceptable conduct.  When two or more unrelated offenses occur at the same time, a greater penalty than would be imposed for a first offense is normally appropriate.  If an act of misconduct is unrelated to a previous act or acts of misconduct, the penalty falls under the second or third offense, as appropriate.

With the offenses so viewed, I advised Mr. Roland, and he agreed, that removal from federal service was the appropriate penalty for Mr. Murray.

24.  In making that determination, I advised Mr. Roland that he should assess the appropriateness of Mr. Murray's removal from NARA under the non-exhaustive list of sanctions considerations that have been established by the

17

Merit Systems Protections Board and that were first articulated in Douglas v. Veterans Administration, 5 M.S.P.R. 313 (1981) ("Douglas"). For example, regarding the first Douglas factor ("the nature and seriousness of the offense . . . including whether the offense was intentional . . . or was frequently repeated"), Mr. Roland should (I advised him) take into account, with regard to Mr. Murray's insubordination offense, that Mr. Cassedy's letter indicated that the September 2004 postings, which violated Murray's supervisor's August 17, 2004 order, were not inadvertent but intentional. Mr. Cassedy specifically stated not that Mr. Murray did not believe that his postings violated the August 17 order but, instead, that he considered such postings to be justified as a form of protest. Mr. Roland should (I further advised) take notice and consider that Mr. Murray had, in 1996, been counseled to stop displaying objectionable materials in the workplace and had, in April 1996, signed a Memorandum of Agreement with the Agency (a copy of which is attached hereto as Exhibit "H") in which he agreed that he would not post or distribute any objectionable material in the workplace.

18

25. With regard to the fifth Douglas factor ("the consistency of the penalty with those imposed upon other employees for the same or similar offenses"), I advised Mr. Roland that NARA had previously removed employees who were charged, as a first offense, with insubordination or with making threatening remarks. Specifically, NARA removed one employee in the Mid-Atlantic Region in December 2003 for making a threatening remark in the workplace and lying during the course of an administrative investigation. Those were the employee's first offenses. In February 2002, NARA decided to remove another employee at headquarters in College Park, Maryland for threatening a NARA building security guard. It was the first offense for that employee, who then resigned before the removal went into effect. In December 1989, NARA removed another College Park employee from service based on a first-offense charge of insubordination for failing to follow an order to turn in work to his supervisor. None of these employees stated that he/she was Muslim; none of them was known by NARA to be Muslim. In addition to advising Mr. Roland about these earlier agency actions, I informed him that no single NARA

19

employee had, until Mr. Murray, been charged with both the offense of making a threatening remark and insubordination.

26.  With regard to the twelfth Douglas factor ("The employee's past work record"), I advised Mr. Roland that he should take into account Mr. Murray's checkered job performance history, including the fact that in 1998 and again in 2003 he was denied a Within Grade Increase ("WGI") to his pay because of minimally satisfactory work performance.

27.  With my guidance, direction, and assistance, and in accordance with them, Mr. Roland, as the deciding official, then sent to Mr. Murray, on November 9, 2004, the agency's final decision notice.  That notice responded to Mr. Cassedy's letter, found that the charges of insubordination and making threatening remarks were supported by a preponderance of the evidence, sustained those charges, took into consideration the Douglas factors, and concluded that Mr. Murray should and would be removed from his position on or about November 16, 2004.  A copy of Mr. Roland's final decision letter is attached hereto as Exhibit "I."

20

28.   All of the NARA employment decisions regarding Mr. Murray and leading up to and including his removal from federal service in November 2004 were, in accordance with NARA policy and procedures, made in full consultation with, direction from, and the concurrence of my office and me.   I remain of the view that all such decisions were consistent with all applicable NARA policies and procedures.

_____
JOAN M. JANSHEGO

Subscribed and sworn
before me on this 28th day
of December, 2006

_____
NOTARY PUBLIC

CONSTANCE M. BROWN
NOTARY PUBLIC
County of Anne Arundel
State of Maryland
My Commission Expires 11/1/07

21

*National Archives and Records Administration*

MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154 1625
www.archives.gov

August 17, 2004

Mr. Darryl Murray
National Archives and Records Administration
Mid Atlantic Region Northeast (Philadelphia)
14700 Townsend Road
Philadelphia, PA  19154

Dear Mr. Murray:

You are currently displaying posters and other written material
in your work area that are offensive to coworkers, the security
force and management.    These include an article entitled "The
Governments Assault on the Black Family" and postings such as:

 "Who are the real Terrorists?  "Osama Totally Exonerated An
Innocent Man,"

"This center is a non-equal opportunity employer"

 "Worthless losers, nothing ass employees"

This creates a hostile work environment and will not be
tolerated.

This is not the first time that you have engaged in this type of
behavior.  In the past, you have been counseled about scrawling
offensive graffiti on a box that was delivered to the Social
Security Administration who called the Federal Protective Service
to conduct an investigation.

You are ordered to immediately remove (no later than 2:30 p.m.
today) all of these materials from your work area and to never
display them or anything similar in any work area at the National
Archives.  To be clear, you are to display no materials that make
reference to race, religion, political views or that make
disparaging remarks in any way at any location at the National
Archives.

If you fail to follow this order, you will be charged with
insubordination, which will form the basis for removal from the
federal service.

Sincerely,

ELIZABETH M. WASHINGTON
Supervisor, Archives Specialist

cc:  J. McEvoy
     NHH
     file

OFFICE OF REGIONAL RECORDS SERVICE

GOVERNMENT
EXHIBIT
3-A

8-17-04

 *National Archives and Records Administration*

MID ATLANTIC REGION
14700 TOWNSEND ROAD
PHILADELPHIA, PENNSYLVANIA 19154-1025
www.archives.gov

September 16, 2004

Mr. Darryl Murray
112 W. Champlost Avenue
Philadelphia, PA 19120

Dear Mr. Murray:

We are consulting with Human Resources Services Division concerning recent misconduct on your part. You will soon be issued a letter concerning this matter.

In accordance with 5 CFR752.604(4), you will be on administrative leave until further notice. This means that you will be paid your regular salary under further notice. At this time, you should turn in your NARA personal identification badge and any Federal Government property you have in your possession.

In order to remain in a paid status, you are ordered to call me every Wednesday at 10:00 a.m. If I am not available when you call, you must leave a telephone number where you can be reached and I will return the call provided there is information that needs to be communicated to you.

If you have any questions about this letter, you may contact Joan Janshego, Human Resources Specialist (Employee Relations) at 301-837-1844.

Sincerely,

JOHN MCEVOY
Director, Record Center Operations
Mid Atlantic Region

_____

Darryl Murray                    9-16-04
                                 Date

My signature above acknowledges receipt of this letter.

GOVERNMENT
EXHIBIT
3-B